**Case Nos. 2023-1093, -1141**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

VANDEWATER INTERNATIONAL INC.

*Plaintiff,*

SIGMA CORPORATION,
SMITH-COOPER INTERNATIONAL, INC.,

*Plaintiffs-Appellants,*

v.

UNITED STATES

*Defendant-Appellee.*

On Appeal from the United States Court of International Trade
Case No. 18-00199, Hon. Leo M. Gordon, Judge

## OPENING BRIEF OF
## PLAINTIFF-APPELLANT SMITH-COOPER INTERNATIONAL, INC.

Gregory S. McCue
Zachary Simmons
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
(202) 429-6421

*Counsel for Smith-Cooper
International, Inc.*

Dated: January 9, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2023-1093, -1141

**Short Case Caption** Vandewater International Inc. v. US

**Filing Party/Entity** Smith-Cooper International, Inc.

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/09/2023

Signature: /s/ Gregory S. McCue

Name: Gregory S. McCue

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Smith-Cooper International, Inc. | | ASC Engineered Solutions |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
| Carbon Steel But-Weld Pipe Fittings from Peoples Republic of China; SCO - Vandewater | A-570-814 | Department of Commerce |
| Smith-Cooper International, Inc, | 19-00011 | Court of International Trade |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

I.     Statement of Related Cases ................................................................1

II.    Jurisdictional Statement.....................................................................1

III.   Statement of the Issues ......................................................................2

IV.   Statement of the Case ........................................................................3

V.     Summary of Argument .....................................................................10

VI.   Argument ..........................................................................................14

     A.     Standard of Review ..................................................................14

     B.     Welded Outlets Are Excluded by the Unambiguous Language of
            the AD Order's Scope ..............................................................16

         1.     The "(k)(0)" Standard ..............................................16

         2.     The CIT's (k)(0) Opinion.........................................17

         3.     Substantial Record Evidence Before Commerce and the
               CIT Demonstrated the Unambiguous Meaning of a "Butt
               Weld" and that Welded Outlets Do Not Utilize a Butt
               Weld ........................................................................18

         4.     The CIT Impermissibly Relied on Non-Record Evidence in
               Disregarding the Unambiguous Meaning of "Butt-Weld" .......20

         5.     The CIT's Reliance on Commerce's *Sprink* Scope Ruling
               is Misplaced ............................................................21

         6.     The CIT Failed to Address Other Unambiguous Terms in
               the Scope Language, Also Excluding Welded Outlets............24

             a.     "Formed" or "Forged" ................................................24

             b.     No "Threaded" or "Grooved" Fastening Methods .........25

             c.     Used to "Join Sections in Piping Systems where
                 Conditions Require Permanent, Welded Connections" .26

     C.     Welded Outlets Are Excluded from the Scope by the Enumerated
            (k)(1) Sources ........................................................................28

         1.     The CIT's (k)(1) Opinion.........................................28

2.    The CIT Correctly Found that the Petition Excludes Welded Outlets Based on Physical Characteristics ..................29

a.    The Petition Language Describing Subject Butt-Weld Fittings Excludes Welded Outlets From the Scope........29

b.    Other Petition Language on Shapes Excludes Welded Outlets From the Scope ................................................31

3.    The CIT Correctly Found that the ITC's Determinations Exclude Welded Outlets from the Scope Based on Physical Characteristics ............................................................34

a.    The ITC's Determinations Describing Subject Butt-Weld Connections Exclude Welded Outlets From the Scope..............................................................................34

b.    Other ITC Determinations Confirm the Exclusion of Welded Outlets from the Scope of the AD Order ..........35

4.    The CIT Ignored Other Information From the (k)(1) Sources that Consistently Support the Exclusion of Welded Outlets from the Scope............................................................36

a.    Commerce's Prior Scope Rulings Confirm the Exclusion of Welded Outlets from the Scope ...............37

b.    Multiple (k)(1) Sources Exclude Welded Outlets Based on Industry Standards .........................................39

D.    Suspension of Liquidation Under Commerce's (k)(2) Remand Redetermination Should Apply Only to Entries Made On or After October 30, 2020 .................................................................43

1.    Commerce's Remand Redetermination ....................................44

2.    The CIT's Handling of Commerce's Final Remand Redetermination ........................................................................50

3.    SCI Did Not Forfeit Its Arguments on the Effective Date for Suspension of Liquidation Under Commerce's Remand Redetermination ........................................................................58

VII.    Conclusion and Relief Requested....................................................61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*A.L. Patterson, Inc. v. United States*
  585 Fed. App'x 778 (Fed. Cir. 2014) ................................................15

*Altx, Inc. v. United States,*
  370 F.3d 1108 (Fed. Cir. 2004) ..........................................................14

*Am. Silicon Techs. v. United States,*
  334 F.3d 1033 (Fed. Cir. 2003) ..........................................................14

*Bell Supply Co., LLC v. United States,*
  179 F. Supp. 3d 1082 (Ct. Int'l Trade Apr. 27, 2016) ........................15

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015) ..........................................................14

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.,*
  955 F.3d 1317 (Fed. Cir. 2020) ..........................................................61

*In re Google Tech.,*
  980 F.3d 858 (Fed. Cir. 2020) ............................................................60

*Hohenberg Bros. Co. v. United States,*
  301 F.3d 1299 (Fed. Cir. 2002) ..........................................................61

*King Supply Co., LLC v. United States,*
  674 F.3d 1343 (Fed. Cir. 2012) ..........................................................42

*Maquilacero S.A. De C.V. v. United States,*
  256 F. Supp. 3d 1294 (Ct. Int'l Trade Aug. 30, 2017) .......................16

*Meridian Prods. v. United States,*
  851 F.3d 1375 (Fed. Cir. 2017) ........................................14, 15, 16. 17

*Novosteel S.A. v. United States,*
  284 F.3d 1261 (Fed. Cir. 2002) ..........................................................59

*Shake & Shingle Alliance v. Unites States,*
  415 F. Supp. 3d 1249 (Ct. Int'l Trade Nov. 13, 2019) .......................15

*Singleton v. Wulff*,
    428 U.S. 106 (1976)................................................................61

*SKF USA, Inc. v. United States*,
    537 F.3d 1373 (Fed. Cir. 2008) ........................................14

*Sunpreme Inc. v. United States*,
    256 F. Supp. 3d 1265 (Ct. Int'l Trade 2017) ......................47

*Sunpreme Inc. v. United States*,
    946 F.3d 1300 (Fed. Cir. 2020) ........................................47

*Tak Fat Trading Co. v. United States*,
    396 F.3d 1378 (Fed. Cir. 2005) ........................................16

*Trimed, Inc. v. Stryker Corp.*,
    608 F.3d 1333 (Fed. Cir. 2010) ........................................61

*U.H.F.C. Co. v. United States*,
    916 F.2d 689 (Fed. Cir. 1990) ..........................................32

*United States v. Dunkel*,
    927 F.2d 955 (7th Cir. 1991) ............................................60

*United States v. Ford Motor Co.*,
    463 F.3d 1267 (Fed. Cir. 2006) ........................................60

*United States v. Great Am. Ins. Co. of N.Y.*,
    738 F.3d 1320 (Fed. Cir. 2013) ...................................60, 61

*United Steel & Fasteners, Inc. v. United States*,
    947 F.3d 794 (Fed. Cir. 2020) .............................47, 48, 51

*Whirlpool Corp. v. United States*,
    890 F.3d 1302 (Fed. Cir. 2018) ...........................14, 15, 17

## Statutes & Regulations

19 U.S.C. § 1516a(a)(2)(B)(vi)......................................................2

28 U.S.C. § 158l(c) ......................................................................2

28 U.S.C. § 1295(a)(5)..................................................................2

19 C.F.R. § 351.225 ...............................................................48

19 C.F.R. § 351.225(d) ........................................................51

19 C.F.R. § 351.225(e)......................................................44, 45

19 C.F.R. § 351.225(k)(1).................................................*passim*

19 C.F.R. § 351.225(k)(2).................................................*passim*

19 C.F.R. § 351.225(l) ......................................................49, 53

19 C.F.R. § 351.225(l)(1)..........................................13, 45, 47, 50

19 C.F.R. § 351.225(l)(2)....................................................48

19 C.F.R. § 351.225(l)(3)................................................*passim*

*Regulations To Improve Administration and Enforcement of
    Antidumping and Countervailing Duty Laws*,
    85 Fed. Reg. 49,472 (Aug. 13, 2020) ..................................49

**Administrative Determinations**

Carbon Steel Butt-Weld Pipe Fittings From Brazil, China, Japan,
    Taiwan, and Thailand, Investigation Nos. 731-TA-308-310, 520,
    and 521(Second Review), USITC Pub. 3809 (Oct. 2005) .................41

Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan,
    Taiwan, and Thailand:  Investigation Nos. 731-TA-308-310 and
    520-521 (Fourth Review), USITC Pub. 4628 (Aug. 2016)................34

Certain Carbon Steel Butt-Weld Pipe Fittings from China and
    Thailand, Determinations of the Commission in Investigations
    Nos. 731-TA-520 and 521 (Final) Under the Tariff Act of 1930,
    Together With the Information Obtained in the Investigations,
    USITC Pub. 2528 (June 1992)......................................*passim*

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's
    Republic of China*,
    57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ...........*passim*

Final Scope Ruling: Antidumping Duty Order on Carbon Steel Butt-
   Weld Pipe Fittings from the People's Republic of China ("PRC")
   (October 20, 2009) (King scope ruling) .......................................................41, 42

Final Scope Ruling On Request by Sprink, Inc. to Exclude Sprink-let
   Carbon Steel Butt Weld Pipe Fittings from the Antidumping Duty
   Order on Carbon Steel Butt-Weld Pipe Fittings from Taiwan
   (March 25, 1992) (Sprink scope ruling) .....................................................*passim*

Forged Steel Fittings from China, Italy, and Taiwan:  Final Scope
   Determination Decision Memorandum (July 23, 2018) (Forged
   Steel Fittings scope ruling) ........................................................................*passim*

## I.     Statement of Related Cases

Counsel for Plaintiff-Appellant Smith-Cooper International, Inc. ("SCI") is aware of no other appeal in or from the same civil action or proceeding in the lower court that was previously before this Court or any other appellate court.

Counsel for SCI is aware of two cases currently stayed at the U.S. Court of International Trade ("CIT") that may be directly affected by this Court's decision in the pending appeal.  These are:  *Smith-Cooper International, Inc. v. United States* (CIT No. 19-00011) ("*SCI*") and *SIGMA Corporation v. United States* (CIT No. 19-00003) ("*SIGMA*").

## II.     Jurisdictional Statement

This is an appeal from the final judgment of the CIT in *Vandewater International Inc. v. United States* (CIT No. 18-00199) ("*Vandewater*"), Slip Op. 22-104 (Ct. Int'l Trade Sept. 8, 2022) ("CIT (k)(2) Opinion"), which affirmed the U.S. Department of Commerce's ("Commerce") final remand redetermination pursuant to court order and under 19 C.F.R. § 351.225(k)(2) ("(k)(2)").  **Appx1-Appx20**.  This appeal also covers the CIT's intermediate decisions on Commerce's initial scope rulings underlying the *Vandewater*, *SCI*, and *SIGMA* proceedings. These decisions are:

(1) the CIT's decision dated June 3, 2020 in the *Vandewater*, *SCI*, and *SIGMA* proceedings, which held that the plain language of the antidumping duty order scope at issue is not dispositive as to the question of inclusion or exclusion of the plaintiffs' respective welded outlet products under the order ("CIT (k)(0) Opinion"), **Appx143-Appx148**; and (2) Slip Op. 20-146 (Ct. Int'l Trade Oct. 16, 2020) in the *Vandewater* proceeding, which remanded Commerce's initial scope ruling under 19 C.F.R. § 351.225(k)(1) ("(k)(1)") back to the agency for further analysis under 19 C.F.R. § 351.225(k)(2) ("CIT (k)(1) Opinion"), **Appx125-Appx130**. The CIT exercised jurisdiction pursuant to 28 U.S.C. § 158l(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi).

SCI timely filed its notice of appeal on November 1, 2022, within sixty days of the CIT's September 8, 2022 entry of final judgement. This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

## III.    Statement of the Issues

This appeal presents the following questions:

1.  Is the plain language of the scope of the antidumping duty order on butt-weld pipe fittings from China ("AD Order") unambiguous and, if so, are welded outlets excluded from the scope pursuant to this language?

2. Alternatively, if the plain language of the AD Order's scope is not

   unambiguous, are the enumerated sources of 19 C.F.R. § 351.225(k)(1)

   dispositive regarding the exclusion of welded outlets from the scope?

3. Alternatively, if the enumerated sources of 19 C.F.R. § 351.225(k)(1) are not

   dispositive, and Commerce's final remand redetermination under 19 C.F.R.

   § 351.225(k)(2) is upheld, what is the effective date for suspension of

   liquidation of entries under such determination?

## IV.    Statement of the Case

On July 6, 1992, Commerce published the antidumping duty order on certain

steel butt-weld pipe fittings from China.  *Certain Carbon Steel Butt-Weld Pipe

Fittings from the People's Republic of China*, 57 Fed. Reg. 29,702 (Dep't of

Commerce July 6, 1992) ("AD Order").  The scope of the AD Order covers (in

relevant part):

> Carbon steel butt-weld pipe fittings, having an inside
> diameter of less than 14 inches, imported in either
> finished or unfinished form. These formed or forged pipe
> fittings are used to join sections in piping systems where
> conditions require permanent, welded connections, as
> distinguished from fittings based on other fastening
> methods (e.g., threaded, grooved, or bolted fittings).

*Id.*

From May to August 2018, Vandewater International Inc. ("Vandewater"),

SIGMA Corporation ("SIGMA"), and SCI (collectively, "importers") filed

separate scope ruling requests with Commerce. The importers provided detailed information demonstrating that their respective welded outlet products are not butt-weld pipe fittings, and are excluded from the scope of the AD Order. **Appx167-Appx451** (Vandewater); **Appx3271-Appx3313** (SIGMA); **Appx3728-Appx3987** (SCI). SCI's request included photographs and diagrams illustrating the clear and substantial physical differences between butt-weld fittings and welded outlets.

### *Butt-Weld Pipe Fittings*



**Butt-Weld Fittings Illustrating the Shallow Channel for a Weld Bead Created by Joining Flat Ends Along the Same Plane**

SCI Scope Ruling Request (August 13, 2018) at 13, **Appx3740**

***SCI's Welded Outlets***



| **Threaded Cooplet (61CG)** | **Grooved Cooplet (61FT)** |

SCI Scope Ruling Request (August 13, 2018) at 4, **Appx3731**



**Cross-Section of Grooved Cooplet
When Attached to Run Pipe with Fillet Welds**

SCI Scope Ruling Request (August 13, 2018) at 5, **Appx3732**



**Grooved Outlet with Fishmouth Opening**

SCI Scope Ruling Request (August 13, 2018) at 5, **Appx3732**

*SCI's Welded Outlets Alongside Butt-Weld Pipe Fitting*



**Threaded and Grooved Cooplets Placed Against the End of a Butt-Weld Fitting, With No Shallow Channel Created For Weld Bead**

SCI Scope Ruling Request (August 13, 2018) at 16, **Appx3743**

In their scope ruling requests, the importers demonstrated that their welded outlet products are excluded from the scope of the AD Order pursuant to (1) the plain language of the scope; (2) the enumerated sources of 19 C.F.R. §

351.225(k)(1) ("(k)(1) sources"), *i.e.*, the petition, the initial investigation, and the

determinations of the Secretary (including prior scope determinations) and the

International Trade Commission ("ITC"); and (3) the factors listed in 19 C.F.R. §

351.225(k)(2) ("(k)(2) factors"), *i.e.*, the physical characteristics of the product, the

expectations of the ultimate purchasers, the ultimate use of the product, the

channels of trade in which the product is sold, and the manner in which the product

is advertised and displayed.

In three separate scope rulings, Commerce determined that Vandewater's,

SIGMA's, and SCI's welded outlet products are subject to the scope of the AD

Order pursuant to the (k)(1) sources; Commerce did not analyze the importers'

arguments under the plain language of the scope, nor did it provide analysis under

the (k)(2) factors. **Appx131-Appx142** (Vandewater); **Appx3711-Appx3727**

(SIGMA); **Appx4081-Appx4098** (SCI).

Vandewater, SIGMA, and SCI each timely appealed Commerce's scope

rulings to the CIT. Due to the similarity of the products and rulings at issue, the

plaintiffs moved to consolidate the three appeals. *See, e.g.*, **Appx4099-Appx4103**;

**Appx4104-Appx4110**. The CIT denied the motions for consolidation, and instead

determined that "all three actions should proceed in parallel." **Appx4111-**

**Appx4113**; **Appx4114-Appx4116**; **Appx4122-Appx4123**. Along these lines, the

CIT first instructed the parties to the below proceedings to brief "the threshold

(k)(zero) issue . . . the legal issue of whether the term 'butt-weld' has an unambiguous meaning." **Appx4114-Appx4116**; **Appx4117-Appx4121**; **Appx4124-Appx4125**.  Following the briefing of the (k)(0) issues by the parties to the below proceedings from September to November 2019, the CIT issued the same decision simultaneously in the three proceedings, holding that the plain language of the AD Order's scope, including the term "butt-weld," is not unambiguous.  **Appx143-Appx148**.

Reversing its earlier determination that "all three actions should proceed in parallel," and without any request from the parties, the CIT then stayed the *SCI* and *SIGMA* proceedings until 30 days after the final resolution of the *Vandewater* proceeding, including all appeals.  The CIT thus considered the next question before it – whether the (k)(1) sources speak definitively to the inclusion or exclusion of welded outlets from the scope of the AD Order – only as to the *Vandewater* proceeding and the related administrative record before Commerce.  Following the briefing of issues related to the (k)(1) sources by the parties below from June to August 2020, the CIT held that, contrary to Commerce's determination in its original Vandewater scope ruling, the (k)(1) sources are not dispositive.  The CIT thus remanded to Commerce for analysis under the (k)(2) factors.  **Appx125-Appx130**.

Commerce's final remand redetermination analyzing the (k)(2) factors, which found welded outlets subject to the scope of the AD Order, was filed with the CIT on July 23, 2021.  **Appx21-Appx124**.  Comments on Commerce's final remand redetermination were filed at the CIT by the parties below between September 2021 and January 2022.  Between July and August 2022, the CIT engaged – through letters and teleconferences – with the parties below to discuss several aspects of the parties' arguments concerning Commerce's final remand redetermination.  In its September 8, 2022 opinion, the CIT affirmed Commerce's final remand redetermination and held, *inter alia*, that SCI had forfeited its arguments concerning the effective date for suspension of liquidation for entries subject to the final remand redetermination.  **Appx1-Appx20**.

## V.    Summary of Argument

The plain language of the AD Order's scope contains multiple unambiguous terms that exclude welded outlets of the kind imported by the importers.  The records before Commerce included substantial evidence concerning the unambiguous meaning of the term "butt-weld" and that welded outlets do not meet this meaning.  Additionally, the records before Commerce included substantial evidence concerning the meanings of other unambiguous language in the scope, which covers only goods that are (1) "formed" or "forged," (2) not based on "grooved" or "threaded" fastening methods, and (3) designed to "join sections in

piping systems where conditions require permanent, welded connections." Welded outlets also do not match any of these unambiguous scope criteria. The CIT erred in finding that the term "butt-weld" is not unambiguous by relying on non-record evidence and an inapposite prior Commerce scope ruling. Also, the CIT altogether failed to address SCI's arguments concerning the unambiguous meanings of the other scope terms. Accordingly, the CIT's (k)(0) decision cannot stand. Instead, substantial record evidence supports the unambiguous meaning of the AD Order's scope language and the exclusion of welded outlets from the scope based on this language.

Even if the Court were to find ambiguity in the relevant scope language, such that analysis under the (k)(1) sources was required, those sources are dispositive with respect to the exclusion of welded outlets from the scope. The Petition explicitly requires that: (1) both or all edges of the fitting are beveled; (2) the fitting is designed to connect to the end of a pipe; and (3) the beveled edge of the fitting is designed to be set against another beveled edge on the connecting pipe, so that the two beveled edges create a channel for welding. The Petition also lists the basic shapes of the subject merchandise: elbows, tees, caps, and reducers. As the Vandewater record before Commerce demonstrated, welded outlets meet none of these requirements and do not match any of these shapes. Similarly, language from the ITC includes several key requirements of the subject

merchandise:  (1) the presence of beveled edges (plural); (2) the presence of

welded connections (plural); (3) the exclusion of "threaded" or "grooved" ends,

which indicates a "different type of fastening method"; and (4) placement against

the beveled end of a pipe.  The ITC also listed the same basic shapes of the subject

merchandise identified by the Petition.  Welded outlets meet none of these

requirements and do not match any of these shapes.  The aforementioned

descriptions from the Petition and the ITC are consistent with Commerce's prior

*Forged Steel Fittings* scope ruling, a (k)(1) source, in which the agency determined

that a butt-weld fitting is "butt welded at both end connections" (unlike welded

outlets).  And, importantly, the relevant industry standards applicable to the subject

merchandise – ASTM A234-82a for materials and ANSI B16.9 for dimensions –

identified in the Petition and by the ITC's determination in the original

investigation, among other (k)(1) sources, are not applicable to welded outlets.

Accordingly, the CIT's (k)(1) decision cannot stand, as substantial record evidence

demonstrates that the (k)(1) sources are dispositive and confirm the exclusion of

welded outlets from the AD Order's scope.

Finally, if the Court were to find that the (k)(1) sources do not confirm the

exclusion of welded outlets from the scope, this Court should address the CIT's

error regarding the effective date for suspension of liquidation of entries under

Commerce's final remand redetermination under (k)(2).  Here, Commerce's

regulations explicitly state that, "where there has been no {prior} suspension of liquidation" (as here), suspension of liquidation and cash deposits shall apply to entries "entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry." 19 C.F.R. § 351.225(l)(3). The regulations allow "continued" suspension of liquidation only when "the product in question is already subject to suspension of liquidation." 19 C.F.R. § 351.225(l)(1), (l)(3). Yet here, Commerce proposes to apply suspension and collection of cash deposits to entries made prior to the date of initiation, where the product in question was not yet subject to suspension, on the ground that some *other* product in the same entry happened to be suspended. Despite the absurdity of this position under the regulations, the CIT refused to consider this issue, asserting that such arguments were forfeited. However, because this issue was briefed fully by SCI to both Commerce and the CIT, there is no plausible assertion that it was forfeited. Accordingly, should this Court affirm Commerce's final remand redetermination under (k)(2), it should find that suspension of liquidation applies only to entries made on or after October 30, 2020, or alternatively, instruct the CIT to rule on this issue in the first instance.

## VI.    Argument

### A.    Standard of Review

This Court reviews the CIT's rulings *de novo*, applying the same standard of review used by the CIT to review Commerce's determinations. *Downhole Pipe & Equip., L.P. v. United States,* 776 F.3d 1369, 1373 (Fed. Cir. 2015). An agency determination, finding, or conclusion will only be sustained if it is supported by substantial evidence on the record or otherwise in accordance with law. *SKF USA, Inc. v. United States,* 537 F.3d 1373, 1377 (Fed. Cir. 2008). Substantial evidence is "more than a mere scintilla" of supportive record information. *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (citation omitted). Rather, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003).

Commerce's scope determinations must be based on substantial evidence. *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1307 (Fed. Cir. 2018) ("*Whirlpool*") ("we uphold a Commerce scope ruling that is supported 'by substantial evidence on the record' and otherwise 'in accordance with law'") (citing *Meridian Prods. v. United States*, 851 F.3d 1375, 1380 (Fed. Cir. 2017) ("*Meridian*"). "Commerce's inquiry begins with the Order{'}s scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation." "If the

scope is unambiguous, the plain meaning of the Order{'}s language governs." *See Whirlpool*, 890 F.3d at 1307-08 (internal citations omitted).  If the plain language of the scope is ambiguous, Commerce may develop its interpretation of the scope language based on the enumerated sources in its regulations.  *Id.*; 19 C.F.R. § 351.225(k)(1)-(2).

Any reliance on the enumerated sources in 19 C.F.R. § 351.225(k)(1) must be supported by substantial evidence.  *Meridian*, 851 F.3d at 1382.  Commerce's reviewing courts have overturned Commerce's scope determinations where "Commerce came forward with no evidence to support the conclusion that {the product at issue} is in the domestic industry investigated by the Commission." *A.L. Patterson, Inc. v. United States*, 585 Fed. App'x 778, 785-86 (Fed. Cir. 2014).  Elsewhere, the courts have remanded scope determinations to Commerce where "{t}he petition language Commerce relied upon … {did} not lend support to Commerce's interpretation" that the particular product at issue was covered by the order.  *Bell Supply Co., LLC v. United States*, 955 F. Supp. 3d 1082, 1100 (Ct. Int'l Trade Apr. 27, 2016).  The courts also will find Commerce scope determinations to be deficient if they do not adequately address how Commerce "concluded that…prior… proceedings or prior scope determinations compared with or were distinguishable from the current scope determination." *Shake & Shingle Alliance v. United States*, 415 F. Supp. 3d 1249, 1260 (Ct. Int'l Trade

Nov. 13, 2019).  Ultimately, however, the (k)(1) sources "cannot substitute for language in the order itself."  "{A} predicate for the interpretive process is language in the order that is subject to interpretation."  *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382-83 (Fed. Cir. 2005) ("*Tak Fat Trading*").

### B.    Welded Outlets Are Excluded by the Unambiguous Language of the AD Order's Scope

In its June 3, 2020 opinion, the CIT erred in failing to recognize the unambiguous language of the scope that excludes welded outlets.  **Appx143-Appx148**.  Because "butt-weld" and other terms in the AD Order scope language are unambiguous, and because SCI's welded outlets do not match these unambiguous terms, this Court should overturn the CIT's (k)(0) opinion.

### 1.    The "(k)(0)" Standard

This Court requires that "Commerce's inquiry must begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation."  *Meridian*, 851 F. 3d at 1381.  Only "{s}hould Commerce find that {the} language is subject to interpretation, {may} Commerce … turn to the (k)(1) factors, *i.e.*, {t}he descriptions of the merchandise contained in the petition, the initial investigation{,}" and other such material.  *Maquilacero S.A. De C.V. v. United States*, 256 F. Supp. 3d 1294, 1304 (Ct. Int'l Trade Aug. 30, 2017).

"{W}hether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law" that the court reviews *de*

*novo*. *Meridian*, 851 F. 3d at 1382 (internal citation omitted). "The relevant scope terms are 'unambiguous' if they have 'a clearly defined or stated meaning{,}'" and if the scope is unambiguous, it governs. *Id.* at 1381 & n.7. Once the court resolves the issue of whether the terms are unambiguous, "{t}he question of whether a product meets the unambiguous scope terms then presents a question of fact reviewed for substantial evidence." *Whirlpool*, 890 F.3d at 1308.

## 2.    The CIT's (k)(0) Opinion

Before the CIT, SCI demonstrated that welded outlets are not covered by the unambiguous term "butt-weld" pipe fittings. In addition, SCI explained that welded outlets are not covered by other unambiguous scope terms, which cover only goods that are (a) "formed" or "forged," (b) not based on "grooved" or "threaded" fastening methods, and (c) designed to "join sections in piping systems where conditions require permanent, welded connections." SCI Opening Brief (September 5, 2019), CIT 19-00011 ECF No. 49; SCI Reply Brief (November 8, 2019), CIT 19-00011 ECF No. 57.

In its cursory, less-than-a-page analysis, the CIT stated that the term "butt-weld" is not unambiguous because there is not a "a well-known, uniform 'trade usage' of the term." **Appx147**. The CIT also stated that the fact that "similar branch outlets have been included since 1992 under a similar antidumping duty order covering butt-weld fittings from another country" made it "hard for a

reasonable mind to be persuaded" that "but-weld" is unambiguous and does not cover these welded outlets. *Id.* The CIT's unsupported and inadequate statements do not withstand scrutiny.

> **3.    Substantial Record Evidence Before Commerce and the CIT Demonstrated the Unambiguous Meaning of a "Butt Weld" and that Welded Outlets Do Not Utilize a Butt Weld**

The CIT's (k)(0) ruling ignored substantial record evidence presented before Commerce and the CIT by SCI, SIGMA, and Vandewater concerning (1) the well-defined and consistently used term "butt-weld" within industry; (2) the different industry standards applicable to welded outlets on the one hand, and "butt-weld" pipe fittings on the other; and (3) objective dictionary definitions of the term "butt-weld."  CIT 18-00199 ECF No. 58; CIT 19-00003 ECF No. 49; CIT 19-00011 ECF No. 49.  SCI's scope ruling request to Commerce also included diagrams (reproduced below) presenting the clear, observable differences between a butt-weld and the fillet weld used for outlets.  Such substantial evidence should have led Commerce and the CIT to conclude that welded outlets do not utilize a butt weld and are therefore not subject to the scope of the AD Order.

*Contrasting a Butt Weld and Fillet Weld*



| Fillet Weld on Threaded Cooplet | Butt Weld |
|---|---|

SCI Scope Ruling Request (August 13, 2018) at 15, **Appx3742**



| Bevel-to-Bevel Weld on a Butt-Weld Fitting |
|---|

SCI Scope Ruling Request (August 13, 2018) at 23, **Appx3750**

**4.    The CIT Impermissibly Relied on Non-Record Evidence in Disregarding the Unambiguous Meaning of "Butt-Weld"**

Without any citation whatsoever, the CIT incorrectly stated that the term "butt-weld" is not unambiguous "largely because {of} a key piece of record information" which, the CIT asserted, used the terms "threaded butt-welded outlet," "grooved butt-welded outlet," and "butt-weld outlets" in describing various welded outlets. **Appx147**. According to the CIT, such usage "weakens any claim that there is a well-known, uniform 'trade usage' of the term 'butt-weld fitting' that excludes {the} Plaintiffs' merchandise from the Order." However, no such documents were ever placed on the administrative records before Commerce (in the SCI, Vandewater, or SIGMA scope proceedings). Nor was any such "information" addressed or relied on by Commerce in its scope rulings (in any of the three aforementioned scope proceedings). Nor was any such "information" cited in the Government's briefs to the CIT. Rather, it appears that the CIT impermissibly relied on an assertion, submitted to Commerce without supporting documentation.

In the Vandewater scope proceeding before Commerce, Petitioner Island Industries ("Island") asserted, without providing any supporting documentation, that "Smith-Cooper International, a major industry player, markets Chinese-made Outlets under the 'Cooplet' brand name" and that "{r}ecent public import records describe these products as 'butt weld outlets.'" Appx456. Because of the CIT's

lack of citation to the record and any meaningful analysis, SCI can only assume that this is the unsupported assertion relied on by the CIT in its (k)(0) opinion. Not only did the CIT incorrectly rely on these unsupported assertions made by Island, but it also failed to meaningfully engage with the arguments presented by SCI to Commerce on these same points. Specifically, SCI explained to Commerce that any mention of "butt-weld" products in a limited number of import documents was the result of human error, and not reflective of the vast majority of SCI's import documents or of the consistent and uniform understanding of the term "butt-weld" in industry, which excludes welded outlets. Appx571. The CIT's (k)(0) opinion simply adopted Island's unsupported assertion and failed to meaningfully address SCI's explanations. The CIT also failed to explain how this limited error could outweigh the thoroughly documented, consistent, and authoritative evidence presented by SCI, SIGMA, and Vandewater demonstrating that the term "butt-weld" is, in fact, unambiguous, and that welded outlets do not match this unambiguous term.

### 5.    The CIT's Reliance on Commerce's *Sprink* Scope Ruling is Misplaced

In its (k)(0) opinion, the CIT held that because "similar branch outlets have been included since 1992 under a similar antidumping duty order covering butt-weld fittings from another country," it is "hard for a reasonable mind to be persuaded that branch outlets could never be classified as butt-weld fittings

because there is one, and only one, widely- and well-known 'trade usage' of the term 'butt-weld fittings.'" **Appx147**.  In reaching this conclusion, the CIT cited the 1992 *Sprink* scope ruling, in which Commerce determined that "Sprink-lets," a product with one welded end and one grooved or threaded end, are covered under the AD order on butt-weld fittings from Taiwan.  There are fundamental flaws with this aspect of the CIT's decision.

First, the CIT never addressed the information on the record demonstrating the likelihood that the *Sprink* scope ruling was incorrectly decided.[1]

Second, Commerce itself determined in this very case that, because the *Sprink* scope ruling was decided under a different order, with different scope language, *Sprink* does not control the interpretation of the AD order on butt-weld pipe fittings from China.[2]  Commerce stated:

---

[1] The 1992 *Sprink* ruling had multiple deficiencies.  Procedurally, the scope ruling was made based on a one-page letter and three sheets of data submitted by Sprink, Inc., with no input from any other industry participants.  Additionally, the ruling failed to address several reasons why Sprink-lets were not covered by the Taiwan order, including that these products do not have butt-welds on both ends, do not have a beveled end-to-beveled end connection with a pipe, and do not conform to the shapes typical of butt-weld pipe fittings, per the relevant industry standard (ASME B16.9).  **Appx3755-Appx3761**.

[2] There are several differences between the scope language of the Taiwan and China orders.  While the Taiwan order covers a broader range of products ("butt-weld **type** fittings" (emphasis added)), the China Order only covers "butt-weld pipe fittings." The China Order also limits the scope to fittings used "to join sections in piping systems where conditions require permanent, welded connections," but this limitation is absent in the Taiwan order.  And, the China

> We agree that the products at issue in the Sprink Scope
> Ruling were similar to SCI's … weld outlets.   However,
> we note that Commerce analyzed those products under
> the *Taiwan Butt-Weld Order* and not the *China Butt-
> Weld Order*.   We recognize that some of the language in
> both orders is the same, but … there is also language
> unique to the *China Butt-Weld Order.* Accordingly, we
> are not bound by the agency's analysis in the Sprink
> Scope Ruling.

**Appx4097**.  The CIT's position is patently unreasonable in giving such weight to

this deeply flawed, older ruling, under a different order with different scope

language, while never addressing Commerce's explicit determination to disregard

that ruling in the present case.

Third, the CIT failed to explain why the *Sprink* scope ruling should be

accorded more weight than the more contemporaneous *Forged Steel Fittings* scope

ruling (also under different orders), which determined that in order to be "butt-

weld", a fitting must have <u>butt welds</u> on <u>both ends</u>.  *See* Forged Steel Fittings from

China, Italy, and Taiwan:  Final Scope Determination Decision Memorandum

(July 23, 2018) ("*Forged Steel Fittings* scope ruling") at 8-9 ("{o}utlets with a

socket-weld or threaded end connection, or with only one butt weld end

---

Order focuses on piping systems in conditions requiring permanent welding, as
opposed to those with "threaded, grooved, or bolted fittings," while the Taiwan
Order does not.  **Appx3760-Appx3761**.  Commerce recognized the existence of
the differing language in its SCI Scope Ruling ("{w}e recognize that some of the
language in both orders is the same, but, … there is also language unique to the
China Butt-Weld Order").  **Appx4097**.

23

connection, are not considered a butt weld fitting"), **Appx590-Appx601**.  In light of the failure to address the clear conflict between the *Sprink* and *Forged Steel Fittings* scope rulings, the CIT's reliance on *Sprink* cannot stand.

> **6.    The CIT Failed to Address Other Unambiguous Terms in the Scope Language, Also Excluding Welded Outlets**

In addition to "butt-weld," there are multiple other unambiguous terms in the scope language.  SCI presented each of these points to the CIT.  SCI Opening Brief (September 5, 2019).  But, the CIT failed entirely to address them.  Each of these terms is unambiguous, and each one is sufficient to demonstrate the exclusion of welded outlets from the scope.  Accordingly, this Court should rule that these additional terms are unambiguous and that welded outlets do not match their meanings.

> **a.    "Formed" or "Forged"**

The scope is explicitly limited to products that are "formed or forged," and each of these terms carry unambiguous meanings.  A fitting is "formed" when the metal is reshaped through mechanical deformation without any change to its mass.  SCI Opening Brief (September 5, 2019) at 7-8.  A fitting is "forged" if it is created using techniques such as hammering, rolling, and pressing, to create the shape of the fitting.  *Id.*, citing ASTM Dictionary of Engineering Science & Technology (2004) at 257 (SCI Scope Ruling Request (August 13, 2018) at Exhibit 13), **Appx3969**.  As described by the ITC, such forming processes may include being

"heated to a cherry red, . . . then pushed over a mandrel" or "formed in a series of progressively smaller dies in a swedge press." Such forging processes may include being "hammer-forged to size." Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand, Determinations of the Commission in Investigations Nos. 731-TA-520 and 521 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigations, USITC Pub. 2528 (June 1992) ("ITC Original Investigation") at I-7 – I-10, **Appx347-Appx350**.

By requiring that butt-weld fittings be "formed or forged," the scope language excludes fittings created by other methods. Unlike forging or forming, which are processes of reshaping without removing any material, SCI confirmed to Commerce and the CIT that SCI's welded outlets are cut from pre-existing pipe and further shaped by machining (a process which cuts away or otherwise removes excess material). **Appx3744-Appx3745**; SCI Opening Brief (September 5, 2019) at 7-8. They are not hammered, rolled, or pressed, and they lose mass through the machining process. SCI Opening Brief (September 5, 2019) at 7-8. Accordingly, SCI's welded outlets are not "formed" or "forged."

### b.    No "Threaded" or "Grooved" Fastening Methods

The scope of the AD Order explicitly excludes "fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)." Thus, per the

unambiguous language of the scope, fittings based on these other fastening

methods, including those of SCI, are not butt-weld pipe fittings.

Because welded outlets always have one end that is threaded or grooved for

temporary fastening, they are not butt-weld pipe fittings under the unambiguous

language in the AD Order's scope. The threaded or grooved end of welded outlets

is the essential feature of the product, as it allows for removal and replacement of

the attached sprinkler head.  Accordingly, these welded outlets are "based on other

fastening methods."[3] **Appx3745-Appx3746**; SCI Opening Brief (September 5,

2019) at 10.  Products relying on these "other fastening methods" are explicitly

identified and excluded by the unambiguous terms of the scope.  Accordingly,

welded outlets are not butt-weld pipe fittings.

### c.    Used to "Join Sections in Piping Systems where Conditions Require Permanent, Welded Connections"

The plain language of the AD Order's scope covers products "used to join

sections in piping systems where conditions require permanent, welded

connections."  This unambiguous scope language requires "sections" (plural) "in

piping systems where conditions require" "permanent, welded connections"

(plural).   This clearly means that butt-weld pipe fittings are used to join two

---

[3] The same is true of both SCI's and Vandewater's welded outlets ("{a}ll of Vandewater's steel branch outlets have a threaded end or a grooved finish on the branch side").  **Appx178**.

different sections of piping, connecting with both sections via permanent, welded

connections.  The intended use of stronger butt-weld pipe fittings – to connect

pipes in high-pressure systems (*i.e.*, requiring "permanent, welded connections") –

has been well established, and products employing weaker fillet welds or unwelded

connections cannot be used for this purpose.  *See* ITC Original Investigation at I-

12.  Moreover, this understanding of the scope language is consistent with

Commerce's *Forged Steel Fittings* scope ruling, discussed above, in which

Commerce determined that an outlet can only be considered a butt-weld fitting if

both ends are connected by butt welds.  **Appx590-Appx601**.

By contrast, welded outlets, which are designed for low-pressure fire

sprinkler systems, only employ a temporary connection between (1) the piping

system and (2) a sprinkler head or another fitting or a branch pipe.  This temporary

connection is necessitated by the fact that the sprinkler head must be replaced after

a fire, or when buildings are remodeled or fire codes are changed.  Accordingly,

welded outlets have zero permanent connections, and are therefore not butt-weld

pipe fittings.[4]  **Appx3746-Appx3748**; SCI Opening Brief (September 5, 2019) at

8-9.

---

[4] The same is true of Vandewater's welded outlets ("a steel branch outlet cannot be
used to join sections where conditions require 'permanent, welded connection**s**'
(emphasis added).  While a steel branch outlet has a permanent welded connection
on one end (albeit a fillet weld, as opposed to a butt weld), the other end of

### C.    Welded Outlets Are Excluded from the Scope by the Enumerated (k)(1) Sources

As explained above, welded outlets are excluded by unambiguous terms in the scope language.  However, even if the scope language were not unambiguous, the sources enumerated in 19 C.F.R. § 351.225(k)(1) consistently demonstrate that welded outlets are excluded from the scope.  Thus, this Court should overturn the CIT's decision that the (k)(1) sources are not dispositive, and find instead that the (k)(1) sources exclude welded outlets from the scope.

### 1.    The CIT's (k)(1) Opinion

In its October 16, 2020 decision, the CIT held that the (k)(1) sources were not dispositive regarding welded outlets.  **Appx125-Appx130**.  Accordingly, the CIT remanded the case to Commerce for analysis under 19 C.F.R. § 351.225(k)(2).  In reaching this (k)(1) decision, the CIT cited only one source – Commerce's 1992 *Sprink* scope ruling – purportedly favoring inclusion of welded outlets in the scope.  *See generally id.*  But, as explained above, and as the CIT itself noted, the *Sprink* scope ruling was under a different order and scope, and was expressly disregarded by Commerce in its underlying scope ruling.  All the other (k)(1) materials cited by the CIT, and those relied on in briefing to the CIT but that were unaddressed in its

---

Vandewater's steel branch outlets has either a threaded or grooved end").  **Appx181**.

(k)(1) opinion, consistently support the exclusion of welded outlets from the scope.

Accordingly, this Court should find that the (k)(1) sources exclude welded outlets

from the scope.

### 2. The CIT Correctly Found that the Petition Excludes Welded Outlets Based on Physical Characteristics

The description of the physical characteristics of the subject merchandise in

the Petition, a (k)(1) source, clearly excludes welded outlets from the scope.

### a. The Petition Language Describing Subject Butt-Weld Fittings Excludes Welded Outlets From the Scope

The original Petition for the AD Order describes subject butt-weld pipe

fittings as follows:

> The edges of finished butt-weld fittings are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins the fitting to the pipe.

**Appx712**.  Thus, the Petition explicitly requires that:  (1) both or all edges of the

fitting are beveled; (2) the fitting is designed to connect to the end of a pipe; and

(3) the beveled edge of the fitting is designed to be set against another beveled

edge on the connecting pipe, so that the two beveled edges create the type of

channel necessary for butt-welding.

None of these physical characteristics, explicitly required by the Petition, are

present for welded outlets.  In contrast to this explicit description, welded outlets

do not have two beveled edges (or only beveled edges). Instead, welded outlets always have one beveled edge (of a type for fillet welding, not butt welding) and one non-beveled edge (not connected via welding). **Appx177-Appx181**. The non-beveled edge is threaded or grooved and connects to a sprinkler head or an intermediate part (*i.e.*, a branch pipe) that is also threaded or grooved, meaning that no weld of any kind is used on that end. *Id.* Additionally, the beveled end of welded outlets possesses a "fishmouth" shape, which physically prevents the outlet from being "placed against the end of the pipe," as required by the Petition. *Id.* Instead, the outlet connects to the rounded face in the middle of the pipe, in direct contrast to the Petition language requiring that a fitting connect to that pipe's "ends. . .which have also been beveled."

Commerce ignored the Petition's plain language requiring specific types of edges for specific types of welding. Instead, Commerce inexplicably determined that the existence of any single beveled edge for any type of welding is the defining characteristic of the subject merchandise. Only by ignoring the clear language of the Petition was Commerce able to make such unreasonable determinations as "{o}ther than the existence of a beveled edge, there are no angle restrictions to what is considered a butt-weld connection according to the scope and the 19 CFR 351.225(k)(1) sources" and that "there is nothing in the … sources

under 19 CFR 351.225(k)(1) that limits the scope … to butt-weld pipe fittings with

an end-to-end … connection." **Appx140**.

The court below correctly found that this (k)(1) language does not describe

the welded outlets at issue.  Quoting the above-cited Petition language, the CIT

held that "{t}he quoted petition language, which contemplates beveling on both

parts of the assembled pipe, is . . . not descriptive of the actual physical

characteristics of {welded outlets}." **Appx130**.  In other words, the CIT confirmed

that the Petition language excludes welded outlets from the scope.  Thus, the

above-cited Petition language is not inconclusive.  Instead, it clearly supports the

exclusion of welded outlets from the scope.

### b.    Other Petition Language on Shapes Excludes Welded Outlets From the Scope

Although other relevant language in the Petition was identified and briefed

to the court below, the CIT ignored such language in its (k)(1) decision.  Had the

CIT addressed this language, it would have appropriately concluded that this

additional Petition language supports the exclusion of welded outlets from the

scope.

The Petition states that "{b}utt-weld fittings come in several basic shapes"

such as:  elbows, tees, caps, and reducers.  **Appx712**; **Appx713-Appx715**;

**Appx755-Appx759**.  Each of the shapes identified in the Petition adhere to the

requirements of the subject merchandise contained in the Petition language

discussed immediately above.  Section VI.B.2.a.  Although this issue was briefed

to the CIT, it ignored these points in its analysis.  *See* Vandewater Opening Brief

(June 24, 2020) at 9-11, CIT 18-00199 ECF No. 93.  Had the CIT addressed these

points, it would have seen that <u>none</u> of the shapes identified in the Petition cover

welded outlets, and that it is thus clear that the Petition language excludes welded

outlets from the scope of the AD Order.

Despite the fact that welded outlets do not match any of the shapes of the

subject merchandise described in the Petition, Commerce engaged in post-hoc

rationalization by arguing for the first time before the CIT that a single image of a

saddle in an appendix to the Petition indicated that the Petition intended to cover

welded outlets.  *See* United States Response Brief (July 22, 2020) at 12, CIT 18-

00199 ECF No. 93; *see also* Vandewater Reply Brief (August 4, 2020) at 4, CIT

18-00199 ECF No. 105.  Because such reasoning does not appear in Commerce's

underlying scope ruling, it cannot serve as a basis for upholding the agency's

determination.  *U.H.F.C. Co. v. United States*, 916 F.2d 689, 699 (Fed. Cir. 1990).

In any event, a saddle – unlike a welded outlet – has a classic, butt-weld

beveled edge on one side, for end-to-end butt-weld connection to a pipe, in exactly

the manner described in the Petition language cited above.  On its other side, the

saddle has a portion of curved pipe face, which will sit in and replace a large hole

cut in the side of the pipe.  Because the saddle has one traditional butt-weld side, it

is not surprising that it was included with traditional butt-weld pipe fittings.  In contrast, a welded outlet has zero butt-weld sides, and did not appear in the aforementioned Petition appendix.  As noted above, the two sides of a welded outlet are (1) a threaded or grooved end, and (2) a fillet weld end that is not designed to butt-weld end-to-end as described in the Petition.  Neither side of a welded outlet has a butt-weld, and therefore does not resemble a saddle.

In its underlying scope ruling, Commerce similarly misinterpreted the Petition's mention of caps (which have one butt-weld end and one closed end which does not connect to anything).  In its scope ruling, it determined that "caps are one of the most common shapes of butt-weld pipe fittings.  Caps are used to seal the end of a pipe and, thus, fittings with only one welded connection are not excluded from the scope of the order."  **Appx140**.  Although Commerce never explained its analysis, it is unquestionably the case that only one end of a cap connects to anything and that this end uses a traditional butt-weld connection. Thus, caps might be a reasonable exception to the Petition description that subject butt-weld fittings should have two butt-weld ends, because a cap only has only one connecting end to begin with (which is a traditional butt-weld connection). However, this does not in any way suggest that welded outlets are subject to the AD Order since, unlike caps, welded outlets have two connecting ends, neither of which are butt-weld connections.

3. **The CIT Correctly Found that the ITC's Determinations Exclude Welded Outlets from the Scope Based on Physical Characteristics**

a. **The ITC's Determinations Describing Subject Butt-Weld Connections Exclude Welded Outlets From the Scope**

As with the Petition, the ITC's determinations clearly exclude welded outlets from the scope of the AD Order based on their physical characteristics.  In its 2016 Sunset Review, the ITC described the subject merchandise as follows:

> Butt weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connection<u>s</u>. The beveled edge<u>s</u> of butt-weld pipe fittings distinguish them from <u>other types of pipe fittings</u>, <u>such as threaded</u>, <u>grooved</u>, or bolted fittings, which rely on different types of fastening methods. When placed <u>against the end of a beveled pipe</u> or another fitting, the beveled edge<u>s</u> of a butt-weld pipe fitting form a shallow channel that accommodates the "bead" of the weld that fastens the two adjoining pieces.

<u>Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand:  Investigation Nos. 731-TA-308-310 and 520-521 (Fourth Review)</u>, USITC Pub. 4628 (Aug. 2016) ("ITC 2016 Sunset Review") at 6 (emphasis added).  **Appx622**.  This language includes several key requirements of the subject merchandise:  (1) the presence of beveled edges (plural); (2) the presence of welded connections (plural); (3) the exclusion of the "threaded" or "grooved" ends, which indicates a "different type of fastening method"; and (4) placement against the beveled end of a pipe.

Commerce's (k)(1) scope ruling failed to reasonably interpret the above-cited language.  Though Commerce cited the ITC's 2016 Sunset Review in its determination, the agency erroneously determined that only a single beveled edge is required for a product to be considered subject to the AD Order, effectively disregarding the other requirements of the subject merchandise identified by the ITC.  **Appx140**.

Commerce's misguided reading of the ITC's language cannot stand.  The CIT agreed, holding that "{t}he quoted language Commerce relied upon from the ITC sunset review suffers from the same problem as the petition language—it contemplates beveling on both parts of the assembled pipe. … The quoted sunset review language is therefore not descriptive of the actual physical characteristics of {welded outlets}."  **Appx130**.  Accordingly, the above-cited language in the ITC's 2016 Sunset Review clearly excludes welded outlets from the scope of the AD Order.

### b.     Other ITC Determinations Confirm the Exclusion of Welded Outlets from the Scope of the AD Order

Additional determinations of the ITC confirm the exclusion of welded outlets from the scope of the AD Order.  In its 2016 Sunset Review, for instance, the ITC identified the common shapes of butt-weld pipe fittings:

> Carbon steel butt-weld pipe fittings come in several basic shapes, the most common of which are elbows, tees, reducers, and caps (figure I-1).  Elbows are two-outlet

fittings usually having a 45-degree or 90-degree bend,
tees are T-shaped fittings having three outlets, and
reducers are two-outlet fittings that connect pipes of two
different diameters.  Caps are used to seal the end of a
pipe.  There are further variations within each class of
fitting based on differences in the size of one or more of
the outlets (for example, there are reducing elbows and
reducing tees).

**Appx652-Appx653**.  These shapes, which, notably, exclude saddles, attach only to

the end of a pipe and only with butt-weld connections, which is not possible for

welded outlets.  The ITC referenced no other kind of shapes in its determination.

And, although the ITC mentioned that there are "further variations" of the subject

merchandise, it only noted such variations "*within* each class of fitting based on

differences in the size of one or more of the outlets (for example, there are

reducing elbows and reducing tees)" (emphasis added).  **Appx652**.  Because

welded outlets meet none of these descriptions or conform to any of these shapes,

the ITC's 2016 Sunset Review clearly indicates that welded outlets are excluded

from the scope of the AD Order.

> **4.     The CIT Ignored Other Information From the (k)(1) Sources
> that Consistently Support the Exclusion of Welded Outlets
> from the Scope**

The CIT ignored other information from the (k)(1) sources that consistently

support the exclusion of welded outlets from the scope of the AD Order.

### a.   Commerce's Prior Scope Rulings Confirm the Exclusion of Welded Outlets from the Scope

The CIT correctly recognized that Commerce "chose to dismiss" the *Sprink* scope ruling (discussed above) as inapplicable to welded outlets. **Appx129**. Importantly, however, the CIT's (k)(1) decision entirely failed to address the *Forged Steel Fittings* scope ruling, as cited in briefing by the parties below. *See* Vandewater Opening Brief (June 24, 2020) at 23-26. The *Forged Steel Fittings* scope ruling confirmed that the definition of a butt-weld fitting excludes welded outlets. In particular, the requirement that butt-weld pipe fittings have "beveled edges" (plural) for butt-welding – as discussed above in the context of the Petition and the ITC's 2016 Sunset Review – was confirmed by Commerce in its own *Forged Steel Fittings* scope ruling. **Appx590-Appx601**. In that scope determination, Commerce rejected the petitioners' request to include butt-weld outlets in the scope of the investigations, which expressly excluded "flanges, butt weld fittings, butt weld outlets, nipples, and all fittings that have a maximum pressure rating of 300 pounds of pressure/PSI or less." **Appx592**. According to Commerce, an outlet "butt welded at both end connections" (emphasis added), was a butt-weld fitting and, therefore, properly excluded from the scope of the forged steel fittings investigations. **Appx597**. Conversely, outlets with a "socket-weld or threaded end connection, or with only one butt weld end connection, {were} not

considered a butt weld fitting and, therefore, {were} not excluded from the scope of the investigations." **Appx597-Appx598**.

Although Commerce's later Scope Clarification Memorandum in the *Forged Steel Fittings* proceeding (which, in any event, postdates the underlying Vandewater scope ruling in this case) attempted to distinguish between butt-weld fittings and outlets with "at least one, but not all" butt-weld connections and those with "all" butt-weld connections, it fails to address how welded outlets – with <u>zero</u> butt-weld connections – could be viewed as butt-weld fittings for purposes of either the *Forged Steel Fittings* orders or butt-weld pipe fittings order.  Placing Carbon Steel Butt Weld Pipe Fitting Scope Ruling on the Record (September 19, 2018), **Appx4071-Appx4072**.  Because welded outlets have <u>no</u> butt-weld connections, employing (1) a fillet weld (not butt weld) to attach to the side of a pipe at one end, and (2) a grooved or threaded connection to attach to a sprinkler head or an intermediate part (*i.e.*, a branch pipe) on the other end, they clearly are not subject butt-weld fittings under the *Forged Steel Fittings* scope ruling.

In the underlying scope proceeding, Commerce attempted to disregard the *Forged Steel Fittings* scope ruling, arguing in a footnote that:

> In the forged steel fittings from China investigations, Commerce explained that "butt weld outlets" were excluded, which it defined as outlets butt welded at both ends.   As we have explained in this decision, outlets butt welded at only one end are covered by the *China Butt-Weld Order*.   In light of the fact that the product at issue

> has a maximum pressure rate of under 300 pounds of
> pressure/PSI, we need not address this distinction further
> for purposes of this scope ruling.

**Appx 141**.  However, Commerce never explained why the same or similar

products should not be treated similarly across these scope rulings.  Although

separate proceedings, that distinction only goes so far, and provides no basis or

explanation for why a "butt-weld pipe fitting" is defined as two different things by

Commerce.[5]  As mentioned above, these points regarding Commerce's *Forged*

*Steel Fittings* scope ruling were thoroughly briefed before the CIT but entirely

ignored by it.  Accordingly, this Court should find that Commerce's *Forged Steel*

*Fittings* scope ruling further supports the exclusion of welded outlets from the

scope of the AD Order here.

### b.    Multiple (k)(1) Sources Exclude Welded Outlets Based on Industry Standards

The Petition, the ITC's determinations from the original investigation and

subsequent sunset reviews, and previous Commerce scope rulings all exclude

welded outlets from the scope of the AD Order based on industry standards.

Although the issue of industry standards was briefed to the court below, the CIT

ignored these important arguments, providing no basis for doing so.  *See*

---

[5] By contrast, SCI explained why the *Sprink* scope ruling, made under the separate
and different Taiwan order on butt-weld fittings, was inapplicable to the
interpretation of the order on butt-weld pipe fittings from China.  *See* notes 1, 2,
*supra*.

Vandewater Opening Brief (June 24, 2020) at 9-12; Vandewater Reply Brief
(August 4, 2020) at 5-9.

The Petition establishes a direct connection between specific industry
standards and the subject merchandise, stating that "{c}arbon steel butt-weld
fittings are commodity type products, manufactured in conformity with industry
standards as established by the American Society for Testing and Materials
('ASTM') and the American National Standards Institute ('ANSI')." **Appx712**.
This language does not soften the connection to suggest that products meeting
these industry standards are "included in" or "among" the subject merchandise.
Rather, the Petition explicitly identifies the subject merchandise as the products
that "are…manufactured in conformity" with those standards.  The Petition
footnote following this sentence identifies the specific ASTM/ANSI standards as
"ASTM A234-82a for materials; ANSI B16.9 for dimensions."  *Id.*

Consistent with the Petition, the ITC's report from the original investigation
stated that butt-weld pipe fittings are checked for conformance with "the
specifications of the American Society for Testing and Materials (ASTM) and
ANSI."  ITC Original Investigation at I-9, **Appx349**.  The ITC made clear that the
relevant ASTM standard is 234, since all five of the products that the ITC selected
for data collection adhered to ASTM A-234.  *Id.* at I-38.  Similarly, the ITC's 2005
Sunset Review stated that purchasers confirmed that subject merchandise "sources

have to manufacture to ANSI B16 standards." <u>Carbon Steel Butt-Weld Pipe</u>

<u>Fittings From Brazil, China, Japan, Taiwan, and Thailand, Investigation Nos. 731-</u>

<u>TA-308-310, 520, and 521(Second Review)</u>, USITC Pub. 3809 (Oct. 2005) ("ITC

2005 Sunset Review") at II-6.  Thus, the ITC has clearly identified the specific

industry standards of ASTM A-234 and ANSI B16 as applicable to the subject

merchandise, and confirmed that "ASTM and ANSI industry standards <u>still</u>

<u>prevail</u>" among the subject merchandise in its more recent 2016 Sunset Review"

(emphasis added).[6]  **Appx631**.

Commerce's *King* scope ruling similarly determined that adherence to

specific ASTM and ANSI industry standards are requirements of the subject

merchandise.  Final Scope Ruling: Antidumping Duty Order on Carbon Steel Butt-

Weld Pipe Fittings from the People's Republic of China ("PRC") (October 20,

2009) ("*King* scope ruling"), **Appx873-Appx878**.  In the *King* scope ruling,

Commerce determined that the "{r}ecord evidence … demonstrate{d} that King's

pipe fittings are produced to meet all ASTM and ANSI certifications <u>that were</u>

<u>listed in the Petition</u>" (emphasis added).  **Appx877**.  Commerce did not indicate

that *any* ASTM or ANSI standards would suffice, but identified those "that were

---

[6] Citing the ITC's findings in the third sunset review, the ITC 2016 Sunset Review also noted that "{t}he Commission observed that <u>all</u> carbon steel BWPF, whether domestic or imported, <u>remained subject to ASTM and ANSI standards</u>…" (emphasis added). **Appx639**.

listed in the Petition" (discussed above).  In affirming Commerce's *King* scope ruling, this Court confirmed the importance of these specific industry standards among the requirements of the subject merchandise.  *See King Supply Co., LLC v. United States*, 674 F.3d 1343, 1345-46 (Fed. Cir. 2012) ("{t}he leading paragraph in the 'product description' section of the Petition identified products subject to the investigation in terms of . . . satisfying certain American Society for Testing and Materials ('ASTM') and American National Standards Institute ('ANSI') industry standards for materials and dimensions"); *Id.* at 1347 ("Commerce emphasized that . . . King's products met the same ASTM and ANSI industry standards as were referenced in the Petition").

In contrast to all of the above descriptions of the subject merchandise, welded outlets do not meet the required ASTM A234-82a specification for materials or the ANSI B16.9 specification for dimensions.  *See* Vandewater Opening Brief (June 24, 2020) at 11-12.  For example, Vandewater's welded outlets conform to a different industry standard:  MSS-SP-97.[7]  *Id.*, citing Affidavit of Walter J. Sperko paras. 8-10, **Appx302**.

---

[7] Though the industry standards applicable to SCI's and Vandewater's welded outlets may vary, none of these standards are those identified in the (k)(1) sources. **Appx3744**.

Despite the consistency of the (k)(1) sources concerning these industry standards, and the fact that welded outlets do *not* conform to these standards, Commerce avoided any discussion of this fundamental distinction in its scope ruling below.  Additionally, although the Government conceded before the CIT that "{t}he petition does include a reference to . . . ASTM A234-82a for materials and ANSI B16.9 for dimensions," it somehow reached the illogical conclusion that the "(k)(1) sources {do not} indicate that the *China Butt-Weld Order* is confined to butt-weld pipe fittings that conform to such standards."  United States Response Brief (July 22, 2020) at 20-21.  Commerce and the CIT failed to meaningfully consider the clear and consistent (k)(1) sources concerning industry standards. Because the (k)(1) sources require specific industry standards – ASTM A234 and ANSI B16 – Commerce's (k)(1) determination cannot be allowed to stand.

### D.    Suspension of Liquidation Under Commerce's (k)(2) Remand Redetermination Should Apply Only to Entries Made On or After October 30, 2020

Should this Court find that neither the unambiguous scope language nor the (k)(1) sources confirm that welded outlets are excluded from the scope of the AD Order, the next step would be an analysis under 19 C.F.R. § 351.225(k)(2).  The CIT remanded to Commerce to perform this (k)(2) analysis, the results of which it subsequently affirmed.  **Appx1-Appx20**.  SCI does not contest the CIT's affirmation of the substance of Commerce's (k)(2) analysis and instead

respectfully submits that the unambiguous scope terms and (k)(1) sources

consistently confirm the exclusion of welded outlets.  *Supra*.  However, if the

(k)(2) analysis applies, SCI contests Commerce's stated intent to apply suspension

of liquidation and cash deposit requirements to entries made prior to the date

Commerce's (k)(2) inquiry was initiated, specifically to entries already suspended

only due to the presence of products other than those in question, that had been

covered by other, unrelated AD/CVD orders.

By incorrectly ruling that SCI forfeited arguments on the issue of the

effective date for suspension of liquidation under Commerce's (k)(2) remand

redetermination, the CIT abused its discretion.  Accordingly, this Court should rule

that Commerce may only impose suspension of liquidation for and collect cash

deposits on entries made on or after October 30, 2020, the date of initiation of the

(k)(2) scope inquiry.  In the alternative, because the CIT incorrectly refused to

consider this issue, this Court should remand to the CIT to address it in the first

instance.

### 1.     Commerce's Remand Redetermination

Under the CIT's remand order, Commerce for the first time in the case

initiated a scope inquiry pursuant to 19 C.F.R. § 351.225(e), on October 30, 2020,

to determine whether Vandewater's welded outlets are subject to the scope of the

AD Order based on the factors enumerated in 19 C.F.R. § 351.225(k)(2).

**Appx125-Appx130**; **Appx882-Appx883**.  Commerce invited comments on the

remand proceeding, which SCI submitted.  **Appx884-Appx1229**.

        In its comments on the record, SCI explained that, "if the Department

decides under the (k)(2) criteria that steel branch outlets are subject to the order (it

should not), . . . the Department also would need to confirm that such a finding

applies only as to unliquidated entries made on or after October 30, 2020" (*i.e.*, the

date of the initiation of the remand proceeding).  **Appx914**.  This comment was

based on Commerce's regulations.  Specifically, 19 C.F.R. § 351.225(l)(3) requires

that Commerce, in the event of a final affirmative scope ruling, "suspend

liquidation and . . . require a cash deposit of estimated duties, at the applicable rate,

for each unliquidated entry of the product <u>entered, or withdrawn from warehouse,</u>

<u>for consumption on or after the date of initiation of the scope inquiry</u>" (emphasis

added).  **Appx915**.  Additionally, 19 C.F.R. § 351.225(l)(1) requires that when

Commerce initiates a scope inquiry under 19 C.F.R. § 351.225(e) *("Ruling where*

*further inquiry is warranted")* (as here), and when "<u>the product in question</u> is

already subject to suspension of liquidation … that suspension of liquidation will

be continued, pending a … final scope ruling" (emphasis added).  **Appx914**.  And

19 C.F.R. § 351.225(l)(3) requires that this "continued" suspension of liquidation

be continued in the event of a final affirmative scope ruling.  **Appx914-Appx915**.

As SCI explained, because of these requirements, and the fact that "the product in

question {was not} "already subject to suspension of liquidation" (*i.e.*, there was no preexisting suspension of liquidation on welded outlets), Commerce could not "continue" suspension of liquidation for entries made *before* October 30, 2020. Instead, Commerce could only impose suspension of liquidation for entries "entered or withdrawn from warehouse … on or after the date of initiation of the scope inquiry" (*i.e.*, entries made *on or after* October 30, 2020). **Appx914-Appx916**.

In its draft remand redetermination, Commerce disagreed with SCI and determined that it need not modify the instructions it had transmitted to CBP following the issuance of the agency's initial (k)(1) scope ruling that was invalidated by the CIT. **Appx3108-Appx3169**. Although these previously issued instructions had included directions to "{c}ontinue to suspend liquidation of entries of carbon steel butt-weld pipe fittings from the People's Republic of China, including Vandewater International Inc.'s steel branch outlets imported by Vandewater International Inc. . . ." going back to the 1992 AD Order, Commerce determined that modification was not necessary because "Vandewater ha{d} not provided any information to show that its outlets were not subject to the suspension of liquidation prior to the date of initiation of th{e} scope inquiry." **Appx3168**.

Commerce's erroneous position was addressed in SCI's comments on the record regarding the draft remand redetermination. **Appx3220-Appx3254**. First,

SCI explained that Commerce's assumption that Vandewater's welded outlets were already subject to suspension of liquidation contravened the requirement that the agency's determinations be based on substantial evidence on the record.

**Appx3246**. Second, SCI explained that Commerce's determination to "continue" to suspend liquidation of entries made prior to October 30, 2020 conflicted with the decisions of this Court in *Sunpreme Inc. v. United States*[8] & *United Steel & Fasteners, Inc. v. United States*.[9] **Appx3246-Appx3249**. Third, SCI explained

---

[8] As SCI explained, in *Sunpreme*, the product at issue first became subject to suspension of liquidation when CBP, on its own initiative, determined that the product, despite being entered as a non-AD/CVD entry, was subject to AD/CVD orders. Following a subsequent determination by Commerce that the product was, in fact, subject to the orders, Commerce instructed CBP to continue suspension of liquidation and collect cash deposits pursuant to 19 C.F.R. §§ 351.225(l)(1) and (l)(3) (*i.e.*, back to the date on which CBP initially commenced suspension).

In its review of the CIT's decision, this Court found the central issue to be whether the original suspension by CBP was legally effective. This Court explained that, "{i}f it was, Sunpreme {was} required to pay antidumping and countervailing duties on products imported on or after {the date} when Customs first determined that Sunpreme's {products} were within the scope of the Orders." However, if CBP's initial suspension was not legally effective because CBP had acted *ultra vires*, "then Sunpreme {was} only required to pay duties on products imported on or after . . . the date the scope inquiry was initiated."

The Court thus made clear that, for purposes of 19 C.F.R. § 351.225(l)(1), a product cannot be considered "already subject to suspension of liquidation" unless there is some legally-valid preexisting suspension of liquidation. *See Sunpreme Inc. v. United States,* 256 F. Supp. 3d 1265, 1292 (Ct. Int'l Trade 2017); *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1315-17 (Fed. Cir. 2020).

[9] As SCI explained, in *United Steel & Fasteners,* United Steel and Fasteners, Inc. ("US&F") requested a scope ruling from Commerce (like Vandewater), alleging

that Commerce's determination conflicted with the agency's own description of its

scope regulations in a 2020 notice of proposed rulemaking.[10]  **Appx3250-**

**Appx3251**.

---

that its products were not covered by an existing AD order from 1993.
Previously, US&F had been importing its products without declaring them subject
to the AD order.  Without initiating a scope inquiry (like the Vandewater case),
Commerce issued a final scope ruling that US&F's products were within the
scope based on the (k)(1) factors in Commerce's regulations (like Vandewater)
and instructed CBP to suspend liquidation of all unliquidated entries made since
the imposition of the AD order, *i.e.*, October 1993 (like Vandewater).

This Court made clear that Commerce may not stretch suspension of
liquidation retroactively in this way.  The Court held that where Commerce does
not initiate a scope inquiry, and yet issues instructions to CBP to retroactively
suspend liquidation to the date of the AD order at issue, Commerce's instructions
are "'clearly inconsistent with the limited prospective authority provided' by §
351.225(l)(3) and must be vacated."  This Court unequivocally stated that "{19
C.F.R. § 351.225(l)(3)} is clear.  When Commerce issues a final scope ruling, and
liquidation has not previously been suspended, Commerce may suspend
liquidation beginning 'on or after the date of initiation of the scope inquiry.'  The
regulation does not allow suspension of liquidation before a scope inquiry."

Accordingly, this Court has made clear that Commerce cannot
retroactively suspend liquidation of entries prior to the date of initiation of a
scope inquiry.  *See United Steel & Fasteners, Inc. v. United States,* 947 F.3d
794-802 (Fed. Cir. 2020).

[10] As SCI explained, on August 13, 2020, Commerce published a notice in the
Federal Register discussing, *inter alia*, proposed amendments to 19 C.F.R.
351.225.  In the notice of proposed rulemaking, Commerce described the operation
of the then unmodified 19 C.F.R. 351.225(l)(2) and (3) as follows:

> current paragraphs (l)(2) and (3) provide that if
> Commerce issues an affirmative preliminary or final
> scope ruling pursuant to a formal scope inquiry, then
> "any suspension of liquidation" will continue.  Where

In its final remand redetermination, Commerce failed to reverse course from its draft remand redetermination.  Commerce stated that:

> In light of the Court's *Remand Order*, should the Court affirm this remand redetermination in a subsequent decision, Commerce intends to issue instructions to CBP consistent with 19 CFR 351.225(l) and section 516A(c) and (e) of the Act.  Specifically, Commerce intends to instruct CBP to suspend or continue to suspend entries that entered, or were withdrawn from warehouse, for consumption on or after the date of initiation of this scope inquiry.  With respect to entries pre-dating the date of initiation of the inquiry that were suspended pursuant to the instructions issued following the September 10, 2018, Final Scope Ruling, Commerce intends to instruct CBP to refund cash deposits upon request but continue to suspend the entries at a zero percent cash deposit rate pending any appeals.  In the event that the Court's final judgment is not appealed or is upheld on appeal, Commerce intends to instruct CBP to lift suspension of

---

> there has been no previous suspension of liquidation, Commerce will direct CBP (in the event of an affirmative preliminary or final scope ruling) to suspend liquidation of unliquidated entries *dating back to the date of initiation of the scope inquiry*.  (emphasis added)

Commerce explained that under provisions of the then unmodified 19 C.F.R. 351.225(l) "all entries not already suspended prior to the date on which Commerce initiates a scope inquiry are essentially excused from AD/CVD duties, even if Commerce finds through the scope inquiry that such duties should have applied."

Commerce's own descriptions of the regulations at issue thus further confirm that the agency cannot suspend liquidation of entries made prior to the date of initiation of the scope inquiry where there has been no previous suspension of liquidation.  *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 85 Fed. Reg. 49,472, 49,482-49,483 (Aug. 13, 2020).

liquidation and liquidate such entries without regard to antidumping duties.

**Appx123**.  Commerce's draft and final remand redeterminations, and the parties'

comments during the remand proceeding, formed the remand proceeding record

that came before the CIT.

### 2.    The CIT's Handling of Commerce's Final Remand Redetermination

In its comments to the CIT on Commerce's remand redetermination, SCI

explained again the problems with Commerce's analysis.  **Appx4261-Appx4279**.

As SCI explained, although Commerce's determination to instruct CBP to refund

cash deposits for entries made prior to October 30, 2020 was correct (seemingly an

acknowledgment that its final remand redetermination applied only to entries made

on or after that date), Commerce's renewed determination to impose (which

Commerce called "continue") suspension of liquidation on certain pre-October 30,

2020 entries was unlawful.  **Appx4265-Appx4277**.  Specifically, Commerce's

determination to "continue" to suspend liquidation for entries made before October

30, 2020 appeared to stem from its desire to preserve these entries for collection,

pending resolution of any and all judicial appeals.  However, the agency cited no

authority or other basis for "continuing" any suspension on pre-initiation entries,

where "the product in question" was not "already subject to suspension of

liquidation."  19 C.F.R. § 351.225(l)(1), (3).  Rather, as SCI explained to the CIT,

50

Commerce was "attempting to achieve a result—suspension 'just in case'—that it

ha{d} no authority to impose." **Appx4265**.  As SCI stated to the CIT:

> Had Commerce properly decided this case, moving to a
> (k)(2) analysis from the beginning, as the Court has now
> required it to do, Commerce would have initiated a scope
> inquiry then, and all entries prior to the date of initiation
> of the scope inquiry would now be ***both*** unburdened by
> cash deposits ***and also*** not subject to any suspension of
> liquidation.  That would have remained true even if the
> petitioner had appealed Commerce's decision to move
> past a (k)(1) analysis, and on to a (k)(2) analysis.  That is
> to say – those pre-initiation entries would have been
> liquidated during the pendency of the appeal.  Indeed,
> Commerce's apparent excuse, that it might want to
> impose retroactive cash deposits again if its previous
> (k)(1) decision were to be reinstated on appeal, has no
> basis in the applicable regulation and has previously been
> rejected by the Federal Circuit.[11]

**Appx4265-Appx4266**.  In addition, SCI explained to the CIT that Commerce's

determination to suspend liquidation of pre-initiation entries was unlawful because

---

[11] In a different hypothetical scenario, had the United States appealed the CIT's
decision below rejecting Commerce's initial (k)(1) scope ruling (which it did not
do), and had Commerce's (k)(1) scope ruling been reinstated by the Court as a
result of such appeal, Commerce would only have been able to impose suspension
of liquidation going back to the date of its scope ruling (September 10, 2018),
which was issued pursuant to 19 C.F.R. § 351.225(d) (*"Ruling based upon the
application"*), consistent with the parallel facts and ruling in *United Steel &
Fasteners, Inc. v. United States*.  *See* SCI Final Remand Redetermination
Comments at 11 ("even if Commerce's (k)(1) decision were to be revived on
appeal, … the suspension of liquidation may not apply to entries made prior to the
date of that (k)(1) decision which, for Vandewater, was September 10, 2018").  *See
also* n. 10, *supra*, discussing *United Steel & Fasteners, Inc. v. United States*
(holding that 19 C.F.R. § 351.225(l)(3) provides Commerce with "limited
prospective authority" to suspend liquidation of entries).

there was no previous suspension to continue on "the product in question". As SCI

stated:

> Prior to the issuance of Commerce's (k)(1) decision to
> Vandewater in September 2018, there was no suspension
> of liquidation present on this merchandise because
> Commerce had made no prior statement regarding
> suspension of liquidation for this type of welded outlet.
> Thus, there is no basis for Commerce to apply suspension
> of liquidation, back to the 1992 inception of the Order,
> based on continuation of some previous suspension of
> liquidation (which does not exist).
> . . .
> As of now in this case, the (k)(1) decision has been
> struck down by {the CIT}. Accordingly, there is no
> (k)(1) decision to apply. Any suspension of liquidation
> that Commerce announced as part of its (k)(1) decision in
> September 2018 is, similarly, struck down. Accordingly,
> there is no previous suspension of liquidation to continue
> now. This matter is governed by the present (k)(2)
> analysis. And, as part of its (k)(2) analysis, Commerce
> initiated the present scope inquiry on October 30, 2020.
> Under the plain language of the regulation, under the
> current (k)(2) proceeding, the suspension of liquidation
> cannot apply to any entries made prior to that date.

**Appx4271-Appx4273**.

On July 21, 2022, acknowledging that this issue had been properly raised

before it, the CIT issued a letter asking the United States to "clarify whether or not

there was a pre-existing suspension of liquidation." **Appx4280-Appx4283**. The

CIT stated:

> Plaintiffs maintain that Commerce provides no support
> for its proposal for the on-going suspension of liquidation
> of entries made before the date of initiation of the

underlying scope inquiry, including back to the date of
the 1992 <u>China BWPFs Order</u>.

The Government attempts to justify the on-going
suspension of the pre-initiation entries based on 19
U.S.C. § 1516a(c) and (e), the statutory injunction
provisions.  The Government also argues that Commerce
may issue instructions for the "continued" suspension of
liquidation based on Commerce's initial instructions to
CBP in connection with the 2018 Final Scope Ruling.
This, the Government maintains, is consistent with the
applicable regulation, 19 C.F.R. § 351.225(l).

The court understands that Commerce referenced the
statutory injunction provisions in addressing this issue,
and that there have been statutory injunctions entered by
the court that cover each Plaintiff's entries going back to
1992.  However, the court is troubled by the
Government's argument, in the alternative, that
Commerce's determination to instruct to CBP to
"continue" suspension of liquidation was within the
bounds of Commerce's authority under 19 C.F.R. §
351.225(l).
. . .
The difficulty for the court is occasioned by the
Government's statement that "{t}he record does not
contain any evidence regarding whether entries were
already subject to an existing suspension by CBP.
(internal citations omitted).

**Appx4281-Appx4282**.

In response to the CIT's July 21, 2022 letter and request to "clarify whether

or not there was a pre-existing suspension of liquidation," the United States

provided the CIT with a list of entries that remained suspended that (1) had entry

dates between January 1, 1992 and July 25, 2022, (2) were suspended under the

AD Order, and (3) were imported by SCI, SIGMA, or Vandewater. **Appx4284-Appx4285**. Only one of the importers had entries meeting these criteria.

On July 29, 2022, at the CIT's request, the parties to the proceeding below had a telephonic conference.[12]  CIT Docket 18-00199 ECF No. 157, **Appx4286**. During the telephonic conference, the CIT indicated that the information provided in the United States' July 27, 2022 letter was insufficient and non-responsive, and requested again that the United States "clarify whether or not there was a pre-existing suspension of liquidation."  According to the CIT, the question could simply be answered "yes" or "no."  In its follow up letter dated August 5, 2022, the United States essentially conceded that there was no pre-existing suspension of liquidation covering Vandewater's steel branch outlets.  **Appx4287-Appx4303**. As stated by the United States:

> Commerce's September 2018 instructions to CBP following the final scope ruling{,} which{} . . . instructed CBP to "{c}ontinue" to suspend liquidation of Vandewater's entries of steel branch outlets covered by the scope ruling{,} were the first such suspension instructions Commerce issued specifically regarding Vandewater's entries of steel branch outlets.  Commerce itself did not issue any relevant suspension instructions prior to September 2018 focused on Vandewater's steel branch outlets, and using the information disclosed in {the} July 27, 2022 initial response to the Court as a basis for inquiry, we have not been able to identify any prior suspension by CBP.  Although it is theoretically

---

[12] The telephonic conference on July 29, 2022 was not recorded and no transcript was produced.

> possible that CBP could have suspended one or more
> individual entries as of September 2018 pursuant to other
> authority, which could have continued under
> Commerce's regulations and post-ruling instructions,
> Commerce's search described in our July 27 filing and
> our inquiries with Vandewater did not identify any such
> entry.  (internal citations omitted).

**Appx4287-Appx4288**.  The United States also informed the CIT that certain

currently suspended entries, made by one of the three parties, were *not* subject to

Commerce's September 2018 suspension instructions (since they pre-dated those

instructions and were not subject to preexisting suspension of liquidation) but *were*

subject to the CIT's October 2018 statutory injunction (which covered entries

going back to the 1992 AD Order).  **Appx4288-Appx4289**.

In a second telephonic conference requested by the CIT, held on August 10,

2022, the CIT inquired as to whether the issue of the effective date for suspension

of liquidation was made moot by the United States' August 5, 2022 letter, and

encouraged the parties to the proceeding below to reach consensus on the issue.

CIT 18-00199 ECF No. 164.  During the telephonic conference, SCI explained that

the United States had adopted the incorrect position that Commerce could

"continue" to suspend pre-initiation entries that included welded outlets so long as

those entries had been suspended for any reason whatsoever (including, for

example, because the entry also included other merchandise subject to suspension

under an unrelated AD/CVD order).  As SCI explained, because the company had

entries that would be impacted by the position taken by the United States, the issue identified by the CIT was not moot.[13]

Following the August 10, 2022 telephonic conference, the United States and Vandewater reached a settlement and proposed to amend the CIT's October 2018 statutory injunction, such that only entries that were made on or after September 10, 2018 (as opposed to on or after the date of the 1992 AD Order) *or* that were previously suspended as of that date *and* that remain unliquidated would be subject to the injunction. **Appx4304-Appx4306**. This proposed amendment was granted by the CIT. **Appx4310-Appx4312**.

As SCI explained to the CIT in its response to Vandewater's motion to amend the October 2018 statutory injunction, the terms of the proposed amendment would not address or resolve the legal position adopted by the United States that Commerce was authorized to "continue" to suspend liquidation of unliquidated entries made prior to initiation of the scope inquiry if those entries were suspended for reasons unrelated to the AD Order on butt-weld pipe fittings from China. **Appx4307-Appx4309**. SCI made three distinct points in its letter. First, SCI explained that Commerce's regulations only afford the agency the authority to "continue" an existing suspension of liquidation as to specific products

---

[13] The telephonic conference on August 10, 2022 was not recorded and no transcript was produced.

(not entries) already subject to suspension.  Second, SCI explained that allowing

Commerce to "continue" to suspend an entry, of any age, that happened to be

suspended pursuant to some other AD/CVD order, would conflict with this Court's

understanding of Commerce's "limited prospective authority" to suspend

liquidation following its scope rulings.  Third, SCI explained that the United

States' position would lead to an arbitrary and absurd result.  For instance, for two

entries, both made prior to October 2020, the first containing only welded outlets

(not subject to any other suspension on welded outlets) and the second containing

welded outlets and Canadian lumber (subject to suspension on lumber), the first

entry would not be subject to duties on the welded outlets whereas the second entry

would be subject to such duties.  SCI offered to "substantiate further these

concerns should the Court determine that additional briefing or consultation is

necessary or appropriate."  **Appx4309**.

In its final decision in the case, the CIT stated that, "{w}hile SCI initially

presented arguments challenging the legal basis for Commerce's instructions to

'continue' suspension of liquidation, SCI's arguments … evolved significantly

after conferencing with the court."  **Appx19**.  As the CIT continued, "SCI

maintains that this issue is not moot because certain of its entries contain both

subject merchandise and non-subject merchandise ('mixed entries'), and argues

that these mixed entries may be inappropriately subject to duties as a result of

Commerce's instructions as applied to a suspension of liquidation covering the non-subject merchandise{,} … formally rais{ing} these arguments for the first time…" *Id.* The CIT concluded that, "{g}iven these circumstances and its discussions with the parties, … SCI's additional arguments on this issue are not properly before the court and are deemed forfeited." *Id.* These assertions by the CIT fail to recognize that SCI's arguments were presented fully to Commerce on the record (which was before the CIT on review) and then again fully to the CIT, both in briefing and subsequent telephonic conferences requested by the CIT on these issues. SCI consistently argued that suspension of liquidation cannot apply to "the product in question" (welded outlets) in entries made prior to the date of initiation of Commerce's scope inquiry.

### 3. SCI Did Not Forfeit Its Arguments on the Effective Date for Suspension of Liquidation Under Commerce's Remand Redetermination

As shown above, SCI clearly did *not* forfeit its arguments concerning the effective date for Commerce's suspension of liquidation in connection with the agency's (k)(2) remand redetermination. These arguments were present in SCI's filings on the record before Commerce and the CIT, and have been consistent throughout. SCI provided additional information to the CIT, at its request, during and subsequent to telephonic conferences, regarding whether or not SCI's arguments were moot in light of the evolving positions of the United States and

Vandewater below. However, such additional information did not fundamentally alter or withdraw SCI's arguments, nor was such information necessary for the CIT to reach the legal questions already contained in SCI's arguments. Thus, the CIT's finding that SCI forfeited its arguments fails to recognize that SCI's arguments were presented fully to Commerce (which became part of the record before the CIT) and then fully to the CIT, both in briefing and subsequent telephonic conferences requested by the CIT. Accordingly, SCI's arguments cannot accurately be described as forfeited, and the CIT abused its discretion in ruling that they were.

This Court has found forfeiture to occur when a party fails to timely assert a right. *In re Google Tech.*, 980 F.3d 858, 862 (Fed. Cir. 2020). For example, this Court found forfeiture to occur in cases where parties neglect to raise an issue in their principle or moving briefs, or raise an issue for the first time in a reply brief. *See Novosteel S.A. v. United States*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) (holding that because Novosteel presented the issue of retroactive application of antidumping duties for the first time in its summary judgment reply brief, instead of in its motion for summary judgment, Novosteel had waived (*i.e.*, forfeited) that argument). As explained by this Court, arguments raised untimely are deemed forfeited, in part, because of concerns for procedural fairness. For example, in *United States v. Ford Motor Co.*, the Court held that because Ford neglected to

raise a particular argument in its opening brief, and provided only a cursory

statement on the argument in its reply brief, Ford forfeited the argument on appeal.

*United States v. Ford Motor Co.*, 463 F.3d 1267, 1277 (Fed. Cir. 2006).  The Court

held that it would be "unfair" to review the argument on appeal because it was "an

argument to which the government had been given no opportunity to respond." *Id*.

Additionally, arguments that are not sufficiently developed or inadequately briefed

may be deemed forfeited.  *See, e.g., United States v. Great Am. Ins. Co. of N.Y.*,

738 F.3d 1320, 1328 (Fed. Cir. 2013) ("the government did no more than end its

brief with a prayer for the relief requested in the complaint and attach a proposed

order"), *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (noting that a

"skeletal 'argument', really nothing more than an assertion, does not preserve a

claim").

None of the above bases for finding an argument to be forfeited were present

for SCI's arguments on the effective date for suspension of liquidation stemming

from Commerce's (k)(2) remand redetermination.  SCI timely raised the arguments

before Commerce and the CIT (both in briefing and during telephonic

conferences).  Both the CIT and other parties to the proceeding below were aware

of and had opportunity to respond to SCI's arguments.  SCI's arguments were fully

and adequately presented.  Accordingly, the CIT's ruling that SCI forfeited its

arguments constitutes an abuse of discretion, and should be overturned by the

Court. *See Hohenberg Bros. Co. v. United States*, 301 F.3d 1299, 1303 (Fed. Cir. 2002) (an abuse of discretion occurs where the trial court's decision is clearly unreasonable, arbitrary or fanciful, or based on clearly erroneous findings of fact or erroneous conclusions of law); *United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d at 1326 (reviewing the lower court's forfeiture ruling based on an abuse of discretion standard).

In overturning the CIT, this Court should rule on the questions of law presented by SCI's arguments. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (stating that the matter of what questions may be taken up and resolved on appeal is left primarily to the discretion of the courts of appeal). This discretion is "especially appropriate" in cases that do not present new issues on appeal. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1322 (Fed. Cir. 2020). Alternatively, the Court should remand these questions to CIT for its consideration and ruling. *See, e.g., Trimed, Inc. v. Stryker Corp.,* 608 F.3d 1333, 1339 (Fed. Cir. 2010) (noting that although certain arguments were raised before the district court, because the district court did not address them, the Court would remand for full consideration).

## VII. Conclusion and Relief Requested

For all the reasons set forth above, we respectfully submit that this Court should find that:

1. the plain language of the AD Order's scope contains unambiguous terms that exclude welded outlets or, in the alternative,

2. the enumerated sources of 19 C.F.R. § 351.225(k)(1) exclude welded outlets from the AD Order's scope or, in the alternative,

3. should Commerce's final (k)(2) remand redetermination be upheld, Commerce may only impose suspension of liquidation as to unliquidated entries that entered on or after October 30, 2020, and that retroactive suspension on any entries made prior to that date is unlawful or, in the alternative,

4. the CIT should address SCI's arguments regarding the effective date for suspension of liquidation in Commerce's final (k)(2) remand redetermination and rule on that issue in the first instance.

Respectfully Submitted,

/s/ Gregory S. M<sup>c</sup>Cue
Gregory S. M<sup>c</sup>Cue
Zachary Simmons

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, DC  20036
(202) 429-6421

*Counsel to Smith-Cooper International, Inc.*

Dated: January 9, 2023

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1093, -1141

**Short Case Caption:** Vandewater International Inc. v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,556 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/09/2023

Signature: /s/ Gregory S. McCue

Name: Gregory S. McCue

**ADDENDUM 1**

tial evidence. On remand, however, if Commerce continues to add VAT and import duties to the natural gas benchmark, for a product that is not imported, Commerce must also explain why the methodology should be different for the phosphate rock benchmark.

## CONCLUSION

The court sustains Commerce's determination regarding Rosneft as a government authority and the <u>de facto</u> specificity finding, and utilization of a tier-three benchmark for natural gas. For the foregoing reasons, the court remands to Commerce for a determination consistent with this opinion on certain calculation issues and with regard to the phosphate rock input. The remand shall be issued within 60 days hereof. Comments may be filed 30 days thereafter and any response 15 days thereafter.



**VANDEWATER INTERNATIONAL INC., Plaintiff,**

**and**

**SIGMA Corporation, and Smith-Cooper International, Inc., Plaintiff-Intervenors,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Island Industries, Defendant-Intervenor.**

**Slip Op. 22-104**

**Court No. 18-00199**

United States Court of International Trade.

September 8, 2022

**Background:** Importer filed suit, in which other importers intervened, challenging

determination of Department of Commerce that importer's steel branch outlets used to join sections in fire sprinkler systems were within scope of antidumping duty order on carbon steel butt-weld pipe fittings (BWPF) from People's Republic of China. The Court of International Trade, 476 F.Supp.3d 1357, remanded for redetermination. On remand, Commerce again determined outlets were within scope of BWPF order. Plaintiffs challenged redetermination.

**Holdings:** The Court of International Trade, Leo M. Gordon, J., held that:

(1) finding that physical characteristics of outlets and BWPFs subject to order were similar was reasonable, as factor in favor of determination that outlets were within order's scope;

(2) finding that outlets and other BWPF were similarly expected by purchasers to be welded into permanent, fixed piping systems for gases or liquids was reasonable, as factor in favor of determination that outlets were within order's scope;

(3) finding that outlets and BWPF were similarly used to be permanently welded into fire sprinkler systems was reasonable, as factor in favor of determination that outlets were within order's scope;

(4) finding that channels of trade for outlets and BWPF were similar was reasonable, as factor in favor of determination that outlets were within order's scope; and

(5) finding that outlets and BWPF were similarly advertised was reasonable, as factor in favor of determination that outlets were within order's scope.

Affirmed.

**1. Customs Duties ⇐84(6)**

When reviewing agency determinations, findings, or conclusions for substantial evidence, the Court of International Trade assesses whether the agency action is reasonable given the record as a whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⇐21.5(5)**

Finding of the Department of Commerce, that the contoured edges of importer's steel branch outlets that connected to the midsection of a pipe constituted butt-weld pipe fittings (BWPF), was reasonable, as factor that weighed in favor of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce's product specification sheets described its female threaded outlet and grooved outlet as having "butt welding ends," and product catalog from a domestic producer with illustrations of basic shapes of BWPFs included a product that had a contoured edge and was connected to the midsection of a pipe. 19 C.F.R. § 351.225(k)(2)(ii).

**3. Customs Duties ⇐21.5(5)**

Finding of the Department of Commerce, that a butt-weld pipe fitting (BWPF) need not have an end-to-end connection, was reasonable, as factor that weighed in favor of Commerce's determination on remand that importer's steel branch outlets used to join sections in fire sprinkler systems were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; even though Commerce had found in a prior proceeding investigating forged steel fittings from China, Italy, and Taiwan that butt weld fittings could only have butt welded end connections, product catalogs on the record supported the finding that there was a broader understanding of the term "butt-weld," and that BWPFs were intended to be covered by the order. 19 C.F.R. § 351.225(k)(2)(ii).

**4. Customs Duties ⇐21.5(5)**

Finding of the Department of Commerce, that saddles were a type of butt-weld pipe fitting (BWPF) that had physical characteristics comparable to importer's steel branch outlets used to join sections in fire sprinkler systems, was reasonable, as factor that weighed in favor of Commerce's redetermination that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; importer's petition included illustrations of various types of butt-weld fittings including an illustration of saddles as a type of BWPF, catalog page in the petition displayed numerous products that were unambiguously BWPFs, including products shown before and after saddles, and image containing the saddle illustration also contained an image of a cap, which was an in-scope BWPF. 19 C.F.R. § 351.225(k)(2)(ii).

**5. Customs Duties ⇐21.5(5)**

Department of Commerce's consideration of expert report in support of importer's position that its steel branch outlets were not butt-weld pipe fittings (BWPF) was reasonable, in importer's action challenging determination on remand that its outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; even though Commerce did not adopt the position recommended in the report, Commerce repeatedly referenced the report, highlighting that various aspects of the report supported Commerce's ultimate findings, and Commerce explained that it would not place greater weight on the expert report created for the purpose of litigation than the other evidence on the record indicating that outlets were BWPFs. 19 C.F.R. § 351.225(k)(2)(ii).

**6. Customs Duties ⟊21.5(5)**

Finding of the Department of Commerce, that the physical characteristics of importer's steel branch outlets were indistinguishable from butt-weld pipe fittings (BWPF) even though there were separate industry standards governing branch outlets and BWPFs, was reasonable, as factor that weighed in favor of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; outlet standard was a nonexclusive standard with substantial overlap with the BWPF standard, and importer's outlets were physically identical to the products described in the first sentence of the antidumping order. 19 C.F.R. § 351.225(k)(2)(ii).

**7. Customs Duties ⟊21.5(5)**

Finding of the Department of Commerce, that the physical characteristics of importer's steel branch outlets were similar to butt-weld pipe fittings (BWPF) even though importer's outlets were imported under a separate subheading of the Harmonized Tariff Schedule of the United States (HTSUS), was reasonable, as factor that weighed in favor of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce considered the relevance of the different HTSUS classifications, and explained that the outlet's physical characteristics indicated that they were in scope, as outlets were formed or forged, made of carbon steel, had a diameter of less than 14 inches, and had one butt-welded end with a beveled edge. 19 C.F.R. § 351.225(k)(2)(ii).

**8. Customs Duties ⟊21.5(5)**

Department of Commerce's finding, that importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similarly expected by purchasers to be welded into permanent, fixed piping systems for gases or liquids, was reasonable, as factor that weighed in favor of Commerce's determination on remand that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce found that, although certain types of BWPFs could be designed to handle high-pressure systems, fire protection sprinkler systems were a contemplated application of BWPFs, which was the intended application for importer's outlets, and importer acknowledged that some sprinkler systems could use BWPFs for run pipes, to which branch connections were attached. 19 C.F.R. § 351.225(k)(2)(ii).

**9. Customs Duties ⟊21.5(5)**

Department of Commerce's finding, that importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similarly used to be permanently welded into fire sprinkler systems, was reasonable, as factor that weighed in favor of Commerce's determination on remand that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; International Trade Commission found that BWPFs were commonly found in automatic fire sprinkler systems, and Commerce determined that even if outlets and other BWPFs did not have identical functions, the uses of outlets and other BWPFs were similar, as they both were permanently welded into automatic fire sprinkler systems to change or divide the flow of water. 19 C.F.R. § 351.225(k)(2)(ii).

**10. Customs Duties ⟊21.5(5)**

Department of Commerce's finding, that the channels of trade for importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similar, was reasonable, as factor that weighed in favor of Commerce's determination on remand

that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; even though importer's outlets were used to join sections in fire sprinkler systems, and were typically sold to a particular type of contractor given their targeted application, both outlets and other BWPFs were sold through distributors and to fabricators and contractors. 19 C.F.R. § 351.225(k)(2)(ii).

**11. Customs Duties** ⚖=21.5(5)

Department of Commerce's finding, that importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similarly advertised via online catalogs in company websites or affiliated or third-party online sources, was reasonable, as factor that weighed in favor of Commerce's redetermination that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce found that outlets were explicitly referenced in advertising materials as having butt-weld ends and were displayed side by side, and even though certain advertisements for outlets did not contain the term "butt-weld ends," record showed that the term "butt-weld" was not a standard term nor commonly used, and, therefore, was not used in certain advertisements. 19 C.F.R. § 351.225(k)(2)(ii).

**12. Customs Duties** ⚖=84(1)

Intervenor-importer forfeited for review argument that government should not be able to apply antidumping duties to welded steel branch outlets contained in entries that were previously suspended for reasons unrelated to petitioner-importer's challenge to Department of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel butt-weld pipe fittings (BWPF) from People's Republic of China; intervenor raised argument for the first time in the context of responding to petitioner's consent motion to amend its statutory injunction, but argument did not appear in intervenor's remand comments, and were not raised before Commerce in the course of the remand.

———

Richard P. Ferrin, D. Alicia Hickok, and Douglas J. Heffner, Faegre Drinker Biddle & Reath, LLP of Washington, D.C., for Plaintiff Vandewater International, Inc.

Lucius B. Lau, Walter Spak, and Ron Kendler, White & Case LLP of Washington, D.C., for Plaintiff-Intervenor SIGMA Corporation.

Gregory S. McCue and Zachary Simmons, Steptoe & Johnson LLP of Washington, D.C., for Plaintiff-Intervenor Smith-Cooper International, Inc.

Joshua E. Kurland, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant United States. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel was Saad Y. Chalchal, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, D.C.

Matthew J. McConkey, Mayer Brown LLP of Washington, D.C., for Defendant-Intervenor Island Industries.

## OPINION

GORDON, Judge:

This action involves the scope of the antidumping duty order on Carbon Steel

Butt-Weld Pipe Fittings ("BWPFs") from the People's Republic of China that covers: carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("China BWPFs Order"). Plaintiff Vandewater International Inc. ("Vandewater") sought a scope ruling from the U.S. Department of Commerce ("Commerce") as to whether its products, steel branch outlets used to join sections in fire sprinkler systems, were covered by the China BWPFs Order. Commerce determined that these products were within the scope of the China BWPFs Order. See Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, ECF No. 25-4 (Dep't of Commerce Sept. 10, 2018) (final scope ruling on Vandewater's steel branch outlets) ("Final Scope Ruling"). Plaintiff-Intervenors SIGMA Corporation ("SIGMA") and Smith-Cooper International, Inc. ("SCI") similarly sought scope rulings from Commerce excluding their respective outlet products from the

China BWPFs Order. And, as with Vandewater, Commerce determined that SIGMA and SCI's outlet products were covered by the China BWPFs Order. See Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, Court No. 19-00003, ECF No. 29-4 (Dep't of Commerce Dec. 11, 2018) (final scope ruling on SIGMA's fire-protection weld outlets); Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, Court No. 19-00011, ECF No. 29-4 (Dep't of Commerce Dec. 10, 2018) (final scope ruling on SCI's cooplet weld outlets). Plaintiffs collectively now challenge Commerce's determinations that their respective outlet products fall under the scope of the China BWPFs Order.[1]

The court presumes familiarity with the history of this action. See Vandewater Int'l, Inc. v. United States, 44 CIT ——, 476 F. Supp. 3d 1357 (2020) ("Vandewater I"). In Vandewater I, the court held that "Commerce unreasonably concluded that the sources in 19 C.F.R. § 351.225(k)(1) were dispositive on the inclusion of Plaintiff's steel branch outlets within the Order," and remanded the matter to Commerce "to conduct a full scope inquiry and evaluate the factors under 19 C.F.R. § 351.225(k)(2)." Vandewater I, 44 CIT at ——, 476 F. Supp. 3d at 1359.

Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 112 ("Remand Results"), filed pursuant to Vandewater I. On remand, Commerce "continue[d] to find that Vandewater's outlets are within the scope of the China BWPFs Order pursuant to an analysis under the (k)(2) criteria." See Remand Results at 2. Plaintiffs

---

1.  Plaintiffs all commenced their own individual actions—Vandewater (Court No. 18-00199); SIGMA (Court No. 19-00003); and SCI (Court No. 19-00011). Because each action had its own administrative record, the court did not consolidate the three actions. However, for litigation efficiency, the court permitted SIGMA and SCI to intervene in this action and brief the merits.

challenge that determination. See Comments of Vandewater in Opp'n to Commerce's Remand Redetermination, ECF No. 133 ("Vandewater Comments"); SIGMA's Comments in Opp'n to Remand Results, ECF No. 132 ("SIGMA Comments"); Comments of SCI in Opp'n to Commerce's Remand Redetermination, ECF No. 134 ("SCI Comments"); see also Defendant's Response to Comments on the Remand Results, ECF No. 144 ("Def.'s Resp."); Defendant-Intervenor's Response to Comments on the Remand Results, ECF No. 146. SCI's comments focused on challenging as unlawful Commerce's determination that it would "continue" to suspend liquidation of Plaintiffs' entries that pre-date the initiation of the underlying scope inquiry. See SCI Comments at 2–14. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi)[2] , and 28 U.S.C. § 1581(c) (2018). For the reasons set forth below, the court sustains Commerce's analysis and scope determination in the Remand Results.

## I. Standard of Review

**[1]**  The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the

record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Dupont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131, (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2022). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022).

## II. Discussion

### A. Framework of 19 C.F.R. § 351.225(k)

Scope proceedings are governed by 19 C.F.R. § 351.225. Commerce may self-initiate a scope proceeding, see § 351.225(b), or an interested party may submit a request for a scope ruling, see § 351.225(d). In determining whether a product is covered by the scope of an order, Commerce will consider the "language of the scope and may make its determination on this basis alone if the language of the scope, includ-

---

**2.** Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of

Title 19 of the U.S. Code, 2018 edition.

ing the descriptions of the merchandise expressly excluded from the scope, is dispositive." 19 C.F.R. § 351.225(k)(1). Additionally, Commerce may consider the following interpretive sources in making its determination—the descriptions of the merchandise contained in the petition pertaining to the subject order, the initial investigation, and Commerce's prior or concurrent determinations, including prior scope determinations pertaining to the subject order, and other orders with similar language, and determinations of the U.S. International Trade Commission ("ITC") regarding the subject order. § 351.225(k)(1)(i). If the (k)(1) sources are not dispositive, then Commerce is to conduct a full scope inquiry and consider the additional criteria in § 351.225(k)(2)—namely, (1) the product's physical characteristics, (2) ultimate purchasers' expectations, (3) the ultimate use of the product, (4) trade channels in which the product is sold, and (5) the manner in which the product is advertised and displayed. § 351.225(k)(2). At the conclusion of its scope inquiry, Commerce will issue a final scope ruling. § 351.225(h). As noted previously, the court, in Vandewater I, rejected Commerce's determination that the (k)(1) sources were dispositive, and directed Commerce to conduct a full scope inquiry and evaluate the additional criteria provided under § 351.225(k)(2). See Remand Results at 9–10.

### B. Commerce's Analysis Under 19 C.F.R. § 351.225(k)(2)

After evaluating the (k)(2) criteria, Commerce determined that Vandewater's steel branch outlets are sufficiently similar to unambiguous examples of subject merchandise and that the record supported the determination that Vandewater's products fell within the China BWPFs Order. See Remand Results at 45–96. Specifically, Commerce found that:

(i) steel branch outlets possess physical characteristics that are similar to other subject merchandise because they are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and are designed to have at least one end with a beveled edge for permanent attachment to a pipe or fitting (id. at 45–54);

(ii) the expectations of ultimate purchasers of steel branch outlets and other subject merchandise are similar because they expect both to be welded into permanent, fixed piping systems for gases or liquids, and fire sprinkler systems are a contemplated application for subject merchandise (id. at 54–57);

(iii) the ultimate uses of steel branch outlets and other subject merchandise are similar because both are permanently welded to piping systems to change or divide the flow of liquids, e.g., redirecting water in an automatic fire sprinkler system (id. at 58–60);

(iv) steel branch outlets and other subject merchandise are sold in similar channels of trade because they are both sold through distributors and to fabricators and contractors (id. at 60); and

(v) steel branch outlets and other subject merchandise are similarly advertised and displayed in online catalogs (id. at 60–62).

Plaintiffs challenge Commerce's findings on each of the (k)(2) criteria as unreasonable. See Vandewater Comments; SIGMA Comments; SCI Comments.

### 1. Physical Characteristics

Commerce found that "the physical characteristics of outlets and BWPFs subject to the China BWPFs Order are similar." Remand Results at 45. Specifically, Commerce concluded that the scope language in the China BWPFs Order "indicates that subject merchandise must be

formed or forged, made of carbon steel, and have a diameter of less than 14 inches." Id. Commerce further found that "to be an in-scope 'butt-weld pipe fitting,' the merchandise must be designed to have at least one end with a beveled edge, whether contoured or not, for permanent attachment to at least one pipe or fitting and may have a temporary connection on another end." Id. Based on the record, Commerce determined that Vandewater's outlets meet these criteria. Id. at 46 ("the record demonstrates that Vandewater's outlets are consistent with BWPFs in terms of manufacturing method (i.e., formed/forged), material (i.e., carbon steel forged steel bars or welded pipe), and size requirements (i.e., less than 14 inches in inside diameter). Like all BWPFs, the outlets feature a beveled edge for permanent attachment to a pipe or fitting.").

Plaintiffs argue that the physical characteristics of subject BWPFs are distinct from Vandewater's outlets. Plaintiffs focus much of their argument, both in the proceeding below and in this action, on the differences between the physical characteristics of their outlets and the subject BWPFs, as this prong of the (k)(2) analysis is critical. See 19 C.F.R. § 351.225(k)(2)(ii) (providing that "[i]n the event of a conflict between the factors under paragraph (k)(2)(i) of this section, [the physical characteristics factor] will normally be allotted greater weight than the other factors").

### a. End-to-End Connection

Plaintiffs first contend that a "butt weld is—by definition—an end-to-end welded connection," and maintain that Commerce cannot reasonably defend its finding that "contoured edges that connect to the mid-section of a pipe [constitute] butt-weld pipe fittings." See Vandewater Comments at 3, 11. Plaintiffs further maintain that Commerce disregarded evidence supporting the conclusion that a BWPF is "intended to be an end-to-end connection." See id. at 9–11. They emphasize that information in the Petition, as well as the ITC's 2016 Sunset Review of the China BWPFs Order, supports their position. Id.; see also Vandewater I, 44 CIT at ——, 476 F. Supp. 3d at 1362 (agreeing with Plaintiffs that product descriptions of covered merchandise from 2016 ITC Sunset Review and Petition, particularly as to "beveling on both parts of the assembled piping," did not reasonably support Commerce's conclusion that (k)(1) sources dispositively demonstrated that steel branch outlets are covered by China BWPFs Order). With respect to the product catalogs and specification sheets relied on by Commerce, Plaintiffs argue that this "out-of-context" information cannot serve as a reasonable basis for Commerce's conclusion that BWPFs do not require end-to-end connections. Id. at 11–15. Plaintiffs stress that various distinctions in the wording and description of outlets as compared to BWPFs demonstrate that the sources relied upon by Commerce cannot reasonably provide a "sufficient basis for determining the meaning of a 'butt-welded' pipe fitting, as found within the scope." Id. at 12.

Plaintiffs also dispute Commerce's reading of the term "butt-weld" in those sources, maintaining that off-hand references to the term "butt-weld" is not indicative of industry recognition that outlets are BWPFs that would fall under the scope of the China BWPFs Order. Id. at 12–14. Ultimately, Plaintiffs ask the court to hold that Commerce erred in determining the meaning of "butt-weld" (i.e., that BWPF may have a "contoured edge that connects [the product] to the midsection of the header or run pipe") on the basis of an inference from the use of that term in product catalogs and specification sheets found in the record. Instead, Plaintiffs

would have Commerce determine that a BWPF may only involve an "end-to-end connection" on the basis of a reasonable inference from other information on the record, including the offered opinion of an expert submitted by Vandewater and the findings by the ITC in its 2016 Sunset Review. Id.

**[2]** In rejecting Plaintiffs' arguments, Commerce found that "the record evidence establishes that products with a contoured edge that are designed to connect to the mid-section of a pipe can be BWPFs." Remand Results at 47. Specifically, Commerce found that "[i]n its product specification sheets, Aleum USA, a U.S.-based distributor of outlets, describes its female threaded outlet and grooved outlet as having "[b]utt welding ends." Id. (further noting that "[l]ike Vandewater's outlets, Aleum USA's outlets have one threaded or grooved end and a contoured edge on the other end that is connected to the middle of another pipe."). Commerce also highlighted that "[t]he exhibits accompanying the Petition included a product catalog from a U.S. producer of the domestic like product with illustrations of basic shapes of BWPFs (under the heading 'seamless welded fittings') and among them is a product that is referred to as a saddle, which, like Vandewater's outlets, has a contoured edge and is connected to the midsection of a pipe." Id. (adding that "the current version of the same U.S. producer's product catalog continues to include saddles as a type of 'seamless welded fitting,' and the product is displayed side-by-side with a full range of other BWPFs" and that "the product catalog for a major U.S. distributor of pipes and fittings also includes a saddle as one of the various 'standard butt weld fitting types.' "). Consequently, Commerce determined that "the contoured edge that connects Vandewater's outlets to the midsection of the head-

er or run pipe is not a physical characteristic that distinguishes the outlets from BWPFs that are subject to the scope of the China BWPFs Order, such as saddles." Id. at 48. Given the record, the court cannot agree with Plaintiffs that Commerce's determination here was unreasonable.

Plaintiffs further contend that Commerce failed to appreciate the importance of the angle of the beveled edges in analyzing the physical characteristics of subject outlets and BWPFs. See Vandewater Comments at 11 (arguing that BWPFs are required to have end-to-end connections that "impact[ ] the very shape of the fitting itself, requiring ends that are beveled at a 37.5 degree angle"). To the contrary, Commerce found that the China BWPFs Order contains no specifications as to any particular bevel angle for subject BWPFs. Remand Results at 48.

Plaintiffs now argue that Commerce's reasoning is "detached from reality and the record evidence." Vandewater Comments at 11. The court disagrees. While Commerce agreed that the "Petition and prior ITC determinations state that the beveled edges of BWPFs distinguish BWPFs from other pipe fittings," Commerce highlighted that "none of these sources indicate that the edge must be beveled at a particular angle for the fitting to be considered a BWPF." Remand Results at 48. Commerce explained that adopting Plaintiffs' suggestion that a BWPF requires a specific bevel angle for proper installation would result in an "end-use requirement for subject merchandise" that would inappropriately be based on the "physical characteristics of the recipient pipe, rather than on the physical characteristics of the outlets in question." Id. at 49. Since Plaintiffs ultimately fail to demonstrate that Commerce's determination is unreasonable, the court rejects their arguments that Commerce did not reasonably

account for the importance of the bevel angle in analyzing the subject outlets and BWPFs.

**b. Forged Steel Fittings Comparison**

Plaintiffs further maintain that Commerce's finding that a BWPF need not have an end-to-end connection is unreasonable in light of Commerce's finding in a prior proceeding that "butt weld fittings can only have butt welded end connections." See Vandewater Comments at 15–16 (quoting final scope decision memorandum from investigations of Forged Steel Fittings from China, Italy, and Taiwan, PR [3] 21 at Tab 8 (Dep't of Commerce July 13, 2018)). As Commerce explained, to qualify as "butt weld outlets" or "butt weld fittings" that would be excluded from the scope of the Forged Steel Fittings investigations, "butt weld outlets must be butt welded at both end connections to be excluded from the scope of the investigations." Id. at 15 (further quoting with emphasis Commerce's statement that "[o]utlets with a socket-weld or threaded end connection, or with only one butt weld end connection, are not considered a butt weld fitting and, therefore, are not excluded from the scope of the investigations"). Plaintiffs maintain that Commerce's "detailed discussion" of the nature of butt weld fittings in that prior scope memorandum "should be the end of the matter" as "Vandewater's grooved and threaded welded outlets are not butt-weld pipe fittings because their end connections on the run side are grooved or welded, not butt-weld end connections." Id. at 16.

[3] Plaintiffs' argument falls short, however, because the scope exclusion guidelines Commerce determined in the Forged Steel Fittings investigation do not neatly correspond to the scope of products covered under the China BWPFs Order. See Remand Results at 85 n.539 (noting that "construction of an exclusion in a separate proceeding is not determinative here" and further finding "that Vandewater's outlets do, in fact, feature a butt-welded connection to the run pipe."). As Plaintiffs acknowledge, Commerce found that products such as caps and lap joint stub ends, which would not meet the narrow definition of BWPFs under the Forged Steel Fittings exclusion guidelines, nevertheless are plainly within the scope of the China BWPFs Order. See Vandewater Comments at 16–17.

Plaintiffs argue that Commerce may not differ in defining what constitutes BWPFs in its Forged Steel Fittings analysis versus the (k)(2) analysis here. However, that argument ignores the different purposes and records undergirding the two analyses. As Commerce noted, accepting Plaintiffs' narrow definition of BWPFs and strictly abiding by the Forged Steel Fittings analysis would require it to ignore the product catalogs on the record that plainly support the finding that there is broader understanding of the term "butt-weld" and BWPFs intended to be covered by the China BWPFs Order. See Remand Results at 85. Accordingly, Commerce's analysis of butt weld fittings in the Forged Steel Fittings investigations does not control here, nor did Commerce act unreasonably in determining a broader definition for BWPFs in this matter than was used to determine scope exclusions in the Forged Steel Fittings investigations.

**c. Product Comparisons**

Much of the parties' disagreement about physical characteristics stems from Commerce's comparison of the subject outlets to other products described in the record

---

**3.** "PR ___" refers to a document contained in the public administrative record, which is found in ECF No. 131-1 unless otherwise noted.

that appear to be covered as BWPFs by the China BWPFs Order, including caps, lap joint stub ends, and saddles. See Remand Results at 83–89 ("We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles)."). Though Plaintiffs maintain that various physical characteristics of outlets make them unique from BWPFs, Commerce addressed each potentially distinguishable physical characteristic raised and found that other products covered by the China BWPFs Order also had the physical characteristics that Plaintiffs claimed were exclusive to outlets and not found in BWPFs. Commerce explained why it rejected Plaintiffs' preferred findings, noting that:

> this line of argument, downplaying the similarity between outlets and caps, for instance, reflects a broader flaw in the importers' arguments throughout their comments – they continue to attempt to artificially narrow the scope of the China BWPFs Order by pointing to subsets of subject merchandise (or subsets of uses/expectation, as discussed below) in their analysis. This is incorrect. In our (k)(2) analysis, we must assess physical similarities between outlets and other in-scope merchandise; this includes cap, lap joint stub ends, elbows, and the variety of fittings that fall within the greater heading of BWPFs.

Remand Results at 88.

[4]   In their remand comments, Plaintiffs continue to attempt to distinguish subject outlets from caps, lap joint stub ends, saddles, and other similar products considered to be BWPFs based on their physical characteristics, see Vandewater Comments at 16–17, while maintaining that Commerce erred in assuming saddles to be BWPFs. Id. at 17–18 ("While it is dispositive that Vandewater's threaded and grooved outlets have zero connections capable of being butt welded, it merits emphasis that a saddle is not a butt-weld pipe fitting.").[4] In arguing that saddles are not a type of BWPF, Vandewater focuses on the distinct "function" of saddles from other BWPFs. In so doing, Vandewater fails to engage with evidence on the record plainly supporting Commerce's finding that saddles are a type of BWPF. See, e.g., Remand Results at 47 n.335 (noting that Petition identifies that "Butt-weld fittings come in several basic shapes: 'elbows', 'tees', 'caps', and 'reducers' . . . Illustrations of the various types of butt-weld fittings are attached at Appendix B," and that Appendix B includes "an illustration of 'saddles' as a type of BWPF"). Commerce specifically explained that it disagreed with "Vandewater['s assertion] that saddles are not BWPF, and that it was merely coincidence that the image of a saddle was included among BWPFs in the petition." Id. (explaining that "[t]he catalog page in the Petition displays numerous products that are unambiguously BWPFs, including products shown before and after saddles, e.g., elbows," and further noting that "the subsection of the image containing the saddle illustration also contains an image of a cap, which is clearly an in-scope BWPF."). In light of the record, the court concludes that Commerce reasonably iden-

---

**4.** Notably, here there appears to be some disagreement between Vandewater and SIGMA that saddles may constitute BWPFs. Vandewater maintains that saddles are not BWPFs, while SIGMA acknowledges that saddles are BWPFs, but does not agree that any physical

similarities between outlets and saddles reasonably justifies a finding that outlets share the same physical characteristics as BWPFs. See Vandewater Comments at 17–18; SIGMA Comments at 7–8.

tified saddles as a type of BWPF that has physical characteristics comparable to the subject outlets.

#### d. Sperko Report

**[5]** Plaintiffs also contend that Commerce failed to fully consider the report of Walter Sperko, President of Sperko Engineering Services, Inc., who provided his expert opinion in support of Plaintiffs' position that the subject outlets are not BWPFs. See Vandewater Comments at 3–9; Remand Results at 27 n.185 (identifying Mr. Sperko). Plaintiffs maintain that "Commerce's disregard of the substance and sources relied on in the Sperko Declaration, except for . . . two offhand and inaccurate references . . . show that Commerce's conclusion was not based on substantial evidence." Vandewater Comments at 9; see also SIGMA Comments at 7 ("the Redetermination contains no meaningful discussion of the expert report of Walter Sperko, P.E. – to which SIGMA, Vandewater, and SCI all cited in their comments prior to Commerce's issuance of the remand."). Plaintiffs' arguments, however, do not address other evidence on the record that supports Commerce's determination. As Commerce explained:

> Ultimately, the importers ask us to ignore the product catalog of Aleum USA and Bonney Forge (the latter of which was placed on the record by Vandewater) and to place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit placed on the record for the purpose of this litigation. We decline to do so, and we note that Commerce regularly considers whether documents are prepared in the ordinary course of business—or prepared specifically for the administrative proceeding—in determining the appropriate weight to accord to record evidence. Moreover, as discussed elsewhere in these final results, we find

that portions of the affidavits support our conclusion regarding the scope status of Vandewater's outlets.

Remand Results at 85–86. While Plaintiffs criticize Commerce for failing to adopt the position recommended by Mr. Sperko, the court does not agree that Commerce "disregarded" or otherwise failed to consider the information in the Sperko report. See Vandewater Comments at 4 n.2 (arguing that "Commerce addresses the Sperko Declaration only superficially in footnote 542 . . ."). Rather, it appears that Commerce repeatedly referenced the Sperko report, highlighting that various aspects of the report actually supported Commerce's ultimate findings on the factors. See, e.g., Remand Results at 49, 86, 88, 91.

As noted above, Commerce refused to afford dispositive weight to Mr. Sperko's views, explaining that the agency would not "place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit placed on the record for the purpose of this litigation" than on the other evidence on the record. Id. at 85–86. Plaintiffs maintain that Commerce unreasonably failed to credit Mr. Sperko's affidavit, despite its preparation in anticipation of litigation, as such a rationale is "inconsistent with Federal Rule of Evidence 702." See Vandewater Comments at 4–6. Plaintiffs offer no explanation, however, for why or how the Federal Rules of Evidence apply to Commerce's administrative determinations or its discretionary decision-making in determining the appropriate weight to accord the evidence on the record. See id. at 5 n.3 ("Although F.R.E. 702 is not binding on the factfinder here (Commerce), the underlying principles should guide Commerce, and this Court in its role in vetting Commerce's fact-finding for substantial evidence."). Accordingly, the court sustains

Commerce's consideration of the Sperko report.

### e. Industry Standards

Vandewater argues that "[t]hroughout the administrative proceeding, Vandewater has consistently emphasized that a critical difference between outlets and butt-weld pipe fittings is that outlets meet the MSS-SP-97 industry standard, which is different from the ANSI/ASME B16.9 specification that governs butt-weld pipe fittings." Vandewater Comments at 18–19. Commerce rejected Plaintiffs' proposed distinction of outlets from in-scope BWPFs on the basis of these different industry standards, finding that adopting Plaintiffs' position would give "undue significance" to these industry standards. See Decision Memorandum at 91. Commerce further noted that "MSS SP-97 is a 'non-exclusive standard' and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME." Id. at 94. Commerce emphasized that it found the two standards at issue to "reflect substantial overlap in terms of attributes, and in turn expectations, for outlets and BWPFs." Id. at 91.

Plaintiffs maintain that Commerce's conclusion that a product could conform to both ANSI/ASME B16.9 and MSS SP-97 standards "would render those standards meaningless," and is therefore unreasonable. See Vandewater Comments at 20; SIGMA Comments at 3–7 ("Industry standards exist to define distinct products; the idea that a product could conform to multiple industry standards, thereby re-categorizing that product, would effectively render those standards meaningless."). Plaintiffs also highlight that Commerce has previously relied on distinctions in industry standards for excluding products from the China BWPFs Order. See SIGMA Comments at 5 (noting that "the CAFC has affirmed Commerce's reliance

on discrete industry standards in a separate scope proceeding concerning the exact same order as the one at issue in this appeal" (citing King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012))).

[6] The court again disagrees. Plaintiffs' arguments reflect an unwillingness to engage with Commerce's uncontradicted finding that the MSS SP-97 is a "non-exclusive standard" with "substantial overlap" of the ANSI/ASME B16.9 standard. Though Plaintiffs are correct that Commerce has relied on industry standards as one relevant consideration in concluding that certain products should be included under the China BWPFs Order, Plaintiffs ignore the fact that Commerce also found that the merchandise at issue to be "physically identical to the products described in the first sentence of the [China BWPFs Order]." See SIGMA Comments at 5 (quoting King Supply Co., LLC, 674 F.3d at 1347). Additionally, while King Supply supports the proposition that Commerce does consider industry standards in reaching its determinations as to the scope of the China BWPFs Order, it does not support Plaintiffs' follow-on proposition that products that do not fall within the industry standards should automatically be excluded from the China BWPFs Order. See id. at 6 (arguing that "[i]t follows that, where a product is neither physically identical to the products described in the Order, nor produced according to these industry standards, it will not fall within the scope of the Order."). Ultimately, Plaintiffs urge the court to conclude that Commerce should have reached a different conclusion based on an inference that the different industry standards serve to establish distinct product categories. Commerce refused to draw Plaintiffs' preferred inference, and instead determined that the "substantial overlap" in the similarities of

those standards did not support a distinction between the subject outlets and BWPFs. Decision Memorandum at 91, 94.

Plaintiffs offer what may well be a reasonable conclusion. This issue presents a close question. However, for Plaintiffs to establish that Commerce's analysis of the physical characteristics of BWPFs and outlets was unreasonable, they must demonstrate that their preferred outcome was the "one and only reasonable" conclusion Commerce could reach in light of the record. See Pokarna Engineered Stone Ltd. v. United States, 45 CIT ——, ——, 547 F. Supp. 3d 1300, 1308 (2021) ("A party's ability to point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination."); see also Mitsubishi Heavy Indus. Ltd. v. United States, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (quoting Consolidated Edison, Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). This Plaintiffs did not do. Accordingly, the court cannot agree that Commerce unreasonably rejected Plaintiffs' arguments seeking to distinguish outlets from BWPFs based on industry standards.

**f. HTSUS Subheadings**

Plaintiffs also challenge Commerce's finding that their outlets and BWPFs have similar physical characteristics even though their outlets are imported under a separate HTSUS subheading from BWPFs. See Remand Results at 54. Commerce first noted that "HTSUS subheadings listed in the scope are not dispositive." Id. (citing Smith Corona Corp. v. United States, 915 F.2d 683, 687 (Fed. Cir. 1990), as well as the language of the China BWPFs Order stating: "Although the

{HTSUS} subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive"). Commerce further explained that it did consider this distinction in HTSUS classifications in its analysis, but ultimately found that "the mere fact that Vandewater's outlets are imported under a different subheading within the same chapter and heading of the HTSUS as the subheading listed in the scope does not necessarily require Commerce to conclude that the outlets have physical characteristics that are distinguishable from subject merchandise." Id. While Commerce acknowledged that Plaintiffs' position was supported by a prior Customs Ruling, it determined that "in light of our broader analysis regarding physical characteristics of in-scope merchandise – including the characteristics of Vandewater's outlets in particular – [the] ruling does not warrant arriving at a different conclusion here." Id. Plaintiffs maintain that the HTSUS classifications are "corroborating evidence that confirms" the correctness of their position that outlets are outside of the scope of the China BWPFs Order. See Vandewater Comments at 22. Thus, in Plaintiffs' view, Commerce unreasonably "disregard[ed]" the different HTSUS classifications in conducting its (k)(2) analysis. Id.

[7]  Plaintiffs' argument is not sustainable. Commerce expressly acknowledged that it considered the relevance of the different HTSUS classifications but concluded that this distinction was insufficient in light of the totality of the record to support a determination that "the outlets have physical characteristics that are distinguishable from subject merchandise." See Remand Results at 54. In reaching its conclusion, Commerce explained that "with respect to physical characteristics, we find that Vandewater's outlets are formed or

forged, made of carbon steel, have a diameter of less than 14 inches, and have one butt-welded end with a beveled edge suitable for permanent attachment to a piping system that conveys gas or liquid. We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles)." Remand Results at 89. Thus, given the record, the physical characteristics factor supports the reasonableness of Commerce's scope determination.

**2. Expectations of Ultimate Purchasers**

Commerce found that "the ultimate purchaser's expectations regarding the uses of outlets and other BWPFs are similar." Remand Results at 55. Specifically, Commerce observed that "[b]oth outlets and BWPFs are used in fire sprinkler systems (among other types of piping systems), are subject to similar, and in some cases overlapping, industry standards, and are sold according to standard sizes." Id. at 57. Commerce also determined that "the record does not reveal that customers would have a significantly different expectation regarding the installation costs for outlets and BWPFs." Id. During the remand, Plaintiffs challenged the reasonableness of these findings, highlighting "four main expectations of ultimate purchasers that purportedly differ across the products: (1) compliance with a particular industry standard; (2) custom vs. standard sizing; (3) whether the product can be used in fire sprinkler systems; and (4) installation costs." Id.

Contrary to Plaintiffs' argument, Commerce found consistency across the expectations of ultimate purchasers of outlets and other BWPFs. Specifically, Commerce noted that "[o]utlets and other BWPFs

are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems." Id. at 90. Commerce further observed that "the fact that Vandewater's outlets have a temporary connection on one end is not a feature that distinguishes outlets from other in-scope merchandise, and, therefore, does not change consumer's expectations regarding the product." Id. Commerce also rejected Vandewater's argument that Commerce should defer to the opinion of Vandewater's expert witness, Walter Sperko, "rather than the other sources on the record, such as the ITC report, to ascertain the expectations of consumers and users." Id. As noted previously, Commerce refused to afford significant weight to the expert opinion affidavit submitted by Vandewater, explaining that Commerce did not "find that the affidavit represents more reliable evidence than other record evidence . . . ." Id.

Plaintiffs now challenge Commerce's finding that "[o]utlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids," as unreasonable. See Vandewater Comments at 23 (quoting with emphasis Remand Results at 90). In particular, Vandewater contends that the record "demonstrates conclusively that Vandewater's outlets are used only for functions in which its customers do not want and cannot use permanent connections." Id. Vandewater further argues that "[t]he reason that outlets are used, and the reason that lower pressure is necessary, is because the outlets are used for functions such as sprinkler heads, which must be capable of removal and replacement. Butt-weld pipe fittings cannot be used for those functions." Id.

[8] The court disagrees with Plaintiffs that Commerce's findings on this factor

are unreasonable. Commerce concluded that the record did not support Vandewater's arguments. Rather, it found that "[a]lthough certain types of BWPFs may be designed to handle high-pressure systems, fire protection sprinkler systems are a contemplated application of BWPFs. This is the intended application for Vandewater's product. Therefore, we find that outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems." Remand Results at 56. While Plaintiffs urged Commerce to focus on the prevalence of BWPFs in high pressure systems rather than low-pressure sprinkler systems, Commerce highlighted that "Vandewater itself acknowledges that '[s]ome sprinkler systems may, however, use butt-weld pipe fittings for the run pipes, to which the branch connections are attached.'" Id. As a result, Commerce reasonably found that Plaintiffs were "simply incorrect that BWPFs are used exclusively in high-pressure settings, while outlets are used in distinct, low-pressure piping systems." Id. at 56.

### 3. Ultimate Use

Commerce determined that "the uses of Vandewater's outlets and other BWPFs are similar." Id. at 58. Specifically, Commerce noted that "Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs subject to the scope of the China BWPFs Order. Furthermore, even though Vandewater emphasized that its outlets are designed for fire sprinkler systems, Vandewater acknowledges that other outlets with physical characteristics that are similar to its outlets are used in a range of applications, including those that the importers identify as fundamental BWPF uses, e.g., piping

connections used in the oil and gas industry." Id.

Plaintiffs challenge Commerce's finding as unreasonable, highlighting that the "ultimate purchasers of Vandewater's steel branch outlets are all fabricators of fire sprinkler systems." Vandewater Comments at 24 (further adding that "Commerce does not (and cannot) deny this fact."). Plaintiffs maintain that this detail is critical, as "no fire sprinkler uses any butt-weld pipe fittings for branch connections to sprinkler leads, because a butt-weld pipe fitting does not have the ability to accept a sprinkler head with threads." Id. Plaintiffs also emphasize that the ITC "has explained the use and expectation of ultimate users of butt-weld pipe fittings by stating that '[b]utt-weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections.'" Id. (citing 2016 ITC Sunset Review at I-4).

[9] Commerce acknowledged that Vandewater's outlets are designed for a specific use within fire sprinkler systems, but found that BWPFs are also used in fire sprinkler systems and that the minor difference in specific uses within a sprinkler system did not indicate a significant difference in the ultimate use of subject outlets as compared to BWPFs. Remand Results at 58–59 ("Such use variation is found throughout the range of BWPFs"). In disagreeing with Plaintiffs that the ITC's findings support a distinction between outlets and BWPFs, Commerce highlighted that the ITC found that BWPFs are commonly found in automatic fire sprinkler systems. Despite Plaintiffs' arguments emphasizing the different in-system uses of outlets and BWPFs, Commerce determined that "[e]ven if it is the case that the outlets and other BWPFs do not have identical or complete overlap of

functions, the fact remains that the uses of outlets and other BWPFs are similar because, as explained above, both are permanently welded into automatic fire sprinkler systems to change or divide the flow of water." Id. at 59. Plaintiffs' argument demonstrating that the subject outlets may have specific uses within automatic fire sprinkler systems does not undermine the reasonableness of Commerce's conclusion that the ultimate use of BWPFs and subject outlets are similar given that both BWPFs and subject outlets are used in automatic fire sprinkler systems. Accordingly, the court concludes that Commerce reasonably found that the ultimate uses of outlets and BWPFs are similar.

### 4. Channels of Trade

Commerce ultimately found that "the channels of trade for outlets and other BWPFs are similar." Remand Results at 60. Commerce noted that "both [outlets and other BWPFs are] sold through distributors and to fabricators and contractors." Id. Plaintiffs challenge Commerce's conclusion that the record, and in particular the Shyman [5] Declaration, supports a finding that the expectations of purchasers of BWPFs and outlets are similar based on the fact that both products are sold through distributors like Neill Supply. See Vandewater Comments at 24 (citing Remand Results at 93–94).

[10] Once again, the court disagrees. Commerce rejected Vandewater's argument that the agency should rely on other parts of the Shyman Declaration, emphasizing "differences in the ultimate consumer of the products." Remand Results at 93. Commerce noted that it considered the

Shyman Declaration, and highlighted that Mr. Shyman acknowledged that "welded branch outlets and butt-weld fittings are both sold to distributors like Neill Supply." Id. at 93–94. Vandewater maintains that Commerce's simplistic analysis on this issue misses the point and fails to engage with the record. See Vandewater Comments at 24–25 (noting that "Home Depot sells paint and flowers, but that says nothing about whether ultimate purchasers deem them to be the same product.").

Commerce acknowledged the distinction highlighted by Plaintiffs, but overall found it unpersuasive in demonstrating that outlets and BWPFs subject to the China BWPFs Order involve different channels of trade. As Commerce explained:

> We agree that Vandewater's outlets are typically sold to a particular type of contractor given their targeted application, when compared to BWPFs more generally – which cover a wide range of products and applications. However, this is true in any circumstance when comparing a particular product to a broad class of products. Outlets and other BWPFs are sold to distributors and then to contractors and users involved in constructing piping systems, even if the particular type of contractor/customer for Vandewater's outlets focuses on certain types of systems, i.e., fire protection and other low-pressure applications.

Remand Results at 94. In the court's view, Plaintiffs' arguments about the overbreadth of Commerce's analysis under this factor go to the weight that the agency should assign this factor in its overall (k)(2) analysis and not the reasonableness of its determination. While the court un-

---

**5.** Vandewater submitted this declaration to Commerce as part of its remand comments, noting that "Mr. Neil Shyman was Vice President and General Manager of Neill Supply from May 1968 to January 2011. Neill Supply

is a fabricator and supplier of fire sprinkler and industrial piping and sells Vandewater's steel branch outlets." See Remand Results at 27 n.186.

derstands that this factor provides limited assistance in comparing BWPFs and subject outlets, it cannot agree with Plaintiffs that Commerce's findings under this factor were unreasonable.

### 5. Manner of Advertisement and Display

As to the final criterion, Commerce found that "outlets and other BWPFs are advertised in a similar manner, i.e., via online catalogs in company websites or affiliated or third-party online sources." Remand Results at 60–61. Commerce observed that "[t]hese sources identify the size, weight, and other technical specifications of the merchandise, including pressure resistance, materials used, and industry standard." Id. at 61. Commerce highlighted that "outlets (and similar products, such as saddles) and BWPFs are displayed side by side. In some instances, outlets are explicitly referenced in advertising materials as having butt-weld ends." Remand Results at 94. Commerce disagreed with Plaintiffs, emphasizing the fact that certain advertising materials for subject merchandise referenced particular industry standards, and further noting that "simply because the advertising materials reference particular standards (i.e., ANSI/ASME B16.9 for certain products) and or references particular uses, [Commerce does not agree] that this reflects a clear dividing line between the method of advertising for each product." Id. at 95.

[11] Plaintiffs maintain that Commerce's analysis sidesteps the critical significance of industry standards in advertising the products, which "draw a clear dividing line between butt-weld pipe fittings on one hand and steel branch outlets on the other." SIGMA Comments at 13. Plaintiffs argue that Commerce "failed to give this evidence due regard," and con-

tend that Commerce's finding that Plaintiffs' afforded "undue significance" to industry standards is unreasonable in light of "repetition and centrality of these standards in the advertisements." Id. Again, Plaintiffs' arguments focusing on the importance of industry standards in advertising ignores contrary evidence in the record, namely that "the record supports Island's proffered explanation: [namely, that] the term 'butt-weld' itself is not a standard term nor commonly used, and, therefore, Island does not use it in its advertising." See Remand Results at 61.

Plaintiffs also contend that Commerce's finding that outlets and BWPFs are "displayed side by side" was unreasonable. Vandewater Comments at 25 (quoting Remand Results at 95 & n.577). Plaintiffs maintain that the sources relied on by Commerce to support such a finding do not actually include "traditional butt-weld pipe fittings." Id. at 26. Plaintiffs' arguments here again focus on a narrow subset of BWPFs, discounting the variety of BWPFs covered by the China BWPFs Order that Commerce found to be advertised in the same product catalogs along with outlets. See Remand Results at 61 ("First, the 'Fire Sprinkler Pipe Fabrication' section of the Aleum USA catalog shows outlets with a branch side that is threaded or grooved along with 'butt welding ends.' Second, product catalogs on the record show outlets and similar products and other BWPFs advertised side by side. For instance, the Petition shows 'elbows,' 'reducers,' 'lap joint stub ends,' 'saddles,' and 'multiple outlet fittings' in the same product catalog; the Shin Tech catalog advertises two outlet products – one with a beveled edge that allows for a permanent connection only on the branch end, and one with such edges on both the branch and contoured ends – in a similar manner."). Given these findings, the court concludes that Commerce reasonably found that outlets

and other BWPFs are advertised in a similar manner.

## C. Suspension of Liquidation Instructions

As a result of Commerce's new analysis on remand, the parties disputed whether Commerce was required to revise its instructions to U.S. Customs and Border Protection regarding suspension of liquidation and cash deposits. See Remand Results at 96–103. This issue was resolved with respect to Vandewater after the conclusion of briefing on the merits of the Remand Results. See Letter, ECF No. 151 (seeking clarification about potential mootness given that existing statutory injunctions already suspend liquidation of unliquidated entries of subject merchandise dating back to 1992 and requesting additional information as to this issue); Def.'s Initial Resp. to Letter, ECF No. 152; Conference Call, ECF No. 157; Def.'s Second Resp. to Letter, ECF No. 159; Second Conference Call, ECF No. 164; Order Amending Statutory Injunction, ECF No. 166. As to SIGMA, this was not an issue.

SCI, though, maintains that this is a live issue. While SCI initially presented arguments challenging the legal basis for Commerce's instructions to "continue" suspension of liquidation, SCI's arguments appear to have evolved significantly after conferencing with the court. Specifically, SCI maintains that this issue is not moot because certain of its entries contain both subject merchandise and non-subject merchandise ("mixed entries"), and argues that these mixed entries may be inappropriately subject to duties as a result of Commerce's instructions as applied to a suspension of liquidation covering the non-subject merchandise. SCI now attempts to formally raise these arguments for the first time in the context of "responding" to Vandewater's consent motion to amend its statutory injunction. Compare SCI

Resp. to Vandewater's Mot. for Amended Order for Statutory Injunction, ECF No. 166 (noting that SCI has no objection to Vandewater's revision of the statutory injunction covering its entries, but adding that "SCI files this response to state that it does not agree with the statement in this motion that the Government should be able to apply antidumping duties to welded outlets contained in entries 'that were previously suspended' for reasons unrelated to the underlying proceeding at issue in this appeal (i.e., entries that were previously suspended because they contained unrelated products subject to suspension pursuant to an unrelated AD/CVD order as of the effective date of Commerce's scope determination on Vandewater's welded outlets (September 10, 2018)).")), with SCI Comments & Remand Results (discussing parties' disagreement as to Commerce's authority to "continue" suspension of liquidation under the regulatory framework, but making no reference to particular mixed entries, or any issues involving inappropriately assessed duties). As noted previously, these arguments regarding "mixed entries" do not appear in SCI's remand comments nor do they appear to have been raised before Commerce in the course of the remand. See SCI Resp. to Vandewater's Mot. for Amended Order for Statutory Injunction, ECF No. 166 (noting that SCI's arguments in the response reflect SCI's arguments "stated during [the August 10, 2022] conference call").

[12]    Given these circumstances and its discussions with the parties, the court concludes that SCI's additional arguments on this issue are not properly before the court and are deemed forfeited. See United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's brief-

ing may be deemed waived."); <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363, 1375–77 (Fed. Cir. 2010) (affirming waiver of arguments not raised until after remand); <u>see also</u> <u>In re Google Tech. Holdings LLC</u>, 980 F.3d 858, 862 (Fed. Cir. 2020) (explaining the distinction between "forfeiture" and "waiver" and acknowledging that "[b]y and large, in reviewing this court's precedent, it is evident that the court mainly uses the term 'waiver' when applying the doctrine of 'forfeiture.' "); <u>Saha Thai Steel Pipe Pub. Co. v. United States</u>, 46 CIT ——, 592 F.Supp.3d 1299, 1305 (2022) (exploring precedent addressing forfeiture and waiver, and explaining that "[f]ailing to raise an argument in a previous proceeding thus forfeits the argument after the matter has been remanded and is back on appeal."). The court also notes that SCI's additional arguments on this issue may well be moot in light of the existing statutory injunction that enjoins liquidation of SCI's imports of unliquidated entries of subject merchandise dating back to July 6, 1992. <u>See</u> Order Entering Form 24 Statutory Injunction, Court No. 19-00011, ECF No. 17 (Jan. 28, 2019).

### III. Conclusion

Despite their arguments supporting an alternative reasonable conclusion, Plaintiffs have failed to demonstrate that the record supports Plaintiffs' preferred outcome as the one and only reasonable determination Commerce could have made. <u>See, e.g.</u>, <u>supra</u> pp. 1336–37. Although Plaintiffs have demonstrated that information on the record <u>could</u> reasonably support a finding that outlets are excluded from the scope of the <u>China BWPFs Order</u>, the court cannot agree that Commerce acted unreasonably in reaching its findings to the contrary under each of the (k)(2) factors. The court therefore sustains Commerce's determination that outlets

and other BWPFs are sufficiently similar such that the subject outlets should be included under the scope of the <u>China BWPFs Order</u>. Judgment will enter accordingly.



**BOTH-WELL (TAIZHOU) STEEL FITTINGS, CO., LTD.,**
**Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Bonney Forge Corporation,**
**Defendant-Intervenor.**

**Slip Op. 22-105**
**Court No. 21-00166**

United States Court of International Trade.

September 13, 2022

**Background:** Foreign exporter filed suit challenging Department of Commerce's final determination in administrative review of countervailing duty (CVD) order on forged steel fittings (FSF) from People's Republic of China. Exporter moved for judgment on agency record. The Court of International Trade, Claire R. Kelly, J., 557 F.Supp.3d 1327, remanded. On remand, Department of Commerce issued remand results.

**Holdings:** The Court of International Trade, Kelly, J., held that application of adverse facts available was not warranted.

Sustained.

**ADDENDUM 2**

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

A-570-814
Remand
Slip Op. 20-146
**Public Document**
E&C/OV:  Team

***Vandewater International, Inc. v. United States*,**
**Court No. 18-00199, Slip Op. 20-146 (CIT October 16, 2020)**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

I.     **SUMMARY**

The Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) in *Vandewater International, Inc. v. United States*, Court No. 18-

00199, Slip Op. 20-146 (October 16, 2020) (*Remand Order*).  This remand concerns

Commerce's Final Scope Ruling,[1] in which we determined, pursuant to 19 CFR 351.225(d), that

steel branch outlets (outlets) imported by Vandewater International Inc. (Vandewater) fall within

the scope of the antidumping duty (AD) order on carbon steel butt-weld pipe fittings (BWPFs)

from the People's Republic of China (China).[2]  In the *Remand Order*, the Court held that

Commerce's determination that the scope language and the descriptions of the merchandise

contained in the sources under 19 CFR 351.225(k)(1) are dispositive as to the inclusion of the

outlets within the scope of the *China BWPFs Order* was unsupported by substantial evidence.[3]

Accordingly, the Court remanded the Final Scope Ruling and directed Commerce to conduct a

scope inquiry to evaluate the outlets using the criteria enumerated under 19 CFR 351.225(k)(2).

---

[1] *See* Memorandum, "Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets," dated September 10, 2018 (Final Scope Ruling).
[2] *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 FR 29702 (July 6, 1992) (*China BWPFs Order*).
[3] *See Remand Order* at 4-9.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

In accordance with the *Remand Order*, on October 30, 2020, Commerce initiated this inquiry and reopened the record to provide interested parties an opportunity to submit comments and new factual information relevant to an analysis under the (k)(2) criteria.[4]  On April 19, 2021, Commerce released the Draft Redetermination to all interested parties and invited parties to comment.[5]  Commerce received comments on April 30, 2021, as discussed below.

In these final results of redetermination, in accordance with the *Remand Order*, we have addressed the comments submitted by interested parties on the draft results of redetermination and continue to find that Vandewater's outlets are within the scope of the *China BWPFs Order* pursuant to an analysis under the (k)(2) criteria on remand.

## II.    SCOPE OF THE *CHINA BWPFS ORDER*

The products covered by this order are BWPFs having an inside diameter of less than 14 inches, imported in either finished or unfinished form.  These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).  BWPFs are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule of the United States (HTSUS).  Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

---

[4] *See* Commerce's Letter, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Initiation of Scope Inquiry," dated October 30, 2020 (Commerce October 30, 2020 Letter).
[5] *See* Memorandum, "Draft Results of Remand Redetermination, *Vandewater International, Inc. v. United States*, Court No. 18-00199, Slip Op. 20-146," dated April 19, 2021 (Draft Redetermination).

2

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

## III.    PRODUCT DESCRIPTION

Vandewater's product is commonly known as a "steel branch outlet" or a "welded outlet."[6]  The outlets in question have two ends and are designed for fire sprinkler systems and other low-pressure piping systems.[7]  One end, called the "header" or "run" side, is designed to be placed against the mid-section of another pipe (*i.e.*, a "header" or "run" pipe), and it is contoured to match the curve of the mid-section of that header pipe.[8]  The contour allows the outlet to sit atop the header pipe like a saddle.[9]  This contoured end has a beveled edge that permits the fitting to be welded to the header pipe.[10]

The other end of the fitting, called the "branch" or "outlet" side, is either threaded or grooved.  Vandewater offers threaded outlets in sizes ranging from ½ inch to 2½ inches, and grooved steel branch outlets in sizes ranging from 1¼ inches to 8 inches.[11]  The threaded or grooved outlet is intended to connect to another component of the piping system, such as a sprinkler head, *e.g.*, by screwing the sprinkler head on to the threaded end of the outlet.[12]

## IV.    BACKGROUND

### A.  Vandewater's Scope Request and Commerce's Final Scope Ruling

In July 1992, Commerce published the *China BWPFs Order*.[13]  On May 17, 2018, Vandewater, an importer of outlets produced in China, requested that Commerce issue a scope

---

[6] *See* Vandewater's Letter, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Request for Scope Ruling for Steel Branch Outlets," dated May 17, 2018 (Scope Ruling Request) at 3.
[7] *See* Scope Ruling Request at 3-4.
[8] *Id.* at 3.
[9] *Id.*
[10] *See* Scope Ruling Request at 4 (product image for Vandewater's threaded outlet), 5 (product image for Vandewater's grooved outlet), and 13 ("{T}he header side of a steel branch fitting is normally beveled at a 45-degree angle").
[11] *See* Scope Ruling Request at 3.
[12] *Id.* at 4.
[13] *See China BWPFs Order.*

3

ruling to determine whether the threaded or grooved outlets that it imports are subject to the *China BWPFs Order*.[14]  On June 12, 2018, Island Industries Inc. (Island), a producer of the domestic like product, submitted its opposition to Vandewater's scope request.[15]  On June 29, 2018, Vandewater submitted rebuttal comments to Island's opposition.[16]

On July 11, 2018, counsel for Vandewater met with Commerce and provided samples of its outlets.[17]  On July 12, 2018, Smith-Cooper International (SCI), a U.S. importer of outlets, submitted comments in support of Vandewater's scope request.[18]  On July 17, 2018, Anvil International, LLC (Anvil), a producer of the domestic like product, submitted its opposition to Vandewater's scope request.[19]  On July 25, 2018, counsel for Island and counsel for Anvil met with Commerce to review the samples submitted by Vandewater.[20]

On August 24, 2018, Commerce placed on the record the Petition and the International Trade Commission (ITC)'s determination in the 2016 sunset review of the *China BWPFs Order*.[21]  On September 5, 2018, Island, SCI, and Vandewater submitted comments regarding the documents placed on the record.[22]

---

[14] *See* Scope Ruling Request.

[15] *See* Island's Letter, "Opposition to Scope Ruling Requests of Vandewater International Inc. and SIGMA Corporation," dated June 12, 2018 (Island June 12, 2018 Comments).

[16] *See* Vandewater's Letter, "Rebuttal Factual Information Concerning Vandewater Scope Inquiry on Steel Branch Outlets," dated June 29, 2018.

[17] *See* Memorandum, "Vandewater Scope: *Ex-Parte* Meeting with Requestor's Counsel," dated July 12, 2018.

[18] *See* SCI's Letter, "Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Comments," dated July 12, 2018.

[19] *See* Anvil's Letter, "Opposition to Scope Ruling Requests of SIGMA and Vandewater and Request for a Meeting," dated July 17, 2018 (Anvil Opposition Letter).

[20] *See* Memorandum, "Vandewater Scope:  Meeting with Counsel to Interested Parties," dated July 26, 2018.

[21] *See* U.S. Fittings Group's Letter, "Petition for the Imposition of Antidumping Duties:  In the Matter of Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China and from Thailand," dated May 22, 1991 (Petition); and Memorandum, "Placing Documents on the Record," dated August 24, 2018; *see also* Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. Nos. 731-TA-308-310 and 520-521 (Fourth Review), USITC Pub. 4628 (August 2016) (USITC Fourth Review).

[22] *See* Island's Letter, "Comments on Documents Placed on Record," dated September 5, 2018; SCI's Letter, "Comments on Documents Placed on the Record," dated September 5, 2018; and Vandewater's Letter, "Vandewater Comments on Factual Information Placed on the Record by Commerce," dated September 5, 2018.

On September 10, 2018, Commerce issued its Final Scope Ruling.[23]  Commerce determined that Vandewater's outlets were covered by the scope of the *China BWPFs Order*, pursuant to 19 CFR 351.225(d) and (k)(1).[24]  Commerce examined the scope language and observed that the outlets "are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections."[25]  Commerce concluded that the scope language can be reasonably interpreted to include the outlets (*i.e.*, products with a single welded connection).[26]  Commerce explained that this conclusion is supported by the descriptions of the merchandise contained in the (k)(1) sources, which revealed that the distinguishing characteristic of subject merchandise is a beveled edge on at least one end that facilitates a permanent, welded connection.[27]

In its analysis, Commerce primarily relied upon the Petition, the USITC Fourth Review, and a prior scope ruling relating to the *China BWPFs Order* issued in 2009[28] as (k)(1) sources to support Commerce's interpretation of the scope language.[29]  Commerce also acknowledged another scope ruling issued in 1992 in connection with the antidumping duty order on BWPFs from Taiwan, hereinafter referred to as the "Sprink Scope Ruling."[30]  The Sprink Scope Ruling

---

[23] *See* Final Scope Ruling.

[24] *Id.* at 8-12.

[25] *Id.* at 9.

[26] *Id.*

[27] *Id.* at 9-10.

[28] *See* Memorandum, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Placing Prior Scope Ruling on the Record," dated September 10, 2018.

[29] *See* Final Scope Ruling at 9-10.

[30] *See* Island June 12, 2018 Comments at Exhibit 2; *see also Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 FR 45152 (December 17, 1986) (*Taiwan BWPFs Order*); and Memorandum, "Recommendation Memo – Final scope ruling on Request by Sprink, Inc. to Exclude Sprink-let Carbon Steel Butt-Weld Pipe Fittings from the Antidumping Duty order on Carbon Steel Butt-Weld Pipe Fittings from Taiwan," dated March 25, 1992 (Sprink Scope Ruling).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

addressed a product "essentially physically identical" to Vandewater's outlets.[31]  In addressing arguments from interested parties, Commerce explained that it was "not bound by the agency's analysis in the Sprink Scope Ruling" because that ruling involved a different proceeding that had a scope with slightly different language.[32]  However, at the same time, Commerce still viewed the Sprink Scope Ruling as informative because it was a prior scope ruling that considered whether outlets nearly identical to the outlets imported by Vandewater are "butt-weld pipe fittings."[33]  Commerce noted in the Final Scope Ruling that, "as in that case, we have concluded that the merchandise is covered by the scope of an antidumping duty order on 'butt-weld pipe fittings' because the merchandise is permanently joined by welding."[34]  Therefore, Commerce ensured that its interpretation of "butt-weld pipe fittings" for purposes of the *China BWPFs Order* was consistent with Commerce's longstanding interpretation of that exact same term in the Sprink Scope Ruling as it relates to the *Taiwan BWPFs Order*.

Because Commerce determined that the outlets are covered by the *China BWPFs Order* based on an analysis of the scope language and the (k)(1) sources, Commerce determined that it was not necessary to consider the criteria set forth in 19 CFR 351.225(k)(2).[35]  As a result of its Final Scope Ruling, Commerce issued instructions to U.S. Customs and Border Protection (CBP) in accordance with 19 CFR 351.225(l)(3).  Vandewater appealed the Final Scope Ruling to the Court.

## B.  The Court's *Remand Order*

On October 16, 2020, the Court remanded Commerce's Final Scope Ruling, holding that

---

[31] *See* Final Scope Ruling at 11.
[32] *Id.*
[33] *Id.* at 5-6 (listing the Sprink Scope Ruling as a relevant prior scope ruling).
[34] *Id.* at 11.
[35] *Id.* at 3.

6

Commerce's scope determination was not supported by substantial evidence.[36]  The Court found that it was unreasonable for Commerce to conclude that the sources identified in 19 CFR 351.225(k)(1) were dispositive regarding whether Vandewater's outlets were covered by the scope of the *China BWPFs Order*.[37]  According to the Court, neither the language of the *China BWPFs Order* nor the (k)(1) sources that Commerce relied upon resolve the question of whether Vandewater's outlets are covered by the scope.  The Court stated the following regarding the scope language:

> {Vandewater's} products have threaded or grooved ends on their non-weldable end.  It is therefore not plainly apparent from the language of the {*China BWPFs Order*} whether a steel branch outlet qualifies as a butt-weld fitting covered by the {*China BWPFs Order*} or not.  They may be covered:  they are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require a permanent, welded connection.  They also may not be covered:  they have a non-weldable, threaded or grooved end, and according to Vandewater, the weldable end is never joined to the sprinkler system via a true "butt-weld."  The language of the {*China BWPFs Order*} simply does not resolve the issue of whether Vandewater's steel branch outlets are covered.[38]

As for the (k)(1) sources, the Court explained that, on the one hand, 28 years ago Commerce determined that a nearly identical product was within the scope of the *Taiwan BWPFs Order*,[39] which is an order on BWPFs with very similar scope language.[40]  On the other hand, certain language in the ITC's most recent sunset review and the Petition contemplates that in-scope fittings must have an end-to-end connection with beveling on the ends of both the fitting and the adjoining pipe, which is not descriptive of Vandewater's outlets.[41]  The Court

---

[36] *See Remand Order* at 3-9.
[37] *Id.* at 5-8.
[38] *Id.* at 5.
[39] *See Taiwan BWPFs Order*.
[40] *See Remand Order* at 5-6; *see also* Sprink Scope Ruling.
[41] *See Remand Order* at 7-8; *see also* USITC Fourth Review at I-4; and Petition at 4.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

concluded that Commerce's determination that the (k)(1) sources were dispositive was not reasonable because Commerce dismissed the Sprink Scope Ruling as non-binding and the other (k)(1) sources Commerce relied upon "do not really tell the court anything about the inclusion of steel branch outlets within the scope."[42]  As a result, the Court remanded the Final Scope Ruling to Commerce with instructions to conduct a scope inquiry and analyze the criteria under 19 CFR 351.225(k)(2).[43]

### C. Remand Proceedings

Pursuant to the *Remand Order*, on October 30, 2020, Commerce initiated this inquiry and reopened the record.[44]  We provided interested parties an opportunity to submit comments and new factual information related to an analysis under 19 CFR 351.225(k)(2).[45]

On November 9, 2020, Island, SCI, Sigma Corporation (SIGMA), and Vandewater submitted comments containing new factual information.[46]  Subsequently, on December 3, 2020, Island, SCI, SIGMA, and Vandewater submitted new factual information to rebut, clarify, or correct the information placed on the record on November 9, 2020.[47]

On April 19, 2021, Commerce released the Draft Redetermination to all interested parties

---

[42] *See Remand Order* at 8.

[43] *Id*. at 9.

[44] *See* Commerce October 30, 2020 Letter.

[45] *Id*. at 2.

[46] *See* Island's Letter, "(k)(2) Analysis of Vandewater 'Steel Branch Outlets,'" dated November 19, 2020 (Island Comments); SCI's Letter, "Comments and Documentation in Formal Scope Inquiry Pursuant to 19 C.F.R. 351.225(e) and (k)(2)," dated November 19, 2020 (SCI Comments); SIGMA's Letter, "SIGMA'S Additional Written Arguments and Supporting Documentation Regarding the "(k)(2)" Criteria," dated November 19, 2020 (SIGMA Comments); and Vandewater's Letter, "Comments of Vandewater International Inc. on (K)(2) Factors," dated November 19, 2020 (Vandewater Comments).

[47] *See* Island's Letter, "(k)(2) Rebuttal Analysis of Vandewater 'Steel Branch Outlets, '" dated December 3, 2020 (Island Rebuttal Comments); SCI's Letter, "Rebuttal Comments in Formal Scope Inquiry Pursuant to 19 C.F.R. 351.225(e) and (k)(2)," dated December 3, 2020 (SCI Rebuttal Comments); SIGMA's Letter, "SIGMA Rebuttal Comments for Commerce's "(k)(2)" Analysis," dated December 3, 2020 (SIGMA Rebuttal Comments); and Vandewater's Letter, "Slip Op. 20-146:  Rebuttal Comments of Vandewater International Inc. on (K)(2) Factors," dated December 3, 2020 (Vandewater Rebuttal Comments).

8

and invited parties to comment.[48]  On April 30, 2021, Island, SCI, SIGMA, and Vandewater each

filed comments on the Draft Redetermination.[49]

## V.    LEGAL FRAMEWORK

Commerce's regulations set out rules regarding the issuance of scope rulings, including

standards used in determining whether a product is within the scope of an order.  When a request

for a scope ruling is filed, Commerce examines the language of the scope of the order at issue

and the description of the product contained in the scope ruling request.[50]  Commerce may also

examine other information, including the description of the merchandise contained in the

petition, the initial investigation, and prior determinations of Commerce (including prior scope

rulings) and the ITC.[51]  If Commerce determines that these sources are dispositive, it will issue a

final scope ruling as to whether the product in question is covered by the scope of the order.[52]  A

determination pursuant to this analysis may take place with or without initiation of a formal

scope inquiry.[53]

Conversely, if Commerce determines the descriptions of the merchandise in the sources

described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the following

five additional factors set forth in 19 CFR 351.225(k)(2):

(i)    The physical characteristics of the product;

---

[48] *See* Draft Redetermination.
[49] *See* Island's Letter, "Comments on Draft Remand Redetermination," dated April 30, 2021 (Island Draft Redetermination Comments); SCI's Letter, "SCI's Comments on the Department's Draft Remand Redetermination," dated April 30, 2021 (SCI Draft Redetermination Comments); SIGMA's Letter, "SIGMA's Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated April 30, 2021 (SIGMA Draft Redetermination Comments); and Vandewater's Letter, "Comments of Vandewater International Inc. on Draft Results of Redetermination Pursuant to Court Remand," dated April 30, 2021 (Vandewater Draft Redetermination Comments).
[50] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[51] *See* 19 CFR 351.225(k)(1).
[52] *See* 19 CFR 351.225(d).
[53] *See* 19 CFR 351.225(d) and (e).

9

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

(ii)    The expectations of the ultimate purchasers;

(iii)    The ultimate use of the product;

(iv)    The channels of trade in which the product is sold; and

(v)    The manner in which the product is advertised and displayed.

The determination as to which analytical framework is most appropriate in any given scope inquiry is made on a case-by-case basis after consideration of all record evidence before Commerce.

As explained above, the Court has directed Commerce to conduct a scope inquiry and analyze the criteria enumerated under 19 CFR 351.225(k)(2) to determine whether Vandewater's outlets are covered by the scope of the *China BWPFs Order*.

## VI.    INITIAL COMMENTS ON THE (K)(2) FACTORS

**Vandewater, SCI, and SIGMA Comments**

*Physical Characteristics of the Product*

Outlets have several distinct characteristics that distinguish them from BWPFs.  These characteristics relate to the ends of the outlets, their method of connection to the header pipe, the shape of the product, the underlying production process, and the applicable industry standard(s). Such considerations, which were each raised by one or more of the importers of outlets, are discussed in turn.

First, outlets always have one end that is contoured with a curved or "fishmouth" design, which allows the outlet to be attached directly to the curved side or face of a pipe, *i.e.*, to be attached in a perpendicular manner to another pipe, rather than through an end-to-end

10

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

connection.[54]  The curvature on an outlet facilitates attachment *only* to the face of run pipe.[55]  In contrast, the ends of BWPFs never have this curved, fishmouth shape because they are attached exclusively to the end of a pipe.[56]  A BWPF connects two pipes along the same plane,[57] and a BWPF always has a square end.[58]  Therefore, outlets are physically different from BWPFs because the welded end of the outlet is curved and does not allow for an end-to-end weld, which is a defining characteristic of BWPFs.[59]

Second, the method of connection for outlets and BWPFs is distinct.[60]  Outlets rest against the face of the pipe at a location that is not itself beveled.  The beveled end of the outlet tapers to a flat surface and does not come to a pointed shape.[61]  Thus, the connecting weld is a fillet weld, where the bead of the weld runs along the edge of the point of connection, but does not fully penetrate the connection and separate the pipes with welding material.[62]  In contrast, BWPFs attach to the end of pipe, and the ends of the BWPF and the connecting pipe are beveled to a pointed shape.[63]  Thus, the two points (*i.e.*, the two beveled edges) are placed together, and the weld "bead" rests in the channel created by the two bevels, fully penetrates the connection, and keeps the two adjoining pieces separate.[64]  The butt weld forms the bridge between the fitting and the pipe but never allows the fitting and pipe to contact each other.[65]  Additionally, this interpretation is supported by the ITC's statement that BWPFs are intended to be placed

---

[54] *See* Vandewater Comments at 7 and Tabs 3 and 4; *see also* SIGMA Comments at 6 and Exhibit 2 at 15.
[55] *See* Vandewater Comments at 7 and Tab 4.
[56] *See* SCI Comments at 5; *see also* Vandewater Comments at 5-7.
[57] *See* SCI Comments at 6.
[58] *Id*.
[59] *Id*.
[60] *See* Vandewater Comments at 4-10; *see also* SCI Comments at 5-7; and SIGMA Comments at 7 and 10-11.
[61] *See* SCI Comments at 8.
[62] *Id.*; *see also* Vandewater Comments at 8-9.
[63] *See* SCI Comments at 8.
[64] *Id*.
[65] *Id*.

11

against the *end* of a beveled pipe or other fitting.[66]  Outlets rest against the face of the pipe at a location that is not itself beveled.[67]

Third, the bevel angles are different between the products.  Outlets have a 45-degree bevel angle on the connecting end that attaches to the run pipe.[68]  BWPFs are beveled, typically at a 37 ½ degree angle, and the receiving component (whether it is a pipe, a valve, another BWPF, or a backing ring) also has a beveled end with a similar angle (generally within a tolerance of plus or minus 2 ½ degrees).[69]  Thus, when placed together, the beveled edges form a shallow channel, normally a combined 75 degrees, that accommodates the bead of the weld that fastens the two adjoining pieces.[70]

Fourth, outlets have a non-welded end that is a temporary connection, unlike BWPFs which do not have any ends featuring a temporary connection.[71]  Vandewater's outlets have grooved or threaded connections.  This characteristic clearly distinguishes outlets from merchandise covered by the *China BWPFs Order*, which does not cover "fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."[72]

Commerce's prior decisions suggest that the character and number of butt-weld end connections are key considerations in analyzing the scope of the *China BWPFs Order*.  In its scope decision in the context of the *Forged Steel Fittings Order*,[73] and in its Forged Steel

---

[66] *Id.* at 6 (citing USITC Fourth Review at 6).

[67] *See* SCI's Comments at 8.

[68] *See* Vandewater Comments at 9 (citing Scope Ruling Request at Exhibits 7, 20, and 21).

[69] *See* SCI Comments at 8-9; *see also* Vandewater Comments at 9, Tab 5 at 107, and Table 12.

[70] *See* Vandewater Comments at 8 (citing USITC Fourth Review at I-5).

[71] *See* SCI Comments at 11.

[72] *Id.* (citing *China BWPFs Order*); *see also* Vandewater Comments at 7-8.

[73] *See* SCI Comments at 13-14 and Exhibit 5 (citing Memorandum, "Forged Steel Fittings from China, Italy, and Taiwan:  Final Scope Determination Decision Memorandum," dated July 23, 2018 (Forged Steel Fittings Scope Determination)); *see also Forged Steel Fittings from Italy and the People's Republic of China:  Antidumping Duty Orders*, 83 FR 227 (November 26, 2018) (*Forged Steel Fittings Order*).

12

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

Fittings Scope Clarification Memorandum,[74] Commerce connected the scope analysis between that investigation and the analysis associated with the *China BWPFs Order*.  Commerce stated that outlets must have butt welds on both ends to be considered butt-weld fittings for the purposes of the exclusion from the *Forged Steel Fittings Order*.  Although the Forged Steel Fittings Scope Clarification Memorandum states that "{f}ittings and outlets with at least one, but not all, butt welded end connection and an inside diameter of less than 14 inches are covered by the scope of the {*China BWPFs Order*}, so long as the other requirements of the {*China BWPFs Order*}scope are satisfied," this does not cover branch outlets, such as Vandewater's, which have no butt-weld ends.[75]  Products with zero butt-weld ends, like outlets, cannot reasonably be considered butt-weld fittings.[76]  Commerce agreed that "{o}utlets with a socket-weld or threaded end connection, or with only one butt-weld end connection, are not considered a butt-weld fitting …"[77]  In addition, the industry that produces forged steel fittings recently told Commerce that "the industry does not consider a welded outlet to be a butt-weld fitting …"[78]

Fifth, outlets and BWPFs follow separate industry standards that require different physical characteristics.  BWPFs always have a square end and bevel made to dimensions specified in American National Standards Institute (ANSI) and American Society of Mechanical Engineers (ASME) B16.9,[79] which is entitled "Factory-Made Wrought Buttwelding Fittings."[80]

---

[74] *See* SCI Comments at 12 (citing Memorandum, "Forged Steel Fittings from the People's Republic of China, Italy, and Taiwan:  Placing Carbon Steel Butt Weld Pipe Fitting Scope Ruling on the Record," dated September 19, 2018 (Forged Steel Fittings Scope Clarification Memorandum)).

[75] *Id.* at 14 and Exhibit 11.

[76] *Id.*

[77] *See* Vandewater Comments at 18 (citing Forged Steel Fittings Scope Determination at 7-9).

[78] *Id.* at 26 (citing Scope Ruling Request at Exhibit 16).

[79] ANSI and ASME are distinct organizations that develop industry standards for various products, including fittings.  *See* Vandewater Comments at Tab 1 (ASME B16.9 standard, "Foreword" discussing ANSI's and ASME's involvement in developing the B16.9 standard).  However, the parties refer to ANSI and ASME interchangeably in their submissions.  For ease of reference, these final results of redetermination refer to both ANSI/ASME in discussing certain industry standards.

[80] *See* SCI Comments at 15; *see also* SIGMA Comments at 6 and Exhibit 2 at 4.

13

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

This ANSI/ASME standard includes long radius reducing elbows, long radius returns, short radius elbows, short radius 180-degree returns, 3D elbows, straight tees and crosses, reducing outlet tees, reducing outlet crosses, lap joint stub ends, caps, and reducers.[81]  Branch outlets do not meet this ANSI/ASME standard, but instead meet Manufacturers Standardization Society (MSS) SP-97, which is entitled "Integrally Reinforced Forged Branch Outlet Fittings – Socket Welding, Threaded, and Butt-welding Ends."[82]  Moreover, while all BWPFs meet American Society for Testing and Materials (ASTM) and ANSI/ASME specifications, branch outlets do not meet ANSI/ASME specifications.[83]

Sixth, outlets and BWPFs are made using different manufacturing processes.[84]  Outlets are not BWPFs because they are made completely by machining and are not formed or forged.[85] Machining is the process of cutting away or otherwise removing excess material.[86]  The scope of the *China BWPFs Order* is expressly limited to fittings that are either "formed or forged" both of which have particular meanings within the industry and refer to the process of reshaping material without removing any material.[87]  BWPFs typically start with seamless pipe,[88] which is then formed into a particular shape over a mandrel.[89]  Most types of BWPFs are made from ASTM A234 grade seamless pipe.[90]  Although it is possible to make some BWPFs with welded pipe,

---

[81] *See* SCI Comments at 15 (citing Scope Ruling Request at 10).
[82] *Id.*
[83] *Id.*
[84] *Id.* at 17.
[85] *Id.* at 17 and Exhibit 6 at 2.
[86] *Id.* at 17 and Exhibit 6 at 6, 17-18.
[87] *Id.* at 17 and Exhibit 6 at 17-18.
[88] *See* Vandewater Comments at 11 and Exhibit 7 at 13.
[89] *Id.*
[90] *Id.*

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

seamless pipe is typically used to manufacture BWPFs because seamless pipe holds pressure better than welded pipes and is easier to bend on a mandrel without causing weakness.[91]

Seventh, outlets are straight in design, whereas BWPFs (except for caps) are not.[92]  For example, as shown in the Weldbend Corporation (Weldbend) catalog, elbows and return bends are curved along their length.  Straight tees and reducing tees have an irregular shape along the length of one side.[93]

Finally, outlets are classified under a different tariff subheading from BWPF.[94]  While an HTSUS classification is not dispositive of a scope analysis, it is not irrelevant.[95]  It is especially relevant here where the distinction is between HTSUS subheading 7307.93, for "Butt-welding fittings" (subject merchandise) and HTSUS subheading 7307.99, for "Other" (outlets).  The HTSUS classification, as confirmed by CBP rulings, recognizes physical differences between outlets and BWPFs.[96]  Additionally, neither Commerce nor the domestic industry appears to have made any effort, over many years, to add the applicable HTSUS subheadings for outlets to the scope of the *China BWPFs Order*.[97]

*Expectations of the Ultimate Purchasers*

Ultimate purchasers expect outlets to be different from BWPFs, as demonstrated by the different industry standards to which such products are sold/produced; installation costs; and pressure ratings and corresponding applications.[98]

Purchasers of Vandewater's outlets expect that the outlet will meet the MSS SP-97

---

[91] *Id.*
[92] *Id.* at 12
[93] *Id.*
[94] *Id.*
[95] *See* SCI Comments at 18.
[96] *Id.* at 18-19.
[97] *Id.* at 19.
[98] *Id.* at 20-23.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

manufacturing standard.  The standard covers "Integrally Reinforced Forged Branch Outlet Fittings  – Socket Welding, Threaded, and Butt-welding Ends."[99]  Paragraphs 6.1 and 6.1.3 of MSS SP-97 explain that the essential characteristic of a covered outlet is the connection to the run pipe, which must be contoured.[100]

Purchasers of BWPFs, on the other hand, "expect that the BWPFs will be forged, or produced from seamless pipe or steel plate, with the starting material conforming to ASTM A105, ASTM A106, and ASTM A285 standards, and for which the finished BWPFs conform to the ANSI/ASME B16.9 standard."[101]  The product description in the Petition explicitly notes the industry standards to which BWPF must conform, *i.e.*, ASTM A234-82a and ANSI/ASME B16.9.  There is no table or description of outlets in ANSI/ASME B16.9 because such outlets are not recognized as BWPFs by the piping industry.[102]

BWPFs have higher installation costs, in part as a result of the need to support higher pressure applications.[103]  Purchasers expect branch outlets to have much lower installation costs than BWPFs because only one end is welded and the weld is relatively weaker and less expensive.[104]  In order to change a BWPF system, an installer must burn out the connection with a cutting torch.[105]

BWPFs are intended to withstand comparatively high levels of pressure and are rated to 300 pounds per square inch (PSI) or higher.[106]  In contrast, because purchasers expect to use

---

[99] *See* Vandewater Comments at Tab 2.
[100] *Id.*
[101] *See* SIGMA Comments at 8 and Exhibit 1 at 25.
[102] *Id.* at 22; *see also* Vandewater Comments at 14 and Tab 1.
[103] *See* Vandewater Comments at 23 and Exhibit 9; SCI Rebuttal Comments at 25; and Vandewater Rebuttal Comments at 5.
[104] *See* SCI Comments at 20.
[105] *See* Vandewater Comments at 7.
[106] *See* SCI Comments at 22 and Exhibits 1, 9 and 17.

16

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

outlets in low-pressure sprinkler systems, the outlets in question are only certified to withstand pressure of 300 PSI or less.[107]

Outlets are custom engineered by the manufacturer for the sizes, pressures, and temperatures of the piping to which they are attached for the purpose of minimizing the cost of creating an outlet in a run of piping.[108]  BWPFs, in contrast, are standard fittings that match up with the size and schedule of the pipe to which they are attached.[109]

*Ultimate Use of the Product*

The ultimate uses of outlets are different from BWPFs.[110]  Vandewater's outlets are designed for fire sprinkler systems, which are low pressure and, thus, are rated at no more than 300 PSI.[111]  These threaded or grooved outlets are used so that the sprinkler head can be changed quickly and easily.[112]  Such temporary connections do not provide the same strength as a butt-weld connection, which is why outlets are used in low pressure applications (*e.g.*, no more than 300 PSI) and not in conditions requiring permanent connection.[113]  In such settings, threaded and grooved connections, rather than welded permanent connections, are commonplace.[114]  No fire sprinkler fabricator uses BWPFs for branch connections to sprinkler heads, because a BWPF does not have the ability to accept a sprinkler head with threads.[115]

---

[107] *Id.* at 22 and Exhibit 1 and 17.
[108] *Id.* (citing Scope Ruling Request at 13 and Exhibit 7).
[109] *Id.*
[110] *Id.* at 24.
[111] *Id.* at 23 (citing Scope Ruling Request at 4); *see also* Vandewater Comments at 23 and Tab 12 ("Please note that certain types of steel branch outlets, with similar basic physical characteristics, are also used by the oil and gas industry.  However, the steel branch outlets that Vandewater imports, which are the subject of this scope ruling request, are used strictly for fire sprinklers").
[112] *See* SCI Comments at 25-26 (citing Scope Ruling Request at Exhibit 23); *see also* Vandewater Comments at 23 ("Steel branch outlets are listed by Underwriter Laboratories (UL) for fire protection systems and are listed in the UL accessory section as 'welded outlets, ' and are not referred to by UL as BWPFs")
[113] *See* Vandewater Comments at 7 and Exhibit 1 at 24 (citing Vandewater Scope Ruling Request at 38); *see also* SCI Comments at 23 and Exhibits 6 (at Exhibit 2).
[114] *See* SIGMA Comments at 7.
[115] *See* Vandewater Comments at 23.

17

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

In contrast, BWPFs are used for connections in high pressure, industrial settings, with permanent connections.[116]  BWPFs are used in a broader set of industrial settings, such as chemical synthesis, petroleum refining, electric power generation, construction, and shipbuilding.[117]  BWPFs are required in these industries because butt welds create permanent, strong bonds capable of safely containing highly pressurized or toxic substances.[118]

*Channels of Trade in Which the Product Is Sold*

Outlets are sold in different channels of trade than BWPFs.[119]  Fire sprinkler system welded outlets are distributed solely within the fire sprinkler industry, which specializes in installing large-scale industrial, commercial, and residential fire sprinkler systems.[120]  For instance, Vandewater sells to fabricators of sprinkler systems and contractors.[121]  Vandewater also sells to fire sprinkler supply distributors, which sell to smaller contractors/fabricators.[122]

Distributors/end users for BWPFs are in totally different lines of business.[123]  BWPFs are sold to master distributors and contractors in the industrial and mechanical pipe-valves-fittings (PVF) segment of the construction industry.[124]  These distributors and contractors service the oil, gas, steam, and chemical industries, and generally maintain inventory of steel pipe and the BWPFs that correspond with the steel pipe they supply to their customers.[125]  According to the staff report of the ITC's 1992 final injury determination in the less-than-fair-value investigation,

---

[116] *Id.* at 25.
[117] *See* SCI Comments at 24.
[118] *Id.*
[119] *Id.* at 26.
[120] *Id.* at 27 and Exhibit 1 at 25.
[121] *See* Vandewater Comments at 26.
[122] *See* SCI Comments at 27 (stating that SIGMA's outlets are distributed solely to contractors within the fire sprinkler system industry) and Exhibit 1 at 25.
[123] *See* Vandewater Comments at 26.
[124] *Id.*
[125] *See* SCI Comments at 26; *see also* SIGMA Comments at 27.

18

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

"domestic manufacturers and importers sell virtually all their finished fittings to distributors, who then resell to end users."[126]

U.S. manufacturers that participated in the scope proceedings on outlets, *i.e.*, Island and Anvil, were not mentioned by the ITC as domestic producers of BWPFs in the original investigation or in any of the sunset reviews.[127]  This is because they are not U.S. manufacturers of BWPFs, but manufacturers of branch outlets, a distinct market segment.[128]

*Manner in Which the Product Is Advertised and Displayed*

Outlets are not advertised or displayed together with BWPFs.[129]  Vandewater's promotional brochures specifically describe its outlets as being intended for "fire protection & other low-pressure piping systems."[130]  Vandewater's promotional brochures do not refer to any of these products as "butt-weld pipe fittings."[131]  Likewise, SIGMA's promotional brochures describe the company's fire sprinkler system weld outlets as intended "for fire protection & other low-pressure piping systems."[132]

An exhibition document for the American Fire Sprinkler Association (AFSA) convention in October 2019 lists past participants for AFSA conventions.  No producer of BWPFs is on the list because BWPFs are not advertised in trade shows that are targeted at the fire sprinkler industry.[133]

---

[126] *See* SCI Comments at 28 (citing Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand, Inv. Nos. 731-TA-520 and 521 (Final), Publication 2528, June 1992 (USITC Final Investigation) at I-18).
[127] *Id.* at 26.
[128] *Id.*
[129] *Id.* at 28.
[130] *See* Vandewater Comments at 27.
[131] *Id.* at 27 and Tab 12.
[132] *See* SIGMA Comments at 9 and Exhibit 1 at 65.
[133] *See* Vandewater Comments at 27 and Tab 15.

19

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

In its own scope proceeding, in response to comments from Island, SCI noted that, beginning in November 2017, it mistakenly described some outlet types as a "Threaded Butt-weld Outlet" or a "Grooved Butt-weld Outlet" on import records.[134]  SCI has corrected this mistake and at no time did it change the classification of its product from HTSUS subheading 7307.99.[135]  Prior product descriptions without the term "butt-weld" had been in place for over a decade, and these descriptions were restored to their original and correct form more than a month before Island's submission in the scope proceeding.[136]  Since then, SCI's relevant import documentation has used the correct description, which is also consistent with SCI's website.[137]

The Chief Executive Officer (CEO) of Island, Mr. Sanders, was deposed regarding Island's claims that Vandewater's threaded and grooved outlets are a type of BWPF.[138]  Mr. Sanders was asked whether he could "recall or identify any document, such as an email or another piece of correspondence, with a customer or a competitor or employee, and prior to your planning for this lawsuit, when you described a grooved outlet or a threaded outlet as a butt-weld pipe fitting?"[139]  Mr. Sanders replied "No."[140]

None of the commercial images of BWPFs provided by the ITC resemble Vandewater's threaded or grooved outlets.[141]  None of the commercial illustrations of BWPFs in the Petition resemble branch outlets.[142]  None of these example products have the fishmouth end or the threaded or grooved ends present on Vandewater's outlets.[143]  The Ladish catalog cited in the

---

[134] *See* SCI Comments at 27 and Exhibit 6 at 37.
[135] *Id.* at 27 Exhibit 6 at 37.
[136] *Id.* at 27-28.
[137] *Id.* at 28 and Exhibit 9 at 2.
[138] *See* Vandewater Comments at 21-22 and Tab 11.
[139] *Id.* at Tab 11(the Sanders deposition).
[140] *Id.*
[141] *See* SCI Comments at 28 and Exhibit 6 at 24-25 (citing USITC Fourth Review at I-5).
[142] *See* Vandewater Rebuttal Comments at 7 (citing Petition at Appendix B).
[143] *Id.* at 28 and Exhibits 6 at 4, and 9 at 4.

20

Petition does illustrate some products that are not BWPFs together on the same page with the BWPFs (*i.e.*, saddles).[144]  However, outlets are not present in this display and even the non-butt-weld products contained therein do not resemble branch outlets.[145]

Island distributes a variety of fire sprinkler system weld outlet types but does not describe them as having a "butt-weld" portion or as constituting "butt-weld fittings."[146]  Island does distribute a butt-weld outlet that is configured on one end with a single-plane, circular, beveled opening.  Island correctly describes this end as a "butt-weld" end, and correctly refers to this product as a "butt-weld" outlet.[147]  Although this product shares the same "fishmouth" opening on one end, as with all of Island's other fire sprinkler system weld outlets, it is only this product that is described as having a butt-weld end or categorized as a butt-weld outlet.[148]  It is because of the beveled/square end that it is a "butt-weld" outlet and, accordingly, assigned the product code "BW."[149]

Island also distributes type 40 & 10 and Type 50 & 80 weld outlets.  Advertisements for these products explicitly identify these "carbon steel branch outlets" and "weld outlets" as being sold "For Fire Protection and Low Pressure Piping Systems."[150]  Although some of these advertisements recognize that Island's weld outlets can be used for other purposes (*e.g.*, building services, power plant services), they also contain more detailed discussion of use for fire

---

[144] *See* SCI Comments at 29.

[145] *Id.* at 28 and Exhibit 6 at 5 and 15, and Exhibit 9 at 4.

[146] *Id.* at 29-30 (citing Island's Letter, "Carbon Steel Butt-Weld Pipe Fittings from China Handouts at July 25, 2018 Department Meeting," dated July 25, 2018).

[147] *Id.* at 28 and Exhibit 17 at 7 and Attachment 4.

[148] *Id.* at 28 and Exhibit 17 at 7.

[149] *See* SIGMA Comments at 11 and Exhibit 3B ("As stated in the advertisement, 'BW' reflects 'Bevel for Welding, ' which is likewise consistent with the physical characteristics of a BWPF").

[150] *Id.* at 9 and Exhibit 3B.

21

sprinkler systems.[151]  Further, these advertisements contain no reference to the ANSI/ASME B16.9 standard.[152]

## Island's Comments

*Physical Characteristics of the Product*

Vandewater offers two types of steel branch outlets:  threaded and grooved.  Various names are used to describe these products, including steel branch outlets, threaded or grooved pipe outlets, and welded outlets.[153]  Vandewater's outlets have the same physical characteristics and welding requirements as products subject to the *China BWPFs Order*:  (1) they are formed or forged pipe fittings made of carbon steel; (2) they have an inside diameter of less than 14 inches; (3) they feature a "beveled edge" that demands that the fitting be welded to a pipe via a shallow channel that accommodates the "bead" of the weld; and (4) they are used to join sections in piping systems where conditions require permanent, welded connections.[154]  The ITC stressed that the beveled edges of these fittings is what distinguishes them from other types of pipe fittings, which rely on different types of fastening methods, such as threaded, grooved, or bolted fittings.[155]  In short, Vandewater's outlets have all of the same relevant physical characteristics and welding requirements as products covered by the *China BWPFs Order*.[156]

*Expectations of the Ultimate Purchasers*

The expectations of the ultimate purchasers of outlets are consistent with those of the purchasers of other merchandise subject to the *China BWPFs Order.*  The ITC has recognized a

---

[151] *Id.*
[152] *Id.*
[153] *See* Island Comments at 5.
[154] *Id.* at 6.
[155] *Id.* at 5-6.
[156] *Id.* at 6.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

large number of uses for in-scope fittings, explaining that the products "are welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air conditioning, *automatic fire sprinklers*, electric conduit, irrigation, and process-piping systems …{and} structural applications."[157]

Products sold and marketed in the United States as "butt-weld pipe fittings" or fittings with butt-welded ends come in many shapes and configurations and have numerous and varied uses.[158]  These products include caps, lap joint stub ends, and saddles.  Purchaser expectations for welded outlets fall within the wide range of expectations associated with the above-referenced products.[159]

Moreover, public litigation records establish that Chinese manufacturers and distributors of welded outlets with threaded or grooved ends recognize that these products are BWPFs.  For example, in 2017, SCI and Jinan Meide, SCI's Chinese manufacturer, took the position that SCI could invoke the exemption carved out for BWPFs from the then-pending AD investigation of forged steel fittings from China, because their welded outlets were BWPFs.[160]  Accordingly, Jinan Meide and SCI changed the description of their welded outlets with threaded and grooved ends to 'butt-weld outlets' in import paperwork, as well as in SCI's statement concerning the applicability of antidumping or countervailing duties,[161] in which the welded outlets were described as "threaded butt-welded outlets" and "grooved butt-welded outlets."[162]

---

[157] *Id.* at 7 (citing USITC Fourth Review at 6 (emphasis added)).
[158] *Id.* at 7 and Exhibits 1-4B.
[159] *Id.*
[160] *Id.* at 8 and Exhibit 6.
[161] *Id.* at 8 ("SCI maintained Anti-Dumping Duty Stationary so that it would have a ready response in the event that CBP questioned it about whether an ADD order applied to a product") and Exhibit 7.
[162] *Id.* at 8 and Exhibits 7 and 8 (noting that "{i}n further communications between SCI and Jinan Meide, SCI acknowledged that the merchandise covered by the Sprink Scope Ruling was 'almost the same as' SCI cooplets, which is virtually identical to Vandewater's outlets").

23

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

In sum, the Petition and the ITC's description of the products covered by the *China BWPFs Order*, the advertising materials published by outlet distributors and producers, as well as their own commercial documents, show that expectations surrounding BWPFs encompasses a broad range of products including outlets.[163]  Such products include pipe fittings with only one beveled end, as well as fittings used in fire sprinkler systems.[164]  Ultimate purchasers' expectations may vary depending on the particular type of, and intended use for, the BWPFs they need.  However, they will invariably expect that any such product is made of formed or forged carbon steel, will have an inside diameter of less than 14 inches, will be permanently welded into a piping system via a beveled butt-welded end, and will connect to other components, such as pipes, fittings, flanges and sprinklers.[165]

*Ultimate Use of the Product*

Because products covered by the *China BWPFs Order* come in so many shapes and configurations, they have many ultimate uses, as noted above.[166]  However, such products are often used in fire sprinkler systems.[167]  The ITC highlighted this application, noting that BWPFs "are welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, *automatic fire sprinklers*, electrical conduit, irrigation, and process-piping systems."[168]  Vandewater's outlets are used in one of these explicitly-named contexts – *i.e.*, they are permanently welded into automatic fire sprinkler systems.[169]

---

[163] *Id.* at 8.
[164] *Id.*
[165] *Id.* at 9.
[166] *Id.*
[167] *Id.*
[168] *Id.* (citing USITC Fourth Review at I-6 and 6) (emphasis added).
[169] *Id.*

24

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

*Channels of Trade in Which the Product Is Sold*

Like the products covered by the *China BWPFs Order*, Vandewater's outlets are sold through distributors.

*Manner in Which the Product Is Advertised and Displayed*

Like any other BWPFs, outlets are advertised and displayed via online catalogs on company websites or by affiliated/third-party online sources.[170]  Such advertisements typically contain size, weight, and other technical specifications for the product, such as pressure rating and source materials.[171]

**Vandewater, SCI, and SIGMA Rebuttal**

*Physical Characteristics of the Product*

Rather than providing a comprehensive comparison of the physical characteristics of Vandewater's outlets and BWPFs, pursuant to (k)(2), Island instead attempts to repackage its (k)(1) arguments by cherry-picking from the investigation of the ITC.[172]  The fact that Commerce has already conducted a (k)(1) analysis, and that the Court ordered Commerce to conduct a (k)(2) analysis, makes clear that the scope of the *China BWPFs Order* is ambiguous and that a recitation of the language of the scope is irrelevant in response to the *Remand Order*.[173]  Island has, tellingly, omitted essential language that directly undermines the conclusion that Island urges Commerce to reach.[174]

As noted in the importers' initial submissions, there are many physical differences

---

[170] *Id.*
[171] *Id.* at 10 and Exhibits 3 and 5.
[172] *See* Vandewater Rebuttal Comments at 2; *see also* SCI Rebuttal Comments at 12-18; SIGMA Rebuttal Comments at 4-6.
[173] *See* SIGMA Rebuttal Comments at 3.
[174] *Id.*

25

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

between Vandewater's outlets and BWPFs, including: different manufacturing specifications; whether the product is produced from welded pipe or seamless pipe; the existence of a contoured end; the existence of a threaded or grooved end connection; whether the product is straight or angular in design; whether the product is welded to the end or to the side of a pipe; whether the product has different bevel angles; and whether the connection is made with a fillet weld.[175]

Contrary to Island's assertions, Vandewater's outlets cannot be BWPFs, which, pursuant to the scope language, "require permanent, welded connections."[176]  One end of the branch outlet is fillet welded to the side of a pipe, and the other end of the branch outlet has the temporary, non-welded, threaded or grooved connection to allow attachment of a sprinkler head or branch pipe.[177]  In contrast, a BWPF never has a threaded end or grooved end because it is designed to make a permanent connection by welding all connectable ends to a pipe or another fitting.[178]

Island asserts that Vandewater's outlets "feature a 'beveled edge' that demands that the fitting be welded to a pipe via the shallow channel that accommodates the 'bead' of the weld, which, in the ITC's view, is the essence of a 'butt-weld pipe fitting.'"[179]  However, "such language contemplates beveling on both parts of the assembled pipe …"[180]  Thus, as the Court unequivocally concluded, "Vandewater's branch outlets are welded to header pipe, which is not, apparently, beveled at the weld.  The quoted sunset review language is, therefore, not descriptive of the actual physical characteristics of Vandewater's steel branch outlets."[181]  Agreeing with Island here would be tantamount to knowingly contradicting the Court's holding.[182]

---

[175] *See* Vandewater Rebuttal Comments at 2-3.
[176] *See* SCI Rebuttal Comments at 14-15.
[177] *Id.*
[178] *Id.* at 15; *see also* Vandewater Rebuttal Comments at 3.
[179] *See* SIGMA Rebuttal Comments at 4 (citing USITC Fourth Review at 6).
[180] *Id.* (citing *Remand Order* at 7).
[181] *Id.* (citing *Remand Order* at 8).
[182] *Id.*

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Island also points to the Ladish catalog contained in the Petition and notes that it features pictures of BWPF that include saddles.[183]  These saddle fittings are not BWPFs by reason of the "fishmouth" opening on one side; they are BWPFs by reason of the other side of the fittings (*i.e.*, the beveled branch end).[184]

In addition to the Sperko affidavit,[185] the Neil Shyman affidavit provided by Vandewater echoes several of the differences in physical characteristics between Vandewater's outlets and BWPFs.[186]  These differences include:  sprinkler heads cannot be attached to a BWPF while welded branch outlets can and are; welded branch outlets always carry Underwriters Laboratory (UL) / Factory Mutual (FM) approvals while BWPFs do not; threaded welded branch outlets are forged using grade A-105 steel and grooved welded branch outlets generally use grade A-53 steel, while BWPFs generally use grade A-224 steel; and welded branch outlets have a maximum pressure rating of 300 PSI, while BWPF generally are rated to handle pressures up to and exceeding 10,000 PSI.[187]  Mr. Shyman's points are confirmed by the ITC in its original 1986 preliminary injury investigation where the ITC stated, "{t}he welded connections used in butt-weld pipe fittings provide a better seal than threaded, grooved, or bolted fittings can give under pressure."[188]  All of these distinctions strongly point to the conclusion that Vandewater's outlets

---

[183] *Id.* (citing Island Comments at 7).

[184] *Id.*

[185] *See* Vandewater Comments at Exhibit 7 (noting that Walter Sperko is the President of Sperko Engineering Services, Inc., which provides engineering consulting services).

[186] *See* Vandewater Rebuttal Comments at 3 and Attachment A (noting that "Mr. Neil Shyman was Vice President and General Manager of Neill Supply from May 1968 to January 2011.  Neill Supply is a fabricator and supplier of fire sprinkler and industrial piping and sells Vandewater's steel branch outlets").

[187] *Id.*

[188] *Id.* at 4 (citing *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand, Inv. Nos. 731-TA-520 and 521 (Preliminary), Publication 2401*, July 1991 (USITC Preliminary Investigation)).

27

have different physical characteristics and are not part of the same class or kind of merchandise as BWPFs.[189]

*Expectations of the Ultimate Purchasers*

Contrary to Island's assertions, the expectations of the ultimate purchasers of BWPF differ from the expectations of the ultimate purchasers with respect to Vandewater's outlets.[190] Purchasers of Vandewater's outlets are all fabricators of fire sprinkler systems and expect the outlets to:  have interchangeable connections between the outlet and the sprinkler head; be manufactured with ASTM A-105 grade forging bars; be sold based on the run (header) size, the branch size, and the pressure rating (300 PSI).[191]  None of these purchasers use BWPFs for branch connections to sprinkler heads,[192] and BWPF purchasers cannot substitute steel branch outlets in their own applications.[193]

Purchasers of BWPFs are from a wide variety of industrial backgrounds (particularly manufacturers of piping systems used to convey oil, gas, steam, or chemicals).[194]  Because BWPFs require a higher PSI rating (up to and beyond 10,000 PSI) and a permanent connection, they also have higher installation costs,[195] are typically made from ASTM A-234 grade seamless pipe,[196] and are sold in nominal pipe sizes with specific pipe schedules which allow for the seamless flow within the pipe.[197]

---

[189] *Id.*
[190] *Id.* at 5.
[191] *Id.* at 5-6.
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] *Id.*

28

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

The Shyman affidavit also states that, Mr. Shyman, in his experience, has never sold BWPFs for fire sprinkler systems and has never seen BWPFs used in fire sprinkler systems.[198] He also states that he has never sold welded outlets to mechanical contractors and has never seen welded outlets used in those systems.[199]  Further, he states that the expectation of the ultimate purchasers of Vandewater's outlets was that they would be used in fire sprinkler systems, and that these customers would never use BWPFs for fire sprinkler systems.[200]

Island's reliance on the ITC language, stating that BWPFs "are welded into permanent, fixed piping systems that convey gases or liquids," including "automatic fire sprinklers," misdirects Commerce from the fundamental question at issue in this scope proceeding:  whether Vandewater's outlets fall within the scope of the *China BWPFs Order*.[201]  Although some products used in fire sprinkler systems may fall under the scope of the *China BWPFs Order*, Vandewater's outlets clearly do not.[202]

Island asserts that products sold and marketed in the United States as BWPFs, or with "butt-welded" ends, come in many shapes and configurations and have numerous and varied uses.[203]  However, none of Island's exhibits show a single example of a threaded or grooved outlet with a butt-weld.[204]  Moreover, Island confuses the issue by pointing to one particular type of outlet, known as a "butt-weld outlet," but Commerce has no need to consider whether a "butt-weld outlet" is a type of butt-weld pipe fitting, because Vandewater's scope request does not cover butt-weld outlets.[205]  Instead, Vandewater's request covers only low-pressure threaded and

---

[198] *Id.* at 6-7 and Attachment A.
[199] *Id.*
[200] *Id.*
[201] *Id.* at 6; *see also* SIGMA Rebuttal Comments at 6 (citing Island Comments at 7-9).
[202] *See* SIGMA Rebuttal Comments at 6.
[203] *See* Vandewater Rebuttal Comments at 7 (citing Island Comments at 7).
[204] *Id.*
[205] *Id.*

29

grooved steel branch outlets, neither of which is designed to accommodate any type of a butt-weld.[206]

Additionally, Island incorrectly asserts that customers have a wide range of expectations, given the diversity of products covered by the scope, including "caps, lap joint stub ends, and saddles," which it argues have characteristics comparable to welded outlets.[207]  For proof, Island points to Ladish's catalog.[208]  This is misleading.  The Ladish catalog to which Island points is not limited to BWPFs.[209]  The catalog segment cited by Island is entitled "Seamless Welding Fittings," but does not state (or imply) that all products in that catalog are butt-weld fittings.[210]  Vandewater agrees that caps and lap joint stub ends are indeed BWPFs.[211]  Vandewater does not agree, however, that a saddle is a butt-weld pipe fitting.[212]  Therefore, the range of products covered by the scope, and the corresponding expectations associated with these products, are not as broad as Island suggests.

Finally, Island argues that "public litigation records establish that manufacturers and distributors of Chinese welded outlets with threaded or grooved ends also recognize that these products are BWPF."[213]  The documents that Island cites, however, are documents of SCI or Jinan Meide, which Vandewater understands was SCI's supplier of outlets.[214]  None of the

---

[206] *Id.* at 7-8.
[207] *Id.* at 8 (citing Island Comments at 7-8).
[208] *Id.* (citing Island Comments at Exhibit 3).
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] *Id.* (noting that the caps and lap joint stub ends shown in the catalog:  (1) all meet B16.9 and ASTM A-234 specifications, based on the notation in upper left and upper right corners, respectively, of the specification sheets; and (2) show a beveled end, beveled only on the non-flanged side for a lap joint stub end, that resembles the characteristic 37.5 degree angle; in contrast, the Ladish catalog sheet showing a saddle does not have a reference to standard B16.9, and the illustration and engineering drawing cross-section of the saddle also does not show a beveled end).
[213] *Id.*
[214] *Id.* at 9

30

litigation documents cited by Island pertain to Vandewater, or to Vandewater's supplier of outlets, much less any "ultimate purchasers" of outlets.[215]  Neither Vandewater, its supplier, nor any purchasers of Vandewater's outlets have ever claimed or implied that Vandewater's outlets are BWPF.[216]  Therefore, the documents cited by Island are irrelevant to this scope proceeding.

The discussion above demonstrates stark differences in expectations between ultimate purchasers of outlets versus purchasers of BWPFs.  These differences support a conclusion that the two products are different classes or kinds of merchandise.

*Ultimate Use of the Product*

There are several differences in the ultimate uses of outlets and BWPFs.[217]  BWPFs are used to connect pipe sections where connections require permanent, welded connections.[218]  In contrast, Vandewater's outlets are used only in fire sprinkler systems.[219]  To the best of Vandewater's knowledge, no fire sprinkler fabricator uses any BWPFs for the branch connection, because a BWPF does not have the ability to accept a sprinkler head.[220]  BWPFs are used primarily in industries such as chemicals, oil refining, energy generation, construction, and shipbuilding.[221]

Vandewater's outlets could not be used in a BWPF application because the branch side of the welded outlet is designed specifically for use with a threaded sprinkler head.[222]  Mr. Shyman stated that "in my entire time working at Neill Supply I have never seen butt-welded fittings used in fire protection systems nor have any customers ever told me they were going to be used in fire

---

[215] *Id.* ("Vandewater does not have personal knowledge to explain what {sic} SCI's position as to those documents")
[216] *Id.*
[217] *Id.*
[218] *Id.*
[219] *Id.*
[220] *Id.* at 9-10.
[221] *Id.* at 10.
[222] *Id.*

31

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

protection sprinkler systems."[223]  For the same reason, Island's comments regarding ultimate use are wrong.  BWPFs are simply not used in fire sprinkler systems to connect to a sprinkler head, because a BWPF does not have the ability to accept a sprinkler with threads.[224]

*Channels of Trade in Which the Product is Sold*

Outlets and BWPFs are sold through completely different distribution channels.[225] BWPFs are sold primarily through distributors to a variety of end-users, whereas outlets are sold to a particular market segment.[226]

Vandewater sells the outlets in question to fabricators of sprinkler systems, who in turn sell to fire sprinkler system installation contractors.[227]  Vandewater also sells to fire sprinkler supply distributors, which sell to smaller contractors that fabricate smaller sprinkler systems.[228] The Shyman affidavit summarized the distinctions in channels of trade as follows:

> While employed by Neill Supply in a sales capacity, I would make sales calls in the morning on fire protection sprinkler contractors, and an afternoon call on a mechanical contractor.  I would offer welded branch outlets to the fire protection sprinkler contractor, but not mention BWPF, because BWPF are not used for fire protection systems.  Likewise, I would sell BWPF to the mechanical contractor, but would not mention welded branch outlets because butt-weld fittings are not used in for {sic} fire protection sprinkler systems.[229]

Thus, Island's sole statement regarding channels of trade – which is that both BWPF and Vandewater's outlets are both sold through "distributors" – simply glosses over the real differences between the channels of distribution for BWPF and steel branch outlets.

---

[223] *Id.* at 10 and Attachment A.
[224] *Id.* at 10.
[225] *Id.*
[226] *Id.* at 10 and Attachment A.
[227] *Id.* at 11.
[228] *Id.*
[229] *Id.* at 11 and Attachment A.

32

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

*Manner in Which the Product is Advertised and Displayed.*

In its affirmative comments, Vandewater explained that the advertising of outlets differs significantly from the advertising of BWPFs.  As an example, Vandewater attached to its affirmative comments the list of exhibitors for the AFSA convention in October 2019.  No producer of BWPFs was on the AFSA exhibitor list, because BWPFs are not advertised in trade shows that are targeted at the fire sprinkler industry.  Rather, BWPFs are advertised and sold to mechanical contractors.  In Vandewater's ten-plus years of attendance at National Fire Protection Association conventions, Vandewater personnel never observed any BWPF exhibitor.

Island's only discussion of this factor is its statement that both outlets and BWPFs are advertised and displayed via online catalogs in company websites or affiliated or third-party online sources.  The fact that some entities advertise a broad array of products does nothing to undermine the fact that the parties who use outlets and BWPF participate in entirely different trade shows, and the advertising literature reflects those differences.

**Island's Rebuttal**

*Physical Characteristics of the Product*

As demonstrated below, each one of the alleged distinctions between outlets and BWPFs raised by the importers is either non-existent or inconsequential for purposes of a (k)(2) analysis.[230]  For purposes of a (k)(2) analysis, Commerce need only demonstrate that the general physical characteristics of the products under consideration are "sufficiently similar" to in-scope merchandise to conclude that the two are of the same class or kind.[231]

---

[230] *See* Island Rebuttal Comments at 5.
[231] *Id.* (citing *Wirth v. United States*, 5 F. Supp. 2d 968, 981 (CIT 1998) (*Wirth*)).

33

The importers argue that a BWPF "never" has a contour on either end, that it "always has a square end,"[232] and that outlets are welded to a hole cut in the wall or side of the pipe, not the end of the pipe.[233]  The importers argue that, in contrast, a BWPF "is always welded to the end of a pipe, another butt-weld fitting, or a butt-weld valve,"[234] and is designed for "end-to-end connection."[235]  However, saddles are covered by the scope and they do not have these characteristics.[236]

The importers further argue that "all connectable end {sic} of the butt-weld pipe fitting are welded to the end of a pipe, another butt-weld fitting, or a butt-weld valve,"[237] and that the ends of a BWPF are "always for welding" and do not have physical characteristics allowing a temporary connection.[238]  However, lap joint stub ends have a beveled edge on one end which allows for a welded, permanent connection, while on the other end, it has a stub end, which cannot be welded to a pipe and is instead designed to be bolted to a piping system.[239]  Therefore, outlets and other BWPFs are similar in that they both can have an end configured for a temporary fastening method (such as grooved, threaded, or bolted), while also being permanently connected to a piping system through at least one welded connection.[240]

The importers argue that outlets are "straight in design" and that, in contrast, BWPFs, "except for caps," are not straight along their length.[241]  However, caps are unambiguously

---

[232] *Id.* at 5-6 (citing Vandewater Comments at 5 and SCI Comments at 5-6).
[233] *Id.* at 6 (citing Vandewater Comments at 7 and SIGMA Comments at 5).
[234] *Id.* (citing Vandewater Comments at 6).
[235] *Id.* (citing SCI Comments at 5).
[236] *Id.* at 6 and Exhibits 2 and 3.
[237] *Id.* at 8 (citing Vandewater Comments at 7).
[238] *Id.* (citing SCI Comments at 6 and 11-12).
[239] *Id.* at 10.
[240] *Id.* at 12.
[241] *Id.* at 13 (citing Vandewater Comments at 12).

34

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

covered by the scope of the *China BWPFs Order*, and, therefore, this is not a characteristics that distinguishes outlets from BWPFs.[242]

The importers argue that the angle of the bevel on an outlet is "normally" 45 degrees, while the bevel angle on a BWPF is 37.5 degrees.[243]  The importers also claim that outlets rely on a fillet weld, which is an incomplete joint penetration with "no channel" in which the outlet rests directly against the pipe, while the butt weld used with BWPFs is a full penetration weld in which the outlet and the pipe do not make contact.[244]

With respect to the bevel angle, neither the *China BWPFs Order*, the Petition, the ITC reports, nor the sunset reviews mention any requirements relating to the angle of the bevels.[245] Rather, all these sources require is for the beveled edge of the fitting to "form a shallow channel that accommodates the 'bead' of the weld that fastens the two adjoining pieces."[246]  With respect to the purportedly incomplete weld penetration for outlets, the evidence provided by the importers undermines their own argument.[247]  Vandewater provided the Sperko affidavit which states:

> The end of a branch fitting where it attaches to the run pipe is beveled at 45°.  The header pipe to which it is welded is not beveled.  This 45-degree angle groove (*i.e.*, channel) allows welding of a full penetration or partial penetration groove weld reinforced by a fillet weld.[248]

This statement demonstrates that outlets do form a channel to accommodate the bead of a weld, and that the weld can be considered a full penetration weld.[249]

---

[242] *Id.* at 6, 13, and Exhibits 2 and 3 (citing Petition at 4; and USITC Preliminary Investigation at A-5).
[243] *Id.* at 14 (citing Vandewater Comments at 8; and SCI Comments at 8).
[244] *Id.* at 16 (citing Vandewater Comments at 9; SCI Comments at 8; and SIGMA Comments at 5).
[245] *Id.* at 15 (citing the *China BWPFs Order*; the Petition; USITC Preliminary Investigation at A-5; and USITC Final Investigation at I-5).
[246] *Id.* (citing USITC Fourth Review at 6; and Petition at 4).
[247] *Id.* at 16-17.
[248] *Id.* at Exhibit 8.
[249] *Id.* at 17.

35

There is nothing on the record supporting the importer's restrictive definition of "butt-weld."  For example, the American Weld Society handbook, cited by SCI in its comments, notes that "butt-weld" is "a non-standard term."[250]  Furthermore, Island's CEO may have never called an outlet a BWPF, but SCI certainly has.[251]  Similarly, Anvil, which has since merged with importer SCI, has previously stated that SCI's outlets were BWPF.[252]  Other market players, such as Aleum USA, also have identified outlets as butt-weld products.[253]  Thus, the record shows that outlets are "butt-weld" products.

The importers argue that outlets and BWPFs are manufactured to different industry standards.[254]  In particular, they submit that outlets are manufactured using MSS SP-97, while BWPFs meet ANSI/ASME B16.9,[255] and they point to other differences in applicable industry standards.[256]  First, the *China BWPFs Order* is silent as to industry standards, which indicates that they are not relevant for purposes of determining the scope of the order.[257]  The ANSI/ASME standard could have been included but was not, and the Court of Appeals for the Federal Circuit (CAFC) has stated that the "absence of a reference to a particular product in the petition does not necessarily indicate that the product is not subject to an order."[258]

It is not true that "all of the manufacturing methods" to produce outlets differ from those used to manufacture BPWFs.[259]  The ITC's description of the manufacturing process of BWPFs includes the following:  "The manufacture of BWPFs typically begins with seamless carbon steel

---

[250] *Id.* at 27 (citing SCI Comments at 9 and Exhibit 6).
[251] *Id.* at 28 and Exhibits 7 and 16.
[252] *Id.* (citing Anvil Opposition Letter).
[253] *Id.* at 28 and Exhibit 10.
[254] *Id.* at 20 (citing Vandewater Comments at 10-11).
[255] *Id.* (citing SCI Comments at 15; and SIGMA Comments at 6).
[256] *Id.* (citing Vandewater Comments at 2-5; SCI Comments at 15-16; and SIGMA Comments at 8, 23, and 25).
[257] *Id.*
[258] *Id.* at 21 (citing *Nitta Industries Corp. v. United States*, 997 F.2d 1459, 1464 (Fed. Cir. 1993)).
[259] *Id.* at 23.

36

pipe *although some types of fittings*, such as caps, are formed from carbon steel plate, billet, or *bar stock and machined* (bored) or punched *to shape* and size in a press."[260]  Many of these processes are typical of outlet production.  Therefore, it is not true that outlet manufacturing methods differ from the methods for producing BWPFs.  Indeed, some BWPF may be made from bar stock and machined.[261]

Additionally, the ITC's description of the manufacturing processes to produce BWPFs illustrates the wide variety of manufacturing processes, and the language impliedly or expressly indicates that there are other methods not listed in the report (*e.g.*, by using words like "typically," "most of the domestic industry," "depending on the type of fitting to be made, one process may be preferred to the other," "the finishing steps involved in the production of BWPF may include one or more of the following steps …," "some manufacturers use semi-automated machinery that …," "the manufacturing process may be continuous," "the Chinese and Thai industries tend to be based on the hot-process …").[262]  These types of statements demonstrate that there is not one single manufacturing process for BWPFs that is distinct from the process used to fabricate outlets.[263]

Additionally, the *China BWPFs Order* covers "formed or forged" fittings and, based on the descriptions provided, Vandewater's threaded outlets are forged.[264]  Furthermore, Vandewater acknowledges that some BWPFs are manufactured with welded pipe, just like the

---

[260] *Id.* (citing ITC Final Investigation at I-7) (emphasis added).
[261] *Id.*
[262] *Id.* at 24 (citing ITC Final Investigation at I-7 through I-10).
[263] *Id.*
[264] *Id.* at 23 and 32.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

grooved outlets.[265]  Therefore, there are various similarities between the manufacturing processes of outlets and BWPF.[266]

Lastly, the classification of outlets and other BWPF under different HTSUS subheadings is irrelevant.[267]  The fact that a threaded outlet is classified under HTSUS subheading 7307.92.3010, because such subheading more specifically describes a threaded outlet, does not mean that the item would not also potentially fall under HTSUS subheading 7307.93, which is less specific to the product.[268]  In any case, HTSUS classification does not determine whether merchandise is covered by an order.[269]

*Expectations of the Ultimate Purchasers*

The core expectation of purchasers of BWPFs, as well as of outlets, is connecting the fitting to a piping system through a welded, permanent connection, regardless of whether one of the ends is amenable to a temporary connection by grooved, bolted, or threaded fastening methods.[270]  Furthermore, the Court has repeatedly held that "if two products can be used in at least some of their applications for similar, if not identical purposes, Commerce may conclude that purchasers of the products have similar expectations."[271]  Outlets and BWPFs share similar purchaser expectations.

The importers argue that ultimate purchasers expect outlets and other BWPFs to be manufactured with different specifications.[272]  However, their specific arguments conflict with one another.  Vandewater argues that ultimate purchasers of outlets expect that threaded outlets

---

[265] *Id.* at 23.
[266] *Id.*
[267] *Id.* at 28-30.
[268] *Id.* at 29.
[269] *Id.* at 30.
[270] *Id.* at 31.
[271] *Id.* at 32 (citing *Olympia Industrial, Inc. v. U.S.*, Court No. 04-00647, 23 (CIT 2006) at 29-30).
[272] *Id.*

38

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

are made from ASTM A105-grade forging bars.[273]  SIGMA, in contrast, argues that ultimate purchasers of outlets expect that the outlets are made from ASTM A572 and ASTM A29 bar stock.[274]  Vandewater argues that purchasers of most types of BWPFs generally expect those products to be made from ASTM A234-grade seamless pipe.[275]  SCI and SIGMA argue that purchasers of most types of BWPFs generally expect those products to be made from ASTM A105, ASTM A106, and ASTM A285 seamless pipe or steel plate.[276]  The importers' argument overstates, or at least misstates, the expectations of the ultimate customers.[277]  In Island's experience, the ultimate purchasers' expectations will generally focus on meeting the minimum requirements of third party listings and approvals, *i.e.*, safety/testing ratings, applicable to the intended application.[278]

The importers claim that outlets are not sold according to the corresponding size or schedule of the pipe,[279] and that BWPFs are sold in nominal pipe sizes with specific pipe schedules which allows a seamless flow within the pipe.[280]  This alleged distinction is simply not true; outlets and BWPFs are both advertised and sold in nominal pipe size.[281]  For example, a 2" or 4" outlet refers to nominal pipe sizes that will connect to corresponding nominal pipe diameters of 2" and 4".[282]  In fact, SCI's outlets are manufactured to "match up" with standard nominal pipe sizes and schedules.[283]  Consequently, the expectations of the ultimate purchasers

---

[273] *Id.* (citing Vandewater Comments at 23).
[274] *Id.* (citing SIGMA Comments at 7-8).
[275] *Id.* (citing Vandewater Comments at 23).
[276] *Id.* (citing SIGMA Comments at 7-8).
[277] *Id.* at 32-33.
[278] *Id.* at 33.
[279] *Id.* at 34 (citing Vandewater Comments at 24 and SCI Comments at 22).
[280] *Id.*
[281] *Id.*
[282] *Id.* at 35 and Exhibits 12 and 13.
[283] *Id.*

39

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

of outlets and BPWFs are similar because they expect both to be manufactured in sizes which match up with standard nominal pipe sizes and schedules.[284]

The importers argue that no fabricators of fire sprinkler systems use BWPFs for branch connections to sprinkler leads because a BWPF does not "have the ability to accept a sprinkler head with threads," or the flexibility to change the sprinkler head quickly and easily.[285]  In contrast, ultimate purchasers of BWPFs, which are in a wide variety of industries, particularly manufacturers of piping systems used to convey oil, gas, steam, or chemicals, would not buy outlets for such applications because of their low-pressure grading and the lesser strength of the connection.[286]  SCI and SIGMA also claim that, because outlets and BWPFs meet different industry standards, they are used in different applications.[287]  However, the *China BWPFs Order* includes a sweeping range of products with differing applications, and the expectations of ultimate purchasers will vary depending on what type of BWPF they need.[288]  That said, the core expectation of purchasers of BWPFs, as well as of outlets, is that of connecting the fitting to a piping system through a welded, permanent connection, regardless of whether one of its ends is amenable to a temporary connection by grooved, bolted or threaded fastening methods.[289]  Additionally, and more specifically, one of the expectations that ultimate purchasers of BWPFs have is the use of BWPFs for "automatic fire sprinklers" applications.[290]  Because ultimate purchasers of both outlets and BWPFs may expect to use them for fire sprinkler applications, the

---

[284] *Id.*
[285] *Id.* at 30 (citing Vandewater Comments at 22).
[286] *Id.*
[287] *Id.* (citing SCI Comments at 21-22; and SIGMA Comments at 7-8).
[288] *Id.* at 31.
[289] *Id.* (citing *China BWPFs Order*).
[290] *Id.* (citing USITC Forth Review).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

expectations of ultimate purchasers of outlets are similar to those of ultimate purchasers of other types of BWPFs.[291]

Importantly, outlets are perceived to be BWPFs by the largest manufacturer and master distributor of outlets in the United States, Anvil.[292]  At the onset of the underlying scope segment, Anvil stated on the record that the importer's outlets are BWPFs that fall within the scope of the *China BWPFs Orders*, and it expressed agreement with Island's arguments.[293]

*The Ultimate Use of the Product*

Connecting the fitting to a piping system through a welded, permanent connection is the main use of both outlets and BPWFs.[294]

The importers argue that outlets are all used "solely" for fabrication of low pressure commercial or residential fire sprinkler systems applications, while BWPFs are used for other applications that require permanent, welded connections for higher pressure conveyance of oil, gas, steam, and chemicals.[295]  Those generalizations are inaccurate.  Both outlets and BWPFs are used in fire sprinkler systems.[296]  For example, weld tees can be used for the fire sprinkler market, although outlets are typically preferred due to cost of installation considerations.[297]  Additionally, outlets are not used exclusively in the fire sprinkler system field.[298]

Although the importers suggest a narrow set of uses for outlets, such characterizations are not accurate.[299]  Certain outlets sizes (½", ¾" and 1") are expected to be used for connecting to a

---

[291] *Id.* at 31-32.
[292] *Id.* at 33.
[293] *Id.* at Exhibits 5 and 11.
[294] *Id.* at 35 (citing USITC Fourth Review at 6).
[295] *Id.* (citing Vandewater Comments at 24-25; SCI Comments at 22-23; and SIGMA Comments at 7).
[296] *Id.* (citing USITC Fourth Review at 6).
[297] *Id.*
[298] *Id.* at 36.
[299] *Id.* at 35.

41

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

sprinkler head, and other outlets sizes (1¼", 1½", and 2") are used to connect to other pipes.[300] Additionally, grooved outlets in all sizes are for pipe connections only.[301] This demonstrates that both outlets and BWPFs may be used to connect the fitting to a pipe.[302] As this discussion indicates, the uses of outlets are similar to those of BWPFs.

*Channels of Trade in Which the Product is Sold*

The importers argue that outlets are sold solely within the fire sprinkler system industry, whereas BWPFs are sold to master distributors and contractors in the industrial and mechanical PVF segment of the construction industry.[303] Vandewater argues that it sells its outlets to fire sprinkler supply distributors or to fabricators of sprinklers systems.[304] In contrast, BWPFs are sold to master distributors and contractors that serve the oil, gas, steam, and chemical industries and BWPF purchasers generally maintain inventory of steel pipe and BWPFs that go with the steel pipe they supply to their customers.[305]

These distinctions are not accurate. The importers all sell widely to master distributors, fabricators, and some contractors.[306] Some of those master distributors also sell into the industrial and mechanical PVF segment.[307] For example, Vandewater sells its outlets to Ferguson Enterprises (Ferguson), the largest pipe valve and fitting distributor in the United States, which in turn sells both outlets and other BWPFs on its website.[308] While Ferguson sells BWPFs, it is also by far the single largest distributor of outlets for fire sprinkler systems.[309] This

---

[300] *Id.*
[301] *Id.*
[302] *Id.* at 36.
[303] *Id.*
[304] *Id.* (citing Vandewater Comments at 26).
[305] *Id.* at 37 (citing Vandewater Comments at 26; SCI Comments at 26; and SIGMA Comments at 8).
[306] *Id.*
[307] *Id.*
[308] *Id.* and Exhibit 14.
[309] *Id.*

42

demonstrates that both outlets and other BWPFs share similar channels of trade because they are both sold to master distributors, fabricators, and contractors.

*Manner in Which the Product is Advertised and Displayed*

Outlets and other BWPFs are displayed in a similar manner.  The importers claim that outlets "are not advertised or displayed for any of the applications for BWPF,"[310] they are described as intended for fire sprinkler systems and other low-pressure piping systems, and promotional brochures do not refer to any of Vandewater's products as BWPFs.[311]

Regardless of the importers' advertising choices, other fire sprinkler system industry players describe outlets as having "butt-welding ends that comply with national and international standards."[312]  Industry players often do not mention the term "butt-weld" in their advertisements – even for clearly covered BWPFs – as it is a non-standard term.[313]  The fact that advertising materials related to outlets do not include a reference to BWPFs does not mean that outlets are not BWPFs.  Instead, as noted above, "butt-weld" is simply a non-standard term that is, accordingly, not always used in the industry marketing materials.[314]

Similarly, Island advertises its outlets for numerous applications, including plant services, building services, mining, oil field services, and pollution control services.[315]  As a result, both outlets and BWPFs are advertised for applications in the same or similar industries.

SIGMA claims that even Island advertises its outlets as sold for fire sprinkler and low-pressure piping systems, while advertising BWPFs for use in boilers and describing them as

---

[310] *Id.* at 38 (citing Vandewater Comments at 27; SCI Comments at 29; and SIGMA Comments at 9).
[311] *Id.*
[312] *Id.* and Exhibits 10 and 15.
[313] *Id.*
[314] *Id.*
[315] *Id.*

43

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

designed to provide unobstructed, full flow characteristics.[316]  This is not true.  Island's grooved outlets (Type 40 & 10 Weld Outlets) and other Island outlets (Type 40 & 80 Seamless Weld Outlets) are advertised for a wide variety of end uses also applicable to BWPFs, including plant services, building services, fire sprinkler systems, mining services, pollution controls services, oil field services, and power plant services.[317]

SCI separately claims that Island does not describe its outlets as BWPFs.[318]  This is because butt-weld is not a standard term.[319]  In fact, Weldbend and Hackney Ladish, the petitioners in the original investigation, usually do not use the term "butt-weld," and instead call their products "Seamless Weld Fittings."[320]

SCI claims that outlets are marketed by size and pipe run size, with size referring to the pipe diameter of the sprinkler head or branch outlet, and pipe run size referring to the diameter of the run pipe to which the fishmouth end of the outlet attaches.[321]  SCI claims that, conversely, BWPFs are not advertised and displayed using pipe run size.  Again, this is not true.  Both outlets and BWPFs are advertised and sold in nominal pipe size.

Vandewater claims that BWPFs are not advertised in trade shows that are targeted at the fire sprinkler industry.[322]  This argument also lacks merit.  Attendance or lack thereof at one type of trade show cannot possibly be proof that BWPFs are not advertised or targeted to the fire sprinkler industry.[323]

---

[316] *Id.* at 39 (citing SIGMA Comments at 10).
[317] *Id.*
[318] *Id.* (citing SCI Comments at 29).
[319] *Id.* at 40.
[320] *Id.* (citing Petition at Attachment A).
[321] *Id.*
[322] *Id.* (citing Vandewater Comments at 27).
[323] *Id.*

44

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

## VII.    ANALYSIS

Pursuant to the Court's *Remand Order*, we have analyzed the parties' comments and supporting information[324] for our evaluation of the (k)(2) factors.  For the reasons discussed below, we find that these factors support a finding that Vandewater's outlets are covered by the scope of the *China BWPFs Order*.

*Physical Characteristics of the Product*

We find that the physical characteristics of outlets and BWPFs subject to the *China BWPFs Order* are similar.  The scope of the *China BWPFs Order* provides, in relevant part, that "the products covered by this order are carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form" and "{t}hese formed or forged fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."[325]  This language indicates that subject merchandise must be formed or forged, made of carbon steel, and have a diameter of less than 14 inches.  As discussed further below, we also find that, to be an in-scope "butt-weld pipe fitting{}," the merchandise must be designed to have at least one end with a beveled edge, whether contoured or not, for permanent attachment to at least one pipe or fitting and may have a temporary connection on another end.

The record demonstrates that Vandewater's outlets meet these criteria.  As stated by Vandewater, Vandewater offers CEREICO brand threaded steel branch outlets in sizes ranging

---

[324] We note that this information contains data from a variety of sources, including sources enumerated under (k)(1). Although the Court determined that the (k)(1) sources do not, themselves, dispositively resolve the question of whether Vandewater's outlets are covered by the scope of the *China BWPFs Order*, information in such sources is nonetheless relevant to our analysis of the (k)(2) factors.
[325] *See China BWPFs Order*.

45

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

from ½ inch to 2½ inches; Vandewater also offers CEREICO brand grooved steel branch outlets in sizes ranging from 1¼ inch to 8 inches.[326]  The outlets are made of carbon steel.[327]  Like other types of BWPF, Vandewater's "threaded branch outlets are manufactured from *forged steel bars*, and its grooved branch outlets are machined from *welded pipe*."[328]  The branch or outlet side is "*formed* with a threaded or grooved end."[329]  Further, Vandewater states that the product is permanently attached to at least one pipe in a fire sprinkler or other low-pressure piping system.[330]

Thus, the record demonstrates that Vandewater's outlets are consistent with BWPFs in terms of manufacturing method (*i.e.*, formed/forged), material (*i.e.*, carbon steel forged steel bars or welded pipe), and size requirements (*i.e.*, less than 14 inches in inside diameter).  Like all BWPFs, the outlets feature a beveled edge for permanent attachment to a pipe or fitting.[331]

The importers construe the requisite physical characteristics for BWPFs in an overly narrow manner to highlight purported differences between in-scope merchandise and Vandewater's product.  However, for many of the attributes identified by the importers as critical to the definition of a BWPF, we find that there is an insufficient basis to conclude that the term "butt-weld pipe fitting{}" in the scope requires such attributes.

The importers assert that in-scope merchandise does not have contoured edges and does not connect to the middle of a pipe.  We disagree, because the record demonstrates that

---

[326] *See* Scope Ruling Request at 4.
[327] *Id.* at Exhibit 1.
[328] *Id.* at 4 (emphasis added).
[329] *Id.* at 3 and 12 (emphasis added).
[330] *Id.* at 15.
[331] *See* Petition at 4 and Appendix B ("{t}he edges of finished {BWPFs} are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins the fitting to the pipe"); *see also* the USITC Fourth Review at I-4 ("{t}he beveled edges of {BWPF} distinguish them from other types of pipe fittings, such as threaded, grooved, or bolted fittings, which rely on different types of fastening methods")

46

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

merchandise with these characteristics can be covered by the scope. Specifically, the record

evidence establishes that products with a contoured edge that are designed to connect to the mid-

section of a pipe can be BWPFs.[332]  In its product specification sheets, Aleum USA, a U.S.-based

distributor of outlets, describes its female threaded outlet and grooved outlet as having "{b}utt

welding ends."[333]  Like Vandewater's outlets, Aleum USA's outlets have one threaded or

grooved end and a contoured edge on the other end that is connected to the middle of another

pipe.  Additionally, Vandewater has described the contoured edge of its outlets as a feature that

allows the outlets to sit on the mid-section of the header pipe like a saddle.[334]  The exhibits

accompanying the Petition included a product catalog from a U.S. producer of the domestic like

product with illustrations of basic shapes of BWPFs (under the heading "seamless welded

fittings") and among them is a product that is referred to as a saddle, which, like Vandewater's

outlets, has a contoured edge and is connected to the midsection of a pipe.[335]  Saddles (whether

full or partial), by design, are meant to fit to a hole cut into the side of a pipe, and do not rely on

an end-to-end connection for their contoured end.[336]  Further, the current version of the same

U.S. producer's product catalog continues to include saddles as a type of "seamless welded

fitting," and the product is displayed side-by-side with a full range of other BWPFs.[337]

Similarly, the product catalog for a major U.S. distributor of pipes and fittings also includes a

---

[332] See Island Comments at Exhibit 4A and 4B; see also Island Rebuttal Comments at 6.
[333] See Island Comments at Exhibits 4A (Aleum USA's specification sheet for a female threaded outlet) and 4B (Aleum USA's specification sheet for a grooved outlet).
[334] See Scope Ruling Request at 3.
[335] See Petition at 4 ("Butt-weld fittings come in several basic shapes: 'elbows', 'tees', 'caps', and 'reducers'… Illustrations of the various types of butt-weld fittings are attached at Appendix B") and Appendix B (including an illustration of "saddles" as a type of BWPF).  Although Vandewater asserts that saddles are not BWPF, and that it was merely coincidence that the image of a saddle was included among BWPFs in the petition, we disagree.  The catalog page in the Petition displays numerous products that are unambiguously BWPFs, including products shown before and after saddles, e.g., elbows.  Additionally, we note that the subsection of the image containing the saddle illustration also contains an image of a cap, which is clearly an in-scope BWPF.
[336] Id.
[337] See Island Comments at Exhibit 3.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

saddle as one of the various "standard butt weld fitting types."[338]  At least one of the importers

agrees that saddles are a type of BWPF.[339]  The product catalog from another U.S. producer of

the domestic like product includes an illustration of a "vesselet," another product with a

contoured edge that is connected to the side of a header pipe, and the illustration refers to the

contoured end as a "butt-weld" and the accompanying description states that the vesselet features

a "{t}rue butt-weld installation in header."[340]  Therefore, the contoured edge that connects

Vandewater's outlets to the midsection of the header or run pipe is not a physical characteristic

that distinguishes the outlets from BWPFs that are subject to the scope of the *China BWPFs*

*Order*, such as saddles.

We also disagree that a particular bevel angle is required.  The bevel angle of a subject

BWPF is not specified in the *China BWPFs Order*.  The Petition and prior ITC determinations

state that the beveled edges of BWPFs distinguish BWPFs from other pipe fittings.[341]  However,

none of these sources indicate that the edge must be beveled at a particular angle for the fitting to

be considered a BWPF.  Thus, we disagree with the importers that all BWPFs must have a bevel

angle of 37.5 degrees with a tolerance of plus or minus 2.5 degrees.  A pipe fitting possesses the

requisite beveled edge if it is capable of creating a shallow channel to accommodate the bead of

the weld that fastens the two adjoining pieces, as described in the Petition and prior ITC

determinations.[342]  Regardless of the bevel angle, Vandewater's outlets are equally able to

---

[338] *Id.* at Exhibit 5.
[339] *See* SIGMA Rebuttal Comments at 4-5 ("These 'saddle' fittings were not butt-weld fittings by reason of the 'fish mouth' opening on one side.  Rather, these 'saddle' fittings were butt-weld fittings by reason of the other side of the fittings (*i.e.*, the beveled branch end)").
[340] *See* Vandewater Comments at Tab 14 (Bonney Forge catalog at 23).
[341] *See* Petition at 4; *see also* USITC Investigation Final at I-5; and USITC Fourth Review at I-4.
[342] *Id.*

48

support a permanent, welded connection.[343]  The importers rely heavily on beveling

specifications established in certain industry standards (in particular, the ANSI/ASME B16.9

standard referenced in the Petition).  However, as explained below, we disagree that the scope

requires subject merchandise to conform to ANSI/ASME B16.9 or any other specific industry

standard.  Additionally, the ITC report at the time of the investigation explicitly noted that not all

shipments of BWPFs from China – the precise product for which the petitioner sought relief –

met the ASME standard.[344]

Relatedly, the importers claim that a combined bevel angle (of approximately 75

degrees), resulting from the welding of two ends featuring a bevel angle of 37.5 degrees (plus or

minus 2.5 degrees), is required.  Beyond the fact that no specific bevel angle is required, as

explained above, we also find such a requirement to be inappropriate, because it is based on

physical characteristics of the recipient pipe, rather than on the physical characteristics of the

outlets in question.[345]  Accepting the importers' argument would essentially introduce an end-use

requirement for subject merchandise (*i.e.*, the BWPF can only be used with a sub-set of recipient

pipes, limited to those with beveled edges of a particular angle) and the scope does not establish

any such restriction.[346]

Regarding the shape of outlets, the importers argue that outlets are straight in design

---

[343] *See* Island Rebuttal Comments at 15-17 and Exhibit 9 (citing USITC Fourth Review); and Vandewater
Comments at Exhibit 7 (Report of Walter Sperko) ("This 45-degree angle groove allows welding of a full-
penetration or partial penetration groove weld reinforced by a fillet weld").
[344] *See* USITC Investigation Final at I-10 through I-11.
[345] We recognize that the Petition and an ITC report cited by the importers imply that end-to-end connections and
beveling on the recipient pipe are important characteristics of BWPFs.[345]  However, given the conflicting evidence
on the record with respect to these points, as discussed above, we disagree with the importers that the statements
cited from these documents are dispositive as to this issue.  Our (k)(2) analysis of the physical characteristics shows
that BWPFs, like outlets, can be permanently attached to a non-beveled opening on the side of the adjoining pipe.
[346] *See King Supply Co. v. United States*, 674 F.3d 1343, 1348-49 (*King Supply*) (holding that "end-use restrictions
do not apply to {antidumping duty} orders unless the {antidumping duty} order at issue includes clear exclusionary
language" and that "{t}he requisite clear exclusionary language must leave no reasonable doubt that certain products
were intended to be outside the scope of the AD order based solely on the end use of those products").

49

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

while BWPFs are not straight but curved or irregularly shaped.  However, the importers

acknowledge that caps are straight in design and are nonetheless in-scope merchandise.[347]

Additionally, we find lap joint stub ends to be straight in design, despite Vandewater's

characterization of the stub end as conveying an "irregular" shape simply because of the lip at

the base of the fitting.[348]  The body of a lap joint stub end has no bend or curvature along its

length, and only has a deviation from the straight cylindrical shape at the ends (*i.e.*, the "stub"

located at the base and the bevel located at the top).[349]  Mere shaping on the end of a fitting

cannot imbue the fitting with an "irregular" shape, as BWPFs of many types, including

Vandewater's outlets, have beveling at the end(s).  Thus, the straight design of Vandewater's

outlets is not a physical characteristic that is distinguishable from subject merchandise.

The importers' assertions regarding differences in physical characteristics presuppose

that subject merchandise must meet a particular industry standard (ANSI/ASME B16.9).  This

line of argument is based on a statement in the Petition that BWPFs are made to ASTM and

ANSI/ASME standards, accompanied by a footnote that references ASTM A234-82a for

materials and ANSI/ASME B16.9 for dimensions.[350]  However, the scope does not include a

requirement that subject merchandise must conform to that standard.  A mere reference to an

industry standard in the petition, without more, does not mean that subject merchandise *must*

meet the specifications of that industry standard.  Evidence on the record shows that BWPFs may

be made to conform to specifications other than those referenced in the footnote in the

---

[347] *See* Vandewater Comments at 12.
[348] *Id*. at 13.
[349] *See* Island Rebuttal Comments at Exhibit 2 at 82-83 (lap joint stub ends dimensions).
[350] *See* Petition at 4.

50

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

Petition.[351]  Therefore, including a requirement that all BWPFs subject to the *China BWPFs*

*Order* must conform to ASTM A234-82a and ANSI/ASME B16.9 would introduce a restriction

that is not found in the scope language and would unduly restrict the coverage of the scope.

Moreover, as noted above, one of the importers agrees that certain products that are not

necessarily designed to conform to ANSI/ASME B16.9 (*i.e.*, saddles) are a type of BWPF

covered by the scope.[352]

In any case, while the importers emphasize the distinct industry standards – asserting that

ANSI/ASME B16.9 covers BWPFs, while MSS SP-97 covers the outlets in question – the MSS

SP-97 standard for "Integrally Reinforced Forged Branch Outlet Fittings" demonstrates that

outlets conforming to that standard may possess physical characteristics similar to other in-scope

BWPFs.  For example, section 1.2 in MSS SP-97 provides that branch outlet fittings

manufactured to the standard are "designed to make a fully reinforced branch connection in

accordance with applicable piping requirements, when attached, at an opening in a run pipe by

means of a full penetration weld."[353]  Additionally, section 6.5 in MSS SP-97 states that "{t}he

contour weld bevel angle on the longitudinal section of the fittings shall be a minimum of 35

degrees,"[354] which is consistent with the essential characteristic of the beveled edge of in-scope

BWPFs (*i.e.*, creates a shallow channel to accommodate the bead of the weld).  Thus, we find no

reason to conclude that products conforming to MSS SP-97 cannot also be BWPFs.  In fact, as

shown above, products covered by MSS SP-97 explicitly have many of the same characteristics

---

[351] *See* Island Rebuttal Comments at Exhibit 2 (certain elbows, reducing outlet tees, reducers, lap joint stub ends, and caps are made to "ASA B36.10" and "are not covered in ASA B16.9").

[352] *See* SIGMA Rebuttal Comments at 4-5 ("These 'saddle' fittings were not butt-weld fittings by reason of the 'fish mouth' opening on one side.  Rather, these 'saddle' fittings were butt-weld fittings by reason of the other side of the fittings (*i.e.*, the beveled branch end)").

[353] *See* Vandewater Comments at Tab 2 at 1 (emphasis added).

[354] *Id.* at Tab 2 at 3 (emphasis added).

51

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

that the importers attribute to BWPFs, *e.g.*, full penetration welds and similar bevel angles. Moreover, MSS SP-97 is described as a "non-exclusive standard"[355] and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME.[356]

The importers assert that BWPFs cannot have an end with a temporary connection because the scope of the *China BWPFs Order* notes that such fittings are used in conditions that "require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)." However, not all ends must have a beveled edge to facilitate a permanent connection to be in-scope merchandise; one unambiguously in-scope fitting type – lap joint stub ends – has a beveled edge for a permanent connection on one end and the other end is temporarily bolted in place with the use of a flange.[357] The lap joint stub ends example shows that the essential characteristic that distinguishes in-scope BWPFs from other pipe fittings is a beveled edge on at least one end that facilitates a permanent, welded connection. Like the lap joint stub ends, Vandewater's outlets have a beveled edge for a permanent connection on one end (*i.e.*, the end that is welded to the midsection of another pipe) and one of the non-permanent fastening methods mentioned in the scope language on the other end (*i.e.*, the threaded or grooved end to which a sprinkler head or other pipe fitting is attached). Thus, Vandewater's outlets have the requisite beveled edge on one end that imparts subject merchandise with the defining characteristic of BWPFs.

Additionally, we find that outlets are produced in a manner consistent with certain other,

---

[355] *Id.*
[356] *See, e.g.*, *id.* at 2 (MSS SP-97, sections 5.1 and 5.2 for material), 3 (MSS SP-97, section 6 for design and dimension), and Appendix C (list and description of the referenced ASTM and ANSI/ASME standards).
[357] *See* Petition at Appendix B.

52

in-scope BWPFs.  Specifically, we find that there is clear overlap between outlets and other BWPFs in terms of the starting materials and processing necessary to produce BWPFs.

With respect to starting materials, the importers' argument that outlets and BWPFs are manufactured from different starting material is not supported by the record.  The importers' assert that BWPFs are typically made from "*seamless pipe*" or "*welded pipe ...*"[358] or "*seamless or welded pipe and tube.*"[359]  The ITC stated that, additionally, "some types of fittings, such as caps, are formed from carbon steel plate, billet, or bar stock."[360]  Accordingly, there is a range of starting materials from which BWPFs are made.  Vandewater states that its "grooved steel outlets are made from *welded pipe*," and its "threaded steel branch outlets are made from *steel bars*."[361]  Thus, Vandewater's outlets are produced from starting materials used to produce other in-scope merchandise.

Similarly, the production process for outlets and other BWPFs is similar.  The ITC explained that BWPFs are produced through a process that involves "forming (or forging)" and then machining.[362]  The importers note that threaded outlets are forged from steel bars with a hot forging die process with threads machined in, and that grooved outlets are manufactured from welded pipe with the grooves machined into the pipe, while the fishmouth end is formed with a high-speed cutting torch.[363]  Thus, just as with other BWPFs, outlets undergo a forming or forging process to achieve their shape, and then undergo a machining process for the threading/grooving/beveling.

---

[358] *See* Vandewater Comments at 11.
[359] *See* SCI Comments at 17.
[360] *See* USITC Investigation Final at I-7.
[361] *See* Vandewater Comments at 11.
[362] *See* USITC Fourth Review at I-6.
[363] *Id.*

Finally, the importers argue that Vandewater's outlets and BWPFs are imported under different HTSUS subheadings in accordance with prior CBP rulings, further evincing differences in physical characteristics.[364]  However, the fact that Vandewater's outlets are not imported under HTSUS subheading 7307.93.30 is not determinative because the HTSUS subheadings listed in the scope are not dispositive.[365]  While Commerce "may consider the decisions of Customs, it is not obligated to follow, nor is it bound by, the classification determinations of Customs."[366]  We note that a prior CBP ruling is on the record, which we have considered. However, we find that, in light of our broader analysis regarding physical characteristics of in-scope merchandise – including the characteristics of Vandewater's outlets in particular – CBP's ruling does not warrant arriving at a different conclusion here.[367]  Accordingly, the mere fact that Vandewater's outlets are imported under a different subheading within the same chapter and heading of the HTSUS as the subheading listed in the scope does not necessarily require Commerce to conclude that the outlets have physical characteristics that are distinguishable from subject merchandise.

---

[364] *See* Scope Ruling Request at 6 ("All of the parts that are subject to this request are properly classifiable under either HTSUS item 7307.92.3010 for threaded fittings,… or 7307.99.5045 for grooved fittings …"); *see also* Vandewater Comments at 12 ("Also, it should be noted that steel branch outlets are not properly classified under HTSUS {sub}heading 7307.93 (for 'Butt welding fittings'), but instead are properly classified under HTSUS {sub}heading 7307.99 ('Other')").

[365] *See Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990) (stating that reference to an HTSUS number "is not dispositive" of the scope of an AD/CVD order); and *Order*, 57 FR at 29702 ("Although the {HTSUS} subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive").

[366] *See Wirth*, 5 F. Supp. 2d at 973 ("Commerce, not Customs, has authority to clarify the scope of AD/CVD orders and findings").

[367] *See* SCI Rebuttal Comments at Exhibit 5 ("The product to be imported is a forged nonalloy steel threaded weld outlet pipe fitting made to ASTM Specification A 105, the Standard Specification for Carbon Steel Forgings for Piping Applications.  The fitting is contoured on one end to provide a precise fit at the opening in the run pipe and threaded on the other end to provide a threaded outlet branch connection.  The applicable subheading for the forged steel threaded weld outlet fitting will be 7307.99.5045…").

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

*Expectations of the Ultimate Purchasers*

We find that the ultimate purchaser's expectations regarding the uses of outlets and other BWPFs are similar.  The importers identify four main expectations of ultimate purchasers that purportedly differ across the products:  (1) compliance with a particular industry standard; (2) custom vs. standard sizing; (3) whether the product can be used in fire sprinkler systems; and (4) installation costs.

First, the importers argue that, because outlets and BWPFs are produced to different industry standards, they are associated with different expectations.  As detailed in the physical characteristics section, above, we disagree that conforming to a different industry standard, *i.e.*, MSS SP-97, indicates that a product cannot also be a BWPF that is covered by the scope.[368]

Additionally, with respect to the production process, we find that there is insufficient evidence to conclude that purchasers expect that the products are made from different starting materials or that BWPFs are formed/forged while outlets are not.  For instance, as noted above, the record demonstrates that both outlets and other BWPFs may be made with welded pipe or may be made from steel bars.[369]  The starting materials for outlets can conform to standards applicable to BWPFs more generally; for instance, the importers report that the materials for both outlets and other BWPFs may meet ASTM A105.[370]  The record also demonstrates that outlets, like other BWPFs, are forged or formed.[371]

---

[368] *See* Vandewater Comments at Tab 1 and 2.

[369] *Id.* at 11; *see also* SCI Comments at 17; and Vandewater Rebuttal Comments at 3.

[370] *See* Vandewater Rebuttal Comments at 5 ("… outlets are made from *ASTM A-105* grade *forging bars*, whereas most {BWPF} are made from *ASTM A-234* grade *seamless pipe*") (emphasis added); SIGMA Comments at 8 ("The starting materials for {BWPF} conform to *ASTM A105*, *ASTM A106*, and *ASTM A285* standards …") (emphasis added); and Vandewater Comments at Tab 14 (Bonney Forge catalog at 4, 6-8) (showing various outlets with an A-105 specification).

[371] *See* USITC Fourth Review at I-6; *see also* SCI Comments at 17 (noting that some steel branch outlets are shaped through a die *forging process*, either a closed-die forging, or an open-die forging; further noting that, for lower

55

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Second, the importers argue that outlets are custom engineered, whereas BWPFs are standardized to match up with the size and schedule of the pipe to which they are attached. The record does not support this distinction. Outlets are not necessarily made to custom specifications and, just as with other BWPFs, are sold based on similar sizing criteria.[372] For instance, SCI's and Vandewater's catalogs shows outlets sold based on nominal pipe sizes.[373]

Third, the importers argue that ultimate purchasers expect different pressure capabilities with outlets and BWPFs. Specifically, they assert that purchasers only expect to use outlets in low-pressure sprinkler systems (*e.g.*, 300 PSI or less), whereas purchasers of BWPFs expect the products to withstand high levels of pressure (*e.g.*, greater than 300 PSI). Although certain types of BWPFs may be designed to handle high-pressure systems, fire protection sprinkler systems are a contemplated application of BWPFs.[374] This is the intended application for Vandewater's product. Therefore, we find that outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems. These usages will, of course, have different requirements and expectations regarding pressure rating and related features, but there is nothing requiring a particular PSI rating to qualify as a BWPF. Indeed, Vandewater itself acknowledges that "{s}ome sprinkler systems may, however, use butt-weld pipe fittings for the run pipes, to which the branch connections are attached."[375] Therefore, it is simply incorrect that BWPFs are

---

pressure applications, branch outlets may also be *machined* from seamless or welded pipe and tube); and Vandewater Rebuttal Comments at 3 and 6.

[372] *See* Vandewater Comments at 3 ("The key dimensions for {BWPF} are the *nominal pipe size* (as an example, two inch is a pipe size) and the schedule (as an example, schedule 40). By contrast, the key dimensions for branch outlets are the *header pipe size range* (example, 2 inches), *outlet pipe nominal size* (example, two inch threaded), and schedule (example, 300 psi)" (emphasis added)).

[373] *See* Island Rebuttal Comments at 35 and Exhibits 12 and 13; and Scope Ruling Request at Exhibits 1 and 2 (showing a header and outlet size concordance).

[374] *See* USITC Fourth Review at 6.

[375] *See* Vandewater Comments at 23.

56

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

used exclusively in high-pressure settings, while outlets are used in distinct, low-pressure piping systems.

Fourth, the importers argue that BWPFs have higher installation costs than outlets because of the effort, skill, and expense required.[376]  However, Vandewater has also argued the opposite, noting that "… installation of a butt-weld pipe fitting can be performed by most pipe welders and requires no special knowledge or expertise.  By contrast, installation of integrally reinforced steel branch outlets is performed to Pipe Fabrication Institute Standard ES-49 which requires much more specialized procedure and background knowledge than installation of BWPFs."[377]  Similarly, SCI asserted that "{p}urchasers expect branch outlets to have much lower installation costs than butt-weld fittings, because … only one end is welded at all."[378]  However, this is plainly incorrect, because caps and lap joint stub ends only require welding on one end despite unambiguously being BWPFs.

Considering these conflicting arguments from the importers, and the similarities between outlets and BWPFs (*i.e.* beveled ends for welded connections in piping systems), we find that there is no significant difference in expectations for the products.

Both outlets and BWPFs are used in fire sprinkler systems (among other types of piping systems), are subject to similar, and in some cases overlapping, industry standards, and are sold according to standard sizes.  We also find that the record does not reveal that customers would have a significantly different expectation regarding the installation costs for outlets and BWPFs.  For these reasons, we find that purchaser expectations for the products are similar.

---

[376] *Id.* at 7 and 23; *see also* SCI Comments at 20; SCI Rebuttal Comments at 25; and Vandewater Rebuttal Comments at 5.
[377] *See* Vandewater Scope Ruling Request at 15.
[378] *See* SCI Comments at 20.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

*Ultimate Use of the Product*

We find that the uses of Vandewater's outlets and other BWPFs are similar. Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs that are subject to the scope of the *China BWPFs Order*.[379] Furthermore, even though Vandewater emphasized that its outlets are designed for fire sprinkler systems, Vandewater acknowledges that other outlets with physical characteristics that are similar to its outlets are used in a range of applications, including those applications that the importers identify as fundamental BWPF uses, *e.g.*, piping connections used in the oil and gas industry.[380]

The importers argue that the design and ultimate use of Vandewater's outlets are specific to fire sprinkler systems.[381]  As stated above, however, BWPFs are similarly used in fire sprinkler systems.[382]  The fact that Vandewater's outlets are designed for a specific use within a sprinkler system, *i.e.*, connecting the piping system to a sprinkler head, whereas another BWPF might be used to connect two pipes in the system, does not mean that the products do not have

---

[379] *See* USITC Fourth Review at 6 ("Butt weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections.... Carbon steel BWPF are utilized in residential, commercial, and industrial pipe systems in chemical synthesis, petroleum refining, electric-power generation, construction, and shipbuilding. Butt-weld pipe fittings join pipes in straight lines and change or divide the flow of fluids (oil, water, natural gas or other gasses {sic}, or steam).  They are welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, automatic fire sprinklers, electric conduit, irrigation, and process-piping systems.  Butt-weld pipe fittings are also found in structural applications for construction, where pipes and fittings are used as support members").

[380] *See* Vandewater Comments at 22 ("Please note that certain types of steel branch outlets, with similar basic physical characteristics, are also used by the oil and gas industry …").

[381] *See* Vandewater Comments at 23 ("Steel branch outlets are not designed with sufficient strength to be used for most butt-weld pipe fitting applications … purchasers of Vandewater's steel branch outlets expect the flexibility of having interchangeable connections between the outlet and the sprinkler head, specifically a thread or groove, so that the sprinkler head can be changed quickly and easily").

[382] *See* USITC Fourth Review at 6; *see also* Island Rebuttal Comments at 35 ("For example, weld tees can be used for the fire sprinkler market, although Outlets are typically preferred due to cost of installation considerations"); and SIGMA Comments at 10 ("It is also important to recognize that a fire protection outlet *can* be a butt weld pipe fitting – but *only* if it contains at least one requisite beveled end that enables the 'bead' necessary for a butt weld to be formed").

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

similar uses.  Such use variation is found throughout the range of BWPFs.  For instance, a cap is clearly a BWPF that is used to seal the end of a pipe[383] and cannot be used to connect two pipes, while an elbow (another BWPF) can.  A reducer may be welded on both ends, while a lap joint stub end is not.  Simply because outlets have a limited and particular use within a piping system does not mean that the outlets do not have a use that is similar to other types of BWPFs (*i.e.*, permanently welded into a piping system that conveys gases or liquids).  Here, outlets and other BWPFs are permanently welded into automatic fire sprinkler systems.

The importers argue that Commerce should not construe a passage in an ITC report describing BWPFs as "welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, *automatic fire sprinklers*, electric conduit, irrigation, and process-piping systems"[384] to mean that BWPFs are ever connected to sprinkler heads.  Even if it is the case that the outlets and other BWPFs do not have identical or complete overlap of functions, the fact remains that the uses of outlets and other BWPFs are similar because, as explained above, both are permanently welded into automatic fire sprinkler systems to change or divide the flow of water.

With respect to the importers' arguments regarding exchangeability of the sprinkler head (via a threaded connection on the branch/outlet side) and the minimum pressure rating, we disagree that these considerations warrant a finding that the product uses are distinct.  As noted above, there is no minimum pressure rating in the scope.  Additionally, the scope covers products with a non-welded side, such as lap joint stub ends, which rely on a bolted end and a butt-welded end.  Thus, products with at least one non-welded side (and their concomitant pressure rating)

---

[383] *See* USITC Fourth Review at 6.
[384] *Id.* at 6 (emphasis added).

59

still fall within the scope of the *China BWPFs Order*.  For the reasons stated, we find that the ultimate uses of outlets and other BWPFs are similar.

*Channels of Trade in Which the Product is Sold*

We find that the channels of trade for outlets and other BWPFs are similar.  They are both sold through distributors and to fabricators and contractors.

The importers argue that Vandewater's outlets are sold in a different channel of trade because outlets are distributed solely within the fire sprinkler system industry, while BWPFs are sold to a more varied set of industries through large distributors.  Vandewater asserts that it sells to fabricators of sprinkler systems who then sell to fire protection installation contractors and fire sprinkler supply distributors (who then sell to smaller contractors that fabricate smaller sprinkler systems and do their own welding).

The fact that Vandewater sells to a particular class of customers does not mean that the products – outlets and other BWPFs – are sold in different channels of trade more generally.  The record demonstrates that both outlets and BWPF share similar channels of trade because they are both sold to master distributors, fabricators, and contractors.[385]  The Vandewater-supplied Shyman affidavit states that outlets and BWPFs are both sold to distributors.[386]  Additionally, the record includes examples of companies and catalogs that sell both outlets and BWPFs, indicating that there is significant overlap in the channels of trade.[387]

*Manner in Which the Product is Advertised and Displayed*

We find that outlets and other BWPFs are advertised in a similar manner, *i.e.*, via online

---

[385] *See* Island Rebuttal Comments at 37.
[386] *See* Vandewater Rebuttal Comments at Attachment A.
[387] *See* Petition at Appendix B; *see also* Island Rebuttal Comments at Exhibits 10, 14 and 15.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

catalogs in company websites or affiliated or third-party online sources.[388]  These sources identify the size, weight, and other technical specifications of the merchandise, including pressure resistance, materials used, and industry standard.[389]

The importers assert that outlets are not displayed as, or together with, BWPFs and are advertised specifically for fire protection systems.  We disagree.  First, the "Fire Sprinkler Pipe Fabrication" section of the Aleum USA catalog shows outlets with a branch side that is threaded or grooved along with "butt welding ends."[390]  Second, product catalogs on the record show outlets and similar products and other BWPFs advertised side by side.[391]  For instance, the Petition shows "elbows," "reducers," "lap joint stub ends," "saddles," and "multiple outlet fittings" in the same product catalog; the Shin Tech catalog advertises two outlet products – one with a beveled edge that allows for a permanent connection only on the branch end, and one with such edges on both the branch *and* contoured ends – in a similar manner.[392]  Additionally, the importers' own product literature advertises outlets for fire protection and other "Low Pressure Piping Systems."[393]

The importers also argue that Island's own products demonstrate that outlets and BWPFs are advertised differently,[394] and even Island's CEO was not aware of any time that an outlet was described as a BWPF.[395]  However, we find that the record supports Island's proffered

---

[388] *Id.*
[389] *See* Island Rebuttal Comments at 34-35 and Exhibits 2, 3, 5, 6, 10, 12 and 13; Vandewater Comments at 24; and SCI Comments at 22.
[390] *See* Island Rebuttal Comments at 28 and Exhibit 10.
[391] *See* Petition at Appendix B; and Island Rebuttal Comments at Exhibit 15 (showing an outlet with a butt-weld branch end on the same page as an outlet with a threaded branch end).
[392] *Id.* at Exhibit 15.
[393] *Id.* at 38 (citing Vandewater Comments at 27 and Tab 12; SCI Comments at 29; and SIGMA Comments at 9).
[394] *See* SIGMA Comments at 10-11 and Exhibit 1.
[395] *See* Vandewater Comments at 21-22 and Tab 11.

61

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

explanation:  the term "butt-weld" itself is not a standard term nor commonly used, and, therefore, Island does not use it in its advertising.[396]

For the reasons discussed above, we find that outlets and other BWPFs are advertised in a similar manner.

*Suspension of Liquidation and Cash Deposit Requirements*

After issuing the Final Scope Ruling, Commerce instructed Customs to "{c}ontinue to suspend liquidation of entries of carbon steel butt-weld pipe fittings from the People's Republic of China, including Vandewater International Inc.'s steel branch outlets imported by Vandewater International Inc …"[397]  No party challenged Commerce's instructions to CBP before the Court, and the Court did not otherwise invalidate the instructions in the *Remand Order*.  As discussed below, should the Court affirm this remand redetermination in a subsequent decision, Commerce intends to issue instructions to CBP consistent with 19 CFR 351.225(l) and section 516A(c) and (e) of the Act.

## VIII.   COMMENTS ON DRAFT RESULTS OF REDETERMINATION

Interested parties provided comments regarding the sources relied on in our analysis, our substantive analysis of the (k)(2) factors, and the suspension of liquidation and cash deposit requirements for Vandewater's entries.  We address these comments in turn.

**Comment 1:   Commerce's Treatment of the (k)(1) Sources**

In the Draft Redetermination, Commerce analyzed information provided by interested parties relating to each of the five (k)(2) factors.  Among the various sources relied upon,

---

[396] *See* Island Rebuttal Comments at 38-40.  The record shows that a U.S. distributor has identified this type of merchandise as "butt-weld" in its products catalog; similarly, one of the importers (SCI) had itself identified the product as "butt-weld" in import records (despite its current claim that the description was an error).  *See* Island Comments at 8; *see also* SCI Rebuttal Comments at 28-32.

[397] *See* SCI Comments *Id.* at Exhibit 14.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Commerce also considered information contained in the sources enumerated in 19 CFR 351.225(k)(1).

*Vandewater's Comments*

- The Draft Redetermination is unreasonable because it ignores the direction of the Court.[398]  The Court remanded Commerce's scope ruling to Commerce with instructions for it to perform a full (k)(2) analysis because the question surrounding  Vandewater's outlets was not resolved by the (k)(1) sources.  However, as it concedes in a footnote, Commerce cites the (k)(1) sources and insists that "information in such sources is nonetheless relevant to our analysis of the (k)(2) factors."[399]

*SIGMA's Comments*

- In its (k)(2) analysis here, Commerce improperly relied on (k)(1) criteria, and mischaracterized and disregarded key record evidence.[400]

- Statements by the Court and the CAFC make clear that (k)(1) and (k)(2) analyses are separate.[401]  The structure of the regulation likewise clearly separates (k)(1) and (k)(2) and requires Commerce to analyze these sources discretely.[402]

- If the (k)(1) sources are not dispositive, they cannot be "relevant" to a (k)(2) analysis. Indeed, in the *Remand Order*, the Court stated that the (k)(1) sources are "not descriptive of the actual physical characteristics of Vandewater's steel branch outlets" and "do not

---

[398] *See* Vandewater Draft Redetermination Comments at 1-2.

[399] *Id.* (citing Draft Redetermination at 44).

[400] *See* SIGMA Draft Redetermination Comments at 2 (citing Draft Redetermination at 2 and 62).

[401] *Id.* (citing *Laminated Woven Sacks Comm. v. United States*, 34 CIT 906, 910, 716 F. Supp. 2d 1316, 1322 (2010) (*Woven Sacks*) (stating that, where it proceeds to a (k)(2) analysis, Commerce "applies the five factors codified" in (k)(2)); and *Toys "R" Us, Inc. v. United States*, 32 CIT 814, 819 (2008) ("finding that consideration of (k)(2) factors under a (k)(1) analysis was improper") (*Toys "R" Us*)).

[402] *Id.* (citing *Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*, 415 F. Supp. 3d 1216, 1230 (CIT 2019) (identifying the "text, structure, history, and purpose of a regulation" as "tools" for interpreting an agency regulation) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019))).

really tell the court anything about the inclusion of steel branch outlets within the scope of the Order."[403]  Thus, in its final remand redetermination, Commerce should focus only on the (k)(2) criteria.[404]

**Commerce Position:**  Vandewater and SIGMA assert that Commerce improperly considered the (k)(1) sources in the Draft Redetermination and contend that this is contrary to the Court's *Remand Order*.  We disagree.

The Court found that the sources listed in 19 CFR 351.225(k)(1) were not dispositive as to the scope status of Vandewater's outlets.[405]  This finding, however, does not indicate that the (k)(1) sources are irrelevant for the purpose of a (k)(2) analysis.  The regulation refers to the (k)(2) factors as "additional" substantive criteria to consider in the scope analysis; it does not create a restriction on the source of information to be considered in such an analysis.

Here, the (k)(1) sources provide factual information that is directly relevant to our consideration of the (k)(2) criteria.  For instance, the ITC determination discussed the physical characteristics and uses of subject merchandise.[406]  That this information appears in a source enumerated by 19 CFR 351.225(k)(1) does not mean that Commerce must ignore the information for the purpose of a (k)(2) analysis.  The importers appear to acknowledge this, as they cite the ITC Report and the Petition dozens of times throughout their initial comments relating to how Commerce should perform its Court-mandated (k)(2) analysis.[407]

---

[403] *Id.* at 3-4 (citing *Remand Order* at 8).
[404] *Id.* at 4.
[405] *See Remand Order* at 8.
[406] *See* USITC Fourth Review at 6 (discussing uses of BWPFs in piping systems); and USITC Investigation Final at I-10 through I-11 (describing physical characteristics of subject merchandise, and noting that not all imported merchandise from China was in compliance with the applicable standard).
[407] *See, e.g.*, Vandewater Comments at 24 ("… the ITC described the uses of butt-weld pipe fittings as follows …"); Vandewater Rebuttal Comments at 4 ("The above points by Mr. Shyman are confirmed by the ITC in its original 1986 preliminary injury investigation"); SIGMA Comments at 10 ("… this is evident in the catalogs provided with

64

The cases cited by the importers do not warrant a different approach.  For instance, in *Woven Sacks*, the Court simply stated that, where Commerce proceeds to a (k)(2) analysis, it must apply the five (k)(2) factors.[408]  That is precisely what we have done here, and the case imposes no limitation on the sources from which Commerce may draw in conducting a (k)(2) analysis.  Similarly, in *Toys "R" Us*, the Court found that consideration of (k)(2) factors under a (k)(1) analysis was improper."[409]  Again, this case does not stand for the opposite proposition that a (k)(2) analysis cannot rely on sources enumerated in (k)(1).  The Courts have previously sustained Commerce's scope determinations which were based on an evaluation of the (k)(2) criteria that relied, in part, on information from (k)(1) sources.[410]

Accordingly, Commerce has, as directed by the Court and in compliance with the regulation, considered the (k)(2) factors.  As we explained in the Draft Redetermination, although the (k)(1) sources are not dispositive regarding the scope status of Vandewater's product, we relied on facts contained in the (k)(1) sources insofar as they are relevant to our analysis of the (k)(2) criteria.

**Comment 2:   Commerce's Analysis of the (k)(2) Criteria**

Pursuant to the Court's *Remand Order*, we evaluated the five (k)(2) criteria to determine whether Vandewater outlets are covered by the scope of the *China BWPFs Order*.  As part of this evaluation, we analyzed interested parties' comments and supporting information, and we

---

the original petition in 1991"); and SIGMA Rebuttal Comments at 4 ("SIGMA does not contest that the ITC stated as much, and indeed, cited to the same language … in its comments").

[408] *See Woven Sacks*, 716 F. Supp. 2d at 1322.

[409] *See Toys "R" Us*, 32 CIT at 819.

[410] *See, e.g.*, *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1364-65 (Fed. Cir. 2009) (sustaining Commerce's determination in a (k)(2) scope analysis in which Commerce relied on the ITC report and underlying petition); and *Power Train Components, Inc. v. United States*, 911 F. Supp. 2d 1338, 1347 (CIT 2013) (sustaining Commerce's determination in a (k)(2) scope analysis in which Commerce cited to the ITC report and underlying petition).

issued a Draft Redetermination, where we determined that Vandewater's outlets are properly considered BWPFs.

*Island's Comments*

- Commerce's determination that Vandewater's outlets fall within the scope of the *China BWPFs Order* is supported by substantial evidence and is in accordance with law.[411]

- It is well established that, for purposes of a (k)(2) analysis, for a product to be covered by the scope of an order, all the law requires is for the product to be "sufficiently similar" to the products covered by the order.[412]

- In its Draft Redetermination, Commerce undertook a comprehensive analysis of the five factors set forth in 19 CFR 351.225(k)(2).  Commerce considered and discussed, in great detail, the comments and supporting information submitted by all interested parties in their initial and rebuttal comments.[413]

- For each of the (k)(2) factors, Commerce explained why Vandewater's outlets met the relevant criterion, based on the language of the *China BWPFs Order*, and showed how Vandewater's outlets were similar to other in-scope BWPFs.[414]

- Commerce also explained why it disagreed with the importers' assertions and arguments and grounded its position in record information.[415]

- Therefore, Commerce complied with the *Remand Order* and reached a reasonable determination "given the circumstances presented by the whole record."[416]  Island agrees

---

[411] *See* Island Draft Redetermination Comments at 3.
[412] *Id.* (citing *Wirth*, 5 F. Supp. 2d at 981).
[413] *Id.* at 4 (citing *Remand Order* at 3).
[414] *Id.*
[415] *Id.* (citing Draft Redetermination at 10-62).
[416] *Id.* (citing *Remand Order* at 3).

66

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

with Commerce's conclusion that Vandewater's outlets fall within the scope of the *China BWPFs Order*.[417]

*Vandewater's Comments*

- There are fundamental differences between BWPFs and Vandewater's outlets:  different design; different function; and different usage by different customers.  Commerce was asked to address these considerations on remand but did not do so in the Draft Redetermination.[418]

- The Draft Redetermination's analysis of physical characteristics is incorrect.[419]

  o Different industry standards exist for BWPFs and welded outlets.  These standards reflect bright-line distinctions within the fittings industry.[420]  Commerce's contentions concerning industry standards are not supported by substantial evidence.[421]

  o The branch end of an outlet is threaded or grooved in order to accommodate a sprinkler head, while BWPFs have no branch end whatsoever.[422]  Additionally, nothing on the branch side of an outlet can be welded.[423]

  o Unlike BWPFs, there is no forging or forming required to turn a pipe, bar or forging into an outlet fitting.[424]

  o One end of an outlet is threaded or grooved, which is a temporary connection.[425]

---

[417] *Id.* (citing Island Comments; and Island Rebuttal Comments).
[418] *See* Vandewater Draft Redetermination Comments at 1-2.
[419] *Id.* at 2-37.
[420] *Id.* at 3.
[421] *Id.* at 23-26.
[422] *Id.* at 4-5.
[423] *Id.* at 5-8.
[424] *Id.* at 27-29.
[425] *Id.* at 26-27.

67

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

- o Neither end of an outlet is butt-welded.  Additionally, a particular angle is required for a butt-weld, and outlets are not connected through a weld of such an angle.[426]

- o The shape of BWPFs are different from outlets.[427]

- o Threaded welded outlets are considered forged steel pipe fittings, rather than BWPFs, by the industry in question.[428]

- o The physical characteristics of Vandewater's outlets differ sufficiently from BWPFs such that they are imported under different HTSUS subheadings.[429]

- The expectations of the ultimate purchasers suggest outlets are not BWPFs.[430]

- o Ultimate purchasers of Vandewater's outlets are all fabricators of fire sprinkler systems.  No fire sprinkler fabricator uses any BWPFs for branch connections to sprinkler leads because a BWPF does not have the ability to accept a sprinkler head with threads.[431]

- o The Draft Redetermination states that "fire protection sprinkler systems are a contemplated application of BWPFs."[432]  In reaching this conclusion, the Draft Redetermination does not mention the declaration of Neil Shyman, who has nearly 43 years of experience as a fabricator and supplier of fire sprinkler and industrial piping.[433]

- o Commerce's analysis ignores the point that sprinkler systems would never use BWPFs to connect to a sprinkler head – like a welded outlet does – because fabricators and

---

[426] *Id.* at 19-22.
[427] *Id.* at 23.
[428] *Id.* at 8-11.
[429] *Id.* at 30-31.
[430] *Id.* at 31-33.
[431] *Id.* at 31 (citing Vandewater Comments at 22-23; and Vandewater Rebuttal Comments at 5).
[432] *Id.* (citing Draft Redetermination at 55).
[433] *Id.* at 32 (citing Vandewater Rebuttal Comments at 3 and Attachment A (Shyman Declaration at 17 and 20)).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

users of sprinkler systems do not want permanent connections, which are an inherent feature of butt-welding.[434]

o The possibility that some fire sprinkler systems might use BWPFs for the run pipes does not undermine Vandewater's point regarding the starkly different customer expectations for outlets.[435]

- The ultimate use of the products suggest outlets are not BWPFs.[436]

o Commerce asserts that the uses of Vandewater's outlets and BWPFs are similar, in part, because "Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs that are subject to the scope of the *China BWPFs Order*."[437]  However, a BWPF is never suitable for connecting to a sprinkler head, precisely because the sprinkler head must be attached in a manner such that it can be changed, and not permanently affixed via a butt-weld.[438]

- The channels of trade in which the products are sold support finding outlets and BWPFs to be distinct.[439]

o According to the Draft Redetermination, "{t}he record demonstrates that both outlets and BWPF share similar channels of trade because they are both sold to master distributors, fabricators, and contractors."[440]  The only "record evidence" in support

---

[434] *Id.* at 32-33 (citing Draft Redetermination at 55-56).
[435] *Id.* at 33.
[436] *Id.* at 33-34.
[437] *Id.* at 33 (citing Draft Redetermination at 57).
[438] *Id.* at 33 (citing Vandewater Rebuttal Comments at Attachment A (Shyman Declaration at 22); and Vandewater Comments at Exhibit 7 (Report of Walter Sperko at 15)).
[439] *Id.* at 34-35.
[440] *Id.* at 34 (citing Draft Redetermination at 59).

69

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

of this assertion are Island's own comments.[441]  This does not constitute substantial

evidence in support of a conclusion that Vandewater's outlets are sold to master

distributors.[442]

o  Vandewater's outlets simply are not sold in the same channels of trade as BWPFs,

and there is no record evidence to the contrary.[443]

•  The manner in which the product is advertised and displayed supports finding

Vandewater's outlets to be out of scope.[444]

o  Advertising for Vandewater's outlets, which are used in the fire sprinkler industry,

differs significantly from the advertising of BWPFs.[445]  For example, at the AFSA

convention in October 2019,[446] no producer of BWPFs was on the exhibitor list

because BWPFs are not advertised in trade shows that are targeted at the fire sprinkler

industry.[447]

o  By contrast, the Shyman affidavit states that BWPFs are advertised and sold to

mechanical contractors.[448]

o  Commerce's analysis of this factor is unsupported by record evidence.  Commerce

cites to two pages of what it characterizes as a "Fire Sprinkler Pipe Fabrication"

section of the Aleum USA catalog.[449]  No information is given as to the source from

which these two pages were extracted.  Regardless, the two pages of materials from

---

[441] *Id.* (citing Draft Redetermination at 59; and Island Rebuttal Comments at 37).
[442] *Id.* at 35.
[443] *Id.*
[444] *Id.* at 35-37.
[445] *Id.* at 35 (citing Vandewater Comments at 25-26; and Vandewater Rebuttal Comments at 11).
[446] *Id.* at 35-36 (citing Vandewater Comments at 25-26 and Tab 15; and Vandewater Rebuttal Comments at 11).
[447] *Id.* at 36.
[448] *Id.* (citing Vandewater Rebuttal Comments at Attachment A).
[449] *Id.* (citing Draft Redetermination at 60; and Island Rebuttal Comments at Exhibit 10).

70

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Aleum USA that constitute Island's Exhibit 10 do not show any BWPFs.[450]  Rather,
the document simply states that the products have "Butt welding ends complying with
a {sic} national or international standards."[451]

o  The Draft Redetermination also cites a "catalog" from "Shin Tech" to support the
same point.[452]  However, the "catalog" consists of four pages, and it says nothing
about BWPFs.

o  In short, the Draft Redetermination points to no evidence to support its conclusion
that Vandewater's outlets and BWPFs are advertised in the same place or manner.[453]

*SCI's Comments*

•  Commerce's Draft Redetermination is not supported by substantial evidence.[454]
Commerce must consider the complete record, including the evidence that contradicts or
undermines its conclusions.[455]

•  Commerce failed to properly analyze the physical characteristics of the product.[456]

o  A contoured edge that connects to the midsection of a pipe is not a butt-weld.[457]  The
Aleum USA catalog cited by Commerce, which identifies an outlet as having "butt
welding ends," does not reflect the industry's understanding more broadly.  It is
important to note that "butt-weld" is not a standard industry term.  Moreover,
references to saddles (which have a contoured edge like an outlet) in other sources,

---

[450] *Id.* (citing Island Rebuttal Comments at Exhibit 10).
[451] *Id.* at 37 (citing Island Rebuttal Comments at Exhibit 10).
[452] *Id.* (citing Draft Redetermination at 60; and Island Rebuttal Comments at Exhibit 15).
[453] *Id.* at 37.
[454] *See* SCI Draft Redetermination Comments at 2-34.
[455] *Id.* (citing *TMB 440AE, Inc. v. United States*, No. 18-00095, 2020 CIT LEXIS 46 at *21 (CIT April 6, 2020)).
[456] *Id.* at 4-17.
[457] *Id.* at 4-9.

71

such as the Ladish catalog, are inapposite because saddles can have a single butt-weld side (on the branch end).[458]

- o BWPFs must attach on a parallel plane to the recipient pipe,[459] and have a beveled edge of a particular angle.[460]

- o Commerce fails to give proper weight to industry standards, which were identified in the petition.[461]

- o BWPFs rely on permanent welded connections.[462]

- o Commerce improperly characterizes the inputs and processing required to produce BWPFs.[463] The manufacture of BWPFs typically begins with seamless carbon steel pipe; Commerce improperly relies on exceptions to this rule in conducting its (k)(2) analysis. The record is replete with evidence of branch outlets that do not employ a forming or forging process.[464]

- The record evidence concerning purchaser expectations does not indicate that expectations are the same for subject BWPFs and outlets.

- o Commerce seems to recognize the correct industry standard for outlets (*i.e.*, MSS SP-97) but then goes on to find that "conforming to {this} standard … does not indicate that a product cannot also be a BWPF."[465] However, Commerce does not indicate what industry standards are applicable to subject BWPFs, and ignores the language in the Petition which provides that the applicable standards are ASTM A234-82a for

---

[458] *Id.* at 4-7.
[459] *Id.* at 7.
[460] *Id.* at 9-12.
[461] *Id.* at 12-14.
[462] *Id.* at 15-16.
[463] *Id.* at 16-17.
[464] *Id.*
[465] *Id.* (citing Draft Redetermination at 50).

72

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

materials and ANSI B16.9 for dimensions, which outlets do not satisfy.[466]  Commerce

simply notes that certain standards, such as for materials, can apply to both outlets

and BWPFs more generally (*e.g.*, ASTM A105).[467]

o  Outlets cannot be certified to meet the high-pressure (300 PSI) applications for which

   BWPFs are used.[468]

o  Purchasers will expect different sizing dimensions between outlets and BWPFs.[469]  For

   outlets, size refers to the pipe diameter of the sprinkler head or outlet, and pipe run size

   refers to the diameter of the run pipe to which the fishmouth end of the outlet

   attaches.[470]  By contrast, BWPFs are not advertised and displayed using "pipe run

   size."[471]

o  Commerce's findings that BWPFs and outlets are both used in fire sprinkler systems is

   not commensurate with a finding that the products are used for the same purposes

   within this application.[472]  Whereas an outlet is used to connect a sprinkler head or

   branch pipe and a piping system, a BWPF is used to connect pipes within the piping

   system.[473]

o  Neither SCI nor the other importers have argued that the installation costs of BWPFs

   are lower than those of outlets.[474]  Rather, both the number and strength of welds

   involved in installing a BWPF make it more expensive than installation for an outlet.[475]

---

[466] *Id.* (citing the Petition at 4).
[467] *Id.* (citing Draft Redetermination at 54).
[468] *Id.* (citing SCI Comments at 22).
[469] *Id.* at 19.
[470] *Id.* at 18-19.
[471] *Id.* at 19 (citing SCI Comments at 29; and Vandewater Rebuttal Comments at 5-6).
[472] *Id.*
[473] *Id.*
[474] *Id.* at 20 (citing Draft Redetermination at 56).
[475] *Id.* (citing SCI Comments at 20).

Additionally, Vandewater's statement that no special knowledge or expertise is required to install a BWPF is not equivalent to saying that installing a BWPF is less expensive than installing an outlet.[476]

- Commerce's determination with respect to the ultimate use of the products is not based on substantial evidence on the record.[477]

  o First, Commerce seems to ignore the fundamental differences in uses between BWPFs and outlets.[478]  Whereas BWPFs are used in numerous applications involving pressures/substances that require a permanent connection (*e.g.*, chemical synthesis, petroleum refining, electric power generation, construction, and shipbuilding), Vandewater's outlets are used in one low-pressure application – fire sprinkler systems.[479]  If any end of a fitting uses a weaker connecting method than welding, such as threading or grooving, the strong-connection value of the BWPF is lost.[480]

  o Additionally, no fire sprinkler fabricator uses BWPFs for branch connections to sprinkler heads, because BWPFs do not have the ability to accept a sprinkler head with threads.[481]

  o Outlets are used specifically to form a temporary connection between a sprinkler head or branch pipe and a piping system.[482]  Commerce presents no evidence that BWPFs are used for this purpose.

- Commerce's determination that BWPFs and outlets are sold through the same channels of

---

[476] *Id.* (citing Draft Redetermination at 56).
[477] *Id.*
[478] *Id.*
[479] *Id.* at 20-21 (citing SCI Comments at 24; and Vandewater Comments at 24-26).
[480] *Id.* (citing SCI Rebuttal Comments at 11).
[481] *Id.* (citing Vandewater Comments at 24-25).
[482] *Id.* (citing SCI Comments at 23).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

trade is unsupported by the record evidence.[483]

○ Commerce observes that, "{t}he record demonstrates that both outlets and BWPF share similar channels of trade because they are both sold to master distributors, fabricators, and contractors."[484]  However, Commerce does not cite record evidence in support of this determination.  Rather, Commerce relies on Island's unsupported assertion that the importers "sell widely to master distributors, fabricators, and some contractors."[485]

○ Although Commerce correctly observes that the record includes a statement that BWPFs and outlets are "both sold to distributors,"[486] the statement indicates that "distributors then resell these two categories of products to distinct market segments."[487]  Accordingly, BWPFs and outlets are viewed very differently by distributors and are sold in different channels of trade to different customers.[488]

○ The product catalogs cited by Commerce do not include both BWPFs and outlets.[489]  Commerce cannot rely on these catalogs to reach the conclusion that "there is significant overlap in the channels of trade" between BWPFs and outlets.[490]

• Commerce is incorrect that the record demonstrates that BWPFs and outlets are advertised or displayed together.[491]

○ Commerce relies on the Aleum USA catalog "{s}how{ing} outlets with a branch side that is threaded or grooved along with a comparable product with 'butt welding

---

[483] *Id.* at 22.
[484] *Id.* (citing Draft Redetermination at 58).
[485] *Id.* (citing Island Rebuttal Comments at 37).
[486] *Id.* (citing Draft Redetermination at 59).
[487] *Id.* (citing Vandewater Rebuttal Comments at Attachment A).
[488] *Id.* at 23.
[489] *Id.* at 24 (citing Draft Redetermination at 59).
[490] *Id.*
[491] *Id.*

75

ends."[492]  However, these specification sheets pertain to a "female threaded outlet"

and a "grooved outlet," not a "BWPF."[493]

o  Commerce also relies on the Shin Tech catalog.[494]  Like the Aleum USA catalog, this

also does not display BWPFs side-by-side with outlets.[495]  This catalog references

"Cold Forging Fire Sprinkler Prefabrication Piping System" products and not

BWPFs.[496]  Accordingly, these materials are not evidence that BWPFs and outlets are

advertised or displayed together.[497]

o  Commerce observes that "{t}he importers' own product literature advertise outlets for

fire protection and other 'Low Pressure Piping Systems.'"[498]  However, Commerce fails

to articulate how this demonstrates that BWPFs and outlets are advertised or displayed

together.[499]

*SIGMA's Comments*

•  Commerce's discussion of physical characteristics contains three crucial shortcomings

that, taken together, invalidate its consideration of such characteristics.

o  First, Commerce's discussion of industry standards is misguided.[500]  Industry standards,

by their very nature, exist to define distinct products; the idea that a product could

---

[492] *Id.* (citing Draft Redetermination at 60).
[493] *Id.* (citing Island Rebuttal Comments at Exhibit 10).
[494] *Id.* (citing Draft Redetermination at 60).
[495] *Id.* at 25.
[496] *Id.*
[497] *Id.*
[498] *Id.* (citing Draft Redetermination at 60).
[499] *Id.*
[500] *See* SIGMA Draft Redetermination Comments at 4.

76

conform to multiple industry standards would effectively render those standards
meaningless.[501]

o   In *King Supply*, the CAFC affirmed Commerce's decision in a scope inquiry and noted
that Commerce "emphasized that, not only were King's products physically identical to
the products described in the first sentence of the AD Order, but evidence also showed
King's products met the same ASTM and ANSI industry standards as were referenced
in the Petition."[502]  Based on this reasoning, if a product is produced according to
ASTM A234-82a or ANSI B16.9, then it will fall within the scope of the *China BWPFs
Order*.  Where a product is neither physically identical to the products described in the
order, nor produced according to the same industry standards, it will not fall within the
scope.

o   The Draft Redetermination contains no discussion of the expert report of Walter Sperko
– to which Vandewater, SIGMA, and SCI all cited in their comments.[503]  It is "well-
established that Commerce's total failure to consider or discuss record evidence which,
on its face, provides significant support for an alternative conclusion renders
{Commerce's} determination unsupported by substantial evidence."[504]

---

[501] *Id.* (citing Draft Redetermination at 49-50; *Viraj Forgings Ltd. v. United States*, 283 F. Supp. 2d 1335, 1341 n.4
(2003) ("Standardization, in manufacturing, means establishing 'desirable criteria for the shape, size, quality and
other aspects of a product'"); *BP Oil Supply Co. v. United States*, Ct. No. 04-00321, Slip Op. 14-48 at 16 (2014)
("The record demonstrates that there are clear differences in recognized industrial standards between many of the
types of imported merchandise and the substitute merchandise"); *Bell Supply Co., LLC v. United States*, 393 F.
Supp. 3d 1229, 1242 (CIT 2019) (noting that "threading is a common process in the industry with various standards
for different types of thread joints"); and *Tai-Ao Aluminium (Taishan) Co. v. United States*, 391 F. Supp. 3d 1301,
1308 n.2 (CIT 2019) ("The Aluminum Association is the authority that maintains the standards for the U.S.
aluminum industry with respect to aluminum alloy designations, the chemical composition for the alloys, and the
approved tempering methods for the different alloys")).
[502] *Id.* at 5 (citing *King Supply*, 674 F.3d at 1347.
[503] *Id.* at 6 (citing SIGMA Comments at 5-6 and Exhibit 2; Vandewater Comments at 7-9, 11-15, and Exhibit 6; and
SCI Comments at 22).
[504] *Id.* at 6-7 (citing *A.L. Patterson, Inc. v. United States*, 36 CIT 1132, 1136 (2012) (quoting *Allegheny Ludlum
Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (2000))).

o  Commerce has mischaracterized a key point raised by SIGMA regarding a fundamental physical characteristic of outlets.[505]  Commerce concluded in the Draft Redetermination that products with a contoured edge (*i.e.*, a "fishmouth" design) "can be BWPF."[506]  It then stated that SIGMA "agrees that saddles are a type of BWPF."[507]  Yet SIGMA's explanation was that saddles can be BWPF "not … by reason of the 'fish mouth' opening on one side" but rather by reason of the other side of the fittings (*i.e.*, the beveled branch end)."[508]

- Commerce's analysis of purchaser expectations is unsupported by record evidence.

o  Commerce dismisses the idea that different industry standards lead to different expectations.[509]  That conclusion is invalid; the courts have long recognized that conformity with industry standards is fundamental to the consumption and use of a given product.[510]

o  Purchasers expect to use outlets in fire protection systems and use BWPFs for a variety of other uses, namely in "the oil, gas, steam, and chemical industries" as well as construction.[511]  Commerce disagreed with this fact, finding that "fire protection sprinkler systems are a contemplated application of BWPFs."[512]  Yet, it nevertheless stated that different "usages will, of course have different requirements and

---

[505] *Id.* at 7.
[506] *Id.* (citing Draft Redetermination at 10, 46-47).
[507] *Id.* (citing Draft Redetermination at 47).
[508] *Id.* (citing Draft Redetermination at 47; and SIGMA Comments at 9-10).
[509] *Id.* at 8 (citing Draft Redetermination at 54).
[510] *Id.* (citing *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1366 (Fed. Cir. 2012) (citing "expert evidence that compliance with such standards is a 'a commercial necessity'" that is "necessary, and expected by the marketplace"); and *Maher-App & Co. v. United States*, 57 C.C.P.A. 31, 35 (1969)).
[511] *Id.* (citing SIGMA Comments at 8).
[512] *Id.* (citing Draft Redetermination at 55).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

expectations regarding pressure rating and related features....”[513]  This recognition

supports the exact opposite of Commerce’s conclusion.[514]

- With respect to ultimate use, Commerce’s analysis is unpersuasive.

  o Commerce states that the “fact that Vandewater’s outlets are designed for a specific use

    within a sprinkler system, *i.e.*, connecting the piping system to a sprinkler head,

    whereas another BWPF might be used to connect two pipes in the system, does not

    mean that the products do not have similar uses.”[515]  Here again, Commerce’s logic is

    unreasonable.  Despite Commerce’s assertions of “similarity,” the uses outlined by

    SIGMA, Vandewater, and SCI are clearly different from those for which BWPFs are

    produced.[516]

  o The courts have previously ruled against such equivocation.  For example, in the

    proceeding underlying *Torrington*, Commerce distinguished between five types of

    antifriction bearings, ultimately rescinding investigations of certain bearings.[517]  The

    petitioner appealed, asserting “that all bearings... have the same ultimate function, that

    is, ‘to reduce friction between moving parts.”[518]  In response, the Court deemed the

    “claim that all bearings reduce friction and therefore have the same ultimate use is a

---

[513] *Id.* (citing Draft Redetermination at 55).
[514] *Id.* at 8-9 (citing *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1181, 1190-91 (2004); and *Torrington Co. v. United States*, 714 F. Supp. 718, 726-27 (1990) (*Torrington*) (“The expectations of the ultimate purchasers of antifriction bearings differ depending on the needs of the customer and the ability of the particular bearing to perform a given task.  For example, a customer who needs bearings that can handle heavy loads, but who is not concerned with speed, would be interested in a plain bearing.  Conversely, a purchaser who expects a bearing to perform at high speeds, but with a light load, would find a ball bearing more useful … Customer expectations do vary depending on the needs of the customer and the ability of a particular bearing to perform a given task”).
[515] *Id.* at 9 (citing Draft Redetermination at 57).
[516] *Id.* (citing SIGMA Comments at 7).
[517] *Id.* at 10 (citing *Torrington v. United States*, 745 F. Supp. 718, 719-20 (“The five types of bearings were (1) ball bearings; (2) spherical roller bearings; (3) cylindrical roller bearings; (4) needle roller bearings: and, (5) plain bearings.”).
[518] *Id.* (citing *Torrington*, 745 F. Supp. at 726).

79

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

simplistic and unpersuasive argument.  Clearly, different bearings exist because they

have various uses.  The industry is a vast and diverse one, and the different types of

bearings serve the disparate needs of the modern mechanized world."[519]

o  The same can be said with respect to the comparison between Vandewater's outlets and

BWPFs.  These two products exist because they have distinct uses (with distinct

industrial standards).  To conclude that they are "similar" because they "connect pipes"

is, in the words of the Court, "simplistic and unpersuasive."[520]

• Commerce's analysis of the manner in which the product is advertised and displayed is

incorrect.

o  Although Commerce mentions in passing that industry standards and other

characteristics are included in these advertisements,[521] it neither discusses nor cites to

the crucial distinction raised by SIGMA in its comments.[522]  Island's advertisements

include specific, advertised characteristics – end use and industry standards – which

draw a clear dividing line between BWPFs on one hand, and outlets on the other.[523]

**Commerce Position:**  The importers raise a number of arguments regarding Commerce's

analysis of the (k)(2) criteria.  However, we continue to find that our analysis of the five criteria

supports finding Vandewater's outlets to be covered by the scope of the *China BWPFs Order*.

---

[519] *Id.* (citing *Legacy Classic Furniture Inc. v. United States*, 867 F. Supp. 2d 1321, 1327 (CIT 2012) ("The fact that seating furniture can {be}, and often is, located in the bedroom does not place it within the scope of the WBF Order. It is unreasonable to conclude that customers seeing a product marketed as a 'bench' or 'seating furniture' would primarily expect to use it as a bedroom chest.  Commerce apparently made its conclusion based on conjecture and not on evidence, or even logical inference from the evidence")).
[520] *Id.*
[521] *Id.* (citing Draft Redetermination at 59-60).
[522] *Id.* (citing Draft Redetermination at 60).
[523] *Id.* (citing SIGMA Comments at 9-10).

80

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

We discuss each criterion, in turn.

With respect to physical characteristics, we continue to find that an analysis of this criterion supports a finding that outlets are BWPFs.  The importers identify purported flaws in our related discussion of:  (1) industry standards; (2) the use of temporary vs. permanent connections; (3) the applicable weld angle/plane of attachment; (4) shape; (5) production process/materials; and (6) HTSUS classification.

First, although the importers assert that Commerce failed to give sufficient weight to an industry standard (*i.e.*, ANSI/ASME B16.9) in analyzing the physical characteristics of outlets, Commerce addressed industry standards extensively in the Draft Redetermination.[524]  The importers, however, urge Commerce to restrict the scope on the basis of such a standard, and we feel it is inappropriate to do so.  In support of this argument, SIGMA cites *King Supply*, in which the CAFC sustained Commerce's finding that "not only were King's products physically identical to the products described in the first sentence of the *AD Order*, *but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition*."[525]  This quotation does not warrant the interpretation favored by SIGMA.  In *King Supply*, we determined that a product that fell within the scope language, *and also met industry standards* referenced in the petition, was within the scope of the order.  That case does not stand for the proposition that the industry standard and the scope of the order are, or must be, coextensive.  Thus, it does not address the question before Commerce here.

For Vandewater's outlets, the question is whether a product that is not among the product types enumerated in ANSI/ASME B16.9 can be covered by the scope.  As explained above, the

---

[524] *See* Draft Redetermination at 49-51, 54.
[525] *See* SIGMA Draft Redetermination Comments at 5 (citing *King Supply*, 674 F.3d at 1347) (emphasis added by SIGMA)).

81

scope does not include a requirement that subject merchandise must conform to ANSI/ASME B16.9.  A mere reference to an industry standard in the Petition, without more, does not mean that subject merchandise *must* meet the specifications of that industry standard.[526]  Therefore, including a requirement that all BWPFs subject to the *China BWPFs Order* must conform to a particular industry standard, such as ANSI/ASME B16.9, would introduce a restriction that is not found in the scope language and would unduly restrict the coverage of the scope.

The importers claim that absence from ANSI/ASME B16.9 indicates that outlets are not covered.  However, we found that certain products that are not listed in the standard, such as saddles, share physical characteristics with in-scope merchandise and are covered by the *China BWPFs Order*.[527]  Additionally, evidence on the record shows that BWPFs may be made to conform to specifications other than the standards referenced in the footnote in the Petition.[528]  In fact, at numerous points throughout their briefing, the importers acknowledge that certain saddles may be covered by the scope.[529]  Thus, they appear to agree that a product is not required to meet ASME B16.9 specifications to be covered by the scope.

Additionally, as noted in the Draft Redetermination, "the ITC report at the time of the investigation explicitly noted that not all shipments of *BWPFs from China* – the precise product for which the petitioner sought relief – met the ASME standard."[530]  This observation is

---

[526] *See United Steel and Fasteners*, 947 F.3d at 800.
[527] *See* Draft Redetermination at 46-47, and 50.
[528] *See* Island Rebuttal Comments at Exhibit 2 (certain elbows, reducing outlet tees, reducers, lap joint stub ends, and caps are made to "ASA B36.10" and "are not covered in ASA B16.9").
[529] *See* SIGMA Rebuttal Comments at 4-5 ("These 'saddle' fittings were not butt-weld fittings by reason of the 'fish mouth' opening on one side.  Rather, these 'saddle' fittings were butt-weld fittings by reason of the other side of the fittings (*i.e.*, the beveled branch end)"); Vandewater Draft Redetermination Comments at 18 ("A saddle would have to have the bevel of the requisite geometry on its *branch end* to qualify for the BWPF taxonomy"); and SCI Draft Redetermination Comments at 10 (asserting that, "perhaps," saddles with a butt-weld end could be found to be within the scope of the order).  Although SIGMA argues that saddles are only BWPFs when the branch end is designed for a butt-weld connection, the points remains that SIGMA agrees that a product that is not listed in ASME B16.9, *i.e.*, a saddle, can be a BWPF.
[530] *See* Draft Redetermination at 48 (citing USITC Investigation Final at I-10 through I-11).

82

consistent with our interpretation that the scope and ANSI/ASME standards are not coextensive.

The importers also take issue with our discussion of the MSS SP-97 standard and assert that the implication of our analysis of the standard was unclear.[531]  However, Commerce was explicit about its conclusion.  We explained:

> Thus, we find no reason to conclude that products conforming to MSS SP-97 cannot also be BWPFs.  In fact, as shown above, products covered by MSS SP-97 explicitly have many of the same characteristics that the importers attribute to BWPFs, *e.g.*, full penetration welds and bevel angles of 37.5 degrees with a tolerance of plus or minus 2.5 degrees.  Moreover, MSS SP-97 is described as a "non-exclusive standard" and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME.[532]

Therefore, despite the importers' contention to the contrary, we disagree that the various industry standards reflect bright-line distinctions between outlets and other BWPFs for the purposes of analyzing the *China BWPFs Order* scope.[533]

Second, the importers again assert that the method of attaching outlets to pipes distinguishes them from BWPFs.  They assert that outlets have a branch end that features a temporary (*i.e.*, non-permanent) connection and attaches to a sprinkler head, whereas BWPFs have no temporary connection and no branch end whatsoever; they also assert that outlets have no ends featuring a butt-weld at all, *i.e.*, that the contoured end that joins along the axis of the header pipe does not constitute a butt-weld joint.  We addressed these arguments in detail in the Draft Redetermination.[534]  With respect to the temporary nature of the connection on the branch

---

[531] *See, e.g.*, Vandewater Draft Redetermination Comment at 25.
[532] *See* Draft Redetermination at 50-51.
[533] SCI asserts that Commerce's finding in this regard "is hardly commensurate with a finding that the industry standards between BWPFs and outlets are the same."  *See* SCI Draft Redetermination Comments at 18.  We agree. We did not, and do not, conclude that the ASME B16.9 and MSS SP-97 standards are the same.  Rather, we observe that there are a number of aspects of the standards that demonstrate common physical characteristics across the products covered by each.  Moreover, we noted that standards need not be treated as exclusive – which is, in fact, explicitly stated in the MSS SP-97 standard itself.
[534] *Id*. at 45-51.

end of the outlets, a lap joint stub end has a beveled edge on one end which allows for a welded, permanent connection, while on the other end, it is designed to be bolted to a piping system.[535] Thus, like outlets, one type of unambiguously in-scope BWPF – which is listed as a BWPF in the very industry standard repeatedly highlighted by the importers – contains a temporary non-welded connection on one end.[536] Thus, the record does not support the importers' position that all ends of a BWPF must have only permanent welded connections.

The importers also assert that BWPFs are never attached to sprinkler heads. This is entirely circular. The question here is whether Vandewater's outlets, which feature a sprinkler head attachment on one end, constitute a BWPF that is covered by the scope of the *China BWPFs Order*. For the reasons discussed here, and in the Draft Redetermination, we find that the shared physical characteristics of outlets and other BWPFs, including the materials, sizes, shapes, and edges, support finding outlets to be BWPFs. We find that a product may be a BWPF if it meets the physical characteristics laid out in the scope and, in addition, has one end that is threaded or grooved or otherwise designed to accommodate a non-permanent attachment. Thus, we find the purported limitation imposed by the importers, *i.e.*, that BWPFs must provide for *only* permanent, welded joints, to not be supported by the record.

With respect to the non-branch end of an outlet, the importers continue to assert that the contoured end is not a butt-weld connection and, thus, outlets have no butt-welded ends. This

---

[535] *See* Petition at Appendix B; and Vandewater Comments at 13. Vandewater itself notes that "{t}he flared end of a lap joint stub end is designed to be fastened to a pipe or another fitting via a flange, not a permanent butt weld." *See* Vandewater Draft Redetermination Comments at 19.

[536] In an apparent recognition of the challenge that lap joint stub ends pose to its position, Vandewater suggests that there is an open question as to whether lap joint stub ends are BWPFs, asserting that "{t}his proceeding, of course, is not intended to resolve the question of whether a lap joint stub end is or is not included within the scope of the *China BWPFs Order*." Vandewater Draft Redetermination Comments at 27. This position directly contradicts its arguments, in the same submission, in which it contends that "{i}n this case, there are bright-line distinctions within the fittings industry, based on differing industry standards" – notwithstanding the fact that lap joint stub ends are explicitly covered by ASME B16.9. *Id.* at 3.

too was addressed fully in the Draft Redetermination.  We explained:

> Specifically, the record evidence establishes that products with a contoured edge that are designed to connect to the midsection of a pipe can be BWPFs.  In its product specification sheets, Aleum USA, a U.S.-based distributor of outlets, *describes its female threaded outlet and grooved outlet as having "butt welding ends."* … The product catalog from another U.S. producer of the domestic like product includes an illustration of a "vesselet," another product with a contoured edge that is connected to the side of a header pipe, and *the illustration refers to the contoured end as a "buttweld" and the accompanying description states that the vesselet features a "{t}rue butt-weld installation in header.*"[537]

These sources demonstrate that contoured ends, such as the fishmouth shaped end (*e.g.*, on the bottom of an outlet or saddle), constitutes a butt-welded connection.  Vandewater appears to have entirely ignored the above-cited passage, asserting that "{n}either {Commerce} nor Island attempt to address the simple, indisputable fact that Vandewater's outlets contain *zero butt welds.*"[538]  Contrary to Vandewater's claim, we examined the evidence on the record and determined that the two catalogs provided a reliable indication of what constitutes a butt-weld joint, which is fully consistent with Vandewater's suggestion that "{f}or (k)(2) purposes, the focus should be on what the pipe fittings industry believes the physical characteristic differences are."[539]  Ultimately, the importers ask us to ignore the product catalog of Aleum USA and Bonney Forge (the latter of which was placed on the record by Vandewater), and to place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit

---

[537] *See* Draft Redetermination at 46-47 (citing Island Comments at Exhibits 4A and 4B, and Vandewater Comments at Tab 14 (Bonney Forge catalog at 23)).

[538] *See* Vandewater Draft Redetermination Comments at 22 (emphasis in original).

[539] *Id*. at 3.  SCI also asserts that, in the context of its *Forged Steel Fittings Order*, Commerce "has already found that products like saddles, that do not have butt welds on both ends, are not butt weld fittings" and that "outlets have zero butt weld ends."  *See* SCI Draft Redetermination Comments at 8.  As discussed in the Draft Redetermination, our construction of an exclusion in a separate proceeding is not determinative here.  More importantly, we conclude that Vandewater's outlets do, in fact, feature a butt-welded connection to the run pipe.  Moreover, for the reasons discussed above, we disagree with SCI's assertion that products such as saddles and lap joint stub ends cannot be considered BWPFs.

placed on the record for the purpose of this litigation.[540]  We decline to do so, and we note that Commerce regularly considers whether documents are prepared in the ordinary course of business – or prepared specifically for the administrative proceeding – in determining the appropriate weight to accord to record evidence.[541]  Moreover, as discussed elsewhere in these final results, we find that portions of the affidavits support our conclusion regarding the scope status of Vandewater's outlets.[542]

Third, and also related to the connection between outlets and the recipient pipe, the importers assert that BWPFs must have a beveled edge of a particular angle and/or must attach to a pipe in a manner that creates an angle of a particular dimension.  As we explained in the Draft Redetermination, "{a} pipe fitting possesses the requisite beveled edge if it is capable of creating a shallow channel to accommodate the bead of the weld that fastens the two adjoining pieces, as described in the Petition and prior ITC determinations."[543]  Consistent with the discussion above, in which we explain that the scope of the *China BWPFs Order* is not coextensive with the ANSI/ASME standard cited by the importers, we similarly find that the particular bevel angles

---

[540] Throughout the importers' submissions, the importers repeatedly ask that Commerce credit the affidavit from Vandewater's witness over other record evidence.  *See, e.g.*, SIGMA Draft Redetermination Comments at 6; and Vandewater Draft Redetermination Comments at 3.  We also note that Vandewater asserts that the source of the Aleum USA exhibit is unknown.  Although the exhibit consists of two pages, which are excerpted from a larger document identified by Island as a product catalog, we find no basis to question the reliability of the exhibit.

[541] *See, e.g.*, *Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber*), and accompanying IDM at Comment 19 ("Although we consider all evidence on the record of a proceeding, in determining the weight to be accorded to a particular piece of evidence, we consider whether the evidence in question was prepared in the ordinary course of business, or for the express purpose of submission in the ongoing administrative proceeding").

[542] For instance, the Sperko affidavit provided by Vandewater is consistent with a finding that the contoured end of an outlet features a full penetration weld, *see, e.g.*, Vandewater Comments at Exhibit 7 (Report of Walter Sperko) ("This 45-degree angle groove allows welding of a *full-penetration* or partial penetration groove weld reinforced by a fillet weld") (emphasis added), and with a finding that outlets and other BWPFs are made from similar materials (noting that "{b}utt-weld pipe fittings most commonly are manufactured *using seamless pipe* as the raw material," and "for lower pressure applications, *branch outlets may also be machined from seamless or welded pipe* and tube," in addition to forgings and bar stock) (emphasis added).

[543] *See* Draft Redetermination at 48.

86

identified in the standard are not required for a product to be in-scope.  In fact, the ITC final

report in the underlying investigation specifically observed that two domestic producers and

multiple importers reported that Chinese BPWF producers often did not meet the applicable

industry standards.[544]  Given that the Petition was explicitly designed to cover imports of BWPFs

from China, there were clear reasons as to why the petitioner would not elect to make the scope

coextensive with industry standards, in light of the fact that such standards were not consistently

adhered to by producers of subject merchandise in the exporting country.

Fourth, Vandewater continues to assert that the shape of BWPFs is distinct from the

shape of outlets, claiming that "welded outlets are straight in design, whereas virtually all

BWPFs (*i.e.*, all BWPFs except caps) are curved or irregularly shaped."[545]  As noted in the Draft

Redetermination, "caps are unambiguously covered by the scope of the *China BWPFs Order*,

and, therefore, this is not a characteristics that distinguishes outlets from BWPFs."[546]  In fact, it

is puzzling that the importers ask us to dismiss caps as a point of comparison given the fact that

caps are among the BWPFs enumerated in the industry standard emphasized by the importers

(*i.e.*, ASME B16.9) and they were identified by the ITC as among the "most common" types of

BWPFs.[547]  Similarly, lap joint stub ends are straight in design.[548]  The body of a lap joint stub

end has no bend or curvature along its length, and only has a deviation from the straight

cylindrical shape at the ends (*i.e.*, the "stub" located at the base and the bevel located at the

---

[544] *See* USITC Investigation Final at "Imported and Domestic Product Comparison" (stating that the two "producers noting quality differences stated that butt-weld fittings from China often do not meet ASTM and/or ANSI specifications when tested by distributors and end users," and that "{a}s with two domestic producers, importers also noted that Chinese butt-weld pipe fittings often do not meet ASTM and ANSI specifications").
[545] *See* Vandewater Draft Redetermination Comments at 22.
[546] *See* Draft Redetermination at 34.
[547] *See* USITC Investigation Final at "The Product" ("Butt-weld pipe fittings come in several basic shapes, the most common of which are elbows, tees, reducers, and *caps*") (emphasis added).
[548] *Id*. at 13.

87

top).[549]  Therefore, the fact that outlets share this characteristic with key types of BWPFs demonstrates that the so-called "straight" design of outlets is not a distinguishing physical characteristic.

We also note this line of argument, downplaying the similarity between outlets and caps, for instance, reflects a broader flaw in the importers' arguments throughout their comments – they continue to attempt to artificially narrow the scope of the *China BWPFs Order* by pointing to subsets of subject merchandise (or subsets of uses/expectation, as discussed below) in their analysis.  This is incorrect.  In our (k)(2) analysis, we must assess physical similarities between outlets and other in-scope merchandise; this includes cap, lap joint stub ends, elbows, and the variety of fittings that fall within the greater heading of BWPFs.

Fifth, with respect to the relevant production process, the importers assert that Commerce improperly characterizes the inputs and processing required to produce BWPFs.  Vandewater asserts that there is no forming or forging involved in the creation of an outlet.[550]  However, elsewhere in the submission, Vandewater asserts that "Threaded Welded Outlets Are *Forged* Steel Pipe Fittings."[551]  Moreover, the Sperko declaration provided by Vandewater also states that "*Forged* steel branch outlets normally are manufactured using *forgings* or bar stock as the raw material.  The forging or bar stock is then shaped through a die *forging* process, either a closed-die *forging*, or an open-die *forging*."[552]  Thus, we find that outlets are, like other BWPFs, formed or forged.

We also previously addressed the importers' assertions regarding the starting materials

---

[549] *See* Island Rebuttal Comments at Exhibit 2 at 82-83 (lap joint stub ends dimensions).
[550] *See* Vandewater Draft Redetermination Comments at 22.
[551] *Id*. at 8 (emphasis added).
[552] *See* Vandewater Comments at Exhibit 7.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

for outlets and other BWPFs.  In the Draft Redetermination, we explained:

> the importers' argument that outlets and BWPFs are manufactured from different starting material is not supported by the record.  The importers' assert that BWPFs are typically made from "seamless pipe" or "welded pipe …" or "seamless or welded pipe and tube."  The ITC stated that, additionally, "some types of fittings, such as caps, are formed from carbon steel plate, billet, or bar stock."  Accordingly, there is a range of starting materials from which BWPFs are made.  Vandewater states that its "grooved steel outlets are made from welded pipe," and its "threaded steel branch outlets are made from steel bars."  Thus, Vandewater's outlets are produced from starting materials used to produce other in-scope merchandise.[553]

Thus, although there is a variation in starting materials across the range of BWPFs, we find that the materials for outlets and other BWPFs are comparable.

Finally, Vandewater repeats its argument regarding HTSUS classification.  As discussed in the Draft Redetermination, although we considered the decisions of CBP, we are not bound by such classifications.  Here, given our analysis regarding the physical characteristics of in-scope merchandise, do not find that the CBP classification is suggestive of different physical characteristics between outlets and other BWPFs.[554]

In summary, with respect to physical characteristics, we find that Vandewater's outlets are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and have one butt-welded end with a beveled edge suitable for permanent attachment to a piping system that conveys gas or liquid.  We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles).

---

[553] See Draft Redetermination at 52.  Additionally, the Sperko affidavit states that "{b}utt-weld pipe fittings most commonly are manufactured using seamless pipe as the raw material," and notes that "for lower pressure applications, branch outlets may also be machined from seamless or welded pipe and tube," in addition to forgings and bar stock.  See Vandewater Comments at Exhibit 7.
[554] See Draft Redetermination at 53.

89

With respect to the expectations of ultimate purchasers, we continue to find that expectations for outlets and other BWPFs are consistent.  Outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems.  As discussed above, the fact that Vandewater's outlets have a temporary connection on one end is not a feature that distinguishes outlets from other in-scope merchandise, and, therefore, does not change consumer's expectations regarding the product.  Regarding this fact, Vandewater again asks Commerce to credit the expert affidavit it provided, rather than the other sources on the record, such as the ITC report, to ascertain the expectations of consumers and users.  For the reasons stated above, we do not find that the affidavit represents more reliable evidence than other record evidence that was not created specifically for this scope proceeding.[555]

SIGMA also asserts that different industry standards apply to the product, which impact consumer expectations.  For the same reasons discussed above – *i.e.*, that the scope is not coextensive with ANSI/ASME B16.9 – we continue to find the importers' characterization of the applicable industry standards to be without merit.  In any case, we also note that the two standards in question, ANSI/ASME B16.9 and MSS SP-97, reflect substantial overlap in terms of attributes, and in turn expectations, for outlets and BWPFs.  For example, the standard states that outlets are attached "at an opening in a run pipe by means of a full penetration weld," which the importers identify as a defining feature of a BWPF.[556]  Also, SIGMA states that Commerce's conclusion regarding the overlap between the ANSI/ASME B16.9 and MSS SP-97 standards "makes no sense" because "{i}ndustry standards, by their very nature, exist to define distinct

---

[555] *See Softwood Lumber* IDM at Comment 19.
[556] *See* Vandewater Comments at Tab 2 at 1.

products; the idea that a product could conform to multiple industry standards, thereby recategorizing that product, would render those standards meaningless."[557]  However, as noted in the Draft Redetermination, MSS SP-97 is a "non-exclusive standard" and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME.[558]

SCI also asserts that the installation costs differ across outlets and other BWPFs, claiming that "the number and strength of welds involved in installing a BWPFs make it more expensive than installation for a branch outlet."[559]  Since there are multiple types of unambiguously in-scope BWPFs that only have one welded end (*e.g.*, caps and lap joint stub ends), we disagree that the number of welds results in different expectations in terms of installation costs for ultimate purchasers.  With respect to the strength of the welds, SCI's argument is based on the assertion that the type of weld (*i.e.*, full penetration for BWPFs vs. fillet for outlets) is a distinguishing feature.  However, as noted above, we find that outlets and other BWPFs both utilize a full penetration weld; this finding is supported by a description of the product contained in the standard proffered by the importers that relates specifically to outlets (*i.e.*, MSS SP-97)[560] as well as the affidavit submitted by Vandewater.[561]

As to the ultimate uses of the product, Vandewater essentially raises the same argument addressed above, contending that  "{a} BWPF is *never* suitable for connecting to a sprinkler

---

[557] *See* SIGMA Draft Redetermination Comments at 5.
[558] *See* Vandewater Comments at Tab 2 at 3.
[559] *See* SCI Draft Redetermination Comments at 20.
[560] *See* Vandewater Comments at Tab 2 at 1 (containing MSS SP-97, which notes that outlets are attached to a header/run pipe via "an opening in a run pipe by means of a full penetration weld").
[561] *See* Vandewater Comments at Exhibit 7 (Report of Walter Sperko) ("This 45-degree angle groove allows welding of a *full-penetration* or partial penetration groove weld reinforced by a fillet weld") (emphasis added); *see also* Vandewater Comments at Tab 14 (Bonney Forge catalog at 23 (noting that the outlet in question is connected to the header pipe with a butt-weld).

91

head, precisely because the sprinkler head must be attached in manner that it can be changed, and *not* permanently attached through a butt weld."[562]  As noted, the fact of a temporary connection does not render outlets distinct from other BWPFs, as certain BWPFs (*e.g.*, lap joint stub ends) have this same characteristic.[563]

SCI similarly asserts that the uses of outlets and other BWPFs are distinct because "BWPFs are used in numerous applications involving highly-pressured substances and requiring a permanent connection (*e.g.*, chemical synthesis, petroleum refining, electric power generation, construction, and shipbuilding)."[564]  Although SCI argues that such applications necessarily require the use of a permanent connection, this too ignores the record evidence, including evidence highlighted by the importers, that not all BWPFs have exclusively permanent connections.[565]  Although Vandewater's outlets have a particular application, *i.e.*, are use in low pressure piping systems and typically have a lower pressure rating due to the use of one non-permanent connection, we continue to find that the uses for such outlets are consistent with the uses of other BWPFs (*i.e.*, permanently welded into a piping system that conveys gases or liquids).

SIGMA asserts that Commerce's analysis of the use criteria is simplistic and merely finds that outlets and BWPF are similar in that they "connect pipes."[566]  However, that is an obvious mischaracterization of Commerce's analysis.  The products do not just connect pipes – they connect pipes in a variety of overlapping settings, *e.g.*, fire protection and other low-pressure

---

[562] *See* Vandewater Draft Redetermination Comments at 33 (emphasis in the original).
[563] *See, e.g.*, Petition at Appendix B; and Vandewater Comments at Tab 1.
[564] *See* SCI Draft Redetermination Comments at 21.
[565] *See, e.g.*, Petition at Appendix B; and Vandewater Comments at Tab 1.  We note that the importers routinely suggest that the ANSI/ASME B16.9 standard defines the scope here, despite the fact that the standard contains fittings (*i.e.*, lap joint stub ends) that do not rely on permanent welds for all ends.  The importers attempt to selectively rely on the industry standard where it supports finding Vandewater's outlets to be out of scope.
[566] *See* SIGMA Draft Redetermination Comments at 10.

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

piping systems, and do so in a similar manner, *i.e.*, through at least one permanent, full penetration welded joint.  Although SCI emphasizes that outlets and other BWPFs do not have the same use within fire protection systems, the same could be said of many subsets of the broader range of BWPF products.  For instance, an elbow connects pipe in a manner that changes the flow of the substance being transported, while caps restrict the flow at a certain location and reducers modify the size of the pipe containing the flow.[567]  All subject fittings have a particular purpose within the broader piping system.  Moreover, certain BWPFs have particular uses that are closely analogous to that of an outlet.  As noted above, a saddle is attached axially to a length of pipe in a manner that changes the flow of the transported substance.[568]  A "tee" is designed to perform a similar function – creating an outbound flow from a run pipe that is perpendicular to the main flow.[569]  A comparison of two images showing Vandewater's outlet and a tee, both provided by Vandewater, demonstrates a high level of similarity in the two products' purpose and function.[570]

With respect to the channels of trade, Vandewater asserts that the record evidence does not support a finding that outlets and BWPFs are sold in the same channel.  It urges Commerce to consider the declaration of Neil Shyman to find differences in the ultimate consumer of the products.[571]  We did consider this evidence in our Draft Redetermination.  Specifically, we noted that the declaration states that "welded branch outlets and butt-weld fittings are both sold to

---

[567] *See, e.g.*, Vandewater Comments at 13.
[568] *See, e.g.*, Petition at Appendix B (showing the shape of a saddle, which is designed to connect to the run pipe).
[569] *See* Vandewater Comments at 13.
[570] Compare *id.* (showing a tee) and Vandewater Draft Redetermination Comments at 8 (showing an installed outlet).  SCI also asserts that "a BWPF is used to connect pipes within the piping system."  *See* SCI Draft Redetermination Comments at 19.  Although this is clearly a common use for such products, unambiguous BWPFs, such as caps, are not designed to connect pipes.
[571] *See* Vandewater Draft Redetermination Comments at 35.

93

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

distributors like Neill Supply."[572]  The importers concede that outlets and BWPFs are both sold

to distributors, but emphasize that distributors resell these two categories of products to distinct

market segments:  BWPFs to mechanical and industrial contractors, and outlets to the fire

protection sprinkler industry.[573]  We agree that Vandewater's outlets are typically sold to a

particular type of contractor given their targeted application, when compared to BWPFs more

generally – which cover a wide range of products and applications.  However, this is true in any

circumstance when comparing a particular product to a broad class of products.  Outlets and

other BWPFs are sold to distributors and then to contractors and users involved in constructing

piping systems, even if the particular type of contractor/customer for Vandewater's outlets

focuses on certain types of systems, *i.e.*, fire protection and other low-pressure applications.

SIGMA asserts that Island's advertising materials reference particular end uses and

industry standards which "draw a clear dividing line between butt-weld pipe fittings on one hand

and steel branch outlets on the other."[574]  Throughout the Draft Redetermination and these final

results of redetermination, we continue to find that the importers give undue significance to

ANSI/ASME B16.9, and those same considerations apply here.

The record indicates that advertisements for outlets and other BWPFs contain similar

types of information, such as measurements of length and inside/outside diameter, and often list

applicable standards.[575]  Although SCI asserts that the sizes reported for outlets are different, *i.e.*,

they are sold on the basis of run pipe size, rather than the dimensions of the end of the recipient

---

[572] *See* Vandewater Rebuttal Comments at Attachment A.
[573] *See, e.g.*, Vandewater Draft Redetermination Comments at 35.
[574] *See* SIGMA Draft Redetermination Comments at 11.
[575] *See, e.g.*, Petition at Appendix B (listing products and applicable ASTM standards); Island Rebuttal Comments at Exhibit 10 (listing products, dimensions, and applicable ASTM standards).

94

pipe,[576] this is not a distinguishing feature.  For instance, a reducer, cap, and saddle would all be

sold according to the dimensions relevant to the type of connection(s) contemplated.

Moreover, outlets (and similar products, such as saddles) and BWPFs are displayed side

by side.[577]  In some instances, outlets are explicitly referenced in advertising materials as having

butt-weld ends.[578]  We do not agree that, simply because the advertising materials reference

particular standards (*i.e.*, ANSI/ASME B16.9 for certain products) and or references particular

uses, that this reflects a clear dividing line between the method of advertising for each product.

Finally, although the importers repeatedly suggest that Vandewater's outlets are

exclusively sold to the fire protection industry[579] – and highlight that the outlets were sold at an

exhibition for the fire protection industry while other BWPFs were not – its own product

literature advertises outlets for fire protection *and other "Low Pressure Piping Systems.*"[580]  This

fact demonstrates that the target audience of Vandewater's advertising extends beyond

exclusively the fire protection industry.  The fact that these outlets happened to be featured at an

exhibition for fire protection products does not demonstrate that the outlets are advertised

---

[576] *See* SCI Draft Redetermination Comments at 19.
[577] *See* Petition at Appendix B (showing "elbows," "reducers," "lap joint stub ends," "saddles," and "multiple outlet fittings" in the same product catalog); and Island Rebuttal Comments at Exhibit 15 (showing an outlet with a butt-weld branch end on the same page as an outlet with a threaded branch end); *see also* Island Rebuttal Comments at Exhibit 10 (describing outlets with threaded/grooved branch ends, and a beveled and contoured end, as having "butt welding ends).
[578] *See* Vandewater Comments at Tab 14 (Bonney Forge catalog at 23) (noting that the vesselet outlet features a "{t}rue butt-weld installation in header"); and Island Comments at Exhibits 4A (Aleum USA's specification sheet for a female threaded outlet) and 4B (Aleum USA's specification sheet for a grooved outlet) (stating that the outlets feature "butt welding ends").
[579] *See, e.g.*, Vandewater Draft Redetermination Comments at 35 ("Vandewater explained that the advertising of its welded outlets—all of which are used for the fire sprinkler industry—differs significantly from the advertising of BWPFs"); SIGMA Comments at 7 ("As both SIGMA and Vandewater explained in their original scope ruling requests, their steel threaded outlets are used exclusively for fire protection, or fire sprinkler systems"); and SCI Comments at 33 ("All of Vandewater's outlets are designed for fire protection applications …").
[580] *See* Vandewater Draft Redetermination Comments at 35.

95

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

exclusively to the fire protection industry and/or that other BWPFs cannot be advertised to that industry.

For these reasons, we continue to find that outlets and other BWPFs are advertised in a similar manner.[581]

**Comment 3:   Commerce's Suspension of Liquidation and Cash Deposit Requirements**

In the Draft Redetermination, we found it unnecessary to change Commerce's previous CBP instructions and determined that, consistent with 19 CFR 351.225(l)(1) and (l)(3), CBP should continue any suspension of liquidation of entries of outlets imported by Vandewater.

*Vandewater's Comments*

- Commerce's interpretation of the suspension of liquidation requirements in the Draft Redetermination is wrong as a matter of law.[582]  The CAFC found in *United Steel and Fasteners* that Commerce cannot retroactively suspend liquidation, holding that the "regulation is clear …{it} does not allow suspension before a scope inquiry."[583]  Further, the CAFC found in *Sunpreme* that, "{w}hen Commerce rules that a product falls within the scope of an order, but there has been no suspension of liquidation {pursuant to a scope inquiry under 19 CFR 351.225(l)(1) or a preliminary scope ruling under 19 CFR 351.225(l)(2)}, a new suspension must be ordered beginning only 'on or after the date of initiation of the scope inquiry."[584]  The CAFC held that "{a}nything else would be

---

[581] *See* Petition at Appendix B (showing BWPFs in a product catalog); and Island Rebuttal Comments at Exhibits 10 and 15 (showing various outlets in product catalogs).
[582] *See* Vandewater Draft Redetermination Comments at 37-42.
[583] *Id.* at 39 (citing *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) (*United Steel and Fasteners*).
[584] *Id.* (citing *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1319 (Fed. Cir. 2020) (*Sunpreme*) (*en banc*) (quoting 19 CFR 351.225(l)(3)) (internal quotation marks and brackets omitted)).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

impermissibly retroactive."[585]

- Commerce initiated a formal scope inquiry on October 30, 2020, and, therefore, Commerce's authority to suspend liquidation is limited to outlets entered on or after that date.[586]  In its letter soliciting (k)(2) comments, Commerce stated that, "{i}n accordance with the *Remand Order*, Commerce is hereby initiating a formal scope inquiry, pursuant to 19 CFR 351.225(e), to evaluate the (k)(2) factors and determine whether Vandewater's steel outlets are covered by the scope of the {*China BWPFs Order*}."[587]

- Accordingly, pursuant to section 351.225(l)(3), absent a prior and continuing "suspension of liquidation under paragraph (l)(1) or (l)(2)," any instructions from Commerce to suspend liquidation are expressly limited to "each unliquidated entry of the product entered... on or after the date of initiation of the scope inquiry."[588]  Here, however, there is no prior and continuing "suspension of liquidation under paragraph (l)(1) or (l)(2)" that would authorize Commerce's suspension of liquidation for outlets entered before the initiation of the scope inquiry (*i.e.*, October 30, 2020).[589]

- Commerce has not shown that the outlets were subject to suspension at the time Commerce issued its cash deposit instructions to CBP on September 17, 2018.[590]  Based on this fact alone, any prior and continuing suspension under 19 CFR 351.225(l)(3) must

---

[585] *Id.* (citing *United Steel and Fasteners*, 947 F.3d at 801 (noting that "'{t}he unambiguous language of {351.225(l)} only authorizes Commerce to act on a prospective basis, and such express prospective authorization reasonably is interpreted to preclude retroactive authorization'") (quoting *AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1344 (2013) (*AMS Assocs.*)).

[586] *Id.* at 39-42.

[587] *Id.* (citing Commerce October 30, 2020 Letter).

[588] *Id.* at 39-40 (citing *United Steel and Fasteners*, 947 F.3d at 801; and *Sunpreme v. United States* 946 F.3d at 1319.)

[589] *Id.* at 40.

[590] *Id.*

97

necessarily derive from Commerce's cash deposit instructions.[591]  There is no dispute that these instructions arose from Commerce's Final Scope Ruling.[592]  However, this ruling was not only issued absent a formal scope inquiry, but it was also stricken by the Court as "unreasonable," in part, due to Commerce's failure to initiate a formal scope inquiry and consider the (k)(2) factors.[593]  Thus, the instructions derived from a ruling that was rejected by the Court as "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[594]

- Commerce argues that its suspension authority is not limited by the scope inquiry date because "Vandewater has not provided any information to show that its outlets were not subject to the suspension of liquidation prior to the date of initiation of this scope inquiry."[595]  But in making this assertion, Commerce does not (and, indeed, cannot) point to any regulation that requires an importer to provide such information.[596]

- The only requirement here is clear:  Commerce must fulfill its legal obligation of issuing instructions consistent with its limited prospective authority under 19 CFR 351.225(l)(3).[597]  Thus, absent a prior and continuing suspension of liquidation (which Commerce implicitly admits it cannot show here), any and all suspension instructions must be limited by the October 30, 2020, date of initiation of the (k)(2) scope inquiry.[598]

---

[591] *Id.* at 40.

[592] *Id.* (citing Commerce's Final Scope Ruling, dated September 10, 2018).

[593] *Id.* (citing *Remand Order* at 9 ("Commerce unreasonably concluded that the sources in {19 CFR 351.225(k)(1)} were dispositive... and remands the matter to Commerce to conduct a full scope inquiry and evaluate the factors under {19 CFR 351.225(k)(2)}").

[594] *Id.* (citing *Remand Order* at 2 and 9; and *Sunpreme v. United States*, 256 F.Supp.3d 1265, 1293 (CIT 2017), *aff'd in part and rev'd in part on other grounds*, 946 F.3d at 1319).

[595] *Id.* (citing *Remand Order* at 62).

[596] *Id.* at 41.

[597] *Id.* at 42.

[598] *Id.*

Any notion that Commerce's authority to suspend is based on requiring an impacted

party to prove a negative is unfounded and contrary to law.[599]

- Commerce also appears to suggest that the parties have waived their ability to challenge

  Commerce's authority under 19 CFR 351.225(l) because "{n}o party challenged

  Commerce's instructions to CBP before the {CIT}."[600]  Even if a waiver theory were a

  viable basis to preclude Vandewater from raising this issue in post-remand administrative

  proceedings, Commerce's baseline assertion is incorrect, since Vandewater did, in fact,

  raise this issue before the Court.[601]

- Any suspension of liquidation instruction to CBP must observe the "clear" dictates of 19

  CFR 351.225(l):  absent a prior and continuing suspension of liquidation (which does not

  exist here), Commerce is prohibited from ordering the suspension of liquidation on

  outlets entered before the October 30, 2020, date of the initiation of this scope inquiry.[602]

*SCI Comments*

- Commerce's analysis in the Draft Redetermination concerning the suspension of

  liquidation of Vandewater's entries is unlawful and inconsistent with multiple CAFC

  precedents.[603]

- Commerce never explains how it reached the determination that Vandewater's entries

  were "already subject to suspension of liquidation" prior to the initiation of the instant

---

[599] *Id.*
[600] *Id.* (citing Draft Redetermination at 61).
[601] *Id.* (citing Vandewater's Mem. of Points and Authorities, *Vandewater Int'l v. United States*, 1:18-cv-00199-LMG (CIT June 24, 2020), ECF No. 93 at 29 ("If the Court determines that the (k)(1) sources are not dispositive either way, then the Court should remand with instructions directing Commerce to initiate a formal scope inquiry, examine the (k)(2) sources, and at a minimum, release any of Vandewater's steel branch outlets that were entered prior to initiation of the formal scope inquiry")).
[602] *Id.*
[603] *See* SCI Draft Redetermination Comments at 26.

99

scope proceeding initiated pursuant to the *Remand Order*.[604]

- Commerce's position is contrary to the CAFC's decision in *United Steel and Fasteners*,[605] which prohibits Commerce from instructing CBP to suspend liquidation of entries prior to the initiation of a scope inquiry.

- Additionally, the language of the applicable regulations themselves demonstrates that the effective date of suspension of liquidation should be the initiation of the current scope inquiry.[606]

- Outlets were not subject to suspension of liquidation prior to Commerce's 2018 scope ruling for Vandewater.  That decision has been invalidated by the Court in its *Remand Order*.[607]

- The present scope inquiry demonstrates that the status of Vandewater's outlets was not knowable without this new scope inquiry.[608]  This is precisely why the regulations call for suspension only from the point of the initiation of the scope inquiry.[609]

- Commerce's characterization of the proposed amendments to 19 CFR 351.225 supports the importers' position.  In that notice, Commerce explained that, under the current rule, "all entries not already suspended prior to the date on which Commerce initiates a scope inquiry are essentially excused from AD/CVD duties, even if Commerce finds through the scope inquiry that such duties should have applied."[610]

---

[604] *Id.* at 27 (citing Draft Redetermination at 62).
[605] *Id.* at 28-30 (citing *United Steel and Fasteners*, 947 F.3d at 794).
[606] *Id.* at 30 (citing 19 CFR 351.225(l)(1)).
[607] *Id.*
[608] *Id.*
[609] *Id.*
[610] *Id.* (citing *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 85 FR 49483 (August 13, 2020)).

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

- In this new scope inquiry, there currently exists no valid suspension of Vandewater's entries prior to the initiation of the scope proceeding on October 30, 2020.[611]  Commerce previously issued instructions to CBP based on the now-invalidated decision regarding Vandewater's scope request.[612]  Therefore, those previous instructions likewise, necessarily, are invalidated.[613]

- Commerce must confirm that any suspension of liquidation applies only to entries made, or withdrawn from warehouse, on or after the date of initiation of this scope inquiry.

*SIGMA's Comments*

- Commerce misinterprets 19 CFR 351.225(l) and misapplies that regulation to Vandewater**.**  Commerce criticizes Vandewater for not providing information showing that its outlets were not subject to suspension of liquidation prior to the date of initiation of the scope inquiry.[614]  The error, however, does not lie with Vandewater.[615]  Rather, the error lies with Commerce for instructing CBP to "continue" the suspension of liquidation as opposed to instructing CBP to affirmatively suspend liquidation.[616]

- Commerce's scope regulation is clear as to the consequences of a final scope ruling that a product is within the scope of an order.  "Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties …"[617]  Separately, that same regulation provides that "any suspension of liquidation under paragraph (l)(1) or (l)(2) will

---

[611] *Id.*
[612] *Id.* at 33 (citing Memorandum, "Placing CBP Instructions on the Record," dated September 17, 2018 (CBP Instruction Memorandum)).
[613] *Id.* at 33.
[614] *See* SIGMA Draft Redetermination Comments (citing Draft Redetermination at 61-62).
[615] *Id.* at 12.
[616] *Id.*
[617] *Id.* (citing 19 CFR 351.225(l)(3)).

101

continue."[618]

- In this instance, Commerce instructed CBP to "continue" the suspension of liquidation of BWPFs from China, including Vandewater's outlets.[619]  It is unclear why Commerce believed that Vandewater's outlets were already subject to suspension of liquidation and, as a result, that such suspension should "continue."  In a case where Vandewater has always contended that its outlets were not BWPFs, it appears that Commerce erred in its conclusion that Vandewater's outlets were already subject to suspension of liquidation.[620]

- If Commerce believed that there was a suspension of liquidation in place that applied to Vandewater's outlets, then it should have identified where this suspension of liquidation was first implemented.[621]

- Finally, Commerce criticizes the parties for not challenging Commerce's CBP instructions before the Court.[622]  SIGMA did not challenge these instructions because it was not harmed by these instructions.[623]

**Commerce's Position:**  On September 14, 2018, upon determining that Vandewater's outlets are covered by the scope of the *China BWPFs Order* pursuant to 19 CFR 351.225(d), Commerce instructed CBP to "{c}ontinue to suspend liquidation of entries of carbon steel butt-weld pipe fittings from the People's Republic of China, including Vandewater International Inc.'s steel branch outlets imported by Vandewater International Inc...."[624]  The importers argue that, in light of the initiation of a scope inquiry on remand, any suspension of liquidation on Vandewater's

---

[618] *Id.* (citing 19 CFR 351.225(l)(3)).

[619] *Id.* at 12.

[620] *Id.* at 12-13.

[621] *Id.* (citing *Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority,* 685 F.2d 547, 577 n. 65 (D.C. Cir. 1981)).

[622] *Id.* (citing Draft Redetermination at 61).

[623] *Id.* at 14.

[624] *See* CBP Instruction Memorandum (containing Message No. 8257302).

outlets should be applied only to entries made on or after the date of initiation of this scope

inquiry on remand, *i.e.*, October 30, 2020.

In the *Remand Order*, the Court held that Commerce's determination that the scope

language and the descriptions of the merchandise contained in the sources under 19 CFR

351.225(k)(1) are dispositive as to the inclusion of Vandewater's outlets within the scope of the

*China BWPFs Order* was unsupported by substantial evidence.  In light of the Court's *Remand*

*Order*, should the Court affirm this remand redetermination in a subsequent decision, Commerce

intends to issue instructions to CBP consistent with 19 CFR 351.225(l) and section 516A(c) and

(e) of the Act.  Specifically, Commerce intends to instruct CBP to suspend or continue to

suspend entries that entered, or were withdrawn from warehouse, for consumption on or after the

date of initiation of this scope inquiry.  With respect to entries pre-dating the date of initiation of

the inquiry that were suspended pursuant to the instructions issued following the September 10,

2018, Final Scope Ruling, Commerce intends to instruct CBP to refund cash deposits upon

request but continue to suspend the entries at a zero percent cash deposit rate pending any

appeals.  In the event that the Court's final judgment is not appealed or is upheld on appeal,

Commerce intends to instruct CBP to lift suspension of liquidation and liquidate such entries

without regard to antidumping duties.

Barcode:4145998-01 A-570-814 REM - Remand  -  Slip Op 20-146

## IX.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, and in view of the parties' comments on the Draft

Redetermination, we have conducted an analysis pursuant to the criteria set forth in 19 CFR

351.225(k)(2).  We continue to find that Vandewater's outlets are within the scope of the *China*

*BWPFs Order.*

7/22/2021

X _____

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

104

Filed By: Kelsie Hohenberger, Filed Date: 7/23/21 1:24 PM, Submission Status: Approved

**ADDENDUM 3**

aside as unlawful because it did not comply with the APA requirements as described in <u>Invenergy I</u>. The court denies the Government's motion to dissolve the PI because it does not have jurisdiction to do so pending the Government's appeal and because the court instead modifies the PI. The court grants Plaintiffs' cross-motion to modify the PI to reflect the <u>Second Withdrawal</u> and Plaintiffs' challenge of that decision in their amended complaints. The court also grants Plaintiffs' motion to complete the agency record, in part, and denies the motion as to the <u>First Withdrawal</u> and the fourth category of documents. The Plaintiffs' motion to stay is denied.

The court notes that if presented with an adequate record and explanation of USTR's action, the court could proceed, in accordance with well-established administrative law standards, to review USTR's decision to withdraw it previously granted exclusion from safeguard duties on imported bifacial solar modules. However, various procedural missteps by USTR mean that the court cannot reach that point now. As the court has stated,

> The court acknowledges the Government and Defendant-Intervenors' concern that domestic industries may face a threat of material injury due to USTR's decision to exclude bifacial solar products from safeguard duties. The court also acknowledges the concerns of Plaintiffs (consumers, purchasers and importers of utility-grade bifacial solar panels), who oppose safeguard duties that they claim increase the cost of bifacial solar panels.

<u>Invenergy III</u>, 450 F. Supp. 3d at 1365 (citations omitted). The court takes no position on the efficacy of safeguard duties in providing protection to the domestic solar industry or of a decision to exclude products from those safeguard duties. <u>Id.</u> Once again, the court merely continues to re-

quire the Government to follow its own laws when it acts.

**SO ORDERED.**



**VANDEWATER INTERNATIONAL, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**and**

**Island Industries, Defendant-Intervenor.**

**Slip Op. 20-146**
**Court No. 18-00199**

United States Court of International Trade.

October 16, 2020

**Background:** Importer filed suit challenging determination of Department of Commerce that importer's steel branch outlets used to join sections in fire sprinkler systems were within scope of antidumping duty order on carbon steel butt-weld pipe fittings from People's Republic of China.

**Holdings:** The Court of International Trade, Leo M. Gordon, J., held that scope determination was unreasonable.

Remanded.

**1. Customs Duties** ⚖ 84(6)

When reviewing an agency's antidumping determinations, findings, or conclusions for substantial evidence, Court of International Trade assesses whether the agency action is reasonable given the record as a whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⊕84(6)**

"Substantial evidence," as required to uphold an antidumping determination, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

**3. Customs Duties ⊕84(6)**

"Substantial evidence," as required to uphold an antidumping determination, is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Customs Duties ⊕84(6)**

Substantial evidence is best understood as a word formula connoting reasonableness review of an antidumping determination.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**5. Customs Duties ⊕84(6)**

When addressing a substantial evidence issue raised by a party, Court of International Trade analyzes whether the agency's challenged antidumping action was reasonable given the circumstances presented by the whole record.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**6. Customs Duties ⊕21.5(5)**

Department of Commerce's determination that importer's steel branch outlets were within scope of antidumping duty order on carbon steel butt-weld pipe fittings from China was unreasonable; Commerce found that importer's description of its steel branch outlets matched order's description of butt-weld pipe fittings, but it was not plainly apparent from order's language whether steel branch outlet qualified as butt-weld fitting covered by order, and sources on which Commerce relied as dispositive, namely, prior scope ruling, scope petition language, and sunset review language, were not informative as to inclusion of steel branch outlets in order's scope, other than one prior scope ruling that seemed to be dispositive but which Commerce dismissed as non-binding.  19 C.F.R. § 351.225(k)(1).

———

Richard Preston Ferrin, Dorothy Alicia Hickok, and Douglas John Heffner, Faegre Drinker Biddle & Reath, LLP of Washington, DC, for Plaintiff Vandewater International, Inc.

Joshua Ethan Kurland, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC., argued for Defendant United States. On the brief were Jeffrey Bossert Clarke, Assistant Attorney General, Jeanne E. Davidson, Director, L. Misha Preheim, Assistant Director, International Trade Field Office, New York, NY. Of counsel were John Anwesen and Saad Younus Chalchal, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Matthew Jon McConkey, Mayer Brown LLP of Washington, DC, for Defendant-Intervenor Island Industries.

**OPINION and ORDER**

GORDON, Judge:

This opinion addresses the scope of the antidumping duty order on Carbon Steel

Butt-Weld Pipe Fittings from the People's Republic of China, which covers:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("Order"). Plaintiff, Vandewater International Inc., sought a scope determination from the U.S. Department of Commerce ("Commerce") that their products, steel branch outlets used to join sections in fire sprinkler systems, are not covered by the Order. Commerce determined that they were. Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, (Dep't of Commerce Sept. 10, 2018) (final scope ruling on Vandewater's steel branch outlets) ("Final Scope Ruling"). For the reasons set forth below, the court holds that Commerce unreasonably concluded that the sources in 19 C.F.R. § 351.225(k)(1) were dispositive on the inclusion of Plaintiff's steel branch outlets within the Order, and remands the matter to Commerce to conduct a full scope inquiry and evaluate the factors under 19 C.F.R. § 351.225(k)(2).

## I. Standard of Review

[1–5]  The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2020). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2020).

## II. Discussion

Commerce may render a scope ruling after a full "scope inquiry," 19 C.F.R.

§ 351.225(e), or, as Commerce did in this case, on the expedited basis of a party's application and the sources listed in 19 C.F.R. § 351.225(k)(1) (the "descriptions of the merchandise contained in the petition [for imposition of an antidumping duty order], the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the [International Trade] Commission."). 19 C.F.R. § 351.225(d). Here, Commerce determined that the (k)(1) sources were dispositive and included Vandewater's steel branch outlets within the Order.

Had Commerce determined the (k)(1) sources were not "dispositive," Commerce would have conducted a full scope inquiry and evaluated the criteria under § 351.225(k)(2), which include the product's physical characteristics, ultimate purchasers' expectations, the ultimate use of the product, trade channels in which the product is sold, and the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2).

[6] In rendering its scope determination Commerce began with a "plain reading" of the Order, finding that Vandewater's description of its steel branch outlets matched the description of the butt-weld pipe fittings in the Order:

A plain reading of the scope includes carbon steel butt-weld pipe fittings that have an inside diameter of fourteen inches or less, which require a weld to be permanently attached to a piping system. Based on Vandewater's description, and the samples provided, the steel branch outlets are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections. Thus, we find that Vandewater's description of its steel branch outlets matches the description

of the scope covering butt-weld pipe fittings.

Final Scope Ruling at 9. Commerce omitted from its "plain reading" the scope language that distinguishes "fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings)." Plaintiff's products have threaded or grooved ends on their non-weldable end. It is therefore not plainly apparent from the language of the Order whether a steel branch outlet qualifies as a butt-weld fitting covered by the Order or not. They may be covered: they are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require a permanent, welded connection. They also may not be covered: they have a non-weldable, threaded or grooved end, and according to Vandewater, the weldable end is never joined to the sprinkler system via a true "butt-weld." The language of the Order itself simply does not resolve the issue of whether Vandewater's steel branch outlets are covered.

As for the (k)(1) sources, Commerce long ago included steel branch outlets virtually identical to Vandewater's within the scope of a companion antidumping duty order on butt-weld fittings from another country. Carbon Steel Butt-Weld Pipe Fittings from Taiwan, (Dep't of Commerce Mar. 25, 1992) (final scope ruling on Sprink, Inc. exclusion request) ("Sprink Scope Ruling"); see also Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan, 51 Fed. Reg. 45,152 (Dep't of Commerce Dec. 17, 1986) ("Taiwan Butt-Weld Order"). In the Final Scope Ruling here, Commerce noted this prior ruling:

Sprink's scope inquiry request stated that "{i}t appears that the definition of a butt-weld fitting is one that requires welding as a method of attachment for all connections. The Sprink-let does re-

quire that it be welded onto the outside of the pipe, but the connection for the joining pipe is either threaded or grooved.

Commerce specifically stated in its ruling, "the order does not require that all pipe fitting connections be welded." Commerce further stated that, "although the initial connection is obtained because of threading or grooving, the Sprink-let, like other products subject to this order, is permanently joined by welding." Commerce concluded that, "{a}ccording to the product descriptions presented above, a pipe fitting with beveled edges that is permanently joined through welding falls within the scope of the order on carbon steel butt-weld pipe fittings from Taiwan. Because the Sprink-let, possesses these characteristics, we determine that the Sprink-let, imported by Sprink, Inc. is within the scope of the antidumping duty order on carbon steel butt-weld pipe fittings from Taiwan."

Final Scope Ruling at 5-6 (footnotes omitted). For over 25 years, then, Commerce has treated steel branch outlets as butt-weld fittings. That would seem to be dispositive. Commerce, however, for some reason, chose to dismiss its Sprink Scope Ruling as non-binding:

 . . . We agree that the products at issue in the Sprink Scope Ruling were essentially physically identical to Vandewater's steel branch outlets. However, we note that Commerce analyzed those products under the Taiwan Butt-Weld Order and not the China Butt-Weld Order. We recognize that some of the language in both orders is the same, but as Vandewater points out, there is also language unique to the China Butt-Weld Order. Accordingly, we are not bound by the agency's analysis in the Sprink Scope Ruling, although we not [sic] that

here, as in that case, we have concluded that the merchandise is covered by the scope of an antidumping duty order on "butt-weld pipe fittings" because the merchandise is permanently joined by welding.

Final Scope Ruling at 11 (emphasis added).

Commerce chose instead to look for support in its King Scope Ruling that fittings with only one weldable end were covered by the Order. Id. at 9 (citing Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China (Dep't of Commerce Oct. 20, 2009)) ("King Scope Ruling"). The King Scope Ruling, however, dealt with subject butt-weld fittings used in applications other than pressurized piping systems—as handrails, fencing, and guardrails—it did not address dual-nature fittings like Vandewater's steel branch outlets. Commerce's reliance on the King Scope Ruling, which has no facial applicability or relevance to Vandewater's branch outlets, and Commerce's eschewing the Sprink Scope Ruling, signals to the court that something is not quite right with Commerce's (k)(1) analysis.

The court was further confused by the balance of Commerce's (k)(1) analysis. Searching for dispositive support among the (k)(1) sources to cover the steel branch outlets, Commerce identified two quotes, one from the petition and one from the U.S. International Trade Commission ("ITC") sunset review. The petition language reads: "{t}he edges of finished butt-weld fittings are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins the fitting to the pipe." Final Scope Ruling at 9–10 (quoting Petitioners' Letter, "In the Matter of Certain Carbon Steel Butt-Weld

Pipe Fittings from the People's Republic of China and from Thailand," dated May 22, 1991 (Petition)). The quoted language contemplates beveling on both parts of the assembled pipe—"{t}he edges ... are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled) ...." Vandewater pointed out to Commerce that its branch outlets, although beveled on one end, do not join to a beveled end on the header pipe. The quoted petition language, which contemplates beveling on both parts of the assembled pipe, is therefore not descriptive of the actual physical characteristics of Vandewater's steel branch outlets.

The quoted language Commerce relied upon from the ITC sunset review suffers from the same problem as the petition language—it contemplates beveling on both parts of the assembled pipe: "When placed against the end of a beveled pipe or another fitting, the beveled edges form a shallow channel that accommodates the 'bead' of the weld that fastens the two adjoining pieces." Final Scope Ruling at 10 (quoting Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. Nos. 731-TA-308-310 and 520-521, at I-4 (Fourth Review), USITC Pub. 4628 (Aug. 2016)). Again, though, Vandewater's branch outlets are welded to header pipe, which is not, apparently, beveled at the weld. The quoted sunset review language is therefore not descriptive of the actual physical characteristics of Vandewater's steel branch outlets.

Commerce also highlights butt-weld caps as an example of a butt-weld fitting that has only one weldable end. Id. at 10. A butt-weld cap though does not also have threads or grooves, problematical attributes that are expressly excluded from the Order.

Other than the Sprink Scope Ruling, which Commerce dismisses as non-binding, the other (k)(1) sources Commerce relied upon as dispositive (the King Scope Ruling, the petition language, and the language from the ITC sunset review) do not really tell the court anything about the inclusion of steel branch outlets within the scope of the Order. Commerce's determination that the (k)(1) sources are dispositive is therefore not reasonable (unsupported by substantial evidence).

For whatever reason Commerce does not have much confidence in its Sprink Scope Ruling. Given that posture, the court believes that Commerce must consider the factors under (k)(2) to determine whether Vandewater's steel branch outlets are within the scope of the Order. Accordingly, it is hereby

**ORDERED** that Commerce's determination that the (k)(1) materials are dispositive of the inclusion of Vandewater's steel branch outlets within the scope of the Order is unreasonable; it is further

**ORDERED** that this matter is remanded to Commerce to conduct a scope inquiry to evaluate the factors under (k)(2); it is further

**ORDERED** that Commerce shall file its remand results once the scope inquiry is completed; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.



**ADDENDUM 4**

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry Vandewater

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-814
SCOPE:  Steel Branch Outlets
**Public Document**
E&C OV:  AC

September 10, 2018

**MEMORANDUM TO:**     James Maeder
Associate Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations
  performing the duties of Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**THROUGH:**     James Doyle
Director, Office V
Antidumping and Countervailing Duty Operations

**FROM:**     Annathea Cook
International Trade Compliance Analyst
Antidumping and Countervailing Duty Operations, Office V

**SUBJECT:**     Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings
from the People's Republic of China: Final Scope Ruling on
Vandewater International Inc.'s Steel Branch Outlets

---

**Summary**

On the basis of our analysis of Vandewater International Inc.'s (Vandewater) scope request, the
scope language, and the sources described in 19 CFR 351.225(k)(1), we have determined that the
steel branch outlets at issue in this scope inquiry are within the scope of the antidumping duty
(AD) order on carbon steel butt-weld pipe fittings (butt-welds) from the People's Republic of
China (China),[1] pursuant to 19 CFR 351.225(d).

**Background**

On May 17, 2018, Vandewater requested that the Department of Commerce (Commerce) issue a
scope ruling to determine whether the threaded or grooved CEREICO brand steel branch outlets
it imports are subject to the *China Butt-Weld Order*.[2]  June 12, 2018, Island Industries (Island), a

---

[1] *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value;
Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China,* 57 FR 29702 (July 6, 1992)
(*China Butt-Weld Order*).
[2] *See* Letter from Vandewater International Inc. to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from the
People's Republic of China: Request for Scope Ruling for Steel Branch Outlets," (May 17, 2018) (Scope Ruling
Request).



producer of the domestic like product, submitted its opposition to Vandewater's scope request.[3]
On June 29, 2018, Vandewater submitted rebuttal comments to Island's opposition.[4] On June
29, 2018, Commerce extended the time period for issuing a scope ruling or initiating a formal
scope inquiry by an additional 45 days until August 13, 2018.[5]

On July 11, 2018, counsel for Vandewater met with Commerce and submitted samples of its
steel branch outlets.[6] On July 12, 2018, Smith-Cooper International (SCI), a U.S. importer of
subject merchandise, submitted comments in support of Vandewater's scope request.[7] On July
17, 2018, Anvil International, LLC (Anvil), a producer of the domestic like product, submitted
its opposition to Vandewater's scope request.[8] On July 25, 2018, counsel for Island and counsel
for Anvil met with Commerce to review the samples submitted by Vandewater.[9] On August 13,
2018, Commerce extended the time period for issuing a scope ruling or initiating a formal scope
inquiry by an additional 30 days until September 12, 2018.[10]

On August 24, 2018, Commerce placed on the record the International Trade Commission's
(ITC) 2016 sunset review and the 1991 petition on carbon steel butt-weld pipe fittings from
China and Thailand.[11] On September 5, 2018, Island, SCI, and Vandewater submitted comments
regarding documents placed on the record.[12]

**Scope of the Order**[13]

The products covered by this order are carbon steel butt-weld pipe fittings, having an inside
diameter of less than 14 inches, imported in either finished or unfinished form. These formed or

---

[3] See Letter from Island to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from China: Opposition to Scope
Ruling Requests of Vandewater International Inc. and SIGMA Corporation," (June 12, 2018) (Island's Comments).
[4] See Letter from Vandewater to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of
China: Rebuttal Factual Information Concerning Vandewater Scope Inquiry on Steel Branch Outlets," (June 29,
2018).
[5] See Letter to All Interested Parties from Commerce, "Scope Ruling Request for Carbon Steel Butt-Weld Pipe
Fittings from the People's Republic of China," (June 29, 2018).
[6] See Memo from Commerce to the File, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic
of China: Vandewater Scope: Ex-Parte Meeting with Requestor's Counsel," (July 12, 2018).
[7] See Letter from SCI to Commerce, "Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of
China: Comments," (July 12, 2018) (SCI's Comments).
[8] See Letter from Anvil to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from The People's Republic of
China/Opposition to Scope Ruling Requests of SIGMA and Vandewater and Request for a Meeting," (July 17,
2018) (Anvil's Comments).
[9] See Memo from Commerce to the File, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic
of China: Vandewater Scope: Meeting with Counsel to Interested Parties," (July 26, 2018).
[10] See Memo from Commerce to the File, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of
China: Vandewater International Inc. and Sigma Corporation Scope Ruling Requests," (August 13, 2018).
[11] See Letter to All Interested Parties from Commerce, "Placing Documents on the Record" (August 24, 2018).
[12] See Letter from Island to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from China: Comments on
Documents Placed on Record" (September 5, 2018); see also Letter from SCI to Commerce, "Certain Carbon Steel
Butt-Weld Pipe Fittings from the People's Republic of China: Comments on Documents Placed on the Record"
(September 5, 2018); see also Letter from Vandewater to Commerce , "Carbon Steel Butt-Weld Pipe Fittings from
the People's Republic of China: Vandewater Comments on Factual Information Placed On the Record By the
Department" (September 5, 2018).
[13] See China Butt-Weld Order, 57 FR at 29703.

forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

**Legal Framework**

When a request for a scope ruling is filed, we examine the scope language of the order at issue and the description of the product contained in the scope ruling request.[14] If Commerce is able to determine whether the product in question falls within or outside the scope based solely on the language of the order, the unambiguous language of the scope governs.[15] If the scope language is ambiguous, we proceed to examine other information, including the descriptions of the merchandise contained in the petition, the record from the investigation, and prior determinations by Commerce, such as prior scope determinations, and the International Trade Commission (ITC).[16] If we determine that these sources are dispositive, we will issue a final scope ruling as to whether the product in question is covered by the order.[17] A determination pursuant to this analysis may take place with or without a formal inquiry.[18]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, we will consider the five additional factors set forth in 19 CFR 351.225(k)(2). These criteria are: (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.[19] The determination as to which analytical framework is most appropriate in any given scope inquiry is made on a case-by-case basis after careful consideration of all the evidence before Commerce.

As explained in the "Commerce's Analysis" section below, we find that the scope language and the information associated with the factors in 19 CFR 351.225(k)(1) are dispositive on the issue of whether the products in Vandewater's Scope Ruling Request are within the scope of the *China Butt-Weld Order*. Pursuant to 19 CFR 351.225(d), we find that Vandewater's imports of steel branch outlets are within the scope of the *China Butt-Weld Order*. Commerce, therefore, finds it unnecessary to initiate a formal scope inquiry pursuant to 19 CFR 351.225(e) or consider the additional factors under 19 CFR 351.225(k)(2).

---

[14] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[15] *See Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (quoting *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013)).
[16] *See* 19 CFR 351.225(k)(1); *see also Meridian Prods., LLC*, 851 F.3d at 1381 ("{T}he inquiry begins with 'the language of the final order' and turns to other sources only if the scope itself 'is ambiguous.'") (quoting *Mid Continent Nail Corp. v. United States*, 725 F.3d at 1302).
[17] *See* 19 CFR 351.225(d).
[18] *See* 19 CFR 351.225(d) and (e).
[19] *See* 19 CFR 351.225(k)(2).

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

**Description of Merchandise Subject to This Scope Request**

In its Scope Ruling Request, Vandewater described its steel branch outlets as follows:

> A steel branch outlet has one side (called the "header" or "run" side) that is contoured to match the curve of a header pipe. The contour allows the steel branch outlet to set on (or through) the pipe like a saddle. The other side (called the "branch" or "outlet" side) is frequently formed with a threaded end, or a groove, and is intended to connect to something else, such as a sprinkler, with a threaded connection or grooved connection.[20]

Vandewater offers two types of CEREICO brand steel branch outlets: threaded and grooved.[21] Various names are used to describe these parts, including steel branch outlets, threaded or grooved pipe outlets, and welded outlets.[22]  Vandewater further described its CEREICO brand steel branch outlets as follows:

> Vandewater offers CEREICO brand threaded steel branch outlets in sizes ranging from ½ inch to 2½ inches. Vandewater also offers CEREICO brand grooved steel branch outlets in sizes ranging from 1¼ inch to 8 inches. Vandewater's threaded branch outlets are manufactured from forged steel bars, and its grooved branch outlets are machined from welded pipe. All of Vandewater's steel branch outlets are designed for fire protection and other low-pressure piping systems, and are pressure rated at no more than 300 psi. Vandewater's steel branch outlets are UL listed and FM approved.[23]

**Relevant Prior Scope Ruling**

<u>King Supply Co.'s Pipe Fittings for Structural Use Applications</u>

In March 2009, King Supply Co. (King) requested that Commerce issue a scope ruling that butt-weld pipe fittings imported by King from China are outside the scope of the *China Butt-Weld Order*.[24]  King argued that the second sentence of the *China Butt-Weld Order* was an end-use restriction that expressly limits the scope of the *China Butt-Weld Order* to pipe fittings used to join sections of piping systems.[25]  By contrast, King's imported butt-weld pipe fittings were "used in ornamental, architectural, and structural applications and are not used to join sections in

---

[20] *See* Scope Ruling Request at 3.
[21] *Id.* at 4.
[22] *Id.* at 3 n.2.
[23] *Id.* at 4; *see also* Exhibit 1 (description of CEREICO brand threaded steel branch outlets), Exhibit 2 (description of CEREICO brand grooved steel branch outlets), and Exhibit 3 (complete list of threaded and grooved steel branch outlets).
[24] *See* Memorandum from Edward C. Yang, Senior NME Coordinator to John M. Andersen, Acting Deputy Assistant Secretary, regarding "Final Scope Ruling: Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ('PRC')," dated October 20, 2009 (King Scope Ruling), at 1.
[25] *Id.* at 2.

Filed By: Annathea Cook, Filed Date: 9/10/18 3:30 PM, Submission Status: Approved

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

piping systems."[26]

Commerce issued its scope ruling on October 20, 2009, concluding that King's imports were included within the scope of the *China Butt-Weld Order*.[27]  Commerce emphasized that, not only were King's products physically identical to the products described in the first sentence of the order, but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition.[28]  Commerce found further support in the ITC's final determination, which defined the domestic like products as including "all pipe fittings having an inside diameter of less than 14 inches, whether finished or unfinished regardless of use."[29]

Commerce rejected King's arguments that its products were outside the scope of the *China Butt-Weld Order* because they were not "used to join sections in piping systems," explaining that the second sentence was not an end-use restriction, but merely a statement that "distinguished butt-welding from other types of fastening methods."  Commerce elaborated as follows:

> Specifically, we find that this sentence uses piping systems as an example of an instance where a permanent, welded connection is desired. We find that the language "are used" does not mean that the use identified is necessarily the exclusive use. Thus, we conclude that the second sentence does not contain an end-use exclusion, but a description of a possible end-use.[30]

Accordingly, Commerce concluded that King's pipe fittings were subject to the *China Butt-Weld Order*.[31]  That scope ruling was upheld by the Court of Appeals for the Federal Circuit in *King Supply*, which affirmed Commerce's interpretation that the second sentence of the *China Butt-Weld Order* is a description of a possible end use that "shed{s} light on the functional capabilities" of subject merchandise and is "intended to distinguish physical characteristics and capabilities of the subject pipe fittings."[32]

Sprink Inc.'s Safelet Outlets

In March 1992, Commerce issued a scope decision that Sprink Inc.'s (Sprink) Sprink-let outlet was within the scope of the *Taiwan Butt-Weld Order*.[33]  Sprink's scope inquiry request stated that "{i}t appears that the definition of a butt-weld fitting is one that requires welding as a

---

[26] *Id.*
[27] *Id.* at 3-6.
[28] *Id* at 5.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *See King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) (*King Supply*).
[33] *See* Memorandum to Joseph A. Spetrini, Deputy Assistant Secretary for Compliance, through Roland L. MacDonald, Director, Office of Antidumping Compliance, regarding "Recommendation Memo - Final scope Ruling on Request by Sprink, Inc. to Exclude Sprink-let Carbon Steel Butt-Weld Pipe Fittings from the Antidumping Duty order on Carbon Steel Butt-Weld Pipe Fittings from Taiwan," (March 25, 1992) (Sprink Scope Ruling); *see also Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 FR 45152 (December 17, 1986) (*Taiwan Butt-Weld Order*).

Filed By: Annathea Cook, Filed Date: 9/10/18 3:30 PM, Submission Status: Approved

method of attachment for all connections.  The Sprink-let does require that it be welded onto the outside of the pipe, but the connection for the joining pipe is either threaded or grooved."[34]

Commerce specifically stated in its ruling, "the order does not require that <u>all</u> pipe fitting connections be welded."[35]  Commerce further stated that, "although the initial connection is obtained because of threading or grooving, the Sprink-let, like other products subject to this order, is permanently joined by welding."[36]  Commerce concluded that, "{a}ccording to the product descriptions presented above, a pipe fitting with beveled edges that is permanently joined through welding falls within the scope of the order on carbon steel butt-weld pipe fittings from Taiwan.  Because the Sprink-let, possesses these characteristics, we determine that the Sprink-let, imported by Sprink, Inc. is within the scope of the antidumping duty order on carbon steel butt-weld pipe fittings from Taiwan."[37]  Commerce ruled that Sprink's Sprink-let is within the scope of the *Taiwan Butt-Weld Order*.[38]

## Arguments from Interested Parties

### *Vandewater's Comments*
- While a steel branch outlet has a permanent welded connection on one end (albeit a fillet weld, as opposed to a butt-weld), the other end has either a threaded or grooved end.[39]  Thus, the language of the *China Butt-Weld Order* specifically excludes steel branch outlets because of their threaded and grooved end.[40]
- The wrongly decided, prior Sprink scope ruling from 1992, that examined a similar product to a steel branch outlet, does not apply because it involved a different antidumping duty order with different scope language.[41]
- Vandewater's steel branch outlets cannot be subject to the *China Butt-Weld Order,* because Commerce recently held in a pending investigation on forged steel fittings that steel branch outlets are forged steel fittings, not butt-weld pipe fittings.[42]
- Use of the factors under 19 CFR 351.225(k)(2), like that in *Diversified Products Corporation v. United States*, demonstrates that Vandewater's steel branch outlets are outside the scope of the *China Butt-Weld Order*.  Vandewater is unaware of any fire sprinkler fabricator that uses butt-weld pipe fittings, because a butt-weld fitting does not have the ability to accept a sprinkler head with threads.[43]

---

[34] *See* Letter from Sprink Inc. to Commerce, "Steel Butt-Weld Pipe Fittings from Taiwan" (October 10, 1991) (Sprink Scope Ruling Request).
[35] *See* Sprink Scope Ruling at 3.
[36] *Id.*
[37] *Id.* at 4.
[38] *See* Sprink Scope Ruling.
[39] *See* Scope Ruling Request at 15.
[40] *Id.*
[41] *Id.* at 2.
[42] *Id.*
[43] *Id.* at 3.

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry - Vandewater

_Island's Comments_

- Vandewater argues that steel branch outlets cannot be butt-weld pipe fittings, because they are built to different standards.[44]  Neither the _China Butt-Weld Order_ nor the ITC product description defined butt-weld pipe fittings based on any particular standard.[45]  Given the important role of sprinkler systems, standard-setting organizations that focus on fire protection have issued distinct specifications for outlets.[46]  The fact that outlets must meet fire-protection standards does not imply that they are not butt-weld pipe fittings.  Butt-weld pipe fittings are used in a variety of ways in a variety of different industries.[47]  As the ITC recognized, the fire protection industry is just one of those industries.[48]

- Vandewater argues that the "industry" does not regard steel branch outlets to be butt-weld pipe fittings.[49]  The industry does, in fact, recognize steel branch outlets as butt-weld fittings.[50]  For example, SCI, a major industry player, markets outlets under the "Cooplet" brand name.[51]  Recent public import records describe these products as "butt-weld outlets."[52]

- Vandewater argues that butt-weld pipe fittings are "always" welded to the end of a pipe.[53]  However, the standard that Vandewater proposes as the true descriptor of butt-weld pipe fittings (ASME B.16.9. 2012 Version) recognizes that butt-weld fittings are not always joined in parallel planes and, in those instances, must be joined by a circular arc or radius, which is precisely how Vandewater's steel branch outlets are welded to header pipes.[54]

- Vandewater similarly argues that butt-welding fittings "always" have a square-end, not a contoured end, yet the same standard Vandewater uses (ASME B.16.9) expressly contemplates that some butt-weld fittings will have contoured ends and are not always welded on a single plane.

- Vandewater suggests that outlets cannot be butt-weld pipe fittings because they are relatively difficult to install.[55]  Again, nothing in the _China Butt-Weld Order_ or the ITC investigation would classify pipe fittings based on their relative installation difficulty.[56]

- Vandewater also argues that butt-weld pipe fittings "get their name from the method in which they are attached to a piping system."[57]  However, Vandewater points to nothing in the _China Butt-Weld Order_ or the ITC investigation to support this assertion.[58]  Rather, the ITC investigation stressed that it was the "beveled edges" that "distinguish" butt-weld pipe fittings from other types of fittings.[59]  There can be no dispute that outlets feature beveled

---

[44] _See_ Island's Comments at 5-6.
[45] _Id._
[46] _Id._
[47] _Id._
[48] _Id._
[49] _Id._ at 5.
[50] _Id._
[51] _Id._
[52] _Id._
[53] _Id._ at 6.
[54] _Id._
[55] _Id._ at 7.
[56] _Id._
[57] _Id._
[58] _Id._
[59] _Id._

edges that create a shallow channel or gap that accommodates the bead of the weld that permanently fastens an outlet to an adjoining piping component.[60]

*SCI's Comments*

- SCI agrees with Vandewater that steel branch outlets are not butt-weld pipe fittings.[61]
- The industry for these products consistently does not consider Vandewater's products to be the type of product described by the scope of the *China Butt-Weld Order*.[62]  The fire protection products that are under review, clearly, are not within the scope and should be excluded.[63]
- Island argues that the label "butt-weld outlet" used in certain import documents for SCI's "Cooplet" product line demonstrates that the industry recognizes outlets as butt-weld fittings. Island is mistaken.[64]  SCI does not regard Cooplets or similar outlets as "butt-weld fittings" and has never labeled them as such.[65]  Import documentation for SCI's Cooplets briefly included the phrases "threaded butt-welded outlet," "grooved butt-welded outlet," and "butt-weld outlets" for shipments sent from December 2017 through April 2018.[66]  But, those phrases are not synonymous with butt-weld fitting, and in any event, were applied in error. Prior product descriptions without the term "butt-welded" had been in place for over a decade, and these descriptions were restored to their original and correct form more than a month before Island's submission.[67]

*Anvil's Comments*

- Anvil agrees with, and affirms, all of Island's arguments.[68]

**Commerce's Analysis**

Vandewater argues that the threaded or grooved CEREICO brand steel branch outlets it imports from China do not meet the description of butt-weld pipe fittings defined in the *China Butt-Weld Order*.  Commerce disagrees and finds the language of the scope supports a conclusion that steel branch outlets are subject merchandise.

The scope of the *China Butt-Weld Order* provides, in relevant part, that "the products covered by this order are carbon steel butt-weld pipe fittings, **having an inside diameter of less than 14 inches**, imported in either finished or unfinished form" and "{t}hese formed or forged fittings **are used to join sections in piping systems where conditions require permanent, welded**

---

[60] *Id.*
[61] *See* SCI's Comments.
[62] *Id.* at 2.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *See* Anvil's Comments.

**connections, as distinguished from fittings based on other fastening methods** (*e.g.*, threaded, grooved, or bolted fittings)."[69]

As stated by Vandewater, "Vandewater's threaded branch outlets are manufactured from forged steel bars, and its grooved branch outlets are machined from welded pipe."[70]  Vandewater also states that, "Vandewater offers CEREICO brand threaded steel branch outlets in sizes ranging from ½ inch to 2 ½ inches.  Vandewater also offers CEREICO brand grooved steel branch outlets in sizes ranging from 1 1/4 inch to 8 inches.[71]  Further, Vandewater states that, "a steel branch outlet is welded to a hole cut into the side of a pipe." [72]

A plain reading of the scope includes carbon steel butt-weld pipe fittings that have an inside diameter of fourteen inches or less, which require a weld to be permanently attached to a piping system.  Based on Vandewater's description, and the samples provided, the steel branch outlets are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections.  Thus, we find that Vandewater's description of its steel branch outlets matches the description of the scope covering butt-weld pipe fittings.

The *China Butt-Weld Order* does not require that each end of the pipe fitting be welded.  The scope provides that butt-weld pipe fittings subject to the *China Butt-Weld Order* "are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."  This scope language references piping systems as an example of an end use application that requires permanent, welded connections.[73]  This example illustrates that a welded connection distinguishes subject merchandise from pipe fittings that rely on other fastening methods.  However, this scope language does not limit the scope to butt-weld pipe fittings with a welded connection on both ends.  A butt-weld pipe fitting with a single welded connection can be used to join pipe sections where conditions require permanent, welded connections.  This is consistent with the King Scope Ruling, in which Commerce found that "the second sentence of the scope distinguishes butt-welding from other types of fastening methods" and "uses piping systems as an example of an instance where a permanent, welded connection is desired."[74]  Thus, we find that the scope language can be reasonably interpreted to include butt-weld pipe fittings with a single welded connection and, thus, can be reasonably interpreted to include Vandewater's steel branch outlets.

The other sources enumerated in 19 CFR 351.225(k)(1) further support Commerce's interpretation of the scope.  The petition explains that "{t}he edges of finished butt-weld fittings are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins

---

[69] *See China Butt-Weld Order.*
[70] *See* Scope Ruling Request at 4.
[71] *Id.*
[72] *Id.* at 12 and Exhibit 7.
[73] *See King Supply*, 674 F.3d at 1348-51.
[74] *See* King Scope Ruling at 5.

9

the fitting to the pipe."[75]  This indicates that only a single welded connection is required to join the fitting to the piping system.  According to the ITC's final determination from the most recent sunset review of the *China Butt-Weld Order*, "{t}he beveled edges of butt-weld fittings distinguish them from other types of pipe fittings, such as threaded, grooved, or bolted fittings, which rely on different types of fastening methods.  When placed against the end of a beveled pipe or another fitting, the beveled edges form a shallow channel that accommodates the 'bead' of the weld that fastens the two adjoining pieces."[76]  This beveled edge is necessary to facilitate a permanent, welded connection to the piping system.  Additionally, caps are one of the most common shapes of butt-weld pipe fittings.[77]  Caps are used to seal the end of a pipe and, thus, fittings with only one welded connection are not excluded from the scope of the order.[78]  Because Vandewater's steel branch outlets each feature a beveled end connection, they are butt-weld pipe fittings that are welded into permanent, fixed piping systems.  This physical characteristic distinguishes Vandewater's steel branch outlets from pipe fittings that fall outside the scope of the *China Butt-Weld Order*.

Vandewater has argued that its steel branch outlets are not butt-weld pipe fittings because butt-weld pipe fittings are always welded to the end of a pipe with an end-to-end connection consisting of a perpendicular connection on a single plane.[79]  However, there is nothing in the scope language or the sources under 19 CFR 351.225(k)(1) that limits the scope of the *Chinese Butt-Weld Order* to butt-weld pipe fittings with an end-to-end, flat, perpendicular, or single plane connection.  Other than the existence of a beveled edge, there are no angle restrictions to what is considered a butt-weld connection according to the scope and the 19 CFR 351.225(k)(1) sources.  Furthermore, simply having a fitting with a connection other than a butt-weld (*e.g.*, threaded or grooved) does not distinguish steel branch outlets from butt-weld pipe fittings.  According to the scope language and the 19 CFR 351.225(k)(1) sources, only a single welded connection is required.

Vandewater also includes arguments regarding the preliminary ITC injury report in the ongoing antidumping and countervailing duty investigations of forged steel fittings from China.[80]  However, the proposed scope in the forged steel fittings investigations expressly excludes (all fittings that have a maximum pressure rate of 300 pounds of pressure/PSI or less," and as Vandewater has argued, its steel branch outlets meet both of those criteria.  Merchandise expressly excluded from an investigation is not part of the "class or kind" of merchandise on which Commerce may find dumping, on which the ITC may find injury, or on which Commerce issues an order and to which Customs and Border Protection applies duties.[81]  Accordingly,

---

[75] *See* the Petitioners' Letter, "In the Matter of Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China and from Thailand," dated May 22, 1991 (Petition).

[76] *See* Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. Nos. 731-TA-308-310 and 520-521, at I-4 (Fourth Review), USITC Pub. 4628 (August 2016).

[77] *Id.* at I-4.

[78] *Id.* at I-4 and Figure I-1.

[79] *See* Scope Ruling Request at 12-15 and Exhibit 7.

[80] *Id.* at 22-24.

[81] *See* Sections 731 (directing the imposition of duties on a class or kind of merchandise) and 771(25) (defining subject merchandise as a class or kind of merchandise covered by an investigation or order) of the Tariff Act of 1930, as amended.

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

Vandewater's steel branch outlets are not part of the "class or kind" of merchandise covered by the forged steel fittings investigations, and therefore there is no concern about two existing or future antidumping duty orders applying to the same merchandise in this case.[82]

Furthermore, the interested parties also raise arguments relying on the Sprink Scope Ruling.[83] We agree that the products at issue in the Sprink Scope Ruling were essentially physically identical to Vandewater's steel branch outlets. However, we note that Commerce analyzed those products under the *Taiwan Butt-Weld Order* and not the *China Butt-Weld Order*. We recognize that some of the language in both orders is the same, but as Vandewater points out, there is also language unique to the *China Butt-Weld Order*. Accordingly, we are not bound by the agency's analysis in the Sprink Scope Ruling, although we not that here, as in that case, we have concluded that the merchandise is covered by the scope of an antidumping duty order on "butt-weld pipe fittings" because the merchandise is permanently joined by welding.

Pursuant to 19 CFR 351.225(d) and (k)(1), we find that the language of the scope of the *China Butt-Weld Order*, as well as the descriptions of the merchandise contained in the petition, the King Scope Ruling, and the ITC's final determination from the most recent sunset review are dispositive. Based on the foregoing analysis, we conclude that the *China Butt-Weld Order* can be reasonably interpreted to include Vandewater's steel branch outlets.

---

[82] We note that, in the forged steel fittings from China investigations, Commerce explained that "butt weld outlets" were excluded, which it defined as outlets butt welded at both ends. As we have explained in this decision, outlets butt welded at only one end are covered by the *China Butt-Weld Order*. In light of the fact that the product at issue has a maximum pressure rate of under 300 pounds of pressure/PSI, we need not address this distinction further for purposes of this scope ruling.

[83] *See* Scope Ruling Request at 2.

Filed By: Annathea Cook, Filed Date: 9/10/18 3:30 PM, Submission Status: Approved

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

**Recommendation**

For the reasons discussed above, and in accordance with 19 CFR 351.225(d) and (k)(1), we recommend finding that the steel branch outlets described by Vandewater fall within the scope of the *China Butt-Weld Order*.  If you agree, we will notify Customs and Border Protection of our determination and send a copy of this memorandum to all interested parties on the scope service list *via* first class mail, as directed by 19 CFR 351.225(f)(4).

☒                              ☐

_____          _____

  Agree                      Disagree

9/10/2018

X *James Maeder*
_____

Signed by: JAMES MAEDER

James Maeder
Associate Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations
  performing the duties of Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

12

**ADDENDUM 5**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| VANDEWATER INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | |
| Defendant, | Court No. 18-00199 |
| and | |
| ISLAND INDUSTRIES, | |
| Defendant-Intervenor. | |

| | |
|---|---|
| SIGMA CORPORATION, | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | |
| Defendant, | Court No. 19-00003 |
| and | |
| ISLAND INDUSTRIES, | |
| Defendant-Intervenor. | |

SMITH-COOPER INTERNATIONAL, INC.,

               Plaintiff,

    v.

UNITED STATES,

               Defendant,

    and

ISLAND INDUSTRIES,

               Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 19-00011

## MEMORANDUM and ORDER

This memorandum opinion addresses three related actions arising from the antidumping duty order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, which covers:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

<u>Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China</u>, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("Order"). The three plaintiffs, Vandewater International Inc., SIGMA Corporation, and Smith-Cooper International, Inc.

Court Nos. 18-00199, 19-00003, and 19-00011                              Page 3

each independently requested scope determinations from Commerce, arguing that their merchandise, Steel Branch Outlets (Vandewater), SAFELET and UNILET fire protection weld outlets (SIGMA), and Cooplet Weld Outlets (Smith-Cooper) were not covered by the Order. See ECF No. 25-1, PDs 2–6 at bar codes 3708194-01–05 (Vandewater, Court No. 18-00199); ECF No. 29-1, PD 1 at bar code 3711158-01 (SIGMA Corp., Court No. 19-00003); ECF No. 29-1, PDs 1–5 at bar codes 3743270-01–05 (Smith-Cooper, Court No. 19-00011).

Commerce separately determined all of the products were within the scope of the Order. See Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets (Sept. 10, 2018), ECF No. 25-1, PD 48 at bar code 3752679-01 ("Vandewater Scope Ruling"); Scope Ruling on SIGMA Corp.'s SAFELET and UNILET fire protection weld outlets (Dec. 11, 2018), ECF No. 29-1, PD 64 at bar code 3782320-01 ("SIGMA Scope Ruling"); Scope Ruling on Smith-Cooper International's Cooplet Weld Outlets (Dec. 20, 2018), ECF No. 29-1, PD 32 at bar code 3785040-01 ("Smith-Cooper Scope Ruling").

**Discussion**

Commerce has by regulation, 19 C.F.R. § 351.225(k), established a process for deciding whether certain imports are covered by the scope of an antidumping or countervailing duty order. Commerce first examines the sources listed under § 351.225(k)(1), which include "the scope language contained in the order itself, the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC." 19 C.F.R. § 351.225(k)(1). If the (k)(1) sources are not dispositive either way, Commerce then conducts a full scope

Court Nos. 18-00199, 19-00003, and 19-00011                                    Page 4

inquiry and evaluates the sources under § 351.225(k)(2), which include the product's physical characteristics, ultimate purchasers' expectations, the ultimate use of the product, trade channels in which the product is sold, and the manner in which the product is advertised and displayed. Id. § 351.225(k)(2); see generally United Steel and Fasteners, Inc. v. United States, 947 F.3d 794, 799 (Fed. Cir. 2020) (describing Commerce's scope framework).

Plaintiffs' central, collective contention is that their products are not "butt-weld fittings" because the weldable end of their fittings cannot accommodate a true "butt-weld"—which they define as a joint type in which welded ends are aligned in approximately the same plane. Commerce was not persuaded by Plaintiffs' interpretation of the term "butt-weld" and instead settled on an interpretation of the scope term "butt-weld fitting" anchored to a specific physical characteristic noted in the petition and the ITC sunset review—having beveled edges that form a shallow channel to accommodate the bead of the weld. Vandewater Scope Ruling at 10; SIGMA Scope Ruling at 14; Smith-Cooper Scope Ruling at 12-13; see also Sprink Inc. Scope Ruling (Mar. 25, 1992).

Plaintiffs (in consultation with the court and other parties) first present a limited argument that the scope term "butt-weld" is clear and unambiguous as a well-understood term in "trade usage" ("(k)(zero) issue"). This is an argument that Plaintiffs contend the court reviews de novo, without deference to Commerce's determination. SIGMA Br. Regarding (K)(Zero) Issues at 2–3.

Court Nos. 18-00199, 19-00003, and 19-00011                                        Page 5

Accepting Plaintiffs' de novo standard, the court does not share Plaintiffs' view that the term "butt-weld fitting" has the one, clear, unambiguous meaning advocated by Plaintiffs largely because there is a key piece of record information that Plaintiffs failed to address that undermines their claims that "trade usage" is clear, unambiguous, and uniform. One Plaintiff's importers referred to branch outlets as a "threaded butt-welded outlet," a "grooved butt-welded outlet," and "butt-weld outlets," which weakens any claim that there is a well-known, uniform "trade usage" of the term "butt-weld fitting" that excludes Plaintiffs' merchandise from the Order. Even if those descriptives were somehow in error, as claimed by Smith-Cooper, they demonstrate that "trade usage" is not as clear and unambiguous as Plaintiffs advocate. Afterall, similar branch outlets have been included since 1992 under a similar antidumping duty order covering butt-weld fittings from another country, making it hard for a reasonable mind to be persuaded that branch outlets could never be classified as butt-weld fittings because there is one, and only one, widely- and well-known "trade usage" of the term "butt-weld fittings" that excludes Plaintiffs' branch outlets. See Sprink Inc. Scope Ruling.

The court does not express any opinion on the reasonableness (supported by substantial evidence) of Commerce's conclusion that the (k)(1) sources were dispositive of the inclusion of Plaintiffs' merchandise. It suffices to say that for Plaintiffs' (k)(zero) issue about there being an unambiguous meaning of the term "butt-weld fitting," the court did not find Plaintiffs' arguments persuasive. Accordingly, it is therefore

Court Nos. 18-00199, 19-00003, and 19-00011                                    Page 6

     **ORDERED** that Plaintiffs' requested relief is denied; and it is further

     **ORDERED** that parties shall, after conferring with one another, file, on or before

June 11, 2020, a proposed briefing schedule in each of the captioned actions regarding

the final disposition of each action.


                                             /s/ Leo M. Gordon
                                         Judge Leo M. Gordon


Dated: June 3, 2020
       New York, New York

**ADDENDUM 6**

(i) The date on which the Secretary released disclosure documents to that party; or

(ii) The date on which the Secretary held a disclosure meeting with that party.

(3) *Replies to comments.* Replies to comments submitted under paragraph (c)(1) of this section must be filed within five days after the date on which the comments were filed with the Secretary. The Secretary will not consider replies to comments submitted in connection with a preliminary determination.

(4) *Extensions.* A party to the proceeding may request an extension of the time limit for filing comments concerning a ministerial error in a final determination or final results of review under § 351.302(c) within three days after the date of any public announcement, or, if there is no public announcement, within five days after the date of publication of the final determination or final results of review, as applicable. The Secretary will not extend the time limit for filing comments concerning a significant ministerial error in a preliminary determination.

(d) *Contents of comments and replies.* Comments filed under paragraph (c)(1) of this section must explain the alleged ministerial error by reference to applicable evidence in the official record, and must present what, in the party's view, is the appropriate correction. In addition, comments concerning a preliminary determination must demonstrate how the alleged ministerial error is significant (*see* paragraph (g) of this section) by illustrating the effect on individual weighted-average dumping margin or countervailable subsidy rate, the all-others rate, or the country-wide subsidy rate (whichever is applicable). Replies to any comments must be limited to issues raised in such comments.

(e) *Corrections.* The Secretary will analyze any comments received and, if appropriate, correct any significant ministerial error by amending the preliminary determination, or correct any ministerial error by amending the final determination or the final results of review (whichever is applicable). Where practicable, the Secretary will an-nounce publicly the issuance of a correction notice, and normally will do so within 30 days after the date of public announcement, or, if there is no public announcement, within 30 days after the date of publication, of the preliminary determination, final determination, or final results of review (whichever is applicable). In addition, the Secretary will publish notice of such corrections in the FEDERAL REGISTER. A correction notice will not alter the anniversary month of an order or suspended investigation for purposes of requesting an administrative review (*see* § 351.213) or a new shipper review (*see* § 351.214) or initiating a sunset review (*see* § 351.218).

(f) *Definition of ''ministerial error.''* Under this section, *ministerial error* means an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial.

(g) *Definition of ''significant ministerial error.''* Under this section, *significant ministerial error* means a ministerial error (*see* paragraph (f) of this section), the correction of which, either singly or in combination with other errors:

(1) Would result in a change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin or the countervailable subsidy rate (whichever is applicable) calculated in the original (erroneous) preliminary determination; or

(2) Would result in a difference between a weighted-average dumping margin or countervailable subsidy rate (whichever is applicable) of zero (or *de minimis*) and a weighted-average dumping margin or countervailable subsidy rate of greater than *de minimis*, or vice versa.

**§ 351.225  Scope rulings.**

(a) *Introduction.* Issues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation. Such issues can arise because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms. At

other times, a domestic interested party may allege that changes to an imported product or the place where the imported product is assembled constitutes circumvention under section 781 of the Act. When such issues arise, the Department issues "scope rulings" that clarify the scope of an order or suspended investigation with respect to particular products. This section contains rules regarding scope rulings, requests for scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation.

(b) *Self-initiation.* If the Secretary determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping or countervailing duty order or a suspended investigation, the Secretary will initiate an inquiry, and will notify all parties on the Department's scope service list of its initiation of a scope inquiry.

(c) *By application*—(1) *Contents and service of application.* Any interested party may apply for a ruling as to whether a particular product is within the scope of an order or a suspended investigation. The application must be served upon all parties on the scope service list described in paragraph (n) of this section, and must contain the following, to the extent reasonably available to the interested party:

(i) A detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number;

(ii) A statement of the interested party's position as to whether the product is within the scope of an order or a suspended investigation, including:

(A) A summary of the reasons for this conclusion,

(B) Citations to any applicable statutory authority, and

(C) Any factual information supporting this position, including excerpts from portions of the Secretary's or the Commission's investigation, and relevant prior scope rulings.

(2) *Deadline for action on application.* Within 45 days of the date of receipt of an application for a scope ruling, the Secretary will issue a final ruling under paragraph (d) of this section or will initiate a scope inquiry under paragraph (e) of this section.

(d) *Ruling based upon the application.* If the Secretary can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, whether a product is included within the scope of an order or a suspended investigation, the Secretary will issue a final ruling as to whether the product is included within the order or suspended investigation. The Secretary will notify all persons on the Department's scope service list (*see* paragraph (n) of this section) of the final ruling.

(e) *Ruling where further inquiry is warranted.* If the Secretary finds that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, the Secretary will notify by mail all parties on the Department's scope service list of the initiation of a scope inquiry.

(f) *Notice and procedure.* (1) Notice of the initiation of a scope inquiry issued under paragraph (b) or (e) of this section will include:

(i) A description of the product that is the subject of the scope inquiry; and

(ii) An explanation of the reasons for the Secretary's decision to initiate a scope inquiry;

(iii) A schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.

(2) The Secretary may issue questionnaires and verify submissions received, where appropriate.

(3) Whenever the Secretary finds that a scope inquiry presents an issue of significant difficulty, the Secretary will issue a preliminary scope ruling, based upon the available information at the time, as to whether there is a reasonable basis to believe or suspect that the product subject to a scope inquiry is included within the order or suspended

**International Trade Administration, Commerce** §351.225

investigation. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the preliminary scope ruling, and will invite comment. Unless otherwise specified, interested parties will have within twenty days from the date of receipt of the notification in which to submit comments, and ten days thereafter in which to submit rebuttal comments.

(4) The Secretary will issue a final ruling as to whether the product which is the subject of the scope inquiry is included within the order or suspended investigation, including an explanation of the factual and legal conclusions on which the final ruling is based. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the final scope ruling.

(5) The Secretary will issue a final ruling under paragraph (k) of this section (other scope rulings) normally within 120 days of the initiation of the inquiry under this section. The Secretary will issue a final ruling under paragraph (g), (h), (i), or (j) of this section (circumvention rulings under section 781 of the Act) normally within 300 days from the date of the initiation of the scope inquiry.

(6) When an administrative review under §351.213, a new shipper review under §351.214, or an expedited antidumping review under §351.215 is in progress at the time the Secretary provides notice of the initiation of a scope inquiry (see paragraph (e)(1) of this section), the Secretary may conduct the scope inquiry in conjunction with that review.

(7)(i) The Secretary will notify the Commission in writing of the proposed inclusion of products in an order prior to issuing a final ruling under paragraph (f)(4) of this section based on a determination under:

(A) Section 781(a) of the Act with respect to merchandise completed or assembled in the United States (other than minor completion or assembly);

(B) Section 781(b) of the Act with respect to merchandise completed or assembled in other foreign countries; or

(C) Section 781(d) of the Act with respect to later-developed products which incorporate a significant techno-

logical advance or significant alteration of an earlier product.

(ii) If the Secretary notifies the Commission under paragraph (f)(7)(i) of this section, upon the written request of the Commission, the Secretary will consult with the Commission regarding the proposed inclusion, and any such consultation will be completed within 15 days after the date of such request. If, after consultation, the Commission believes that a significant injury issue is presented by the proposed inclusion of a product within an order, the Commission may provide written advice to the Secretary as to whether the inclusion would be inconsistent with the affirmative injury determination of the Commission on which the order is based.

(g) *Products completed or assembled in the United States.* Under section 781(a) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order imported parts or components referred to in section 781(a)(1)(B) of the Act that are used in the completion or assembly of the merchandise in the United States at any time such order is in effect. In making this determination, the Secretary will not consider any single factor of section 781(a)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(a)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(h) *Products completed or assembled in other foreign countries.* Under section 781(b) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order, at any time such order is in effect, imported merchandise completed or assembled in a foreign country other than the country to which the order applies. In making this determination, the Secretary will not consider any single factor of section 781(b)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(b)(1)(D) of the Act, or of

processing performed by an affiliated person under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(i) *Minor alterations of merchandise.* Under section 781(c) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order articles altered in form or appearance in minor respects.

(j) *Later-developed merchandise.* In determining whether later-developed merchandise is within the scope of an antidumping or countervailing duty order, the Secretary will apply section 781(d) of the Act.

(k) *Other scope determinations.* With respect to those scope determinations that are not covered under paragraphs (g) through (j) of this section, in considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary will take into account the following:

(1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

(2) When the above criteria are not dispositive, the Secretary will further consider:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

(l) *Suspension of liquidation.* (1) When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

(2) If the Secretary issues a preliminary scope ruling under paragraph

(f)(3) of this section to the effect that the product in question is included within the scope of the order, any suspension of liquidation described in paragraph (l)(1) of this section will continue. If liquidation has not been suspended, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary issues a preliminary scope ruling to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the product ended, and will instruct the Customs Service to refund any cash deposits or release any bonds relating to that product.

(3) If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

(4) If, within 90 days of the initiation of a review of an order or a suspended investigation under this subpart, the Secretary issues a final ruling that a product is included within the scope of the order or suspended investigation that is the subject of the review, the Secretary, where practicable, will include sales of that product for purposes of the review and will seek information

regarding such sales. If the Secretary issues a final ruling after 90 days of the initiation of the review, the Secretary may consider sales of the product for purposes of the review on the basis of non-adverse facts available. However, notwithstanding the pendency of a scope inquiry, if the Secretary considers it appropriate, the Secretary may request information concerning the product that is the subject of the scope inquiry for purposes of a review under this subpart.

(m) *Orders covering identical products.* Except for a scope inquiry and a scope ruling that involves section 781(a) or section 781(b) of the Act (assembly of parts or components in the United States or in a third country), if more than one order or suspended investigation cover the same subject merchandise, and if the Secretary considers it appropriate, the Secretary may conduct a single inquiry and issue a single scope ruling that applies to all such orders or suspended investigations.

(n) *Service of applications; scope service list.* The requirements of §351.303(f) apply to this section, except that an application for a scope ruling must be served on all persons on the Department's scope service list. For purposes of this section, the "scope service list" will include all persons that have participated in any segment of the proceeding. If an application for a scope ruling in one proceeding results in a single inquiry that will apply to another proceeding (*see* paragraph (m) of this section), the Secretary will notify persons on the scope service list of the other proceeding of the application for a scope ruling.

(o) *Publication of list of scope rulings.* On a quarterly basis, the Secretary will publish in the FEDERAL REGISTER a list of scope rulings issued within the last three months. This list will include the case name, reference number, and a brief description of the ruling.

## Subpart C—Information and Argument

### § 351.301   Time limits for submission of factual information.

(a) *Introduction.* This section sets forth the time limits for submitting factual information, as defined by §351.102(b)(21). The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. Notwithstanding paragraph (b) of this section, the Secretary may request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information. Section 351.302 sets forth the procedures for requesting an extension of such time limits, and provides that, unless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established in the Department's regulations. Section 351.303 contains the procedural rules regarding filing (including procedures for filing on non-business days), format, translation, service, and certification of documents. In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the following: The time limit for the response; the information to be provided; the form and manner in which the interested party must submit the information; and that failure to submit the requested information in the requested form and manner by the date specified may result in use of the facts available under section 776 of the Act and §351.308.

(b) *Submission of factual information.* Every submission of factual information must be accompanied by a written explanation identifying the subsection of §351.102(b)(21) under which the information is being submitted.

(1) If an interested party states that the information is submitted under §351.102(b)(21)(v), the party must explain why the information does not satisfy the definitions described in §351.102(b)(21)(i)–(iv).

(2) If the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation identifying the information which is already on the record that the factual information seeks to rebut, clarify, or correct, including the name of the interested party that submitted the information and the date on which the information was submitted.