2023-1093, 2023-1141

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

VANDEWATER INTERNATIONAL INC.,

Plaintiff,

SIGMA CORPORATION, SMITH-COOPER INTERNATIONAL, INC.,

Plaintiffs-Appellants,

v.

UNITED STATES, ISLAND INDUSTRIES,

Defendants-Appellees.

---

Appeal from the United States Court of International Trade
in Case No. 1:18-CV-00199
Senior Judge Leo M. Gordon

---

### BRIEF OF PLAINTIFF-APPELLANT
### SIGMA CORPORATION

Walter J. Spak
Lucius B. Lau
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

January 9, 2023                Counsel to Plaintiff-Appellant
                               Sigma Corporation

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1093, -1141 |
| **Short Case Caption** | Vandewater International Inc. v. US |
| **Filing Party/Entity** | SIGMA Corporation |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/09/2023

Signature: /s/ Lucius B. Lau

Name: Lucius B. Lau

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| SIGMA Corporation | | Fairfax Financial Holdings LTD |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable      ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable      ☐ Additional pages attached

| | | |
|---|---|---|
| Carbon Steel But-Weld Pipe Fittings from Peoples Republic of China; SCO - Vandewater | A-570-814 | Department of Commerce |
| Sigma Corporation v. United States and Island Industries | 19-00003 | Court of International Trade |
| Vandewater International Inc. v. US | 2023-1411 | Court of Appeals for the Federal Circuit |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable      ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................................1

JURISDICTIONAL STATEMENT ...................................................................2

STATEMENT OF THE ISSUE.................................................................3

STATEMENT OF THE CASE .............................................................4

SUMMARY OF THE ARGUMENT ................................................21

ARGUMENT ..........................................................................23

    I.    STANDARD OF REVIEW.................................................23

    II.    COMMERCE'S DETERMINATION THAT WELDED OUTLETS FALL WITHIN THE SCOPE OF THE *BUTT-WELD ORDER* IS CONTRARY TO LAW ..........................................24

        A.    Commerce Must First Examine the Scope Language and Make a Finding of Ambiguity......................................................25

        B.    Commerce Must Interpret the Terms of ADD Orders Consistent with Trade Usage and Industry Standards ...................27

        C.    This Court Has Affirmed Commerce's Reliance on the Same Industry Standard When Affirming Commerce's Finding That Certain Merchandise Falls Within the Scope of the *Butt-Weld Order* .............................................................33

        D.    Commerce Disregarded Relevant Trade Usage and Industry Standards Applicable to the Term "Butt-Weld" in the *Vandewater Scope Decision*............................................37

        E.    Statement Regarding Joinder ......................................39

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................41

ADDENDUM ....................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Am. Silicon Techs. v. United States,
 334 F.3d 1033 (Fed. Cir. 2003) ...........................................................23

Anderson v. United States Sec'y of Agric.,
 462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006) ................................35, 36

Arcelormittal Stainless Belg. N.V. v. United States,
 694 F.3d 82 (Fed. Cir. 2012) ....................................................passim

B Hall Contr., Inc. v. Evanston Ins. Co.,
 273 Fed. Appx. 310 (5th Cir. 2008) (unpublished opinion) ..............32

Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.,
 682 F.3d 1003 (Fed. Cir. 2012) ...........................................................32

Bell Supply Co., LLC v. United States,
 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) .....................................29

Boen Hardwood Flooring, Inc. v. United States,
 357 F.3d 1262 (Fed. Cir. 2004) ...........................................................32

BP Oil Supply Co. v. United States,
 38 C.I.T. 652 (2014) ............................................................................29

Diamond Sawblades Manufacturers' Coal. v. United States,
 540 F. Supp. 3d 1338 (Ct. Int'l Trade 2021) .....................................38

Duferco Steel, Inc. v. United States,
 296 F.3d 1087 (Fed. Cir. 2002) .....................................................25, 38

Fedmet Res. Corp. v. United States,
 755 F.3d 912 (Fed. Cir. 2014) ......................................................25, 28

Glob. Commodity Grp. LLC v. United States,
 709 F.3d 1134 (Fed. Cir. 2013) ....................................................23, 38

JTEKT Corp. v. United States,
 642 F.3d 1378 (Fed. Cir. 2011) ...........................................................23

*King Supply Co. v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012) ...................................................passim

*Koito Mfg. Co. v. Turn-Key-Tech, LLC,*
    381 F.3d 1142 (Fed. Cir. 2004) ...............................................................32

*Litton Sys. v. Honeywell, Inc.,*
    87 F.3d 1559 (Fed. Cir. 1996),
    *rev'd on other grounds*, 520 U.S. 1111 (1997) .................................24

*Meridian Prods., LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017) .........................................7, 23, 24, 27

*Microsoft Corp. v. DataTern, Inc.,*
    755 F.3d 899 (Fed. Cir. 2014) .............................................................40

*Mid Continent Nail Corp. v. United States,*
    725 F.3d 1295 (Fed. Cir. 2013) .............................................7, 25, 26

*Midwest Fastener Corp. v. United States,*
    335 F. Supp. 3d 1355 (Ct. Int'l Trade 2018),
    *remanded to* 389 F. Supp. 3d 1384 (Ct. Int'l Trade 2019),
    *aff'd on other grounds* 818 Fed. Appx. 1020 (Fed. Cir. 2020)
    (unpublished opinion) ....................................................................28, 39

*Nat'l Muffler Dealers Ass'n v. United States,*
    440 U.S. 472 (1979).............................................................................35

*OMG, Inc. v. United States,*
    321 F. Supp. 3d 1262 (Ct. Int'l Trade 2018),
    *remanded to* 389 F. Supp. 3d 1312 (Ct. Int'l Trade 2019),
    *aff'd on other grounds* 972 F.3d 1358 (Fed. Cir. 2020) ..............28, 39

*Rocknel Fastener, Inc. v. United States,*
    267 F.3d 1354 (Fed. Cir. 2001) ...........................................................32

*S. Shore Hosp., Inc. v. Thompson,*
    308 F.3d 91 (1st Cir. 2002)...................................................................35

*Sangamo Capacitor Div. v. United States,*
    611 F. Supp. 967 (Ct. Int'l Trade 1985),
    *aff'd* 779 F.2d 30 (Fed. Cir. 1985).......................................................32

*SunEdison, Inc. v. United States*,
  179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) ................................................35, 36

*Tai-Ao Aluminium (Taishan) Co. v. United States*,
  391 F. Supp. 3d 1301 (Ct. Int'l Trade 2019),
  *remanded on other grounds to* 415 F. Supp. 3d 1391 (Ct. Int'l Trade 2019),
  *aff'd on other grounds* 983 F.3d 487 (Fed. Cir. 2020) .......................................29

*Tak Fat Trading Co. v. United States*,
  396 F.3d 1378 (Fed. Cir. 2005) .........................................................................25

*Teg-Paradigm Envtl., Inc. v. United States*,
  465 F.3d 1329 (Fed. Cir. 2006) .........................................................................32

*Transmatic, Inc. v. Gulton Indus.*,
  180 F.3d 1343 (Fed. Cir. 1999) .........................................................................32

*United States v. Great Am. Ins. Co.*,
  738 F.3d 1320 (Fed. Cir. 2013) ....................................................................32, 33

*Vandewater International Inc. v. United States*,
  589 F. Supp. 3d 1324 (Ct. Int'l Trade 2022) .................................................4, 19

*Viraj Forgings Ltd. v. United States*,
  283 F. Supp. 2d 1335 (Ct. Int'l Trade 2003) .....................................................29

*Wellman, Inc. v. Eastman Chem. Co.*,
  642 F.3d 1355 (Fed. Cir. 2011) .........................................................................32

*Whirlpool Corp. v. United States*,
  890 F.3d 1302 (Fed. Cir. 2018) .........................................................................23

## STATUTES AND REGULATIONS

28 U.S.C. § 1295(a)(5)........................................................................................2

28 U.S.C. § 1581(c) .............................................................................................2

31 U.S.C. §§ 3729, *et seq.*..................................................................................20

19 C.F.R. § 351.225 ..........................................................................................4, 5

19 C.F.R. § 351.225(a)..........................................................................................5

19 C.F.R. § 351.225(c).................................................................7, 9

19 C.F.R. § 351.225(c)(1)..................................................................5

19 C.F.R. § 351.225(c)(ii)(C)(2).........................................................5

19 C.F.R. § 351.225(d) ....................................................................5, 6

19 C.F.R. § 351.225(e)........................................................................6

19 C.F.R. § 351.225(k)(1).................................................6, 16, 18, 38

19 C.F.R. § 351.225(k)(2).............................................................6, 38

19 C.F.R. § 351.225(k)(2)(i)–(v) .........................................................6

## ADMINISTRATIVE DETERMINATIONS

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*,
57 Fed. Reg. 29,702 (July 6, 1992)..................................................4, 5

*Certain Pasta From Italy*,
78 Fed. Reg. 9,364 (Feb. 8, 2013),
and accompanying Issues & Decision Memorandum ......................................30

*Forged Steel Fittings From the People's Republic of China*,
83 Fed. Reg. 60,396 (Nov. 26, 2018) .....................................................30

*Stainless Steel Sheet and Strip in Coils From the United Kingdom*,
64 Fed. Reg. 30,688 (June 8, 1999)......................................................30

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiff-Appellant, Sigma Corporation ("Sigma"), make the following statement:

1.    Plaintiff-Appellant Smith-Cooper International, Inc. ("Smith-Cooper") filed an appeal of the same lower court proceeding (No. 2023-1141) on November 1, 2022. This Court consolidated appeal Nos. 2023-1093 and 2023-1141 on December 14, 2022. *See* ECF 10. No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.    No other case is known to counsel that is pending in this or any other court or agency that will directly affect or will be directly affected by this Court's decision in this case.

# JURISDICTIONAL STATEMENT

The action filed by Plaintiff Vandewater International Inc. ("Vandewater") before the Court of International Trade ("CIT"), *Vandewater International Inc. v. United States*, Ct. No. 18-00199, in which Sigma was a plaintiff-intervenor and which resulted in this appeal, contested the final results of the scope inquiry conducted by the U.S. Department of Commerce ("Commerce"), considering whether welded outlets imported by Vandewater are subject to the antidumping duty ("ADD") order covering butt-weld pipe fittings from the People's Republic of China ("*Butt-Weld Order*"). The CIT had exclusive jurisdiction over Vandewater's complaint under 28 U.S.C. § 1581(c).

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On September 8, 2022, the CIT issued the final decision from which this appeal was taken. Sigma timely filed a notice of appeal on October 21, 2022.

## **STATEMENT OF THE ISSUE**

1.   Does the term "butt-weld" have a single, unambiguous meaning consistent with the trade usage of that term, as reflected in relevant industry standards, such that the products interchangeably known as steel branch outlets, threaded or grooved pipe outlets, and/or welded outlets fall outside the scope of the order?

## STATEMENT OF THE CASE

Sigma appeals from the final decision of the CIT in *Vandewater International Inc. v. United States*, 589 F. Supp. 3d 1324 (Ct. Int'l Trade 2022) ("*Vandewater III*"). Appx1-20. The CIT issued *Vandewater III* after a remand proceeding by Commerce and two earlier decisions, (1) 476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020) ("*Vandewater II*"), Appx125-130, and (2) a June 3, 2020 unpublished "Memorandum and Order" ("*Vandewater I*"). Appx143-148. Pursuant to Federal Circuit Rule 28(a)(11), these CIT decisions and the underlying Commerce scope ruling are attached hereto in the Addendum. Additionally, pursuant to Federal Rule of Appellate Procedure 28(f), because this Court's "determination of the issues presented requires the study of statutes, rules, regulations, etc.," the Addendum also includes the relevant regulation (19 C.F.R. § 351.225) at issue in this appeal.

### The *Butt-Weld Order* and Scope Proceedings

Commerce published the *Butt-Weld Order* on July 6, 1992. *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 57 Fed. Reg. 29,702 (July 6, 1992). The scope of the *Butt-Weld Order* is as follows:

> The products covered by this order are carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings

based on other fastening methods (*e.g.,* threaded, grooved, or bolted fittings).

*Id.*

Commerce's regulations provide an interested party the opportunity to seek clarification regarding the scope of an ADD order by filing a scope ruling request, detailed in 19 C.F.R. § 351.225. Commerce amended § 351.225 in 2021. However, because Vandewater, Sigma, and Smith-Cooper filed their scope ruling requests in 2018, we discuss and summarize the relevant regulatory provisions as effective in 2018, as well as provide the 2018 edition of the regulation in the Addendum to this brief.

As stated in 19 C.F.R. § 351.225(a), "[i]ssues arise as to whether a particular product is included within the scope" of an ADD order "because the descriptions of subject merchandise . . . must be written in general terms." Consequently, the regulations permit any interested party to "apply for a ruling as to whether a particular product is within the scope of an order . . . ." 19 C.F.R. § 351.225(c)(1).

Under the regulation as effective in 2018, Commerce was required to, within 45 days "of the receipt of an application for a scope ruling," either "issue a final ruling under paragraph (d) of this section or . . . initiate a scope inquiry under paragraph (e) of this section." 19 C.F.R. § 351.225(c)(ii)(C)(2). Section (d), in turn, provided that if Commerce could "determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1)

of this section, whether a product is included within the scope of an order[,]" then it would "issue a final ruling as to whether the product is included within the order[.]" 19 C.F.R. § 351.225(d). Section (e) provided that, if Commerce found that "the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section," then it would initiate a scope inquiry. 19 C.F.R. § 351.225(e).

Consequently, section 351.225(k) of Commerce's regulation established the analytical framework for Commerce's scope inquiry. Under 19 C.F.R. § 351.225(k)(1) ("(k)(1)"), Commerce was first required to "take into account . . . descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the [International Trade] Commission. 19 C.F.R. § 351.225(k)(1).

Then, if Commerce determined that these (k)(1) "criteria are not dispositive," it would "further consider" a number of factors under 19 C.F.R. § 351.225(k)(2) ("(k)(2)"), such as physical characteristics and end uses, to determine whether the product falls within the scope of the order. 19 C.F.R. § 351.225(k)(2)(i)–(v).

Importantly, this Court has explained that, before resorting to a (k)(1) or (k)(2) analysis, "Commerce must first examine the language of the final order."

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (citations omitted).  "If the scope is unambiguous, it governs."  *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citations and footnote omitted).  Only if "the language is ambiguous, Commerce must next consider . . . the so-called '(k)(1) materials[.]'"  *Mid Continent*, 725 F.3d at 1302 (citations omitted).  In other words, Commerce must make an initial threshold evaluation of ambiguity, and if it finds that the language of the scope is unambiguous, then there is no further inquiry.  In proceedings below, the CIT deemed this initial evaluation of ambiguity the "(k)(zero)" analysis.  *See* Appx146, Appx4112, Appx4115.

**Importers' Requests for Scope Determinations**

In 2018, three different U.S. importers — Vandewater, Sigma, and Smith-Cooper, exercised their rights under 19 C.F.R. § 351.225(c) to request that Commerce conduct a scope inquiry and determine that the products imported by each company — known interchangeably as "steel branch outlets"; "threaded or grooved pipe outlets"; and/or "weld outlets" (hereinafter and collectively, "weld outlets" or "welded outlets") — are not subject to the scope of the *Butt-Weld Order*.

As described further below, each of these importers ultimately appealed Commerce's scope ruling to the CIT.  The CIT later stayed Sigma and Smith-Cooper's appeals, and proceeded to adjudicate Vandewater's appeal, the final

decision of which is now before this Court.   The discussion below includes citations to documents from the administrative record of Vandewater's scope proceeding.   That scope proceeding is the subject of this appeal, and those documents underlie the arguments made in this brief.   Sigma also cites in this Statement of the Case, and will include in the joint appendix, relevant submissions from its own scope proceeding.   Those limited citations do not form the basis for any arguments made in this brief, and are included for the purpose of providing the Court a complete factual background and demonstrating to the Court that Sigma has exhausted its administrative remedies.

Vandewater submitted its scope ruling request on May 17, 2018.   Appx167 (cover page of scope ruling request), Appx169, n.2 (noting that "steel branch outlets" are also known as "threaded or grooved pipe outlets, and weld outlets").   As Vandewater explained, the "term 'butt-weld pipe fitting' is a term that is well-understood and defined in the piping systems industry.   There are numerous distinctions in physical characteristics, production processes, and uses that lead the piping systems industry to consider steel branch outlets to be an ***entirely different*** product than a butt-weld pipe fitting."   Appx168 (emphasis added).

In its request, Vandewater highlighted the foremost distinction between butt-weld pipe fittings and welded outlets:   different industry standards.   That is, butt-weld pipe fittings are "defined by an industry standard: [American Society of

Mechanical Engineers ("ASME")] B16.9, which is entitled *Factory-Made Wrought Buttwelding Fittings*." Appx176. In part, tables included in ASME B16.9 list "several types of fittings" — but, "there is no table or description of steel branch outlets in ASME B16.9, for a simple reason: *steel branch outlets are not recognized as butt-weld pipe fittings by the piping industry*." *Id.* (emphasis in original).

Rather, "there is an entirely *different* standard for steel branch outlets. Instead of ASME, the Manufacturers Standardization Society ('MSS') defines steel branch outlet fittings in MSS SP-97, which is a standard entitled *Integrally Reinforced Forged Branch Outlet Fittings - Socket Welding, Threaded, and Buttwelding Ends*." Appx176-177 (emphasis in original, footnote omitted). Quoting the language of MSS SP-97, Vandewater explained that "the essential characteristic" of steel branch or welded outlets "is the contoured connection to the run pipe, which must be contoured[.]" Appx177.

Despite the fact that both ASME B16.9 and MSS SP-97 contain the term "buttwelding" in their titles, a comparison of the two standards makes clear that they do not both govern butt-weld pipe fittings as specified by ASME B16.9. *Compare*, *e.g.*, Appx1324, Appx1327, Appx1330, Appx1333 (technical diagrams and dimensions for "buttwelding" outlets covered by MSS SP-97) *with* Appx1280-1295, Appx1298-1310 (technical diagrams and dimensions for various parts

9

qualifying as butt-weld pipe fittings covered by ASME B16.9). Additionally, MSS SP-97 includes specifications, technical diagrams, and dimensions for threaded and socket-welded outlets, which are clearly not covered by ASME B16.9. *Compare*, *e.g.*, Appx1324, Appx1327, Appx1325-1326, Appx1328-1329, Appx1331-1332, Appx1334-1335 (technical diagrams and dimensions for "threaded" and "socket-weld" outlets covered by MSS SP-97) *with* Appx1280-1295, Appx1298-1310 (technical diagrams and dimensions for various parts qualifying as butt-weld pipe fittings covered by ASME B16.9).

In support of the crucial distinction between the two products, based on different industry standards, Vandewater submitted with its scope ruling request a declaration by Walter J. Sperko, P.E. as Exhibit 7 thereto. Appx176, n.14, Appx300-303. Mr. Sperko is an expert in the field of piping and piping systems, having worked as an engineer in the piping industry since 1969, and possesses expertise in "how the components that make up piping systems are made, how they are installed and how they are used." Appx1900. His firm, Sperko Engineering, was founded in 1981 and provides "engineering consulting services to customers in the metal fabrication industries in the technical areas of welding, metallurgy, manufacturing processes, piping and pressure vessel design, inspection, and quality assurance." Appx301. At the time of submission, Mr. Sperko served in various leadership roles on multiple committees of the ASME and the American Welding

Society ("AWS") and regularly published articles "in *The Fabricator, Tube and Pipe Journal, Welding Journal,* and other trade magazines regarding piping fabrication, installation, and inspection issues, and ASME Section IX[,]" as well as co-authoring "the piping design section of the Standard Handbook of Plant Engineering." *Id.*; *see also* Appx1899-1930.

Aside from Vandewater (and the two other importers who each sought a scope ruling request from Commerce on welded outlets), no other interested party provided expert testimony on the meaning of "butt-weld," trade usage, or industry standards; nor, as discussed in further detail below, did Commerce ultimately cite to any industry expert in its ultimate scope ruling (the "*Vandewater Scope Ruling*"). *See* Appx131-142

Mr. Sperko's declaration provided, in no uncertain terms: "Butt-weld pipe fittings are manufactured to ASME standard B16.9, *Factory-Made Wrought Buttwelding Fittings.*" Appx302. "Forged steel branch outlet fittings are manufactured to MSS standard SP-97, *Integrally Reinforced Forged Branch Outlet Fittings–Socket Welding, Threaded and Buttwelding Ends*[.]" *Id.* "Branch connection outlet fittings are not buttwelding fittings since they are manufactured to different standards." *Id.*

Mr. Sperko also cited to industry definitions related to specific product characteristics, demonstrating how these standardized differences further

distinguish the two products. Specifically, the AWS *Standard Terms and Definitions* defines a "butt joint" as a "joint type in which the butting ends of one or more workpieces are aligned in approximately the same plane" and a "corner joint" as a "joint type in which butting or nonbutting ends of one or more workpieces converge approximately perpendicular to one another." *Id.* Then, Mr. Sperko added that joints "between butt welding fittings and pipe are ***always*** in the same plane" while joints "between outlet fittings are ***always*** between members that are perpendicular to each other." *Id.* (emphasis added).

Elsewhere in his declaration, and reinforcing the underlying different industry standards, Mr. Sperko explained that a "butt-weld pipe fitting is always welded to the *end* of a pipe, another butt weld fitting or a butt weld valve" and "is always an *end-to-end connection*" whereas, conversely, "an outlet fitting is welded to a hole cut in the wall of the pipe, not to the end of the pipe" and must have the "essential characteristic" of a "contoured connection to the run pipe[.]" *Id.* (emphasis in original).

One week after Vandewater requested a scope ruling from Commerce, Sigma filed a scope ruling request regarding its SAFELET and UNILET brand fire-protection weld outlets. *See* Appx3271 (cover page of scope ruling request). These outlets, Sigma explained, are "used solely in low-pressure fire-protection pipe systems to connect sprinkler heads, at intermediate intervals, to the steel pipes

that convey water to the fire-protection system." Appx3275. Over the course of its submission, Sigma demonstrated how the specific characteristics and uses of its SAFELET and UNILET threaded outlets excluded them from the scope of the *Butt-Weld Order*. Appx3272-3298. In summary:

> [U]nlike subject Butt-Weld Pipe Fittings, SIGMA's fire-protection weld outlets: (1) *are not* attached end-to-end to the beveled end of another pipe or the beveled end of another fitting; (2) *are not* configured with at least one single-plane, circular, beveled end; and (3) *are not* joined to another beveled-end pipe or beveled-end fitting with a single-plane, circumferential butt weld. Unlike subject Butt-Weld Pipe Fittings, SIGMA's fire-protection weld outlets *are*: (1) attached at an intermediate point to a non-beveled opening in the convex surface of a  fire-protection pipe; (2) configured on one end with a multi-plane "fish mouth" opening, and on the other end with a single-plane, non-beveled, circular, interior-threaded opening; and (3) joined on one end to the non-beveled, convex surface of a fire-protection pipe using a multi-plane fillet weld, and to a threaded pipe nipple or threaded sprinkler head by way of the circular, interior-threaded opening of the other end of the weld outlet.

Appx3272 (citations omitted, emphasis in original). Like Vandewater, Sigma noted that butt-weld pipe fittings "conform to the ASME B16.9 standard." *See* Appx3293.

Approximately one month later, on the records of their respective scope proceedings, Vandewater and Sigma each submitted to Commerce a response to comments filed by domestic producer Island Industries ("Island"), which included additional information regarding the classification of their respective imported welded outlets. *See generally* Appx485 (cover page of Vandewater responsive

submission), Appx3314 (cover page of Sigma responsive submission). Vandewater and Sigma each submitted a new declaration by Mr. Sperko — that is, different from the initial declaration submitted by Vandewater, but essentially identical across the two scope proceedings. *Compare* Appx553-559 *with* Appx3327-3332.

In this declaration, Mr. Sperko again explained that a "butt-weld has a very specific industry meaning" because the AWS "defines a butt weld as a 'joint type in which the butting ends of one or more work pieces are aligned in approximately the same plane.'" Appx553, Appx3327. Mr. Sperko elaborated: "By having the abutting ends aligned on the same plane, the beveled edges of the fitting and the beveled pipe ( or beveled end of another butt-weld fitting) form a shallow channel that accommodates the circumferential 'beads' of the butt weld that fastens together the two parallel adjoining pieces." Appx553; *see also* Appx3327. Conversely, Mr. Sperko explained that Vandewater's steel branch outlets and Sigma's "[i]nternally threaded weld outlets[,]" respectively, "do not have a circular, single-plane, beveled opening that can be abutted and butt-welded to the beveled end of a pipe or to the beveled end of another fitting." *See* Appx554, Appx3327-3328.

Once again, and consistent with his earlier declaration submitted by Vandewater, Mr. Sperko pointed to relevant industry standards. "***Butt-weld***

*fittings must meet ASME B16.9* standards," while "***steel branch outlets***" and "***internally threaded weld outlets must meet MSS SP-97*** standards." Appx554, Appx3327-3328 (emphasis added). Mr. Sperko also explained again, citing the AWS definitions, that steel branch outlets and internally threaded outlets are attached by way of a corner joint, not a butt-weld joint. Appx555-556, Appx3328-3329.

Mr. Sperko's declaration, along with written argument by Vandewater and Sigma, also addressed a new claim raised by Island. Namely, that a 1992 scope ruling by Commerce (the "*Sprink-let Ruling*") in a separate order regarding butt-weld pipe fittings from Taiwan ("*Taiwan Butt-Weld Order*"), in which Commerce found that "Sprink-let" brand fire protection outlets (which were similar to those imported by Vandewater and Sigma) fell within the scope of that order, was controlling. *See* Appx502-504, Appx3316. As Mr. Sperko explained, the determination that Sprink-let fittings fell under the scope of the *Taiwan Butt-Weld Order* "is wrong from an industry perspective, relies on faulty logic, and runs counter to the very definition of a 'butt-weld.'" Appx553. In part, Mr. Sperko explained, the *Sprink-let Ruling* did not take into account the different physical characteristics and industry standards used in producing each kind of product. *See* Appx554.

Following additional submissions from the parties, Commerce issued the *Vandewater Scope Ruling* on September 10, 2018, and the respective scope rulings in Sigma's scope proceeding on December 11, 2018 (the "*Sigma Scope Ruling*"); and in Smith-Cooper's scope proceeding on December 20, 2018 (the "*Smith-Cooper Scope Ruling*").  *See* Appx131-142, Appx3711-3727, Appx4081-4098.

Commerce reached the same conclusion in all three rulings:  the welded outlets imported by each party fall within the scope of the *Butt-Weld Order*.  *See* Appx138-142, Appx3726-3727, Appx4096-4097.  In all three cases, Commerce reached this conclusion based on each party's "scope request, the scope language, and the sources described in 19 CFR 351.225(k)(1)" — despite trade usage (including industry standards) and the unambiguous definition of the term "butt-weld," as highlighted by the parties.  Appx131, Appx3711, Appx4081.

Although Commerce briefly addressed the issue of industry standards and trade usage in all three scope rulings, it did not discuss or even acknowledge the multiple declarations by Mr. Sperko.  *See* Appx131-142, Appx3711-3727, Appx4081-4098.  Moreover, in the *Vandewater Scope Ruling*, Commerce referred to a prior scope ruling concerning the *Butt-Weld Order* in which it noted that the products at issue in that proceeding — which it found fell within the scope — "met *the same* [American Society for Testing and Materials ("]ASTM["]] and [American National Standards Institute ("]ANSI["]] industry standards as were

referenced in the Petition." Appx135 (emphasis added). Commerce also referenced the 1992 *Sprink-let Scope Ruling*, stating that, because the *Butt-Weld Order* and the *Taiwan Butt-Weld Order* are different, it was "not bound by the agency's analysis in the Sprink Scope Ruling . . . ." Appx141. In the *Sigma Scope Ruling* and *Smith-Cooper Scope Ruling*, Commerce dismissed arguments regarding industry standards by stating that "nothing in the scope language or the (k)(1) sources limits the scope of the . . . *Butt-Weld Order* to merchandise conforming to ASME B.16.9 standards." Appx3724, Appx4094.

## Importers' Appeals to the CIT

Vandewater, Sigma, and Smith-Cooper appealed Commerce's respective scope decisions to the CIT on September 12, 2018; January 3, 2019; and January 18, 2019, respectively. Within weeks of Sigma's and Smith-Cooper's appeals, Vandewater filed motions on the docket of its appeal requesting that the CIT consolidate those appeals with its appeal as the lead case. *See* Appx4099-4103, Appx4104-4110.

The move to consolidate reflected the views of all three plaintiffs that the "branch outlet products at issue in these three scope rulings and these three appeals are all similar items, about which [Commerce] reached its decisions using similar reasoning. Thus, all three actions involve common questions of law and fact." Appx4105-4106. Vandewater further explained that consolidation would prevent

"inconsistent adjudication" and constituted "the best way to ensure that the common issues" in the appeals "can be adjudicated fairly and efficiently, with the common facts and issues presented to the court in one proceeding." Appx4106.

The Court deliberated the question of consolidation and ultimately decided on July 18, 2019 to deny Vandewater's motions. Appx4122-4123. Following briefing by the parties, the CIT issued *Vandewater I* on June 3, 2020 (listing all three case captions on the opinion, and filing it across all three dockets), rejecting plaintiffs' (k)(zero) arguments on two bases. *See* Appx143-144, 147.

First, the CIT pointed to a statement by an employee of Smith-Cooper referring "to branch outlets as a 'threaded butt-welded outlet,' a 'grooved butt-welded outlet,' and 'butt-weld outlets,' which weakens any claim that there is a well-known, uniform 'trade usage' of the term "butt-weld fitting" that excludes Plaintiffs' merchandise from the Order." Appx147. Second, the CIT highlighted the 1992 *Sprink-let Ruling*, concluding that its existence undermined the notion that there is "one, and only one, widely- and well-known 'trade usage' of the term 'butt-weld fittings'" that excludes Plaintiffs' branch outlets." *Id.*

Like Commerce, the CIT did not address, discuss, or even acknowledge the multiple declarations by Mr. Sperko. *See generally* Appx143-148. Nor did it discuss the industry standards at issue and their role in defining "butt-weld." *See generally id.* The CIT then proceeded to the briefing stage regarding Commerce's

(k)(1) analysis in Vandewater's case, and shortly thereafter stayed Sigma's case "until 30 days after the final resolution" of Vandewater's case, "including all appeals and appeal periods." *See* CIT Case No. 19-00003, ECF 69 at 1.

Both Sigma and Smith-Cooper subsequently intervened in Vandewater's appeal. On October 16, 2020, the CIT concluded that "Commerce's determination that the (k)(1) sources are dispositive is . . . not reasonable" and remanded the *Vandewater Scope Ruling* to Commerce in *Vandewater II*, instructing Commerce to evaluate the scope under (k)(2). Appx130; *see generally* Appx125-130. Commerce then found Vandewater's outlets to fall within the scope of the *Butt-Weld Order* under its (k)(2) analysis, which the CIT affirmed in *Vandewater III* on September 8, 2022. Appx1-20.

On April 28, 2021, between the CIT's issuance of *Vandewater II* and *Vandewater III*, Vandewater filed for Chapter 11 bankruptcy in the Florida Southern Bankruptcy Court. *See* Voluntary Pet. for Non-Individuals Filing for Bankruptcy at 1, No. 21-14098 (Bankr. S.D. Fla. ECF Apr. 28, 2021).

With the CIT having rendered its final judgment, Sigma now appeals to this Court with respect to the CIT's earlier (k)(zero) decision in *Vandewater I*.

**Parallel Proceeding in the Ninth Circuit**

On June 13, 2017, Island commenced in the Central District of California *United States of America ex rel. Island Industries, Inc. v. Vandewater Int'l Inc., et*

*al.* ("*United States ex rel. Island*").  Compl. For Violation of the False Claims Act, *United States ex rel. Island*, No. 17-4393 (C.D. Cal. ECF June 13, 2017).  Island filed its complaint under seal, and the complaint remained under seal until January 30, 2019, at which time the District Court ordered the action unsealed and directed Island to serve the complaint on the defendants.  The defendants in that case included Vandewater, Sigma, and Smith-Cooper.  In the suit, Island sought damages pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, claiming that the defendants are liable under the False Claims Act because they allegedly imported "welded outlets" from China, but failed to pay antidumping duties imposed by Commerce under the *Butt-Weld Order*.

On February 8, 2022, after a jury trial, the District Court entered final judgment in favor of Island.  Final J. Following Jury Verdict in Favor of Pl. United States of America Against Def. Sigma Corporation at 2, No. 17-4393 (C.D. Cal. ECF Feb. 8, 2022).  That decision is now on appeal before the Ninth Circuit.  *See generally* Time Schedule Order, *Island Industries, Inc. v. Sigma Corp.*, No. 22-55603 (9th Cir. ECF June 21, 2022).  An outcome in this appeal may, but will not necessarily, affect the proceeding before the Ninth Circuit.

## SUMMARY OF THE ARGUMENT

Commerce's finding that welded outlets imported by Vandewater fall within the scope of the *Butt-Weld Order* is contrary to law.

Pursuant to this Court's binding precedent, Commerce must first make a threshold finding of ambiguity pursuant to a (k)(zero) analysis, before it may resort to the sources and factors under (k)(1) and/or (k)(2). If there is no ambiguity in the scope, the inquiry ends there.

The scope of the *Butt-Weld Order* is limited to "butt-weld pipe fittings." The term "butt-weld" has a single, unambiguous meaning in trade usage, as reflected in relevant industry standards. This Court has made clear that Commerce must read scope language in the context of relevant trade usage. Moreover, this Court, the CIT, and Commerce have found industry standards to be central to trade usage. Accordingly, this Court, the CIT, and Commerce have all interpreted ADD orders consistent with trade usage and industry standards. Indeed, in another scope proceeding concerning the *Butt-Weld Order*, Commerce found — and this Court affirmed — that the products at issue fell within the scope *because*, in relevant part, they were manufactured pursuant to the same industry standard at issue here.

Inexplicably, Commerce did not carry out the requisite (k)(zero) analysis here. It was aware that butt-weld pipe fittings are produced pursuant to one industry standard, while physically distinct welded outlets are produced to a

different industry standard.  Commerce did not determine that the term "butt-weld" was ambiguous, and did not consider these industry standards.  Then, despite these deficiencies, Commerce conducted a (k)(1) analysis and concluded that welded outlets imported by Vandewater fall within the scope of the *Butt-Weld Order*.  The CIT rejected and remanded that decision.

Because Commerce conducted a (k)(1) analysis without a threshold finding of ambiguity and without considering trade usage and industry standards, its determination is contrary to law.  Consideration of trade usage and industry standards leads to one — and only one — conclusion:  welded outlets are not butt-weld pipe fittings.  This Court should therefore remand the *Vandewater Scope Ruling* to Commerce, with instructions to find that weld outlets are not "butt-weld pipe fittings" (as that term is defined using industry standards) and, as a result, such products are excluded from the scope of the *Butt-Weld Order*.

# <u>ARGUMENT</u>

## I.   STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted).   Because it does so "without affording any deference to the Court of International Trade, this court reassesses the administrative record for substantial evidence and for consistency with law." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003) (citation and internal quotation marks omitted).

With respect to scope rulings in particular, the Court will "uphold a Commerce scope ruling that is supported 'by substantial evidence on the record' and otherwise 'in accordance with law.'" *Meridian Prods.*, 851 F.3d at 1381 (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).   In evaluating such a ruling, this Court has emphasized that "Commerce may not . . . interpret the scope of an order contrary to the order's terms or in such a way so as to change the scope of the order." *Glob. Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013). "Commerce's inquiry begins with the Orders' scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation . . . . The question of ***whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo***." *Whirlpool*

*Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (citing *Meridian Prods*, 851 F.3d at 1381–82) (emphasis added). "*De novo*" in this context means review without deference to Commerce's determination. *Accord Litton Sys. v. Honeywell, Inc.*, 87 F.3d 1559, 1566 n.1 (Fed. Cir. 1996), *rev'd on other grounds*, 520 U.S. 1111 (1997) ("By use of the term *de novo*, this court means that it does not defer to the 'lower court ruling or agency decision in question.'") (quoting *Yepes-Prado v. INS*, 10 F.3d 1363, 1367 n.5 (9th Cir. 1993)). The separate "question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence." *Meridian Prods.*, 851 F.3d at 1382.

In sum, this Court affords no deference to the CIT or Commerce when considering whether the scope language of the *Butt-Weld Order* is unambiguous.

## II. COMMERCE'S DETERMINATION THAT WELDED OUTLETS FALL WITHIN THE SCOPE OF THE *BUTT-WELD ORDER* IS CONTRARY TO LAW

As explained below, this Court's precedent requires Commerce to first examine the scope language and make an affirmative finding of ambiguity before resorting to the (k)(1) factors. To determine whether there is such ambiguity, Commerce must refer to the trade usage of certain terms, which involves industry standards. Commerce did not take any of these steps in the *Vandewater Scope Ruling*.

24

Additionally, this Court has affirmed Commerce's explicit citation to and reliance on industry standards when affirming Commerce's finding that certain merchandise falls within the scope of the *Butt-Weld Order*. Because Commerce disregarded relevant trade usage and industry standards applicable to defining "butt-weld," its determination that welded outlets fall within the scope of the *Butt-Weld Order* is contrary to law.

## A.    Commerce Must First Examine the Scope Language and Make a Finding of Ambiguity

As this Court has established, before Commerce may consider the scope language under (k)(1) or (k)(2), it "must first examine the language of the final order" itself. *Mid Continent*, 725 F.3d at 1302 (citing *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005)); *Duferco Steel, Inc. v. United States,* 296 F.3d 1087, 1097 (Fed. Cir. 2002)). This is what the CIT deemed the "(k)(zero) issue." Appx146, Appx4112, Appx4115.

Consequently, this Court has analyzed Commerce's scope decisions along these lines: "[a]lthough we interpreted the scope of the order in light of the petitions and investigations, the cornerstone of our analysis still rested on the language of the order." *Duferco*, 296 F.3d at 1097 (citation omitted). Put differently, the "plain language of a countervailing or antidumping order is 'paramount' in determining whether particular products are included within its scope." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014)

(quoting *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)).

Commerce may only consider the (k)(1) factors if the scope language is ambiguous. *Mid Continent*, 725 F.3d at 1302.

Despite this framework — and its own statements to the contrary — Commerce failed to actually examine the "plain language" of the scope in this case. Specifically, Commerce failed to give meaning to the term "butt-weld." Instead, analyzing the scope and Vandewater's welded outlets in the *Vandewater Scope Ruling*, Commerce stated as follows:

> The products covered by this order are carbon steel ***butt-weld*** pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form" and "[t]hese formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings). . . .

> A plain reading of the scope includes carbon steel ***butt-weld*** pipe fittings that have an inside diameter of fourteen inches or less, which require a weld to be permanently attached to a piping system. Based on Vandewater's description, and the samples provided, the steel branch outlets are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections. Thus, we find that Vandewater's description of its steel branch outlets matches the description of the scope covering butt-weld pipe fittings . . . . The other sources enumerated in 19 CFR 351.225(k)(1) further support Commerce's interpretation of the scope.

Appx132-133, Appx139 (emphasis added, footnote omitted). As evident above, Commerce considered much of the scope language, yet glossed over the term

"butt-weld." That is, Commerce proceeded to discuss "permanent, welded connections" in general, without considering that there are ***non***-butt-weld, permanent welded connections, and then moved on to the (k)(1) factors. *See* Appx138-141. Commerce did not consider the full scope language (*i.e.*, "butt-weld") — which clearly and unequivocally excludes welded outlets from the scope because they have no butt weld — nor did it find any ambiguity. *See* Appx132-133, Appx139. Yet, "Commerce must not 'identify an ambiguity where none exists . . . .'" *Meridian Prods.*, 851 F.3d at 1381 n.6 (quoting *Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 89 (Fed. Cir. 2012)). By failing to examine the scope language and proceeding to a (k)(1) analysis without first finding ambiguity, Commerce acted contrary to law.

## B. Commerce Must Interpret the Terms of ADD Orders Consistent with Trade Usage and Industry Standards

Had it properly examined the scope language of the *Butt-Weld Order*, Commerce would have recognized the centrality of the term "butt-weld" to defining the subject merchandise, and subsequently, that this term has an established trade usage as supported by industry standards.

This is because "antidumping orders should not be interpreted in a vacuum devoid of any consideration of ***the way the language of the order is used in the relevant industry***." *Arcelormittal*, 694 F.3d at 88 (emphasis added). "Because the primary purpose of an antidumping order is to place foreign exporters on notice of

27

what merchandise is subject to duties, the terms of an order should be consistent, to

the extent possible, with trade usage." *Id.*

This Court, the CIT, and Commerce have all followed the above holding

from *Arcelormittal*.  For example, in *Fedmet*, this Court highlighted that petitioner,

Resco:

> . . .  chose to rely on industry terminology to continue to define the
> subject merchandise and the domestic like product.  At the urging of
> Resco, Commerce adopted this industry terminology and defined the
> scope of the orders in terms of "magnesia carbon bricks," . . . .  In this
> case, the terms "magnesia carbon brick" and "magnesia alumina
> carbon brick" are ubiquitous and well-understood in the refractories
> industry.

755 F.3d at 920-21.

The CIT has applied the same standard in other cases, and ruled against

Commerce when that agency has failed to consider trade usage.  *Compare OMG,*

*Inc. v. United States*, 321 F. Supp. 3d 1262, 1269 (Ct. Int'l Trade 2018), *remanded*

*to* 389 F. Supp. 3d 1312 (Ct. Int'l Trade 2019), *aff'd on other grounds* 972 F.3d

1358 (Fed. Cir. 2020) ("Trade usage further supports the conclusion that OMG's

zinc anchors are not nails.") *with Midwest Fastener Corp. v. United States*, 335 F.

Supp. 3d 1355, 1364 (Ct. Int'l Trade 2018), *remanded to* 389 F. Supp. 3d 1384 (Ct.

Int'l Trade 2019), *aff'd on other grounds* 818 Fed. Appx. 1020 (Fed. Cir. 2020)

(unpublished opinion) ("Commerce's determination that anchors are two piece

nails does not reasonably conform to trade usage.").

Indeed, in a number of cases, the CIT has explicitly linked trade usage to industry standards. *See*, *e.g.*, *Viraj Forgings Ltd. v. United States*, 283 F. Supp. 2d 1335, 1341 n.4, 1348–49, 1357 (Ct. Int'l Trade 2003) (explaining that "[s]tandardization, in manufacturing, means establishing 'desirable criteria for the shape, size, quality and other aspects of a product'" and remanding Commerce's conclusion that steel forgings produced according to ASTM standards were similar and comparable to steel flanges produced according to the German *Deutsches Institut fur Normung* ("DIN") standards); *see also Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1242 (Ct. Int'l Trade 2019) ("[T]hreading is a common process in the industry with various standards for different types of thread joints."); *Tai-Ao Aluminium (Taishan) Co. v. United States*, 391 F. Supp. 3d 1301, 1308 n.2 (Ct. Int'l Trade 2019), *remanded on other grounds to* 415 F. Supp. 3d 1391 (Ct. Int'l Trade 2019), *aff'd on other grounds* 983 F.3d 487 (Fed. Cir. 2020) (citing to Aluminum Association guidelines and explaining that the "Aluminum Association is the authority that maintains the standards for the U.S. aluminum industry with respect to aluminum alloy designations, the chemical composition for the alloys, and the approved tempering methods for the different alloys."); *BP Oil Supply Co. v. United States*, 38 C.I.T. 652, 663 (2014) ("The record demonstrates that there are clear differences in recognized industrial standards between many of the types of imported merchandise and the substitute merchandise.").

Put simply, some terms in an ADD order can only have meaning when understood in the context of the industry that actually uses those terms, and consequently, as reflected in the standards promulgated by that industry. This is the fundamental holding of *Arcelormittal*, and is clearly at play when considering the term "butt-weld" in the context of the *Butt-Weld Order*.

Indeed, this is why Commerce — notwithstanding its finding in the *Vandewater Scope Ruling* — has regularly utilized trade usage in the course of trade remedy proceedings. *See*, *e.g.*, *Forged Steel Fittings From the People's Republic of China*, 83 Fed. Reg. 60,396, 60,397 (Nov. 26, 2018) ("The term forged is an industry term used to describe a class of products included in applicable standards and does not reference an exclusive manufacturing process."); *Certain Pasta From Italy*, 78 Fed. Reg. 9,364 (Feb. 8, 2013), accompanying *Issues and Decision Memorandum* at 29 ("Because we strive to identify a universal set of criteria which apply to all respondents in this proceeding, we looked to publicly available information and published industry standards for guidance  . . . .  the industry standard for superior semolina is that its protein content must exceed 12.5 percent."); *Stainless Steel Sheet and Strip in Coils From the United Kingdom*, 64 Fed. Reg. 30,688, 30,707 (June 8, 1999) ("The development of the flat wire exclusion language is reflective of  . . .  a recognized industry publication listing the dimensional characteristics of this product and other stainless steel

products."). Contrary to its practice, Commerce failed to interpret "butt-weld" consistently with trade usage.

In sum, this Court's holding in *Arcelormittal* means that Commerce was obligated to consider the trade usage of the term "butt-weld." Had Commerce conducted such an inquiry, it would have concluded that the term as used in the *Butt-Weld Order* has an unambiguous meaning. *Accord Arcelormittal*, 694 F.3d at 89–90 ("Commerce's broad reading of the SSPC order ***is in conflict with the plain language of the order*** itself, which unambiguously precludes nominal merchandise meeting the specified dimension ***when read in light of industry practice*** regarding delivered products and Commerce's previous decision in *Carbon Steel Plate*.") (emphasis added).

Indeed, consideration of industry terms provides the necessary context and meaning to terms used in an antidumping order. "As the Court of International Trade also observed, '[c]ourts have long recognized the importance of considering context, including industry custom, in interpreting written language.'" *Id.* at 88 (citation omitted). Yet, Commerce failed to consider the trade usage of and relevant industry standard applicable to the term "butt-weld," thereby rendering the *Vandewater Scope Ruling* contrary to law.

This Court's consideration of and reliance on trade usage, including industry standards and terms, is not limited to Commerce antidumping duty orders. The

Court has regularly referenced, or affirmed reference to, trade usage and industry standards when considering cases in other areas of law.   These include tariff classification cases, *see Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1359–61 (Fed. Cir. 2001); *see also Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262, 1263–66 (Fed. Cir. 2004); *Sangamo Capacitor Div. v. United States*, 611 F. Supp. 967, 973 (Ct. Int'l Trade 1985), *aff'd* 779 F.2d 30, 31 (Fed. Cir. 1985); contract law, *see*, *e.g.*, *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1335, 1339–41 (Fed. Cir. 2006); and patent law, *see Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1357, 1367  (Fed. Cir. 2011); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004).   Other circuit courts have done the same.   *See*, *e.g.*, *B Hall Contr., Inc. v. Evanston Ins. Co.*, 273 Fed. Appx. 310, 311–13 (5th Cir. 2008) (unpublished opinion).   This Court has further recognized that procedural and substantive questions arising under one area of the law can be addressed through reference to other areas.   *Cf.*, *e.g.*, *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012); *Transmatic, Inc. v. Gulton Indus.*, 180 F.3d 1343, 1347 (Fed. Cir. 1999); *cf. also United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1330 (Fed. Cir. 2013).

**C.    This Court Has Affirmed Commerce's Reliance on the Same Industry Standard When Affirming Commerce's Finding That Certain Merchandise Falls Within the Scope of the *Butt-Weld Order***

As part of its premature (k)(1) analysis, Commerce relied on a 2009 scope ruling with respect to the *Butt-Weld Order* that was requested by importer King Supply Co. ("King Supply") and concerned fittings "used in ornamental, architectural, and structural applications and . . . not . . . to join sections in piping systems" (the "*King Supply Scope Ruling*").  *See* Appx134-135 (citation omitted). King Supply argued that the second sentence of the scope language ("used to join sections in piping systems") amounted to an end-use limitation, such that its imported fittings, used in other applications, fell outside the scope of the *Butt-Weld Order*.  *See id.*

Commerce rejected this argument, finding that King Supply's imported fittings fell within the scope of the *Butt-Weld Order*.  *See id.*  Discussing this decision in the *Vandewater Scope Ruling*, Commerce noted that this Court upheld its scope ruling with respect to King Supply.  Appx135.  In fact, this Court's opinion in *King Supply* contradicts Commerce's conclusion in the *Vandewater Scope Ruling*.

Specifically, this Court affirmed Commerce's scope ruling in *King Supply* because it found that Commerce "emphasized that not only were King's products physically identical to the products described in the first sentence of the *AD Order*,

33

*but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition*." *King Supply*, 674 F.3d at 1347 (emphasis added). The standards identified in the Petition are "ASTM A234-82a for materials; [and] ANSI B16.9 for dimensions." Appx712; *see also* Appx184, n.28 (explaining that "standard 16.9 refers both to the standard of the [ANSI] and the [ASME]").

Even though Commerce's decision in the *Vandewater Scope Ruling* (relying on *King Supply*), as well as this Court's decision in *King Supply*, were made on the basis of (k)(1) sources (*i.e.*, another scope ruling and the petition, respectively), the centrality of industry standards to those decisions goes to the heart of defining "butt-weld" and is therefore pertinent to the (k)(zero) analysis.

That is, based on this Court's reasoning, if a physically-identical product is produced according to ASTM A234-82a and ANSI B16.9, then it will meet the definition of a butt-weld pipe fitting, and fall within the scope of the *Butt-Weld Order*. The legal basis for this Court's decision, therefore, is that Commerce was reasonable in finding King Supply's products to be within the scope *because* they were physically identical to butt-weld pipe fittings and produced according to ASTM A234-82a and ANSI B16.9. *See King Supply*, 674 F.3d at 1347–51.

It follows that, where a product is neither physically identical to the products described in the *Butt-Weld Order*, nor produced according to these industry

standards, they will fall outside the scope of the *Butt-Weld Order*. That is the case here. As discussed in the Statement of the Case above, welded outlets are neither physically identical nor produced to the same industry standards as butt-weld pipe fittings.

A "principal justification for the administrative state is that 'in areas of limitless factual variations, like cases will be treated alike.'" *Anderson v. United States Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (Ct. Int'l Trade 2006) (quoting *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979); *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 101 (1st Cir. 2002)). Indeed, an "agency determination . . . is *ipso facto* unreasonable, and . . . arbitrary when it . . . treats similar situations in dissimilar ways." *SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2016) (citations, internal quotations, and brackets omitted).

Commerce's determination that the imported welded outlets fall within the scope of the *Butt-Weld Order* is therefore "*ipso facto* unreasonable." This is because Vandewater made clear to Commerce that its imported welded outlets are neither physically identical to butt-weld pipe fittings, nor produced pursuant to ASME B16.9. *See*, *e.g.*, Appx176-177, Appx302, Appx553-554. And, this Court indicated in *King Supply* that, where a product is physically distinct from butt-weld

pipe fittings, and is not produced in accordance with ASTM A234-82a and ANSI B16.9, it cannot fall within the scope of the *Butt-Weld Order*.

The inconsistency between *King Supply* and the *Vandewater Scope Ruling* is dispositive. Commerce may not treat similar situations in dissimilar ways. *See Anderson*, 462 F. Supp. 2d at 1339 ("Agencies have a responsibility to administer their statutorily accorded powers fairly and rationally, which includes not 'treating similar situations in dissimilar ways'") (quoting *Burinskas v. N.L.R.B.*, 357 F.2d 822, 827 (D.C. Cir. 1966)) (internal brackets omitted). As a result, Commerce's expansion of the scope to include Vandewater's welded outlets — despite the explicit language of *King Supply* — makes the *Vandewater Scope Ruling* "*ipso facto* unreasonable." *See SunEdison*, 179 F. Supp. 3d at 1316.

There is no rational reason why the industry standards relevant to one scope ruling would be irrelevant to another scope ruling **pertaining to the same ADD order**. The degree of Commerce's unreasonableness is all the more apparent when considering that the *Vandewater Scope Ruling* contains Commerce's explicit recognition that its decision at issue in *King Supply* was reasonable **because** "King's products **met the same ASTM and ANSI industry standards** as were referenced in the Petition." Appx135 (citation omitted, emphasis added). In other words, Commerce in the *Vandewater Scope Ruling* acknowledges this basis for its earlier decision, upheld by this Court in *King Supply*. Yet, Commerce proceeded

to disregard that basis with respect to Vandewater, despite its awareness that its imported welded outlets were not made in accordance with ANSI/ASME B16.9.

**D.  Commerce Disregarded Relevant Trade Usage and Industry Standards Applicable to the Term "Butt-Weld" in the *Vandewater Scope Decision***

Given that, as explained above:  (1) Commerce must first evaluate the scope language for ambiguity; (2) Commerce must interpret ADD orders consistent with industry usage; and (3) this Court has relied upon trade usage and industry standards to affirm another scope ruling under the *Butt-Weld Order*, it follows that Commerce's determination in the *Vandewater Scope Ruling* was contrary to law. This is evident from the language of the order and the information available to Commerce — above all, Mr. Sperko's expert declarations regarding these products.

In particular, as discussed above, Commerce was aware that in the piping industry a butt-weld pipe fitting must conform to ASME B16.9, while welded outlets must conform to MSS SP-97.  Appx302, Appx554.  Commerce was also aware of the different joints used in these products under the AWS standards. Appx302 Appx555-556.  Despite this evidence, Commerce skipped over the central question of ambiguity, ignored the trade usage and definition of "butt-weld" per industry standards, and proceeded to a (k)(1) analysis, unreasonably concluding that welded outlets are "butt-weld pipe fittings."

Commerce's failure to consider industry standards, trade usage, and the fact that welded outlets do not actually have a butt weld permeated the administrative process. For example, in its remand determination, in which it evaluated the (k)(2) factors, Commerce continued to equate butt-weld pipe fittings with any "permanently welded" connection "into a piping system that conveys gases or liquids[.]" Appx79. However, even "when Commerce conducts this inquiry and analysis according to the strictures of 19 C.F.R. § 351.225(k)(1)&(2), the Department's inquiry still must center on the scope language of the antidumping duty order, for the Department's role in issuing a scope ruling is to interpret, not modify, the scope language." *Diamond Sawblades Manufacturers' Coal. v. United States*, 540 F. Supp. 3d 1338, 1343 (Ct. Int'l Trade 2021) (citing *Duferco*, 296 F.3d at 1095). By determining that any pipe fitting with a "permanently welded" connection is within the scope, Commerce impermissibly expanded the scope contrary to its terms (*i.e.*, contrary to the industry and trade meaning of "butt-weld"). *See*, *e.g.*, *Glob. Commodity Grp.*, 709 F.3d at 1138; *Duferco*, 296 F.3d at 1097 ("[R]eview of the [(k)(1) sources] may provide valuable guidance . . . . But they cannot substitute for language in the order itself.").

The conclusion that welded outlets fall within the scope of the order, despite the fact that they do not have a butt weld, and are made pursuant to different industry standards from butt-weld pipe fittings," violates this Court's holding in

*Arcelormittal*.  *See* 694 F.3d at 88 ("antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry.").  It also disregards relevant precedent referring to technical sources in ascertaining the trade usage or industry definition of a term. *See*, *e.g.*, *Midwest Fastener Corp.*, 335 F. Supp. 3d at 1362–63 ("In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information, including testimony of record.") (citation and internal quotation marks omitted); *OMG, Inc.*, 321 F. Supp. 3d at 1269 ("Multiple industry actors categorize anchors with steel pins as anchors rather than as nails.") (citing Certain Steel Nails from the Socialist Republic of Vietnam: OMG Scope Request: Zinc Anchors at Exs. 5-9.).

Consequently, Commerce's ruling that welded outlets are "butt-weld pipe fittings" is contrary to law.

### E.    Statement Regarding Joinder

Pursuant to Fed. R. App. P. 28(i), Sigma joins and adopts portions of the opening brief of Plaintiff-Appellant Smith-Cooper pertaining to (1) the statement by Smith-Cooper's employee, *see* Appx147; and (2) Commerce's (k)(1) analysis. That is, Sigma joins and adopts the arguments contained in Sections VI.B.4 and VI.C of Smith-Cooper's brief.

Consistent with this Court's holding in *Microsoft Corp. v. DataTern, Inc.*, Sigma has included the word count for those sections of Smith-Cooper's brief when calculating its compliance with the word count requirement as listed on the Form 19 attached to this brief. *See* 755 F.3d 899, 910 (Fed. Cir. 2014) ("We hold that incorporation of co-party briefing is only allowed in consolidated cases as explained in Fed. R. App. P. 28(i) . . . . The incorporated material counts against the litigants' word count in exactly the same manner as if it had been expressly included in the brief.").

*        *        *

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, this Court should:

1)      Vacate the CIT's judgment;

2)      Find that Commerce's determination that welded outlets fall within the scope of the *Butt-Weld Order* is not in accordance with law;

3)      Remand to Commerce with instructions to find that welded outlets are not "butt-weld pipe fittings" (as that term is defined using industry standards) and, as a result, such products are excluded from the scope of the *Butt-Weld Order*; and

4)      Grant Sigma such additional relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Lucius B. Lau*
Walter J. Spak
Lucius B. Lau
Ron Kendler
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant Sigma
Corporation

January 9, 2023

ADDENDUM

*Vandewater International Inc. v. United States*,
589 F. Supp. 3d 1324 (Ct. Int'l Trade 2022)
Slip Op. 22-104
("*Vandewater III*")
Appx1-20

tial evidence. On remand, however, if Commerce continues to add VAT and import duties to the natural gas benchmark, for a product that is not imported, Commerce must also explain why the methodology should be different for the phosphate rock benchmark.

## CONCLUSION

The court sustains Commerce's determination regarding Rosneft as a government authority and the de facto specificity finding, and utilization of a tier-three benchmark for natural gas. For the foregoing reasons, the court remands to Commerce for a determination consistent with this opinion on certain calculation issues and with regard to the phosphate rock input. The remand shall be issued within 60 days hereof. Comments may be filed 30 days thereafter and any response 15 days thereafter.



**VANDEWATER INTERNATIONAL INC., Plaintiff,**

**and**

**SIGMA Corporation, and Smith-Cooper International, Inc., Plaintiff-Intervenors,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Island Industries, Defendant-Intervenor.**

**Slip Op. 22-104**

**Court No. 18-00199**

United States Court of International Trade.

September 8, 2022

**Background:** Importer filed suit, in which other importers intervened, challenging

determination of Department of Commerce that importer's steel branch outlets used to join sections in fire sprinkler systems were within scope of antidumping duty order on carbon steel butt-weld pipe fittings (BWPF) from People's Republic of China. The Court of International Trade, 476 F.Supp.3d 1357, remanded for redetermination. On remand, Commerce again determined outlets were within scope of BWPF order. Plaintiffs challenged redetermination.

**Holdings:** The Court of International Trade, Leo M. Gordon, J., held that:

(1) finding that physical characteristics of outlets and BWPFs subject to order were similar was reasonable, as factor in favor of determination that outlets were within order's scope;

(2) finding that outlets and other BWPF were similarly expected by purchasers to be welded into permanent, fixed piping systems for gases or liquids was reasonable, as factor in favor of determination that outlets were within order's scope;

(3) finding that outlets and BWPF were similarly used to be permanently welded into fire sprinkler systems was reasonable, as factor in favor of determination that outlets were within order's scope;

(4) finding that channels of trade for outlets and BWPF were similar was reasonable, as factor in favor of determination that outlets were within order's scope; and

(5) finding that outlets and BWPF were similarly advertised was reasonable, as factor in favor of determination that outlets were within order's scope.

Affirmed.

**1. Customs Duties ⬅84(6)**

When reviewing agency determinations, findings, or conclusions for substantial evidence, the Court of International Trade assesses whether the agency action is reasonable given the record as a whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⬅21.5(5)**

Finding of the Department of Commerce, that the contoured edges of importer's steel branch outlets that connected to the midsection of a pipe constituted butt-weld pipe fittings (BWPF), was reasonable, as factor that weighed in favor of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce's product specification sheets described its female threaded outlet and grooved outlet as having "butt welding ends," and product catalog from a domestic producer with illustrations of basic shapes of BWPFs included a product that had a contoured edge and was connected to the midsection of a pipe. 19 C.F.R. § 351.225(k)(2)(ii).

**3. Customs Duties ⬅21.5(5)**

Finding of the Department of Commerce, that a butt-weld pipe fitting (BWPF) need not have an end-to-end connection, was reasonable, as factor that weighed in favor of Commerce's determination on remand that importer's steel branch outlets used to join sections in fire sprinkler systems were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; even though Commerce had found in a prior proceeding investigating forged steel fittings from China, Italy, and Taiwan that butt weld fittings could only have butt welded end connections, product catalogs on the record supported the finding that there was a broader understanding of the term "butt-weld," and that BWPFs were intended to be covered by the order. 19 C.F.R. § 351.225(k)(2)(ii).

**4. Customs Duties ⬅21.5(5)**

Finding of the Department of Commerce, that saddles were a type of butt-weld pipe fitting (BWPF) that had physical characteristics comparable to importer's steel branch outlets used to join sections in fire sprinkler systems, was reasonable, as factor that weighed in favor of Commerce's redetermination that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; importer's petition included illustrations of various types of butt-weld fittings including an illustration of saddles as a type of BWPF, catalog page in the petition displayed numerous products that were unambiguously BWPFs, including products shown before and after saddles, and image containing the saddle illustration also contained an image of a cap, which was an in-scope BWPF. 19 C.F.R. § 351.225(k)(2)(ii).

**5. Customs Duties ⬅21.5(5)**

Department of Commerce's consideration of expert report in support of importer's position that its steel branch outlets were not butt-weld pipe fittings (BWPF) was reasonable, in importer's action challenging determination on remand that its outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; even though Commerce did not adopt the position recommended in the report, Commerce repeatedly referenced the report, highlighting that various aspects of the report supported Commerce's ultimate findings, and Commerce explained that it would not place greater weight on the expert report created for the purpose of litigation than the other evidence on the record indicating that outlets were BWPFs. 19 C.F.R. § 351.225(k)(2)(ii).

**6. Customs Duties ⬤21.5(5)**

Finding of the Department of Commerce, that the physical characteristics of importer's steel branch outlets were indistinguishable from butt-weld pipe fittings (BWPF) even though there were separate industry standards governing branch outlets and BWPFs, was reasonable, as factor that weighed in favor of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; outlet standard was a non-exclusive standard with substantial overlap with the BWPF standard, and importer's outlets were physically identical to the products described in the first sentence of the antidumping order. 19 C.F.R. § 351.225(k)(2)(ii).

**7. Customs Duties ⬤21.5(5)**

Finding of the Department of Commerce, that the physical characteristics of importer's steel branch outlets were similar to butt-weld pipe fittings (BWPF) even though importer's outlets were imported under a separate subheading of the Harmonized Tariff Schedule of the United States (HTSUS), was reasonable, as factor that weighed in favor of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce considered the relevance of the different HTSUS classifications, and explained that the outlet's physical characteristics indicated that they were in scope, as outlets were formed or forged, made of carbon steel, had a diameter of less than 14 inches, and had one butt-welded end with a beveled edge. 19 C.F.R. § 351.225(k)(2)(ii).

**8. Customs Duties ⬤21.5(5)**

Department of Commerce's finding, that importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similarly expected by purchasers to be welded into permanent, fixed piping systems for gases or liquids, was reasonable, as factor that weighed in favor of Commerce's determination on remand that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce found that, although certain types of BWPFs could be designed to handle high-pressure systems, fire protection sprinkler systems were a contemplated application of BWPFs, which was the intended application for importer's outlets, and importer acknowledged that some sprinkler systems could use BWPFs for run pipes, to which branch connections were attached. 19 C.F.R. § 351.225(k)(2)(ii).

**9. Customs Duties ⬤21.5(5)**

Department of Commerce's finding, that importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similarly used to be permanently welded into fire sprinkler systems, was reasonable, as factor that weighed in favor of Commerce's determination on remand that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; International Trade Commission found that BWPFs were commonly found in automatic fire sprinkler systems, and Commerce determined that even if outlets and other BWPFs did not have identical functions, the uses of outlets and other BWPFs were similar, as they both were permanently welded into automatic fire sprinkler systems to change or divide the flow of water. 19 C.F.R. § 351.225(k)(2)(ii).

**10. Customs Duties ⬤21.5(5)**

Department of Commerce's finding, that the channels of trade for importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similar, was reasonable, as factor that weighed in favor of Commerce's determination on remand

that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; even though importer's outlets were used to join sections in fire sprinkler systems, and were typically sold to a particular type of contractor given their targeted application, both outlets and other BWPFs were sold through distributors and to fabricators and contractors. 19 C.F.R. § 351.225(k)(2)(ii).

**11. Customs Duties ⟜21.5(5)**

Department of Commerce's finding, that importer's steel branch outlets and other butt-weld pipe fittings (BWPF) were similarly advertised via online catalogs in company websites or affiliated or third-party online sources, was reasonable, as factor that weighed in favor of Commerce's redetermination that importer's outlets were within scope of antidumping duty order on carbon steel BWPFs from People's Republic of China; Commerce found that outlets were explicitly referenced in advertising materials as having butt-weld ends and were displayed side by side, and even though certain advertisements for outlets did not contain the term "butt-weld ends," record showed that the term "butt-weld" was not a standard term nor commonly used, and, therefore, was not used in certain advertisements. 19 C.F.R. § 351.225(k)(2)(ii).

**12. Customs Duties ⟜84(1)**

Intervenor-importer forfeited for review argument that government should not be able to apply antidumping duties to welded steel branch outlets contained in entries that were previously suspended for reasons unrelated to petitioner-importer's challenge to Department of Commerce's determination on remand that outlets were within scope of antidumping duty order on carbon steel butt-weld pipe fittings (BWPF) from People's Republic of China; intervenor raised argument for the first time in the context of responding to petitioner's consent motion to amend its statutory injunction, but argument did not appear in intervenor's remand comments, and were not raised before Commerce in the course of the remand.

———

Richard P. Ferrin, D. Alicia Hickok, and Douglas J. Heffner, Faegre Drinker Biddle & Reath, LLP of Washington, D.C., for Plaintiff Vandewater International, Inc.

Lucius B. Lau, Walter Spak, and Ron Kendler, White & Case LLP of Washington, D.C., for Plaintiff-Intervenor SIGMA Corporation.

Gregory S. McCue and Zachary Simmons, Steptoe & Johnson LLP of Washington, D.C., for Plaintiff-Intervenor Smith-Cooper International, Inc.

Joshua E. Kurland, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant United States. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel was Saad Y. Chalchal, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, D.C.

Matthew J. McConkey, Mayer Brown LLP of Washington, D.C., for Defendant-Intervenor Island Industries.

**OPINION**

GORDON, Judge:

This action involves the scope of the antidumping duty order on Carbon Steel

Butt-Weld Pipe Fittings ("BWPFs") from the People's Republic of China that covers:

carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("China BWPFs Order"). Plaintiff Vandewater International Inc. ("Vandewater") sought a scope ruling from the U.S. Department of Commerce ("Commerce") as to whether its products, steel branch outlets used to join sections in fire sprinkler systems, were covered by the China BWPFs Order. Commerce determined that these products were within the scope of the China BWPFs Order. See Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, ECF No. 25-4 (Dep't of Commerce Sept. 10, 2018) (final scope ruling on Vandewater's steel branch outlets) ("Final Scope Ruling"). Plaintiff-Intervenors SIGMA Corporation ("SIGMA") and Smith-Cooper International, Inc. ("SCI") similarly sought scope rulings from Commerce excluding their respective outlet products from the

China BWPFs Order. And, as with Vandewater, Commerce determined that SIGMA and SCI's outlet products were covered by the China BWPFs Order. See Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, Court No. 19-00003, ECF No. 29-4 (Dep't of Commerce Dec. 11, 2018) (final scope ruling on SIGMA's fire-protection weld outlets); Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, Court No. 19-00011, ECF No. 29-4 (Dep't of Commerce Dec. 10, 2018) (final scope ruling on SCI's cooplet weld outlets). Plaintiffs collectively now challenge Commerce's determinations that their respective outlet products fall under the scope of the China BWPFs Order.[1]

The court presumes familiarity with the history of this action. See Vandewater Int'l, Inc. v. United States, 44 CIT ——, 476 F. Supp. 3d 1357 (2020) ("Vandewater I"). In Vandewater I, the court held that "Commerce unreasonably concluded that the sources in 19 C.F.R. § 351.225(k)(1) were dispositive on the inclusion of Plaintiff's steel branch outlets within the Order," and remanded the matter to Commerce "to conduct a full scope inquiry and evaluate the factors under 19 C.F.R. § 351.225(k)(2)." Vandewater I, 44 CIT at ——, 476 F. Supp. 3d at 1359.

Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 112 ("Remand Results"), filed pursuant to Vandewater I. On remand, Commerce "continue[d] to find that Vandewater's outlets are within the scope of the China BWPFs Order pursuant to an analysis under the (k)(2) criteria." See Remand Results at 2. Plaintiffs

---

**1.** Plaintiffs all commenced their own individual actions—Vandewater (Court No. 18-00199); SIGMA (Court No. 19-00003); and SCI (Court No. 19-00011). Because each action had its own administrative record, the court did not consolidate the three actions. However, for litigation efficiency, the court permitted SIGMA and SCI to intervene in this action and brief the merits.

challenge that determination. See Comments of Vandewater in Opp'n to Commerce's Remand Redetermination, ECF No. 133 ("Vandewater Comments"); SIGMA's Comments in Opp'n to Remand Results, ECF No. 132 ("SIGMA Comments"); Comments of SCI in Opp'n to Commerce's Remand Redetermination, ECF No. 134 ("SCI Comments"); see also Defendant's Response to Comments on the Remand Results, ECF No. 144 ("Def.'s Resp."); Defendant-Intervenor's Response to Comments on the Remand Results, ECF No. 146. SCI's comments focused on challenging as unlawful Commerce's determination that it would "continue" to suspend liquidation of Plaintiffs' entries that pre-date the initiation of the underlying scope inquiry. See SCI Comments at 2–14. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi)[2], and 28 U.S.C. § 1581(c) (2018). For the reasons set forth below, the court sustains Commerce's analysis and scope determination in the Remand Results.

## I. Standard of Review

**[1]** The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the

record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Dupont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131, (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2022). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022).

## II. Discussion

### A. Framework of 19 C.F.R. § 351.225(k)

Scope proceedings are governed by 19 C.F.R. § 351.225. Commerce may self-initiate a scope proceeding, see § 351.225(b), or an interested party may submit a request for a scope ruling, see § 351.225(d). In determining whether a product is covered by the scope of an order, Commerce will consider the "language of the scope and may make its determination on this basis alone if the language of the scope, includ-

---

**2.** Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of

Title 19 of the U.S. Code, 2018 edition.

ing the descriptions of the merchandise expressly excluded from the scope, is dispositive." 19 C.F.R. § 351.225(k)(1). Additionally, Commerce may consider the following interpretive sources in making its determination—the descriptions of the merchandise contained in the petition pertaining to the subject order, the initial investigation, and Commerce's prior or concurrent determinations, including prior scope determinations pertaining to the subject order, and other orders with similar language, and determinations of the U.S. International Trade Commission ("ITC") regarding the subject order. § 351.225(k)(1)(i). If the (k)(1) sources are not dispositive, then Commerce is to conduct a full scope inquiry and consider the additional criteria in § 351.225(k)(2)—namely, (1) the product's physical characteristics, (2) ultimate purchasers' expectations, (3) the ultimate use of the product, (4) trade channels in which the product is sold, and (5) the manner in which the product is advertised and displayed. § 351.225(k)(2). At the conclusion of its scope inquiry, Commerce will issue a final scope ruling. § 351.225(h). As noted previously, the court, in Vandewater I, rejected Commerce's determination that the (k)(1) sources were dispositive, and directed Commerce to conduct a full scope inquiry and evaluate the additional criteria provided under § 351.225(k)(2). See Remand Results at 9–10.

## B. Commerce's Analysis Under 19 C.F.R. § 351.225(k)(2)

After evaluating the (k)(2) criteria, Commerce determined that Vandewater's steel branch outlets are sufficiently similar to unambiguous examples of subject merchandise and that the record supported the determination that Vandewater's products fell within the China BWPFs Order. See Remand Results at 45–96. Specifically, Commerce found that:

(i) steel branch outlets possess physical characteristics that are similar to other subject merchandise because they are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and are designed to have at least one end with a beveled edge for permanent attachment to a pipe or fitting (id. at 45–54);

(ii) the expectations of ultimate purchasers of steel branch outlets and other subject merchandise are similar because they expect both to be welded into permanent, fixed piping systems for gases or liquids, and fire sprinkler systems are a contemplated application for subject merchandise (id. at 54–57);

(iii) the ultimate uses of steel branch outlets and other subject merchandise are similar because both are permanently welded to piping systems to change or divide the flow of liquids, e.g., redirecting water in an automatic fire sprinkler system (id. at 58–60);

(iv) steel branch outlets and other subject merchandise are sold in similar channels of trade because they are both sold through distributors and to fabricators and contractors (id. at 60); and

(v) steel branch outlets and other subject merchandise are similarly advertised and displayed in online catalogs (id. at 60–62).

Plaintiffs challenge Commerce's findings on each of the (k)(2) criteria as unreasonable. See Vandewater Comments; SIGMA Comments; SCI Comments.

### 1. Physical Characteristics

Commerce found that "the physical characteristics of outlets and BWPFs subject to the China BWPFs Order are similar." Remand Results at 45. Specifically, Commerce concluded that the scope language in the China BWPFs Order "indicates that subject merchandise must be

formed or forged, made of carbon steel, and have a diameter of less than 14 inches." Id. Commerce further found that "to be an in-scope 'butt-weld pipe fitting,' the merchandise must be designed to have at least one end with a beveled edge, whether contoured or not, for permanent attachment to at least one pipe or fitting and may have a temporary connection on another end." Id. Based on the record, Commerce determined that Vandewater's outlets meet these criteria. Id. at 46 ("the record demonstrates that Vandewater's outlets are consistent with BWPFs in terms of manufacturing method (i.e., formed/forged), material (i.e., carbon steel forged steel bars or welded pipe), and size requirements (i.e., less than 14 inches in inside diameter). Like all BWPFs, the outlets feature a beveled edge for permanent attachment to a pipe or fitting.").

Plaintiffs argue that the physical characteristics of subject BWPFs are distinct from Vandewater's outlets. Plaintiffs focus much of their argument, both in the proceeding below and in this action, on the differences between the physical characteristics of their outlets and the subject BWPFs, as this prong of the (k)(2) analysis is critical. See 19 C.F.R. § 351.225(k)(2)(ii) (providing that "[i]n the event of a conflict between the factors under paragraph (k)(2)(i) of this section, [the physical characteristics factor] will normally be allotted greater weight than the other factors").

**a. End-to-End Connection**

Plaintiffs first contend that a "butt weld is—by definition—an end-to-end welded connection," and maintain that Commerce cannot reasonably defend its finding that "contoured edges that connect to the mid-section of a pipe [constitute] butt-weld pipe fittings." See Vandewater Comments at 3, 11. Plaintiffs further maintain that Commerce disregarded evidence supporting

the conclusion that a BWPF is "intended to be an end-to-end connection." See id. at 9–11. They emphasize that information in the Petition, as well as the ITC's 2016 Sunset Review of the China BWPFs Order, supports their position. Id.; see also Vandewater I, 44 CIT at ——, 476 F. Supp. 3d at 1362 (agreeing with Plaintiffs that product descriptions of covered merchandise from 2016 ITC Sunset Review and Petition, particularly as to "beveling on both parts of the assembled piping," did not reasonably support Commerce's conclusion that (k)(1) sources dispositively demonstrated that steel branch outlets are covered by China BWPFs Order). With respect to the product catalogs and specification sheets relied on by Commerce, Plaintiffs argue that this "out-of-context" information cannot serve as a reasonable basis for Commerce's conclusion that BWPFs do not require end-to-end connections. Id. at 11–15. Plaintiffs stress that various distinctions in the wording and description of outlets as compared to BWPFs demonstrate that the sources relied upon by Commerce cannot reasonably provide a "sufficient basis for determining the meaning of a 'butt-welded' pipe fitting, as found within the scope." Id. at 12.

Plaintiffs also dispute Commerce's reading of the term "butt-weld" in those sources, maintaining that off-hand references to the term "butt-weld" is not indicative of industry recognition that outlets are BWPFs that would fall under the scope of the China BWPFs Order. Id. at 12–14. Ultimately, Plaintiffs ask the court to hold that Commerce erred in determining the meaning of "butt-weld" (i.e., that BWPF may have a "contoured edge that connects [the product] to the midsection of the header or run pipe") on the basis of an inference from the use of that term in product catalogs and specification sheets found in the record. Instead, Plaintiffs

would have Commerce determine that a BWPF may only involve an "end-to-end connection" on the basis of a reasonable inference from other information on the record, including the offered opinion of an expert submitted by Vandewater and the findings by the ITC in its 2016 Sunset Review. Id.

[2]  In rejecting Plaintiffs' arguments, Commerce found that "the record evidence establishes that products with a contoured edge that are designed to connect to the mid-section of a pipe can be BWPFs." Remand Results at 47. Specifically, Commerce found that "[i]n its product specification sheets, Aleum USA, a U.S.-based distributor of outlets, describes its female threaded outlet and grooved outlet as having "[b]utt welding ends." Id. (further noting that "[l]ike Vandewater's outlets, Aleum USA's outlets have one threaded or grooved end and a contoured edge on the other end that is connected to the middle of another pipe."). Commerce also highlighted that "[t]he exhibits accompanying the Petition included a product catalog from a U.S. producer of the domestic like product with illustrations of basic shapes of BWPFs (under the heading 'seamless welded fittings') and among them is a product that is referred to as a saddle, which, like Vandewater's outlets, has a contoured edge and is connected to the midsection of a pipe." Id. (adding that "the current version of the same U.S. producer's product catalog continues to include saddles as a type of 'seamless welded fitting,' and the product is displayed side-by-side with a full range of other BWPFs" and that "the product catalog for a major U.S. distributor of pipes and fittings also includes a saddle as one of the various 'standard butt weld fitting types.' "). Consequently, Commerce determined that "the contoured edge that connects Vandewater's outlets to the midsection of the head-

er or run pipe is not a physical characteristic that distinguishes the outlets from BWPFs that are subject to the scope of the China BWPFs Order, such as saddles." Id. at 48. Given the record, the court cannot agree with Plaintiffs that Commerce's determination here was unreasonable.

Plaintiffs further contend that Commerce failed to appreciate the importance of the angle of the beveled edges in analyzing the physical characteristics of subject outlets and BWPFs. See Vandewater Comments at 11 (arguing that BWPFs are required to have end-to-end connections that "impact[ ] the very shape of the fitting itself, requiring ends that are beveled at a 37.5 degree angle"). To the contrary, Commerce found that the China BWPFs Order contains no specifications as to any particular bevel angle for subject BWPFs. Remand Results at 48.

Plaintiffs now argue that Commerce's reasoning is "detached from reality and the record evidence." Vandewater Comments at 11. The court disagrees. While Commerce agreed that the "Petition and prior ITC determinations state that the beveled edges of BWPFs distinguish BWPFs from other pipe fittings," Commerce highlighted that "none of these sources indicate that the edge must be beveled at a particular angle for the fitting to be considered a BWPF." Remand Results at 48. Commerce explained that adopting Plaintiffs' suggestion that a BWPF requires a specific bevel angle for proper installation would result in an "end-use requirement for subject merchandise" that would inappropriately be based on the "physical characteristics of the recipient pipe, rather than on the physical characteristics of the outlets in question." Id. at 49. Since Plaintiffs ultimately fail to demonstrate that Commerce's determination is unreasonable, the court rejects their arguments that Commerce did not reasonably

account for the importance of the bevel angle in analyzing the subject outlets and BWPFs.

### b. Forged Steel Fittings Comparison

Plaintiffs further maintain that Commerce's finding that a BWPF need not have an end-to-end connection is unreasonable in light of Commerce's finding in a prior proceeding that "butt weld fittings can only have butt welded end connections." See Vandewater Comments at 15–16 (quoting final scope decision memorandum from investigations of Forged Steel Fittings from China, Italy, and Taiwan, PR [3] 21 at Tab 8 (Dep't of Commerce July 13, 2018)). As Commerce explained, to qualify as "butt weld outlets" or "butt weld fittings" that would be excluded from the scope of the Forged Steel Fittings investigations, "butt weld outlets must be butt welded at both end connections to be excluded from the scope of the investigations." Id. at 15 (further quoting with emphasis Commerce's statement that "[o]utlets with a socket-weld or threaded end connection, or with only one butt weld end connection, are not considered a butt weld fitting and, therefore, are not excluded from the scope of the investigations"). Plaintiffs maintain that Commerce's "detailed discussion" of the nature of butt weld fittings in that prior scope memorandum "should be the end of the matter" as "Vandewater's grooved and threaded welded outlets are not butt-weld pipe fittings because their end connections on the run side are grooved or welded, not butt-weld end connections." Id. at 16.

**[3]** Plaintiffs' argument falls short, however, because the scope exclusion guidelines Commerce determined in the Forged Steel Fittings investigation do not neatly correspond to the scope of products

covered under the China BWPFs Order. See Remand Results at 85 n.539 (noting that "construction of an exclusion in a separate proceeding is not determinative here" and further finding "that Vandewater's outlets do, in fact, feature a butt-welded connection to the run pipe."). As Plaintiffs acknowledge, Commerce found that products such as caps and lap joint stub ends, which would not meet the narrow definition of BWPFs under the Forged Steel Fittings exclusion guidelines, nevertheless are plainly within the scope of the China BWPFs Order. See Vandewater Comments at 16–17.

Plaintiffs argue that Commerce may not differ in defining what constitutes BWPFs in its Forged Steel Fittings analysis versus the (k)(2) analysis here. However, that argument ignores the different purposes and records undergirding the two analyses. As Commerce noted, accepting Plaintiffs' narrow definition of BWPFs and strictly abiding by the Forged Steel Fittings analysis would require it to ignore the product catalogs on the record that plainly support the finding that there is broader understanding of the term "butt-weld" and BWPFs intended to be covered by the China BWPFs Order. See Remand Results at 85. Accordingly, Commerce's analysis of butt weld fittings in the Forged Steel Fittings investigations does not control here, nor did Commerce act unreasonably in determining a broader definition for BWPFs in this matter than was used to determine scope exclusions in the Forged Steel Fittings investigations.

### c. Product Comparisons

Much of the parties' disagreement about physical characteristics stems from Commerce's comparison of the subject outlets to other products described in the record

---

**3.** "PR ___" refers to a document contained in the public administrative record, which is

found in ECF No. 131-1 unless otherwise noted.

that appear to be covered as BWPFs by the China BWPFs Order, including caps, lap joint stub ends, and saddles. See Remand Results at 83–89 ("We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles)."). Though Plaintiffs maintain that various physical characteristics of outlets make them unique from BWPFs, Commerce addressed each potentially distinguishable physical characteristic raised and found that other products covered by the China BWPFs Order also had the physical characteristics that Plaintiffs claimed were exclusive to outlets and not found in BWPFs. Commerce explained why it rejected Plaintiffs' preferred findings, noting that:

> this line of argument, downplaying the similarity between outlets and caps, for instance, reflects a broader flaw in the importers' arguments throughout their comments – they continue to attempt to artificially narrow the scope of the China BWPFs Order by pointing to subsets of subject merchandise (or subsets of uses/expectation, as discussed below) in their analysis. This is incorrect. In our (k)(2) analysis, we must assess physical similarities between outlets and other in-scope merchandise; this includes cap, lap joint stub ends, elbows, and the variety of fittings that fall within the greater heading of BWPFs.

Remand Results at 88.

[4] In their remand comments, Plaintiffs continue to attempt to distinguish sub-ject outlets from caps, lap joint stub ends, saddles, and other similar products considered to be BWPFs based on their physical characteristics, see Vandewater Comments at 16–17, while maintaining that Commerce erred in assuming saddles to be BWPFs. Id. at 17–18 ("While it is dispositive that Vandewater's threaded and grooved outlets have zero connections capable of being butt welded, it merits emphasis that a saddle is not a butt-weld pipe fitting.").[4] In arguing that saddles are not a type of BWPF, Vandewater focuses on the distinct "function" of saddles from other BWPFs. In so doing, Vandewater fails to engage with evidence on the record plainly supporting Commerce's finding that saddles are a type of BWPF. See, e.g., Remand Results at 47 n.335 (noting that Petition identifies that "Butt-weld fittings come in several basic shapes: 'elbows', 'tees', 'caps', and 'reducers' . . . Illustrations of the various types of butt-weld fittings are attached at Appendix B," and that Appendix B includes "an illustration of 'saddles' as a type of BWPF"). Commerce specifically explained that it disagreed with "Vandewater['s assertion] that saddles are not BWPF, and that it was merely coincidence that the image of a saddle was included among BWPFs in the petition." Id. (explaining that "[t]he catalog page in the Petition displays numerous products that are unambiguously BWPFs, including products shown before and after saddles, e.g., elbows," and further noting that "the subsection of the image containing the saddle illustration also contains an image of a cap, which is clearly an in-scope BWPF."). In light of the record, the court concludes that Commerce reasonably iden-

---

**4.** Notably, here there appears to be some disagreement between Vandewater and SIGMA that saddles may constitute BWPFs. Vandewater maintains that saddles are not BWPFs, while SIGMA acknowledges that saddles are BWPFs, but does not agree that any physical similarities between outlets and saddles reasonably justifies a finding that outlets share the same physical characteristics as BWPFs. See Vandewater Comments at 17–18; SIGMA Comments at 7–8.

tified saddles as a type of BWPF that has physical characteristics comparable to the subject outlets.

### d. Sperko Report

**[5]** Plaintiffs also contend that Commerce failed to fully consider the report of Walter Sperko, President of Sperko Engineering Services, Inc., who provided his expert opinion in support of Plaintiffs' position that the subject outlets are not BWPFs. See Vandewater Comments at 3–9; Remand Results at 27 n.185 (identifying Mr. Sperko). Plaintiffs maintain that "Commerce's disregard of the substance and sources relied on in the Sperko Declaration, except for ... two offhand and inaccurate references ... show that Commerce's conclusion was not based on substantial evidence." Vandewater Comments at 9; see also SIGMA Comments at 7 ("the Redetermination contains no meaningful discussion of the expert report of Walter Sperko, P.E. – to which SIGMA, Vandewater, and SCI all cited in their comments prior to Commerce's issuance of the remand."). Plaintiffs' arguments, however, do not address other evidence on the record that supports Commerce's determination. As Commerce explained:

> Ultimately, the importers ask us to ignore the product catalog of Aleum USA and Bonney Forge (the latter of which was placed on the record by Vandewater) and to place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit placed on the record for the purpose of this litigation. We decline to do so, and we note that Commerce regularly considers whether documents are prepared in the ordinary course of business—or prepared specifically for the administrative proceeding—in determining the appropriate weight to accord to record evidence. Moreover, as discussed elsewhere in these final results, we find

that portions of the affidavits support our conclusion regarding the scope status of Vandewater's outlets.

Remand Results at 85–86. While Plaintiffs criticize Commerce for failing to adopt the position recommended by Mr. Sperko, the court does not agree that Commerce "disregarded" or otherwise failed to consider the information in the Sperko report. See Vandewater Comments at 4 n.2 (arguing that "Commerce addresses the Sperko Declaration only superficially in footnote 542 ..."). Rather, it appears that Commerce repeatedly referenced the Sperko report, highlighting that various aspects of the report actually supported Commerce's ultimate findings on the factors. See, e.g., Remand Results at 49, 86, 88, 91.

As noted above, Commerce refused to afford dispositive weight to Mr. Sperko's views, explaining that the agency would not "place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit placed on the record for the purpose of this litigation" than on the other evidence on the record. Id. at 85–86. Plaintiffs maintain that Commerce unreasonably failed to credit Mr. Sperko's affidavit, despite its preparation in anticipation of litigation, as such a rationale is "inconsistent with Federal Rule of Evidence 702." See Vandewater Comments at 4–6. Plaintiffs offer no explanation, however, for why or how the Federal Rules of Evidence apply to Commerce's administrative determinations or its discretionary decision-making in determining the appropriate weight to accord the evidence on the record. See id. at 5 n.3 ("Although F.R.E. 702 is not binding on the factfinder here (Commerce), the underlying principles should guide Commerce, and this Court in its role in vetting Commerce's fact-finding for substantial evidence."). Accordingly, the court sustains

Commerce's consideration of the Sperko report.

### e. Industry Standards

Vandewater argues that "[t]hroughout the administrative proceeding, Vandewater has consistently emphasized that a critical difference between outlets and butt-weld pipe fittings is that outlets meet the MSS-SP-97 industry standard, which is different from the ANSI/ASME B16.9 specification that governs butt-weld pipe fittings." Vandewater Comments at 18–19. Commerce rejected Plaintiffs' proposed distinction of outlets from in-scope BWPFs on the basis of these different industry standards, finding that adopting Plaintiffs' position would give "undue significance" to these industry standards. See Decision Memorandum at 91. Commerce further noted that "MSS SP-97 is a 'non-exclusive standard' and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME." Id. at 94. Commerce emphasized that it found the two standards at issue to "reflect substantial overlap in terms of attributes, and in turn expectations, for outlets and BWPFs." Id. at 91.

Plaintiffs maintain that Commerce's conclusion that a product could conform to both ANSI/ASME B16.9 and MSS SP-97 standards "would render those standards meaningless," and is therefore unreasonable. See Vandewater Comments at 20; SIGMA Comments at 3–7 ("Industry standards exist to define distinct products; the idea that a product could conform to multiple industry standards, thereby re-categorizing that product, would effectively render those standards meaningless."). Plaintiffs also highlight that Commerce has previously relied on distinctions in industry standards for excluding products from the China BWPFs Order. See SIGMA Comments at 5 (noting that "the CAFC has affirmed Commerce's reliance

on discrete industry standards in a separate scope proceeding concerning the exact same order as the one at issue in this appeal" (citing King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012))).

[6] The court again disagrees. Plaintiffs' arguments reflect an unwillingness to engage with Commerce's uncontradicted finding that the MSS SP-97 is a "non-exclusive standard" with "substantial overlap" of the ANSI/ASME B16.9 standard. Though Plaintiffs are correct that Commerce has relied on industry standards as one relevant consideration in concluding that certain products should be included under the China BWPFs Order, Plaintiffs ignore the fact that Commerce also found that the merchandise at issue to be "physically identical to the products described in the first sentence of the [China BWPFs Order]." See SIGMA Comments at 5 (quoting King Supply Co., LLC, 674 F.3d at 1347). Additionally, while King Supply supports the proposition that Commerce does consider industry standards in reaching its determinations as to the scope of the China BWPFs Order, it does not support Plaintiffs' follow-on proposition that products that do not fall within the industry standards should automatically be excluded from the China BWPFs Order. See id. at 6 (arguing that "[i]t follows that, where a product is neither physically identical to the products described in the Order, nor produced according to these industry standards, it will not fall within the scope of the Order."). Ultimately, Plaintiffs urge the court to conclude that Commerce should have reached a different conclusion based on an inference that the different industry standards serve to establish distinct product categories. Commerce refused to draw Plaintiffs' preferred inference, and instead determined that the "substantial overlap" in the similarities of

those standards did not support a distinction between the subject outlets and BWPFs. Decision Memorandum at 91, 94.

Plaintiffs offer what may well be a reasonable conclusion. This issue presents a close question. However, for Plaintiffs to establish that Commerce's analysis of the physical characteristics of BWPFs and outlets was unreasonable, they must demonstrate that their preferred outcome was the "one and only reasonable" conclusion Commerce could reach in light of the record. See Pokarna Engineered Stone Ltd. v. United States, 45 CIT ——, ——, 547 F. Supp. 3d 1300, 1308 (2021) ("A party's ability to point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination."); see also Mitsubishi Heavy Indus. Ltd. v. United States, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (quoting Consolidated Edison, Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). This Plaintiffs did not do. Accordingly, the court cannot agree that Commerce unreasonably rejected Plaintiffs' arguments seeking to distinguish outlets from BWPFs based on industry standards.

**f. HTSUS Subheadings**

Plaintiffs also challenge Commerce's finding that their outlets and BWPFs have similar physical characteristics even though their outlets are imported under a separate HTSUS subheading from BWPFs. See Remand Results at 54. Commerce first noted that "HTSUS subheadings listed in the scope are not dispositive." Id. (citing Smith Corona Corp. v. United States, 915 F.2d 683, 687 (Fed. Cir. 1990), as well as the language of the China BWPFs Order stating: "Although the

{HTSUS} subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive"). Commerce further explained that it did consider this distinction in HTSUS classifications in its analysis, but ultimately found that "the mere fact that Vandewater's outlets are imported under a different subheading within the same chapter and heading of the HTSUS as the subheading listed in the scope does not necessarily require Commerce to conclude that the outlets have physical characteristics that are distinguishable from subject merchandise." Id. While Commerce acknowledged that Plaintiffs' position was supported by a prior Customs Ruling, it determined that "in light of our broader analysis regarding physical characteristics of in-scope merchandise – including the characteristics of Vandewater's outlets in particular – [the] ruling does not warrant arriving at a different conclusion here." Id. Plaintiffs maintain that the HTSUS classifications are "corroborating evidence that confirms" the correctness of their position that outlets are outside of the scope of the China BWPFs Order. See Vandewater Comments at 22. Thus, in Plaintiffs' view, Commerce unreasonably "disregard[ed]" the different HTSUS classifications in conducting its (k)(2) analysis. Id.

[7] Plaintiffs' argument is not sustainable. Commerce expressly acknowledged that it considered the relevance of the different HTSUS classifications but concluded that this distinction was insufficient in light of the totality of the record to support a determination that "the outlets have physical characteristics that are distinguishable from subject merchandise." See Remand Results at 54. In reaching its conclusion, Commerce explained that "with respect to physical characteristics, we find that Vandewater's outlets are formed or

forged, made of carbon steel, have a diameter of less than 14 inches, and have one butt-welded end with a beveled edge suitable for permanent attachment to a piping system that conveys gas or liquid. We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles)." Remand Results at 89. Thus, given the record, the physical characteristics factor supports the reasonableness of Commerce's scope determination.

**2. Expectations of Ultimate Purchasers**

Commerce found that "the ultimate purchaser's expectations regarding the uses of outlets and other BWPFs are similar." Remand Results at 55. Specifically, Commerce observed that "[b]oth outlets and BWPFs are used in fire sprinkler systems (among other types of piping systems), are subject to similar, and in some cases overlapping, industry standards, and are sold according to standard sizes." Id. at 57. Commerce also determined that "the record does not reveal that customers would have a significantly different expectation regarding the installation costs for outlets and BWPFs." Id. During the remand, Plaintiffs challenged the reasonableness of these findings, highlighting "four main expectations of ultimate purchasers that purportedly differ across the products: (1) compliance with a particular industry standard; (2) custom vs. standard sizing; (3) whether the product can be used in fire sprinkler systems; and (4) installation costs." Id.

Contrary to Plaintiffs' argument, Commerce found consistency across the expectations of ultimate purchasers of outlets and other BWPFs. Specifically, Commerce noted that "[o]utlets and other BWPFs

are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems." Id. at 90. Commerce further observed that "the fact that Vandewater's outlets have a temporary connection on one end is not a feature that distinguishes outlets from other in-scope merchandise, and, therefore, does not change consumer's expectations regarding the product." Id. Commerce also rejected Vandewater's argument that Commerce should defer to the opinion of Vandewater's expert witness, Walter Sperko, "rather than the other sources on the record, such as the ITC report, to ascertain the expectations of consumers and users." Id. As noted previously, Commerce refused to afford significant weight to the expert opinion affidavit submitted by Vandewater, explaining that Commerce did not "find that the affidavit represents more reliable evidence than other record evidence . . . ." Id.

Plaintiffs now challenge Commerce's finding that "[o]utlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids," as unreasonable. See Vandewater Comments at 23 (quoting with emphasis Remand Results at 90). In particular, Vandewater contends that the record "demonstrates conclusively that Vandewater's outlets are used only for functions in which its customers do not want and cannot use permanent connections." Id. Vandewater further argues that "[t]he reason that outlets are used, and the reason that lower pressure is necessary, is because the outlets are used for functions such as sprinkler heads, which must be capable of removal and replacement. Butt-weld pipe fittings cannot be used for those functions." Id.

[8] The court disagrees with Plaintiffs that Commerce's findings on this factor

are unreasonable. Commerce concluded that the record did not support Vandewater's arguments. Rather, it found that "[a]lthough certain types of BWPFs may be designed to handle high-pressure systems, fire protection sprinkler systems are a contemplated application of BWPFs. This is the intended application for Vandewater's product. Therefore, we find that outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems." Remand Results at 56. While Plaintiffs urged Commerce to focus on the prevalence of BWPFs in high pressure systems rather than low-pressure sprinkler systems, Commerce highlighted that "Vandewater itself acknowledges that '[s]ome sprinkler systems may, however, use butt-weld pipe fittings for the run pipes, to which the branch connections are attached.'" Id. As a result, Commerce reasonably found that Plaintiffs were "simply incorrect that BWPFs are used exclusively in high-pressure settings, while outlets are used in distinct, low-pressure piping systems." Id. at 56.

### 3. Ultimate Use

Commerce determined that "the uses of Vandewater's outlets and other BWPFs are similar." Id. at 58. Specifically, Commerce noted that "Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs subject to the scope of the China BWPFs Order. Furthermore, even though Vandewater emphasized that its outlets are designed for fire sprinkler systems, Vandewater acknowledges that other outlets with physical characteristics that are similar to its outlets are used in a range of applications, including those that the importers identify as fundamental BWPF uses, e.g., piping

connections used in the oil and gas industry." Id.

Plaintiffs challenge Commerce's finding as unreasonable, highlighting that the "ultimate purchasers of Vandewater's steel branch outlets are all fabricators of fire sprinkler systems." Vandewater Comments at 24 (further adding that "Commerce does not (and cannot) deny this fact."). Plaintiffs maintain that this detail is critical, as "no fire sprinkler uses any butt-weld pipe fittings for branch connections to sprinkler leads, because a butt-weld pipe fitting does not have the ability to accept a sprinkler head with threads." Id. Plaintiffs also emphasize that the ITC "has explained the use and expectation of ultimate users of butt-weld pipe fittings by stating that '[b]utt-weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections.'" Id. (citing 2016 ITC Sunset Review at I-4).

[9] Commerce acknowledged that Vandewater's outlets are designed for a specific use within fire sprinkler systems, but found that BWPFs are also used in fire sprinkler systems and that the minor difference in specific uses within a sprinkler system did not indicate a significant difference in the ultimate use of subject outlets as compared to BWPFs. Remand Results at 58–59 ("Such use variation is found throughout the range of BWPFs"). In disagreeing with Plaintiffs that the ITC's findings support a distinction between outlets and BWPFs, Commerce highlighted that the ITC found that BWPFs are commonly found in automatic fire sprinkler systems. Despite Plaintiffs' arguments emphasizing the different in-system uses of outlets and BWPFs, Commerce determined that "[e]ven if it is the case that the outlets and other BWPFs do not have identical or complete overlap of

functions, the fact remains that the uses of outlets and other BWPFs are similar because, as explained above, both are permanently welded into automatic fire sprinkler systems to change or divide the flow of water." Id. at 59. Plaintiffs' argument demonstrating that the subject outlets may have specific uses within automatic fire sprinkler systems does not undermine the reasonableness of Commerce's conclusion that the ultimate use of BWPFs and subject outlets are similar given that both BWPFs and subject outlets are used in automatic fire sprinkler systems. Accordingly, the court concludes that Commerce reasonably found that the ultimate uses of outlets and BWPFs are similar.

### 4. Channels of Trade

Commerce ultimately found that "the channels of trade for outlets and other BWPFs are similar." Remand Results at 60. Commerce noted that "both [outlets and other BWPFs are] sold through distributors and to fabricators and contractors." Id. Plaintiffs challenge Commerce's conclusion that the record, and in particular the Shyman [5] Declaration, supports a finding that the expectations of purchasers of BWPFs and outlets are similar based on the fact that both products are sold through distributors like Neill Supply. See Vandewater Comments at 24 (citing Remand Results at 93–94).

[10] Once again, the court disagrees. Commerce rejected Vandewater's argument that the agency should rely on other parts of the Shyman Declaration, emphasizing "differences in the ultimate consumer of the products." Remand Results at 93. Commerce noted that it considered the

Shyman Declaration, and highlighted that Mr. Shyman acknowledged that "welded branch outlets and butt-weld fittings are both sold to distributors like Neill Supply." Id. at 93–94. Vandewater maintains that Commerce's simplistic analysis on this issue misses the point and fails to engage with the record. See Vandewater Comments at 24–25 (noting that "Home Depot sells paint and flowers, but that says nothing about whether ultimate purchasers deem them to be the same product.").

Commerce acknowledged the distinction highlighted by Plaintiffs, but overall found it unpersuasive in demonstrating that outlets and BWPFs subject to the China BWPFs Order involve different channels of trade. As Commerce explained:

> We agree that Vandewater's outlets are typically sold to a particular type of contractor given their targeted application, when compared to BWPFs more generally – which cover a wide range of products and applications. However, this is true in any circumstance when comparing a particular product to a broad class of products. Outlets and other BWPFs are sold to distributors and then to contractors and users involved in constructing piping systems, even if the particular type of contractor/customer for Vandewater's outlets focuses on certain types of systems, i.e., fire protection and other low-pressure applications.

Remand Results at 94. In the court's view, Plaintiffs' arguments about the overbreadth of Commerce's analysis under this factor go to the weight that the agency should assign this factor in its overall (k)(2) analysis and not the reasonableness of its determination. While the court un-

---

**5.** Vandewater submitted this declaration to Commerce as part of its remand comments, noting that "Mr. Neil Shyman was Vice President and General Manager of Neill Supply from May 1968 to January 2011. Neill Supply

is a fabricator and supplier of fire sprinkler and industrial piping and sells Vandewater's steel branch outlets." See Remand Results at 27 n.186.

derstands that this factor provides limited assistance in comparing BWPFs and subject outlets, it cannot agree with Plaintiffs that Commerce's findings under this factor were unreasonable.

### 5. Manner of Advertisement and Display

As to the final criterion, Commerce found that "outlets and other BWPFs are advertised in a similar manner, i.e., via online catalogs in company websites or affiliated or third-party online sources." Remand Results at 60–61. Commerce observed that "[t]hese sources identify the size, weight, and other technical specifications of the merchandise, including pressure resistance, materials used, and industry standard." Id. at 61. Commerce highlighted that "outlets (and similar products, such as saddles) and BWPFs are displayed side by side. In some instances, outlets are explicitly referenced in advertising materials as having buttweld ends." Remand Results at 94. Commerce disagreed with Plaintiffs, emphasizing the fact that certain advertising materials for subject merchandise referenced particular industry standards, and further noting that "simply because the advertising materials reference particular standards (i.e., ANSI/ASME B16.9 for certain products) and or references particular uses, [Commerce does not agree] that this reflects a clear dividing line between the method of advertising for each product." Id. at 95.

[11] Plaintiffs maintain that Commerce's analysis sidesteps the critical significance of industry standards in advertising the products, which "draw a clear dividing line between butt-weld pipe fittings on one hand and steel branch outlets on the other." SIGMA Comments at 13. Plaintiffs argue that Commerce "failed to give this evidence due regard," and con-

tend that Commerce's finding that Plaintiffs' afforded "undue significance" to industry standards is unreasonable in light of "repetition and centrality of these standards in the advertisements." Id. Again, Plaintiffs' arguments focusing on the importance of industry standards in advertising ignores contrary evidence in the record, namely that "the record supports Island's proffered explanation: [namely, that] the term 'butt-weld' itself is not a standard term nor commonly used, and, therefore, Island does not use it in its advertising." See Remand Results at 61.

Plaintiffs also contend that Commerce's finding that outlets and BWPFs are "displayed side by side" was unreasonable. Vandewater Comments at 25 (quoting Remand Results at 95 & n.577). Plaintiffs maintain that the sources relied on by Commerce to support such a finding do not actually include "traditional butt-weld pipe fittings." Id. at 26. Plaintiffs' arguments here again focus on a narrow subset of BWPFs, discounting the variety of BWPFs covered by the China BWPFs Order that Commerce found to be advertised in the same product catalogs along with outlets. See Remand Results at 61 ("First, the 'Fire Sprinkler Pipe Fabrication' section of the Aleum USA catalog shows outlets with a branch side that is threaded or grooved along with 'butt welding ends.' Second, product catalogs on the record show outlets and similar products and other BWPFs advertised side by side. For instance, the Petition shows 'elbows,' 'reducers,' 'lap joint stub ends,' 'saddles,' and 'multiple outlet fittings' in the same product catalog; the Shin Tech catalog advertises two outlet products – one with a beveled edge that allows for a permanent connection only on the branch end, and one with such edges on both the branch and contoured ends – in a similar manner."). Given these findings, the court concludes that Commerce reasonably found that outlets

and other BWPFs are advertised in a similar manner.

### C. Suspension of Liquidation Instructions

As a result of Commerce's new analysis on remand, the parties disputed whether Commerce was required to revise its instructions to U.S. Customs and Border Protection regarding suspension of liquidation and cash deposits. See Remand Results at 96–103. This issue was resolved with respect to Vandewater after the conclusion of briefing on the merits of the Remand Results. See Letter, ECF No. 151 (seeking clarification about potential mootness given that existing statutory injunctions already suspend liquidation of unliquidated entries of subject merchandise dating back to 1992 and requesting additional information as to this issue); Def.'s Initial Resp. to Letter, ECF No. 152; Conference Call, ECF No. 157; Def.'s Second Resp. to Letter, ECF No. 159; Second Conference Call, ECF No. 164; Order Amending Statutory Injunction, ECF No. 166. As to SIGMA, this was not an issue.

SCI, though, maintains that this is a live issue. While SCI initially presented arguments challenging the legal basis for Commerce's instructions to "continue" suspension of liquidation, SCI's arguments appear to have evolved significantly after conferencing with the court. Specifically, SCI maintains that this issue is not moot because certain of its entries contain both subject merchandise and non-subject merchandise ("mixed entries"), and argues that these mixed entries may be inappropriately subject to duties as a result of Commerce's instructions as applied to a suspension of liquidation covering the non-subject merchandise. SCI now attempts to formally raise these arguments for the first time in the context of "responding" to Vandewater's consent motion to amend its statutory injunction. Compare SCI

Resp. to Vandewater's Mot. for Amended Order for Statutory Injunction, ECF No. 166 (noting that SCI has no objection to Vandewater's revision of the statutory injunction covering its entries, but adding that "SCI files this response to state that it does not agree with the statement in this motion that the Government should be able to apply antidumping duties to welded outlets contained in entries 'that were previously suspended' for reasons unrelated to the underlying proceeding at issue in this appeal (i.e., entries that were previously suspended because they contained unrelated products subject to suspension pursuant to an unrelated AD/CVD order as of the effective date of Commerce's scope determination on Vandewater's welded outlets (September 10, 2018))."), with SCI Comments & Remand Results (discussing parties' disagreement as to Commerce's authority to "continue" suspension of liquidation under the regulatory framework, but making no reference to particular mixed entries, or any issues involving inappropriately assessed duties). As noted previously, these arguments regarding "mixed entries" do not appear in SCI's remand comments nor do they appear to have been raised before Commerce in the course of the remand. See SCI Resp. to Vandewater's Mot. for Amended Order for Statutory Injunction, ECF No. 166 (noting that SCI's arguments in the response reflect SCI's arguments "stated during [the August 10, 2022] conference call").

[12]   Given these circumstances and its discussions with the parties, the court concludes that SCI's additional arguments on this issue are not properly before the court and are deemed forfeited. See United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's brief-

ing may be deemed waived."); <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363, 1375–77 (Fed. Cir. 2010) (affirming waiver of arguments not raised until after remand); <u>see also</u> <u>In re Google Tech. Holdings LLC</u>, 980 F.3d 858, 862 (Fed. Cir. 2020) (explaining the distinction between "forfeiture" and "waiver" and acknowledging that "[b]y and large, in reviewing this court's precedent, it is evident that the court mainly uses the term 'waiver' when applying the doctrine of 'forfeiture.' "); <u>Saha Thai Steel Pipe Pub. Co. v. United States</u>, 46 CIT ——, 592 F.Supp.3d 1299, 1305 (2022) (exploring precedent addressing forfeiture and waiver, and explaining that "[f]ailing to raise an argument in a previous proceeding thus forfeits the argument after the matter has been remanded and is back on appeal."). The court also notes that SCI's additional arguments on this issue may well be moot in light of the existing statutory injunction that enjoins liquidation of SCI's imports of unliquidated entries of subject merchandise dating back to July 6, 1992. <u>See</u> Order Entering Form 24 Statutory Injunction, Court No. 19-00011, ECF No. 17 (Jan. 28, 2019).

### III. Conclusion

Despite their arguments supporting an alternative reasonable conclusion, Plaintiffs have failed to demonstrate that the record supports Plaintiffs' preferred outcome as the one and only reasonable determination Commerce could have made. <u>See, e.g.</u>, <u>supra</u> pp. 1336–37. Although Plaintiffs have demonstrated that information on the record <u>could</u> reasonably support a finding that outlets are excluded from the scope of the <u>China BWPFs Order</u>, the court cannot agree that Commerce acted unreasonably in reaching its findings to the contrary under each of the (k)(2) factors. The court therefore sustains Commerce's determination that outlets

and other BWPFs are sufficiently similar such that the subject outlets should be included under the scope of the <u>China BWPFs Order</u>. Judgment will enter accordingly.



**BOTH-WELL (TAIZHOU) STEEL FITTINGS, CO., LTD.,
Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Bonney Forge Corporation,
Defendant-Intervenor.**

**Slip Op. 22-105
Court No. 21-00166**

United States Court of International Trade.

September 13, 2022

**Background:** Foreign exporter filed suit challenging Department of Commerce's final determination in administrative review of countervailing duty (CVD) order on forged steel fittings (FSF) from People's Republic of China. Exporter moved for judgment on agency record. The Court of International Trade, Claire R. Kelly, J., 557 F.Supp.3d 1327, remanded. On remand, Department of Commerce issued remand results.

**Holdings:** The Court of International Trade, Kelly, J., held that application of adverse facts available was not warranted.

Sustained.

*Vandewater International Inc. v. United States*,
476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020)
Slip Op. 20-146
("*Vandewater II*")
Appx125-130

aside as unlawful because it did not comply with the APA requirements as described in Invenergy I. The court denies the Government's motion to dissolve the PI because it does not have jurisdiction to do so pending the Government's appeal and because the court instead modifies the PI. The court grants Plaintiffs' cross-motion to modify the PI to reflect the Second Withdrawal and Plaintiffs' challenge of that decision in their amended complaints. The court also grants Plaintiffs' motion to complete the agency record, in part, and denies the motion as to the First Withdrawal and the fourth category of documents. The Plaintiffs' motion to stay is denied.

The court notes that if presented with an adequate record and explanation of USTR's action, the court could proceed, in accordance with well-established administrative law standards, to review USTR's decision to withdraw it previously granted exclusion from safeguard duties on imported bifacial solar modules. However, various procedural missteps by USTR mean that the court cannot reach that point now. As the court has stated,

> The court acknowledges the Government and Defendant-Intervenors' concern that domestic industries may face a threat of material injury due to USTR's decision to exclude bifacial solar products from safeguard duties. The court also acknowledges the concerns of Plaintiffs (consumers, purchasers and importers of utility-grade bifacial solar panels), who oppose safeguard duties that they claim increase the cost of bifacial solar panels.

Invenergy III, 450 F. Supp. 3d at 1365 (citations omitted). The court takes no position on the efficacy of safeguard duties in providing protection to the domestic solar industry or of a decision to exclude products from those safeguard duties. Id. Once again, the court merely continues to re-

quire the Government to follow its own laws when it acts.

**SO ORDERED.**



## VANDEWATER INTERNATIONAL, INC., Plaintiff,

v.

## UNITED STATES, Defendant,

and

## Island Industries, Defendant-Intervenor.

Slip Op. 20-146
Court No. 18-00199

United States Court of International Trade.

October 16, 2020

**Background:** Importer filed suit challenging determination of Department of Commerce that importer's steel branch outlets used to join sections in fire sprinkler systems were within scope of antidumping duty order on carbon steel butt-weld pipe fittings from People's Republic of China.

**Holdings:** The Court of International Trade, Leo M. Gordon, J., held that scope determination was unreasonable.

Remanded.

### 1. Customs Duties ⟚84(6)

When reviewing an agency's antidumping determinations, findings, or conclusions for substantial evidence, Court of International Trade assesses whether the agency action is reasonable given the record as a whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⚖84(6)**

"Substantial evidence," as required to uphold an antidumping determination, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

**3. Customs Duties ⚖84(6)**

"Substantial evidence," as required to uphold an antidumping determination, is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Customs Duties ⚖84(6)**

Substantial evidence is best understood as a word formula connoting reasonableness review of an antidumping determination.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**5. Customs Duties ⚖84(6)**

When addressing a substantial evidence issue raised by a party, Court of International Trade analyzes whether the agency's challenged antidumping action was reasonable given the circumstances presented by the whole record.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**6. Customs Duties ⚖21.5(5)**

Department of Commerce's determination that importer's steel branch outlets were within scope of antidumping duty order on carbon steel butt-weld pipe fittings from China was unreasonable; Commerce found that importer's description of its steel branch outlets matched order's description of butt-weld pipe fittings, but it was not plainly apparent from order's language whether steel branch outlet qualified as butt-weld fitting covered by order, and sources on which Commerce relied as dispositive, namely, prior scope ruling, scope petition language, and sunset review language, were not informative as to inclusion of steel branch outlets in order's scope, other than one prior scope ruling that seemed to be dispositive but which Commerce dismissed as non-binding.  19 C.F.R. § 351.225(k)(1).

―――――――

Richard Preston Ferrin, Dorothy Alicia Hickok, and Douglas John Heffner, Faegre Drinker Biddle & Reath, LLP of Washington, DC, for Plaintiff Vandewater International, Inc.

Joshua Ethan Kurland, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC., argued for Defendant United States. On the brief were Jeffrey Bossert Clarke, Assistant Attorney General, Jeanne E. Davidson, Director, L. Misha Preheim, Assistant Director, International Trade Field Office, New York, NY. Of counsel were John Anwesen and Saad Younus Chalchal, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Matthew Jon McConkey, Mayer Brown LLP of Washington, DC, for Defendant-Intervenor Island Industries.

**OPINION and ORDER**

GORDON, Judge:

This opinion addresses the scope of the antidumping duty order on Carbon Steel

Butt-Weld Pipe Fittings from the People's Republic of China, which covers:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("Order"). Plaintiff, Vandewater International Inc., sought a scope determination from the U.S. Department of Commerce ("Commerce") that their products, steel branch outlets used to join sections in fire sprinkler systems, are not covered by the Order. Commerce determined that they were. Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, (Dep't of Commerce Sept. 10, 2018) (final scope ruling on Vandewater's steel branch outlets) ("Final Scope Ruling"). For the reasons set forth below, the court holds that Commerce unreasonably concluded that the sources in 19 C.F.R. § 351.225(k)(1) were dispositive on the inclusion of Plaintiff's steel branch outlets within the Order, and remands the matter to Commerce to conduct a full scope inquiry and evaluate the factors under 19 C.F.R. § 351.225(k)(2).

## I. Standard of Review

[1–5] The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2020). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2020).

## II. Discussion

Commerce may render a scope ruling after a full "scope inquiry," 19 C.F.R.

§ 351.225(e), or, as Commerce did in this case, on the expedited basis of a party's application and the sources listed in 19 C.F.R. § 351.225(k)(1) (the "descriptions of the merchandise contained in the petition [for imposition of an antidumping duty order], the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the [International Trade] Commission."). 19 C.F.R. § 351.225(d). Here, Commerce determined that the (k)(1) sources were dispositive and included Vandewater's steel branch outlets within the Order.

Had Commerce determined the (k)(1) sources were not "dispositive," Commerce would have conducted a full scope inquiry and evaluated the criteria under § 351.225(k)(2), which include the product's physical characteristics, ultimate purchasers' expectations, the ultimate use of the product, trade channels in which the product is sold, and the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2).

[6]  In rendering its scope determination Commerce began with a "plain reading" of the Order, finding that Vandewater's description of its steel branch outlets matched the description of the butt-weld pipe fittings in the Order:

> A plain reading of the scope includes carbon steel butt-weld pipe fittings that have an inside diameter of fourteen inches or less, which require a weld to be permanently attached to a piping system. Based on Vandewater's description, and the samples provided, the steel branch outlets are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections. Thus, we find that Vandewater's description of its steel branch outlets matches the description

of the scope covering butt-weld pipe fittings.

Final Scope Ruling at 9. Commerce omitted from its "plain reading" the scope language that distinguishes "fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings)." Plaintiff's products have threaded or grooved ends on their non-weldable end. It is therefore not plainly apparent from the language of the Order whether a steel branch outlet qualifies as a butt-weld fitting covered by the Order or not. They may be covered: they are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require a permanent, welded connection. They also may not be covered: they have a non-weldable, threaded or grooved end, and according to Vandewater, the weldable end is never joined to the sprinkler system via a true "butt-weld." The language of the Order itself simply does not resolve the issue of whether Vandewater's steel branch outlets are covered.

As for the (k)(1) sources, Commerce long ago included steel branch outlets virtually identical to Vandewater's within the scope of a companion antidumping duty order on butt-weld fittings from another country. Carbon Steel Butt-Weld Pipe Fittings from Taiwan, (Dep't of Commerce Mar. 25, 1992) (final scope ruling on Sprink, Inc. exclusion request) ("Sprink Scope Ruling"); see also Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan, 51 Fed. Reg. 45,152 (Dep't of Commerce Dec. 17, 1986) ("Taiwan Butt-Weld Order"). In the Final Scope Ruling here, Commerce noted this prior ruling:

> Sprink's scope inquiry request stated that "{i}t appears that the definition of a butt-weld fitting is one that requires welding as a method of attachment for all connections. The Sprink-let does re-

quire that it be welded onto the outside of the pipe, but the connection for the joining pipe is either threaded or grooved.

Commerce specifically stated in its ruling, "the order does not require that all pipe fitting connections be welded." Commerce further stated that, "although the initial connection is obtained because of threading or grooving, the Sprink-let, like other products subject to this order, is permanently joined by welding." Commerce concluded that, "{a}ccording to the product descriptions presented above, a pipe fitting with beveled edges that is permanently joined through welding falls within the scope of the order on carbon steel butt-weld pipe fittings from Taiwan. Because the Sprink-let, possesses these characteristics, we determine that the Sprink-let, imported by Sprink, Inc. is within the scope of the antidumping duty order on carbon steel butt-weld pipe fittings from Taiwan."

Final Scope Ruling at 5-6 (footnotes omitted). For over 25 years, then, Commerce has treated steel branch outlets as butt-weld fittings. That would seem to be dispositive. Commerce, however, for some reason, chose to dismiss its Sprink Scope Ruling as non-binding:

> . . . We agree that the products at issue in the Sprink Scope Ruling were essentially physically identical to Vandewater's steel branch outlets. However, we note that Commerce analyzed those products under the Taiwan Butt-Weld Order and not the China Butt-Weld Order. We recognize that some of the language in both orders is the same, but as Vandewater points out, there is also language unique to the China Butt-Weld Order. Accordingly, we are not bound by the agency's analysis in the Sprink Scope Ruling, although we not [sic] that

here, as in that case, we have concluded that the merchandise is covered by the scope of an antidumping duty order on "butt-weld pipe fittings" because the merchandise is permanently joined by welding.

Final Scope Ruling at 11 (emphasis added).

Commerce chose instead to look for support in its King Scope Ruling that fittings with only one weldable end were covered by the Order. Id. at 9 (citing Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China (Dep't of Commerce Oct. 20, 2009)) ("King Scope Ruling"). The King Scope Ruling, however, dealt with subject butt-weld fittings used in applications other than pressurized piping systems—as handrails, fencing, and guardrails—it did not address dual-nature fittings like Vandewater's steel branch outlets. Commerce's reliance on the King Scope Ruling, which has no facial applicability or relevance to Vandewater's branch outlets, and Commerce's eschewing the Sprink Scope Ruling, signals to the court that something is not quite right with Commerce's (k)(1) analysis.

The court was further confused by the balance of Commerce's (k)(1) analysis. Searching for dispositive support among the (k)(1) sources to cover the steel branch outlets, Commerce identified two quotes, one from the petition and one from the U.S. International Trade Commission ("ITC") sunset review. The petition language reads: "{t}he edges of finished butt-weld fittings are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins the fitting to the pipe." Final Scope Ruling at 9–10 (quoting Petitioners' Letter, "In the Matter of Certain Carbon Steel Butt-Weld

Pipe Fittings from the People's Republic of China and from Thailand," dated May 22, 1991 (Petition)). The quoted language contemplates beveling on both parts of the assembled pipe—"{t}he edges ... are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled) ...." Vandewater pointed out to Commerce that its branch outlets, although beveled on one end, do not join to a beveled end on the header pipe. The quoted petition language, which contemplates beveling on both parts of the assembled pipe, is therefore not descriptive of the actual physical characteristics of Vandewater's steel branch outlets.

The quoted language Commerce relied upon from the ITC sunset review suffers from the same problem as the petition language—it contemplates beveling on both parts of the assembled pipe: "When placed against the end of a beveled pipe or another fitting, the beveled edges form a shallow channel that accommodates the 'bead' of the weld that fastens the two adjoining pieces." Final Scope Ruling at 10 (quoting Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. Nos. 731-TA-308-310 and 520-521, at I-4 (Fourth Review), USITC Pub. 4628 (Aug. 2016)). Again, though, Vandewater's branch outlets are welded to header pipe, which is not, apparently, beveled at the weld. The quoted sunset review language is therefore not descriptive of the actual physical characteristics of Vandewater's steel branch outlets.

Commerce also highlights butt-weld caps as an example of a butt-weld fitting that has only one weldable end. Id. at 10. A butt-weld cap though does not also have threads or grooves, problematical attributes that are expressly excluded from the Order.

Other than the Sprink Scope Ruling, which Commerce dismisses as non-binding, the other (k)(1) sources Commerce relied upon as dispositive (the King Scope Ruling, the petition language, and the language from the ITC sunset review) do not really tell the court anything about the inclusion of steel branch outlets within the scope of the Order. Commerce's determination that the (k)(1) sources are dispositive is therefore not reasonable (unsupported by substantial evidence).

For whatever reason Commerce does not have much confidence in its Sprink Scope Ruling. Given that posture, the court believes that Commerce must consider the factors under (k)(2) to determine whether Vandewater's steel branch outlets are within the scope of the Order. Accordingly, it is hereby

**ORDERED** that Commerce's determination that the (k)(1) materials are dispositive of the inclusion of Vandewater's steel branch outlets within the scope of the Order is unreasonable; it is further

**ORDERED** that this matter is remanded to Commerce to conduct a scope inquiry to evaluate the factors under (k)(2); it is further

**ORDERED** that Commerce shall file its remand results once the scope inquiry is completed; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.



*Vandewater International Inc. v. United States*
*Sigma Corp. v. United States*
*Smith-Cooper International, Inc. v. United States*
June 3, 2020 Memorandum and Order
("*Vandewater I*")
Appx143-148

UNITED STATES COURT OF INTERNATIONAL TRADE

VANDEWATER INTERNATIONAL, INC.,

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

     and

ISLAND INDUSTRIES,

                Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 18-00199

SIGMA CORPORATION,

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

     and

ISLAND INDUSTRIES,

                Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 19-00003

SMITH-COOPER INTERNATIONAL, INC.,

               Plaintiff,

    v.

UNITED STATES,

               Defendant,

    and

ISLAND INDUSTRIES,

               Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 19-00011

## MEMORANDUM and ORDER

This memorandum opinion addresses three related actions arising from the antidumping duty order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, which covers:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("Order"). The three plaintiffs, Vandewater International Inc., SIGMA Corporation, and Smith-Cooper International, Inc.

Court Nos. 18-00199, 19-00003, and 19-00011                                  Page 3

each independently requested scope determinations from Commerce, arguing that their merchandise, Steel Branch Outlets (Vandewater), SAFELET and UNILET fire protection weld outlets (SIGMA), and Cooplet Weld Outlets (Smith-Cooper) were not covered by the Order. See ECF No. 25-1, PDs 2–6 at bar codes 3708194-01–05 (Vandewater, Court No. 18-00199); ECF No. 29-1, PD 1 at bar code 3711158-01 (SIGMA Corp., Court No. 19-00003); ECF No. 29-1, PDs 1–5 at bar codes 3743270-01–05 (Smith-Cooper, Court No. 19-00011).

Commerce separately determined all of the products were within the scope of the Order. See Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets (Sept. 10, 2018), ECF No. 25-1, PD 48 at bar code 3752679-01 ("Vandewater Scope Ruling"); Scope Ruling on SIGMA Corp.'s SAFELET and UNILET fire protection weld outlets (Dec. 11, 2018), ECF No. 29-1, PD 64 at bar code 3782320-01 ("SIGMA Scope Ruling"); Scope Ruling on Smith-Cooper International's Cooplet Weld Outlets (Dec. 20, 2018), ECF No. 29-1, PD 32 at bar code 3785040-01 ("Smith-Cooper Scope Ruling").

**Discussion**

Commerce has by regulation, 19 C.F.R. § 351.225(k), established a process for deciding whether certain imports are covered by the scope of an antidumping or countervailing duty order. Commerce first examines the sources listed under § 351.225(k)(1), which include "the scope language contained in the order itself, the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC." 19 C.F.R. § 351.225(k)(1). If the (k)(1) sources are not dispositive either way, Commerce then conducts a full scope

Court Nos. 18-00199, 19-00003, and 19-00011                                Page 4

inquiry and evaluates the sources under § 351.225(k)(2), which include the product's physical characteristics, ultimate purchasers' expectations, the ultimate use of the product, trade channels in which the product is sold, and the manner in which the product is advertised and displayed. Id. § 351.225(k)(2); see generally United Steel and Fasteners, Inc. v. United States, 947 F.3d 794, 799 (Fed. Cir. 2020) (describing Commerce's scope framework).

Plaintiffs' central, collective contention is that their products are not "butt-weld fittings" because the weldable end of their fittings cannot accommodate a true "butt-weld"—which they define as a joint type in which welded ends are aligned in approximately the same plane. Commerce was not persuaded by Plaintiffs' interpretation of the term "butt-weld" and instead settled on an interpretation of the scope term "butt-weld fitting" anchored to a specific physical characteristic noted in the petition and the ITC sunset review—having beveled edges that form a shallow channel to accommodate the bead of the weld. Vandewater Scope Ruling at 10; SIGMA Scope Ruling at 14; Smith-Cooper Scope Ruling at 12-13; see also Sprink Inc. Scope Ruling (Mar. 25, 1992).

Plaintiffs (in consultation with the court and other parties) first present a limited argument that the scope term "butt-weld" is clear and unambiguous as a well-understood term in "trade usage" ("(k)(zero) issue"). This is an argument that Plaintiffs contend the court reviews de novo, without deference to Commerce's determination. SIGMA Br. Regarding (K)(Zero) Issues at 2–3.

Court Nos. 18-00199, 19-00003, and 19-00011                                    Page 5

Accepting Plaintiffs' de novo standard, the court does not share Plaintiffs' view that the term "butt-weld fitting" has the one, clear, unambiguous meaning advocated by Plaintiffs largely because there is a key piece of record information that Plaintiffs failed to address that undermines their claims that "trade usage" is clear, unambiguous, and uniform. One Plaintiff's importers referred to branch outlets as a "threaded butt-welded outlet," a "grooved butt-welded outlet," and "butt-weld outlets," which weakens any claim that there is a well-known, uniform "trade usage" of the term "butt-weld fitting" that excludes Plaintiffs' merchandise from the Order. Even if those descriptives were somehow in error, as claimed by Smith-Cooper, they demonstrate that "trade usage" is not as clear and unambiguous as Plaintiffs advocate. Afterall, similar branch outlets have been included since 1992 under a similar antidumping duty order covering butt-weld fittings from another country, making it hard for a reasonable mind to be persuaded that branch outlets could never be classified as butt-weld fittings because there is one, and only one, widely- and well-known "trade usage" of the term "butt-weld fittings" that excludes Plaintiffs' branch outlets. See Sprink Inc. Scope Ruling.

The court does not express any opinion on the reasonableness (supported by substantial evidence) of Commerce's conclusion that the (k)(1) sources were dispositive of the inclusion of Plaintiffs' merchandise. It suffices to say that for Plaintiffs' (k)(zero) issue about there being an unambiguous meaning of the term "butt-weld fitting," the court did not find Plaintiffs' arguments persuasive. Accordingly, it is therefore

Court Nos. 18-00199, 19-00003, and 19-00011                                     Page 6

**ORDERED** that Plaintiffs' requested relief is denied; and it is further

**ORDERED** that parties shall, after conferring with one another, file, on or before

June 11, 2020, a proposed briefing schedule in each of the captioned actions regarding

the final disposition of each action.

 

_____/s/ Leo M. Gordon_____

Judge Leo M. Gordon

Dated: June 3, 2020
      New York, New York

U.S. Department of Commerce
*Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets*
Sept. 10, 2018
("*Vandewater Scope Ruling*")
Appx131-142

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry/Determination

**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-814
SCOPE:  Steel Branch Outlets
**Public Document**
E&C OV:  AC

September 10, 2018

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Associate Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations<br> performing the duties of Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **THROUGH:** | James Doyle<br>Director, Office V<br>Antidumping and Countervailing Duty Operations |
| **FROM:** | Annathea Cook<br>International Trade Compliance Analyst<br>Antidumping and Countervailing Duty Operations, Office V |
| **SUBJECT:** | Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets |

---

**Summary**

On the basis of our analysis of Vandewater International Inc.'s (Vandewater) scope request, the scope language, and the sources described in 19 CFR 351.225(k)(1), we have determined that the steel branch outlets at issue in this scope inquiry are within the scope of the antidumping duty (AD) order on carbon steel butt-weld pipe fittings (butt-welds) from the People's Republic of China (China),[1] pursuant to 19 CFR 351.225(d).

**Background**

On May 17, 2018, Vandewater requested that the Department of Commerce (Commerce) issue a scope ruling to determine whether the threaded or grooved CEREICO brand steel branch outlets it imports are subject to the *China Butt-Weld Order*.[2]  June 12, 2018, Island Industries (Island), a

---

[1] *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China,* 57 FR 29702 (July 6, 1992) (*China Butt-Weld Order*).

[2] *See* Letter from Vandewater International Inc. to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Request for Scope Ruling for Steel Branch Outlets," (May 17, 2018) (Scope Ruling Request).



INTERNATIONAL
**T R A D E**
ADMINISTRATION

producer of the domestic like product, submitted its opposition to Vandewater's scope request.[3]
On June 29, 2018, Vandewater submitted rebuttal comments to Island's opposition.[4]  On June
29, 2018, Commerce extended the time period for issuing a scope ruling or initiating a formal
scope inquiry by an additional 45 days until August 13, 2018.[5]

On July 11, 2018, counsel for Vandewater met with Commerce and submitted samples of its
steel branch outlets.[6]  On July 12, 2018, Smith-Cooper International (SCI), a U.S. importer of
subject merchandise, submitted comments in support of Vandewater's scope request.[7]  On July
17, 2018, Anvil International, LLC (Anvil), a producer of the domestic like product, submitted
its opposition to Vandewater's scope request.[8]  On July 25, 2018, counsel for Island and counsel
for Anvil met with Commerce to review the samples submitted by Vandewater.[9]  On August 13,
2018, Commerce extended the time period for issuing a scope ruling or initiating a formal scope
inquiry by an additional 30 days until September 12, 2018.[10]

On August 24, 2018, Commerce placed on the record the International Trade Commission's
(ITC) 2016 sunset review and the 1991 petition on carbon steel butt-weld pipe fittings from
China and Thailand.[11]  On September 5, 2018, Island, SCI, and Vandewater submitted comments
regarding documents placed on the record.[12]

**Scope of the Order**[13]

The products covered by this order are carbon steel butt-weld pipe fittings, having an inside
diameter of less than 14 inches, imported in either finished or unfinished form.  These formed or

---

[3] *See* Letter from Island to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from China: Opposition to Scope
Ruling Requests of Vandewater International Inc. and SIGMA Corporation," (June 12, 2018) (Island's Comments).
[4] *See* Letter from Vandewater to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of
China: Rebuttal Factual Information Concerning Vandewater Scope Inquiry on Steel Branch Outlets," (June 29,
2018).
[5] *See* Letter to All Interested Parties from Commerce, "Scope Ruling Request for Carbon Steel Butt-Weld Pipe
Fittings from the People's Republic of China," (June 29, 2018).
[6] *See* Memo from Commerce to the File, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic
of China: Vandewater Scope: *Ex-Parte* Meeting with Requestor's Counsel," (July 12, 2018).
[7] *See* Letter from SCI to Commerce, "Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of
China: Comments," (July 12, 2018) (SCI's Comments).
[8] *See* Letter from Anvil to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from The People's Republic of
China/Opposition to Scope Ruling Requests of SIGMA and Vandewater and Request for a Meeting," (July 17,
2018) (Anvil's Comments).
[9] *See* Memo from Commerce to the File, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic
of China: Vandewater Scope: Meeting with Counsel to Interested Parties," (July 26, 2018).
[10] *See* Memo from Commerce to the File, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of
China: Vandewater International Inc. and Sigma Corporation Scope Ruling Requests," (August 13, 2018).
[11] *See* Letter to All Interested Parties from Commerce, "Placing Documents on the Record" (August 24, 2018).
[12] *See* Letter from Island to Commerce, "Carbon Steel Butt-Weld Pipe Fittings from China: Comments on
Documents Placed on Record" (September 5, 2018); *see also* Letter from SCI to Commerce, "Certain Carbon Steel
Butt-Weld Pipe Fittings from the People's Republic of China: Comments on Documents Placed on the Record"
(September 5, 2018); *see also* Letter from Vandewater to Commerce , "Carbon Steel Butt-Weld Pipe Fittings from
the People's Republic of China: Vandewater Comments on Factual Information Placed On the Record By the
Department" (September 5, 2018).
[13] *See China Butt-Weld Order*, 57 FR at 29703.

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry - Vandewater

forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

**Legal Framework**

When a request for a scope ruling is filed, we examine the scope language of the order at issue and the description of the product contained in the scope ruling request.[14] If Commerce is able to determine whether the product in question falls within or outside the scope based solely on the language of the order, the unambiguous language of the scope governs.[15] If the scope language is ambiguous, we proceed to examine other information, including the descriptions of the merchandise contained in the petition, the record from the investigation, and prior determinations by Commerce, such as prior scope determinations, and the International Trade Commission (ITC).[16] If we determine that these sources are dispositive, we will issue a final scope ruling as to whether the product in question is covered by the order.[17] A determination pursuant to this analysis may take place with or without a formal inquiry.[18]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, we will consider the five additional factors set forth in 19 CFR 351.225(k)(2). These criteria are: (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.[19] The determination as to which analytical framework is most appropriate in any given scope inquiry is made on a case-by-case basis after careful consideration of all the evidence before Commerce.

As explained in the "Commerce's Analysis" section below, we find that the scope language and the information associated with the factors in 19 CFR 351.225(k)(1) are dispositive on the issue of whether the products in Vandewater's Scope Ruling Request are within the scope of the *China Butt-Weld Order*. Pursuant to 19 CFR 351.225(d), we find that Vandewater's imports of steel branch outlets are within the scope of the *China Butt-Weld Order*. Commerce, therefore, finds it unnecessary to initiate a formal scope inquiry pursuant to 19 CFR 351.225(e) or consider the additional factors under 19 CFR 351.225(k)(2).

---

[14] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[15] *See Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (quoting *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013)).
[16] *See* 19 CFR 351.225(k)(1); *see also Meridian Prods., LLC*, 851 F.3d at 1381 ("{T}he inquiry begins with 'the language of the final order' and turns to other sources only if the scope itself 'is ambiguous.'") (quoting *Mid Continent Nail Corp. v. United States*, 725 F.3d at 1302).
[17] *See* 19 CFR 351.225(d).
[18] *See* 19 CFR 351.225(d) and (e).
[19] *See* 19 CFR 351.225(k)(2).

Filed By: Annathea Cook, Filed Date: 9/10/18 3:30 PM, Submission Status: Approved

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry - Vandewater

**Description of Merchandise Subject to This Scope Request**

In its Scope Ruling Request, Vandewater described its steel branch outlets as follows:

> A steel branch outlet has one side (called the "header" or "run" side) that is contoured to match the curve of a header pipe. The contour allows the steel branch outlet to set on (or through) the pipe like a saddle. The other side (called the "branch" or "outlet" side) is frequently formed with a threaded end, or a groove, and is intended to connect to something else, such as a sprinkler, with a threaded connection or grooved connection.[20]

Vandewater offers two types of CEREICO brand steel branch outlets: threaded and grooved.[21] Various names are used to describe these parts, including steel branch outlets, threaded or grooved pipe outlets, and welded outlets.[22] Vandewater further described its CEREICO brand steel branch outlets as follows:

> Vandewater offers CEREICO brand threaded steel branch outlets in sizes ranging from ½ inch to 2½ inches. Vandewater also offers CEREICO brand grooved steel branch outlets in sizes ranging from 1¼ inch to 8 inches. Vandewater's threaded branch outlets are manufactured from forged steel bars, and its grooved branch outlets are machined from welded pipe. All of Vandewater's steel branch outlets are designed for fire protection and other low-pressure piping systems, and are pressure rated at no more than 300 psi. Vandewater's steel branch outlets are UL listed and FM approved.[23]

**Relevant Prior Scope Ruling**

<u>King Supply Co.'s Pipe Fittings for Structural Use Applications</u>

In March 2009, King Supply Co. (King) requested that Commerce issue a scope ruling that butt-weld pipe fittings imported by King from China are outside the scope of the *China Butt-Weld Order*.[24] King argued that the second sentence of the *China Butt-Weld Order* was an end-use restriction that expressly limits the scope of the *China Butt-Weld Order* to pipe fittings used to join sections of piping systems.[25] By contrast, King's imported butt-weld pipe fittings were "used in ornamental, architectural, and structural applications and are not used to join sections in

---

[20] *See* Scope Ruling Request at 3.
[21] *Id.* at 4.
[22] *Id.* at 3 n.2.
[23] *Id.* at 4; *see also* Exhibit 1 (description of CEREICO brand threaded steel branch outlets), Exhibit 2 (description of CEREICO brand grooved steel branch outlets), and Exhibit 3 (complete list of threaded and grooved steel branch outlets).
[24] *See* Memorandum from Edward C. Yang, Senior NME Coordinator to John M. Andersen, Acting Deputy Assistant Secretary, regarding "Final Scope Ruling: Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ('PRC')," dated October 20, 2009 (King Scope Ruling), at 1.
[25] *Id.* at 2.

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

piping systems."[26]

Commerce issued its scope ruling on October 20, 2009, concluding that King's imports were included within the scope of the *China Butt-Weld Order*.[27]  Commerce emphasized that, not only were King's products physically identical to the products described in the first sentence of the order, but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition.[28]  Commerce found further support in the ITC's final determination, which defined the domestic like products as including "all pipe fittings having an inside diameter of less than 14 inches, whether finished or unfinished regardless of use."[29]

Commerce rejected King's arguments that its products were outside the scope of the *China Butt-Weld Order* because they were not "used to join sections in piping systems," explaining that the second sentence was not an end-use restriction, but merely a statement that "distinguished butt-welding from other types of fastening methods."  Commerce elaborated as follows:

> Specifically, we find that this sentence uses piping systems as an example of an instance where a permanent, welded connection is desired. We find that the language "are used" does not mean that the use identified is necessarily the exclusive use. Thus, we conclude that the second sentence does not contain an end-use exclusion, but a description of a possible end-use.[30]

Accordingly, Commerce concluded that King's pipe fittings were subject to the *China Butt-Weld Order*.[31]  That scope ruling was upheld by the Court of Appeals for the Federal Circuit in *King Supply*, which affirmed Commerce's interpretation that the second sentence of the *China Butt-Weld Order* is a description of a possible end use that "shed{s} light on the functional capabilities" of subject merchandise and is "intended to distinguish physical characteristics and capabilities of the subject pipe fittings."[32]

Sprink Inc.'s Safelet Outlets

In March 1992, Commerce issued a scope decision that Sprink Inc.'s (Sprink) Sprink-let outlet was within the scope of the *Taiwan Butt-Weld Order*.[33]  Sprink's scope inquiry request stated that "{i}t appears that the definition of a butt-weld fitting is one that requires welding as a

---

[26] *Id.*

[27] *Id.* at 3-6.

[28] *Id* at 5.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *See King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) (*King Supply*).

[33] *See* Memorandum to Joseph A. Spetrini, Deputy Assistant Secretary for Compliance, through Roland L. MacDonald, Director, Office of Antidumping Compliance, regarding "Recommendation Memo - Final scope Ruling on Request by Sprink, Inc. to Exclude Sprink-let Carbon Steel Butt-Weld Pipe Fittings from the Antidumping Duty order on Carbon Steel Butt-Weld Pipe Fittings from Taiwan," (March 25, 1992) (Sprink Scope Ruling); *see also Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 FR 45152 (December 17, 1986) (*Taiwan Butt-Weld Order*).

5

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

method of attachment for all connections.  The Sprink-let does require that it be welded onto the outside of the pipe, but the connection for the joining pipe is either threaded or grooved."[34]

Commerce specifically stated in its ruling, "the order does not require that <u>all</u> pipe fitting connections be welded."[35]  Commerce further stated that, "although the initial connection is obtained because of threading or grooving, the Sprink-let, like other products subject to this order, is permanently joined by welding."[36]  Commerce concluded that, "{a}ccording to the product descriptions presented above, a pipe fitting with beveled edges that is permanently joined through welding falls within the scope of the order on carbon steel butt-weld pipe fittings from Taiwan.  Because the Sprink-let, possesses these characteristics, we determine that the Sprink-let, imported by Sprink, Inc. is within the scope of the antidumping duty order on carbon steel butt-weld pipe fittings from Taiwan."[37]  Commerce ruled that Sprink's Sprink-let is within the scope of the *Taiwan Butt-Weld Order*.[38]

**Arguments from Interested Parties**

*Vandewater's Comments*
- While a steel branch outlet has a permanent welded connection on one end (albeit a fillet weld, as opposed to a butt-weld), the other end has either a threaded or grooved end.[39]  Thus, the language of the *China Butt-Weld Order* specifically excludes steel branch outlets because of their threaded and grooved end.[40]
- The wrongly decided, prior Sprink scope ruling from 1992, that examined a similar product to a steel branch outlet, does not apply because it involved a different antidumping duty order with different scope language.[41]
- Vandewater's steel branch outlets cannot be subject to the *China Butt-Weld Order,* because Commerce recently held in a pending investigation on forged steel fittings that steel branch outlets are forged steel fittings, not butt-weld pipe fittings.[42]
- Use of the factors under 19 CFR 351.225(k)(2), like that in *Diversified Products Corporation v. United States*, demonstrates that Vandewater's steel branch outlets are outside the scope of the *China Butt-Weld Order*.  Vandewater is unaware of any fire sprinkler fabricator that uses butt-weld pipe fittings, because a butt-weld fitting does not have the ability to accept a sprinkler head with threads.[43]

---

[34] *See* Letter from Sprink Inc. to Commerce, "Steel Butt-Weld Pipe Fittings from Taiwan" (October 10, 1991) (Sprink Scope Ruling Request).
[35] *See* Sprink Scope Ruling at 3.
[36] *Id.*
[37] *Id.* at 4.
[38] *See* Sprink Scope Ruling.
[39] *See* Scope Ruling Request at 15.
[40] *Id.*
[41] *Id.* at 2.
[42] *Id.*
[43] *Id.* at 3.

Filed By: Annathea Cook, Filed Date: 9/10/18 3:30 PM, Submission Status: Approved

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

### Island's Comments

- Vandewater argues that steel branch outlets cannot be butt-weld pipe fittings, because they are built to different standards.[44]  Neither the *China Butt-Weld Order* nor the ITC product description defined butt-weld pipe fittings based on any particular standard.[45]  Given the important role of sprinkler systems, standard-setting organizations that focus on fire protection have issued distinct specifications for outlets.[46]  The fact that outlets must meet fire-protection standards does not imply that they are not butt-weld pipe fittings.  Butt-weld pipe fittings are used in a variety of ways in a variety of different industries.[47]  As the ITC recognized, the fire protection industry is just one of those industries.[48]

- Vandewater argues that the "industry" does not regard steel branch outlets to be butt-weld pipe fittings.[49]  The industry does, in fact, recognize steel branch outlets as butt-weld fittings.[50]  For example, SCI, a major industry player, markets outlets under the "Cooplet" brand name.[51]  Recent public import records describe these products as "butt-weld outlets."[52]

- Vandewater argues that butt-weld pipe fittings are "always" welded to the end of a pipe.[53]  However, the standard that Vandewater proposes as the true descriptor of butt-weld pipe fittings (ASME B.16.9. 2012 Version) recognizes that butt-weld fittings are not always joined in parallel planes and, in those instances, must be joined by a circular arc or radius, which is precisely how Vandewater's steel branch outlets are welded to header pipes.[54]

- Vandewater similarly argues that butt-welding fittings "always" have a square-end, not a contoured end, yet the same standard Vandewater uses (ASME B.16.9) expressly contemplates that some butt-weld fittings will have contoured ends and are not always welded on a single plane.

- Vandewater suggests that outlets cannot be butt-weld pipe fittings because they are relatively difficult to install.[55]  Again, nothing in the *China Butt-Weld Order* or the ITC investigation would classify pipe fittings based on their relative installation difficulty.[56]

- Vandewater also argues that butt-weld pipe fittings "get their name from the method in which they are attached to a piping system."[57]  However, Vandewater points to nothing in the *China Butt-Weld Order* or the ITC investigation to support this assertion.[58]  Rather, the ITC investigation stressed that it was the "beveled edges" that "distinguish" butt-weld pipe fittings from other types of fittings.[59]  There can be no dispute that outlets feature beveled

---

[44] *See* Island's Comments at 5-6.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at 5.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.* at 6.
[54] *Id.*
[55] *Id.* at 7.
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*

7

edges that create a shallow channel or gap that accommodates the bead of the weld that permanently fastens an outlet to an adjoining piping component.[60]

### SCI's Comments

- SCI agrees with Vandewater that steel branch outlets are not butt-weld pipe fittings.[61]
- The industry for these products consistently does not consider Vandewater's products to be the type of product described by the scope of the *China Butt-Weld Order*.[62]  The fire protection products that are under review, clearly, are not within the scope and should be excluded.[63]
- Island argues that the label "butt-weld outlet" used in certain import documents for SCI's "Cooplet" product line demonstrates that the industry recognizes outlets as butt-weld fittings. Island is mistaken.[64]  SCI does not regard Cooplets or similar outlets as "butt-weld fittings" and has never labeled them as such.[65]  Import documentation for SCI's Cooplets briefly included the phrases "threaded butt-welded outlet," "grooved butt-welded outlet," and "butt-weld outlets" for shipments sent from December 2017 through April 2018.[66]  But, those phrases are not synonymous with butt-weld fitting, and in any event, were applied in error. Prior product descriptions without the term "butt-welded" had been in place for over a decade, and these descriptions were restored to their original and correct form more than a month before Island's submission.[67]

### Anvil's Comments

- Anvil agrees with, and affirms, all of Island's arguments.[68]

### Commerce's Analysis

Vandewater argues that the threaded or grooved CEREICO brand steel branch outlets it imports from China do not meet the description of butt-weld pipe fittings defined in the *China Butt-Weld Order*.  Commerce disagrees and finds the language of the scope supports a conclusion that steel branch outlets are subject merchandise.

The scope of the *China Butt-Weld Order* provides, in relevant part, that "the products covered by this order are carbon steel butt-weld pipe fittings, **having an inside diameter of less than 14 inches**, imported in either finished or unfinished form" and "{t}hese formed or forged fittings **are used to join sections in piping systems where conditions require permanent, welded**

---

[60] *Id.*
[61] *See* SCI's Comments.
[62] *Id.* at 2.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *See* Anvil's Comments.

**connections, as distinguished from fittings based on other fastening methods** (*e.g.*, threaded, grooved, or bolted fittings)."[69]

As stated by Vandewater, "Vandewater's threaded branch outlets are manufactured from forged steel bars, and its grooved branch outlets are machined from welded pipe."[70] Vandewater also states that, "Vandewater offers CEREICO brand threaded steel branch outlets in sizes ranging from ½ inch to 2 ½ inches. Vandewater also offers CEREICO brand grooved steel branch outlets in sizes ranging from 1 1/4 inch to 8 inches.[71] Further, Vandewater states that, "a steel branch outlet is welded to a hole cut into the side of a pipe." [72]

A plain reading of the scope includes carbon steel butt-weld pipe fittings that have an inside diameter of fourteen inches or less, which require a weld to be permanently attached to a piping system. Based on Vandewater's description, and the samples provided, the steel branch outlets are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections. Thus, we find that Vandewater's description of its steel branch outlets matches the description of the scope covering butt-weld pipe fittings.

The *China Butt-Weld Order* does not require that each end of the pipe fitting be welded. The scope provides that butt-weld pipe fittings subject to the *China Butt-Weld Order* "are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)." This scope language references piping systems as an example of an end use application that requires permanent, welded connections.[73] This example illustrates that a welded connection distinguishes subject merchandise from pipe fittings that rely on other fastening methods. However, this scope language does not limit the scope to butt-weld pipe fittings with a welded connection on both ends. A butt-weld pipe fitting with a single welded connection can be used to join pipe sections where conditions require permanent, welded connections. This is consistent with the King Scope Ruling, in which Commerce found that "the second sentence of the scope distinguishes butt-welding from other types of fastening methods" and "uses piping systems as an example of an instance where a permanent, welded connection is desired."[74] Thus, we find that the scope language can be reasonably interpreted to include butt-weld pipe fittings with a single welded connection and, thus, can be reasonably interpreted to include Vandewater's steel branch outlets.

The other sources enumerated in 19 CFR 351.225(k)(1) further support Commerce's interpretation of the scope. The petition explains that "{t}he edges of finished butt-weld fittings are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins

---

[69] *See China Butt-Weld Order.*
[70] *See* Scope Ruling Request at 4.
[71] *Id.*
[72] *Id.* at 12 and Exhibit 7.
[73] *See King Supply*, 674 F.3d at 1348-51.
[74] *See* King Scope Ruling at 5.

the fitting to the pipe."[75]  This indicates that only a single welded connection is required to join the fitting to the piping system.  According to the ITC's final determination from the most recent sunset review of the *China Butt-Weld Order*, "{t}he beveled edges of butt-weld fittings distinguish them from other types of pipe fittings, such as threaded, grooved, or bolted fittings, which rely on different types of fastening methods.  When placed against the end of a beveled pipe or another fitting, the beveled edges form a shallow channel that accommodates the 'bead' of the weld that fastens the two adjoining pieces."[76]  This beveled edge is necessary to facilitate a permanent, welded connection to the piping system.  Additionally, caps are one of the most common shapes of butt-weld pipe fittings.[77]  Caps are used to seal the end of a pipe and, thus, fittings with only one welded connection are not excluded from the scope of the order.[78]  Because Vandewater's steel branch outlets each feature a beveled end connection, they are butt-weld pipe fittings that are welded into permanent, fixed piping systems.  This physical characteristic distinguishes Vandewater's steel branch outlets from pipe fittings that fall outside the scope of the *China Butt-Weld Order*.

Vandewater has argued that its steel branch outlets are not butt-weld pipe fittings because butt-weld pipe fittings are always welded to the end of a pipe with an end-to-end connection consisting of a perpendicular connection on a single plane.[79]  However, there is nothing in the scope language or the sources under 19 CFR 351.225(k)(1) that limits the scope of the *Chinese Butt-Weld Order* to butt-weld pipe fittings with an end-to-end, flat, perpendicular, or single plane connection.  Other than the existence of a beveled edge, there are no angle restrictions to what is considered a butt-weld connection according to the scope and the 19 CFR 351.225(k)(1) sources.  Furthermore, simply having a fitting with a connection other than a butt-weld (*e.g.*, threaded or grooved) does not distinguish steel branch outlets from butt-weld pipe fittings.  According to the scope language and the 19 CFR 351.225(k)(1) sources, only a single welded connection is required.

Vandewater also includes arguments regarding the preliminary ITC injury report in the ongoing antidumping and countervailing duty investigations of forged steel fittings from China.[80]  However, the proposed scope in the forged steel fittings investigations expressly excludes (all fittings that have a maximum pressure rate of 300 pounds of pressure/PSI or less," and as Vandewater has argued, its steel branch outlets meet both of those criteria.  Merchandise expressly excluded from an investigation is not part of the "class or kind" of merchandise on which Commerce may find dumping, on which the ITC may find injury, or on which Commerce issues an order and to which Customs and Border Protection applies duties.[81]  Accordingly,

---

[75] *See* the Petitioners' Letter, "In the Matter of Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China and from Thailand," dated May 22, 1991 (Petition).

[76] *See* Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. Nos. 731-TA-308-310 and 520-521, at I-4 (Fourth Review), USITC Pub. 4628 (August 2016).

[77] *Id.* at I-4.

[78] *Id.* at I-4 and Figure I-1.

[79] *See* Scope Ruling Request at 12-15 and Exhibit 7.

[80] *Id.* at 22-24.

[81] *See* Sections 731 (directing the imposition of duties on a class or kind of merchandise) and 771(25) (defining subject merchandise as a class or kind of merchandise covered by an investigation or order) of the Tariff Act of 1930, as amended.

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

Vandewater's steel branch outlets are not part of the "class or kind" of merchandise covered by the forged steel fittings investigations, and therefore there is no concern about two existing or future antidumping duty orders applying to the same merchandise in this case.[82]

Furthermore, the interested parties also raise arguments relying on the Sprink Scope Ruling.[83] We agree that the products at issue in the Sprink Scope Ruling were essentially physically identical to Vandewater's steel branch outlets. However, we note that Commerce analyzed those products under the *Taiwan Butt-Weld Order* and not the *China Butt-Weld Order*. We recognize that some of the language in both orders is the same, but as Vandewater points out, there is also language unique to the *China Butt-Weld Order*. Accordingly, we are not bound by the agency's analysis in the Sprink Scope Ruling, although we note that here, as in that case, we have concluded that the merchandise is covered by the scope of an antidumping duty order on "butt-weld pipe fittings" because the merchandise is permanently joined by welding.

Pursuant to 19 CFR 351.225(d) and (k)(1), we find that the language of the scope of the *China Butt-Weld Order*, as well as the descriptions of the merchandise contained in the petition, the King Scope Ruling, and the ITC's final determination from the most recent sunset review are dispositive. Based on the foregoing analysis, we conclude that the *China Butt-Weld Order* can be reasonably interpreted to include Vandewater's steel branch outlets.

---

[82] We note that, in the forged steel fittings from China investigations, Commerce explained that "butt weld outlets" were excluded, which it defined as outlets butt welded at both ends. As we have explained in this decision, outlets butt welded at only one end are covered by the *China Butt-Weld Order*. In light of the fact that the product at issue has a maximum pressure rate of under 300 pounds of pressure/PSI, we need not address this distinction further for purposes of this scope ruling.

[83] *See* Scope Ruling Request at 2.

Filed By: Annathea Cook, Filed Date: 9/10/18 3:30 PM, Submission Status: Approved

Barcode:3752679-01 A-570-814 SCO - Scope Inquiry  -  Vandewater

**Recommendation**

For the reasons discussed above, and in accordance with 19 CFR 351.225(d) and (k)(1), we recommend finding that the steel branch outlets described by Vandewater fall within the scope of the *China Butt-Weld Order*.  If you agree, we will notify Customs and Border Protection of our determination and send a copy of this memorandum to all interested parties on the scope service list *via* first class mail, as directed by 19 CFR 351.225(f)(4).

☒                          ☐
_____        _____
   Agree                    Disagree

9/10/2018

X  *James Maeder*
_____

Signed by: JAMES MAEDER

James Maeder
Associate Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations
  performing the duties of Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

12

19 C.F.R. § 351.225
(2018)

(i) The date on which the Secretary released disclosure documents to that party; or

(ii) The date on which the Secretary held a disclosure meeting with that party.

(3) *Replies to comments.* Replies to comments submitted under paragraph (c)(1) of this section must be filed within five days after the date on which the comments were filed with the Secretary. The Secretary will not consider replies to comments submitted in connection with a preliminary determination.

(4) *Extensions.* A party to the proceeding may request an extension of the time limit for filing comments concerning a ministerial error in a final determination or final results of review under § 351.302(c) within three days after the date of any public announcement, or, if there is no public announcement, within five days after the date of publication of the final determination or final results of review, as applicable. The Secretary will not extend the time limit for filing comments concerning a significant ministerial error in a preliminary determination.

(d) *Contents of comments and replies.* Comments filed under paragraph (c)(1) of this section must explain the alleged ministerial error by reference to applicable evidence in the official record, and must present what, in the party's view, is the appropriate correction. In addition, comments concerning a preliminary determination must demonstrate how the alleged ministerial error is significant (*see* paragraph (g) of this section) by illustrating the effect on individual weighted-average dumping margin or countervailable subsidy rate, the all-others rate, or the country-wide subsidy rate (whichever is applicable). Replies to any comments must be limited to issues raised in such comments.

(e) *Corrections.* The Secretary will analyze any comments received and, if appropriate, correct any significant ministerial error by amending the preliminary determination, or correct any ministerial error by amending the final determination or the final results of review (whichever is applicable). Where practicable, the Secretary will an-

nounce publicly the issuance of a correction notice, and normally will do so within 30 days after the date of public announcement, or, if there is no public announcement, within 30 days after the date of publication, of the preliminary determination, final determination, or final results of review (whichever is applicable). In addition, the Secretary will publish notice of such corrections in the FEDERAL REGISTER. A correction notice will not alter the anniversary month of an order or suspended investigation for purposes of requesting an administrative review (*see* § 351.213) or a new shipper review (*see* § 351.214) or initiating a sunset review (*see* § 351.218).

(f) *Definition of "ministerial error."* Under this section, *ministerial error* means an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial.

(g) *Definition of "significant ministerial error."* Under this section, *significant ministerial error* means a ministerial error (*see* paragraph (f) of this section), the correction of which, either singly or in combination with other errors:

(1) Would result in a change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin or the countervailable subsidy rate (whichever is applicable) calculated in the original (erroneous) preliminary determination; or

(2) Would result in a difference between a weighted-average dumping margin or countervailable subsidy rate (whichever is applicable) of zero (or *de minimis*) and a weighted-average dumping margin or countervailable subsidy rate of greater than *de minimis*, or vice versa.

**§ 351.225  Scope rulings.**

(a) *Introduction.* Issues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation. Such issues can arise because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms. At

other times, a domestic interested party may allege that changes to an imported product or the place where the imported product is assembled constitutes circumvention under section 781 of the Act. When such issues arise, the Department issues "scope rulings" that clarify the scope of an order or suspended investigation with respect to particular products. This section contains rules regarding scope rulings, requests for scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation.

(b) *Self-initiation.* If the Secretary determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping or countervailing duty order or a suspended investigation, the Secretary will initiate an inquiry, and will notify all parties on the Department's scope service list of its initiation of a scope inquiry.

(c) *By application*—(1) *Contents and service of application.* Any interested party may apply for a ruling as to whether a particular product is within the scope of an order or a suspended investigation. The application must be served upon all parties on the scope service list described in paragraph (n) of this section, and must contain the following, to the extent reasonably available to the interested party:

(i) A detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number;

(ii) A statement of the interested party's position as to whether the product is within the scope of an order or a suspended investigation, including:

(A) A summary of the reasons for this conclusion,

(B) Citations to any applicable statutory authority, and

(C) Any factual information supporting this position, including excerpts from portions of the Secretary's or the Commission's investigation, and relevant prior scope rulings.

(2) *Deadline for action on application.* Within 45 days of the date of receipt of an application for a scope ruling, the Secretary will issue a final ruling under paragraph (d) of this section or will initiate a scope inquiry under paragraph (e) of this section.

(d) *Ruling based upon the application.* If the Secretary can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, whether a product is included within the scope of an order or a suspended investigation, the Secretary will issue a final ruling as to whether the product is included within the order or suspended investigation. The Secretary will notify all persons on the Department's scope service list (*see* paragraph (n) of this section) of the final ruling.

(e) *Ruling where further inquiry is warranted.* If the Secretary finds that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, the Secretary will notify by mail all parties on the Department's scope service list of the initiation of a scope inquiry.

(f) *Notice and procedure.* (1) Notice of the initiation of a scope inquiry issued under paragraph (b) or (e) of this section will include:

(i) A description of the product that is the subject of the scope inquiry; and

(ii) An explanation of the reasons for the Secretary's decision to initiate a scope inquiry;

(iii) A schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.

(2) The Secretary may issue questionnaires and verify submissions received, where appropriate.

(3) Whenever the Secretary finds that a scope inquiry presents an issue of significant difficulty, the Secretary will issue a preliminary scope ruling, based upon the available information at the time, as to whether there is a reasonable basis to believe or suspect that the product subject to a scope inquiry is included within the order or suspended

**International Trade Administration, Commerce**                    **§ 351.225**

investigation. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the preliminary scope ruling, and will invite comment. Unless otherwise specified, interested parties will have within twenty days from the date of receipt of the notification in which to submit comments, and ten days thereafter in which to submit rebuttal comments.

(4) The Secretary will issue a final ruling as to whether the product which is the subject of the scope inquiry is included within the order or suspended investigation, including an explanation of the factual and legal conclusions on which the final ruling is based. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the final scope ruling.

(5) The Secretary will issue a final ruling under paragraph (k) of this section (other scope rulings) normally within 120 days of the initiation of the inquiry under this section. The Secretary will issue a final ruling under paragraph (g), (h), (i), or (j) of this section (circumvention rulings under section 781 of the Act) normally within 300 days from the date of the initiation of the scope inquiry.

(6) When an administrative review under § 351.213, a new shipper review under § 351.214, or an expedited antidumping review under § 351.215 is in progress at the time the Secretary provides notice of the initiation of a scope inquiry (see paragraph (e)(1) of this section), the Secretary may conduct the scope inquiry in conjunction with that review.

(7)(i) The Secretary will notify the Commission in writing of the proposed inclusion of products in an order prior to issuing a final ruling under paragraph (f)(4) of this section based on a determination under:

(A) Section 781(a) of the Act with respect to merchandise completed or assembled in the United States (other than minor completion or assembly);

(B) Section 781(b) of the Act with respect to merchandise completed or assembled in other foreign countries; or

(C) Section 781(d) of the Act with respect to later-developed products which incorporate a significant technological advance or significant alteration of an earlier product.

(ii) If the Secretary notifies the Commission under paragraph (f)(7)(i) of this section, upon the written request of the Commission, the Secretary will consult with the Commission regarding the proposed inclusion, and any such consultation will be completed within 15 days after the date of such request. If, after consultation, the Commission believes that a significant injury issue is presented by the proposed inclusion of a product within an order, the Commission may provide written advice to the Secretary as to whether the inclusion would be inconsistent with the affirmative injury determination of the Commission on which the order is based.

(g) *Products completed or assembled in the United States.* Under section 781(a) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order imported parts or components referred to in section 781(a)(1)(B) of the Act that are used in the completion or assembly of the merchandise in the United States at any time such order is in effect. In making this determination, the Secretary will not consider any single factor of section 781(a)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(a)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(h) *Products completed or assembled in other foreign countries.* Under section 781(b) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order, at any time such order is in effect, imported merchandise completed or assembled in a foreign country other than the country to which the order applies. In making this determination, the Secretary will not consider any single factor of section 781(b)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(b)(1)(D) of the Act, or of

processing performed by an affiliated person under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(i) *Minor alterations of merchandise.* Under section 781(c) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order articles altered in form or appearance in minor respects.

(j) *Later-developed merchandise.* In determining whether later-developed merchandise is within the scope of an antidumping or countervailing duty order, the Secretary will apply section 781(d) of the Act.

(k) *Other scope determinations.* With respect to those scope determinations that are not covered under paragraphs (g) through (j) of this section, in considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary will take into account the following:

(1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

(2) When the above criteria are not dispositive, the Secretary will further consider:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

(l) *Suspension of liquidation.* (1) When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

(2) If the Secretary issues a preliminary scope ruling under paragraph

(f)(3) of this section to the effect that the product in question is included within the scope of the order, any suspension of liquidation described in paragraph (l)(1) of this section will continue. If liquidation has not been suspended, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary issues a preliminary scope ruling to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the product ended, and will instruct the Customs Service to refund any cash deposits or release any bonds relating to that product.

(3) If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

(4) If, within 90 days of the initiation of a review of an order or a suspended investigation under this subpart, the Secretary issues a final ruling that a product is included within the scope of the order or suspended investigation that is the subject of the review, the Secretary, where practicable, will include sales of that product for purposes of the review and will seek information

regarding such sales. If the Secretary issues a final ruling after 90 days of the initiation of the review, the Secretary may consider sales of the product for purposes of the review on the basis of non-adverse facts available. However, notwithstanding the pendency of a scope inquiry, if the Secretary considers it appropriate, the Secretary may request information concerning the product that is the subject of the scope inquiry for purposes of a review under this subpart.

(m) *Orders covering identical products.* Except for a scope inquiry and a scope ruling that involves section 781(a) or section 781(b) of the Act (assembly of parts or components in the United States or in a third country), if more than one order or suspended investigation cover the same subject merchandise, and if the Secretary considers it appropriate, the Secretary may conduct a single inquiry and issue a single scope ruling that applies to all such orders or suspended investigations.

(n) *Service of applications; scope service list.* The requirements of §351.303(f) apply to this section, except that an application for a scope ruling must be served on all persons on the Department's scope service list. For purposes of this section, the "scope service list" will include all persons that have participated in any segment of the proceeding. If an application for a scope ruling in one proceeding results in a single inquiry that will apply to another proceeding (*see* paragraph (m) of this section), the Secretary will notify persons on the scope service list of the other proceeding of the application for a scope ruling.

(o) *Publication of list of scope rulings.* On a quarterly basis, the Secretary will publish in the FEDERAL REGISTER a list of scope rulings issued within the last three months. This list will include the case name, reference number, and a brief description of the ruling.

## Subpart C—Information and Argument

**§ 351.301  Time limits for submission of factual information.**

(a) *Introduction.* This section sets forth the time limits for submitting factual information, as defined by §351.102(b)(21). The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. Notwithstanding paragraph (b) of this section, the Secretary may request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information. Section 351.302 sets forth the procedures for requesting an extension of such time limits, and provides that, unless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established in the Department's regulations. Section 351.303 contains the procedural rules regarding filing (including procedures for filing on non-business days), format, translation, service, and certification of documents. In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the following: The time limit for the response; the information to be provided; the form and manner in which the interested party must submit the information; and that failure to submit the requested information in the requested form and manner by the date specified may result in use of the facts available under section 776 of the Act and §351.308.

(b) *Submission of factual information.* Every submission of factual information must be accompanied by a written explanation identifying the subsection of §351.102(b)(21) under which the information is being submitted.

(1) If an interested party states that the information is submitted under §351.102(b)(21)(v), the party must explain why the information does not satisfy the definitions described in §351.102(b)(21)(i)–(iv).

(2) If the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation identifying the information which is already on the record that the factual information seeks to rebut, clarify, or correct, including the name of the interested party that submitted the information and the date on which the information was submitted.

(Form 19)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS
### CAFC Court Nos. 2023-1093, 2023-1141
### <u>Vandewater International Inc. v. US</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 12,480 words.[*]

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: January 9, 2023          Signature:       */s/ Lucius B. Lau*

                               Name:            Lucius B. Lau

---

[*] The total word count includes 8,500 words from Sigma's opening brief, as well as 3,950 words from the portions joined and adopted from the opening brief of Plaintiff-Appellant Smith-Cooper International, Inc.

## CERTIFICATE OF SERVICE

### <u>Vandewater International Inc. v. US</u>
### CAFC Court Nos. 2023-1093, 2023-1141

I hereby certify that on January 9, 2023 the foregoing document filed on behalf of SIGMA Corporation was served upon all parties by operation of the Court's electronic filing system.

Date: January 9, 2023                   */s/ Lucius B. Lau*
                                         Lucius B. Lau
                                         WHITE & CASE LLP
                                         701 Thirteenth Street, NW
                                         Washington, DC 20005
                                         (202) 626-3600