No. 2023-1093, 2023-1141

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

VANDEWATER INTERNATIONAL INC.,

Plaintiff,

SIGMA CORPORATION, SMITH-COOPER INTERNATIONAL, INC.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

ISLAND INDUSTRIES,

Defendant.

Appeal from the United States Court of International Trade in
Case No. 1:18-cv-00199, Senior Judge Leo M. Gordon

**BRIEF OF DEFENDANT-APPELLEE UNITED STATES**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                        JOSHUA E. KURLAND
JARED CYNAMON                      Senior Trial Counsel
Attorney                          U.S. Department of Justice
Office of the Chief Counsel       Civil Division
for Trade Enforcement & Compliance  Commercial Litigation Branch
U.S. Department of Commerce       P.O. Box 480, Ben Franklin Station
                                  Washington, D.C.  20044
                                  Tel: (202) 616-0477
                                  Email: Joshua.E.Kurland@usdoj.gov

April 20, 2023                    *Attorneys for Defendant-Appellee
                                  United States*

# **TABLE OF CONTENTS**

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF THE CASE...........................................................1

STATEMENT OF FACTS ................................................................2

I.    Legal Framework For Scope Rulings..........................................2

II.   Course Of Proceedings Below....................................................6

     A.  Commerce's Order And The Underlying Petition ..................6

     B.  Vandewater's Scope Request And Commerce's Initial Determination....8

     C.  The Vandewater Litigation And The Trial Court's Remand ................13

     D.  Remand Proceedings And The Trial Court's (k)(2) Ruling ..................16

SUMMARY OF THE ARGUMENT ...............................................22

ARGUMENT ..................................................................................24

I.    Standard Of Review....................................................................24

II.   The Court Should Disregard Materials And Arguments From Outside The Record Of This Case ..............................................................25

III.  Commerce's And The Trial Court's (k)(0) Analysis Was Lawful................28

     A.  The Term "Butt-Weld" Is Not Defined In The Order's Scope And Appellants' "Trade Usage" Arguments Take That Concept Too Far.....29

     B.  The Term "Butt-Weld" Pipe Fittings Lacks Unambiguous Meaning.....34

     C.  The *King Supply* Decision Does Not Support Appellants' Position.......40

     D.  SCI's Additional Arguments Lack Merit.................................43

IV.  Appellants' Claims That (k)(1) Sources Dispositively Exclude
     Vandewater's Welded Outlets From Commerce's Order Lack Merit ..........50

     A.  Commerce Lawfully Determined That The Petition Does Not
         Exclude Welded Outlets From The Order ................................................52

     B.  The ITC's 2016 Sunset Review Determination Does Not Exclude
         Welded Outlets From The Order............................................................59

     C.  SCI's Arguments Concerning Additional (k)(1) Sources Lack Merit....61

V.   SCI Forfeited Its "Mixed Entries" Challenge To Commerce's
     Suspension Instructions And The Issue Is Also Moot ..................................67

     A.  SCI Forfeited Its Claim Regarding "Mixed Entries" By Not Timely
         Raising It Below......................................................................................68

     B.  In Any Event, SCI's Claim Is Moot Because Vandewater Has No
         Suspended "Mixed Entries" ....................................................................72

     C.  This Court Should Decline To Address The Merits Of SCI's
         "Mixed Entries" Claim In The First Instance .........................................74

CONCLUSION ....................................................................................................74

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. United States*,
   59 F.4th 1349 (Fed. Cir. 2023) ...................................................... 37, 48

*ArcelorMittal Stainless Belgium N.V. v. United States*,
   694 F.3d 82 (Fed. Cir. 2012) ........................................................ 4, 33

*Axiom Res. Mgmt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009) .................................................... 27, 45

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) ............................................... 25, 27, 48

*Bowen v. City of New York*,
   476 U.S. 467 (1986) ...................................................................... 74

*Camp v. Pitts*,
   411 U.S. 138 (1973) ...................................................................... 27

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007) ....................................................... 27

*Downhole Pipe & Equip. L.P. v. United States*,
   776 F.3d 1369 (Fed. Cir. 2015) ...................................... 25, 50, 54, 66

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1087 (Fed. Cir. 2002) ......................................................... 3

*Ericsson GE Mobile Commc'ns, Inc. v. United States*,
   60 F.3d 778 (Fed. Cir. 1995) .......................................................... 33

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012) ....................................................... 27

*Fedmet Res. Corp. v. United States*,
   755 F.3d 912 (Fed. Cir. 2014) ....................................................... 5, 6

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ...............................................25

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
    582 F.3d 1288 (Fed. Cir. 2009) ...............................................71

*King Supply Co. v. United States*,
    674 F.3d 1343 (Fed. Cir. 2012) .................................... *passim*

*Local No. 8-6, Oil Chem. & Atomic Workers Int'l Union v. Missouri*,
    361 U.S. 363 (1960).................................................................73

*M S Int'l, Inc. v. United States*,
    32 F.4th 1145 (Fed. Cir. 2022) ..............................................63

*Melendez Camilo v. United States*,
    642 F.3d 1040 (Fed. Cir. 2011) ...................................... 32, 57

*Meridian Prods. LLC v. United States*,
    851 F.3d 1375 (Fed. Cir. 2017) .................................... *passim*

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008) ...................................... 25, 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................31

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ...............................................25

*Novosteel SA v. United States*,
    284 F.3d 1261 (Fed. Cir. 2002) .................................... *passim*

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ...............................................25

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ...............................................25

*Sango Int'l, L.P. v. United States,*
    484 F.3d 1371 (Fed. Cir. 2007) .............................................................5

*Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States,*
    268 F.3d 1376 (Fed. Cir. 2001) ...........................................................24

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,*
    776 F.3d 1351 (Fed. Cir. 2015) .............................................................3

*Smith v. Berryhill,*
    139 S. Ct. 1765 (2019)........................................................................74

*SmithKline Beecham Corp. v. Apotex Corp.,*
    439 F.3d 1312 (Fed. Cir. 2006) ........................................... 44, 51, 71

*Stein Indus. v. United States,*
    365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ......................................56

*SunPower Corp. v. United States,*
    253 F. Supp. 3d 1275 (Ct. Int'l Trade 2017) ......................................63

*Sunpreme Inc. v. United States,*
    946 F.3d 1300 (Fed. Cir. 2020) ...................................... 24, 56, 68, 69

*Tak Fat Trading Co. v. United States,*
    396 F.3d 1378 (Fed. Cir. 2005) .............................................................4

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,*
    482 F.3d 1330 (Fed. Cir. 2007) ...........................................................73

*Tolbert v. Queens Coll.,*
    242 F.3d 58 (2d Cir.2001) ...................................................................44

*Torrington Co. v. United States,*
    68 F.3d 1347 (Fed. Cir. 1995) .............................................................24

*United States v. Eurodif,*
    555 U.S. 305 (2009)............................................................................24

*United States v. Great Am. Ins. Co. of New York*,
    738 F.3d 1320 (Fed. Cir. 2013) .............................................................51

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952)...................................................................... 27-28

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977).......................................................... 37, 38, 39, 48

*United Steel and Fasteners, Inc. v. United States*,
    947 F.3d 794 (Fed. Cir. 2020) ..................................................... *passim*

*Vinson v. Washington Gas Light Co.*,
    321 U.S. 489 (1944)........................................................................73

*Whirlpool Corp. v. United States*,
    890 F.3d 1302 (Fed. Cir. 2018) ..............................................................6

*Wirth Ltd. v. United States*,
    5 F. Supp. 2d 968 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999) ....5

*Woodford v. Ngo*,
    548 U.S. 81 (2006).........................................................................71

**Statutes**

19 U.S.C. § 1673e ................................................................................2

28 U.S.C. § 2637.......................................................................... 27, 71

28 U.S.C. § 2639................................................................................24

**Regulations**

19 C.F.R. § 159.1 .............................................................................67

19 C.F.R. § 351.202 ...........................................................................55

19 C.F.R. § 351.225 ................................................................... *passim*

**Administrative Determinations**

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China,*
    57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992)............................... 7, 30

*Forged Steel Fittings from Italy and the People's Republic of China,*
    83 Fed. Reg. 60,397 (Dep't of Commerce Nov. 26, 2018) ................................64

*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,*
    86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021) ..................................3

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of this Court's Rules, counsel for defendant-appellee states that, other than the consolidated appeals forming this matter, he is unaware of any other appeal from this civil action that previously has been before this Court or any other appellate court under the same or similar title.  Counsel is likewise unaware of any case pending in this or any other court or agency that may directly affect or be affected by the decision in this appeal.  At the same time, counsel is aware of two actions that counsel understands are not "related" within the Court's rule, but involve the same or related legal issues (in the context of separate records in those cases).  These actions are:

- *Sigma Corporation v. United States*, Ct. Int'l Trade No. 19-00003, involving similar issues in a challenge to the Department of Commerce's scope determination concerning Sigma Corporation's products;

- *Smith-Cooper International, Inc. v. United States*, Ct. Int'l Trade No. 19-00011, involving similar issues in a challenge to the Department of Commerce's scope determination concerning Smith-Cooper's products.

Both cases are currently stayed pending the outcome of this litigation.  Finally, counsel is aware of a False Claims Act case before the Court of Appeals for the Ninth Circuit, *Island Industries, Inc., et al. v. Sigma Corp.*, No. 22-55603, that is stayed pending decisions in this case and in an unrelated Supreme Court matter.

## STATEMENT OF ISSUES

1.    Whether the trial court lawfully held that the butt-weld pipe fittings

(BWPFs) order at issue does not unambiguously exclude Vandewater International

Inc.'s (Vandewater's) welded steel branch outlet fittings.

2.    Whether, in remanding a Department of Commerce (Commerce)

scope determination made under 19 C.F.R. § 351.225(k)(1) for more fulsome

analysis under 19 C.F.R. § 351.225(k)(2), the trial court erred by failing to

conclude that the sources listed in section 351.225(k)(1) dispositively exclude

Vandewater's welded steel branch outlet fittings from the BWPFs order.

3.    Whether the trial court abused its discretion in holding that plaintiff-

appellant Smith-Cooper International, Inc. (SCI) failed to raise properly its current

claim regarding the potential suspension of liquidation for "mixed entries," and

whether the issue is moot in this case due to a lack of relevant Vandewater entries.

## STATEMENT OF THE CASE

This appeal concerns Commerce's determination in a proceeding examining

whether products imported by Vandewater fall within the scope of Commerce's

antidumping duty order covering butt-weld pipe fittings from China.  The trial

court remanded Commerce's determination for the agency to perform a more in-

depth analysis of Vandewater's products under the factors set forth in 19 C.F.R.

§ 351.225(k)(2).  Analyzing an extensive record on the products' characteristics

and treatment—including considerable trade usage evidence—Commerce found

(and the trial court upheld) that the order's scope covers Vandewater's products.

Appx1-124. Appellants are plaintiff-intervenors who intervened in the litigation

following the trial court's remand for Commerce to perform the more fulsome

"(k)(2)" analysis. *Appellants do not challenge that analysis or the trial court*

*decision sustaining it*. Rather, appellants argue that the trial court should have

concluded earlier that the order's scope unambiguously excludes Vandewater's

products (and hence their own products, which are subject to separate litigation).

Alternatively, they argue that that the trial court should have held that the more

limited sources that Commerce analyzed under 19 C.F.R. § 351.225(k)(1) in its

initial determination dispositively exclude Vandewater's products, superseding the

unchallenged, in-depth analysis that led Commerce and the trial court to find

otherwise. Finally, SCI raises a claim concerning Commerce's suspension of

liquidation in this case that the trial court held was not properly raised below.

## STATEMENT OF FACTS

### I.    Legal Framework For Scope Rulings

When Commerce issues an antidumping duty order, it defines the scope and

"includes a description of the subject merchandise, in such detail as {Commerce}

deems necessary." 19 U.S.C. § 1673e(a)(2). It is well-established that the scope

must be written in general terms because it concerns the overall "class or kind" of

merchandise subject to the order.  *Meridian Prods. LLC v. United States*, 851 F.3d

1375, 1379 (Fed. Cir. 2017) (discussing 19 C.F.R. § 351.225(a) and 19 U.S.C. §

1677(25)).  Hence, Commerce is often called upon to determine whether a certain

product is included within the scope of its orders, and does so by issuing a scope

ruling.  *Id.*; *see* 19 C.F.R. § 351.225(a); *Duferco Steel, Inc. v. United States*, 296

F.3d 1087, 1096 (Fed. Cir. 2002).  When Commerce confronts such a question, it

follows the analytical framework in its regulations.  19 C.F.R. § 351.225 (2020);[1]

*see also Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d

1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing

the interpretation of the scope of antidumping or countervailing orders.").

    The first step in determining whether a certain product is within the scope of

an order is considering the language of the order itself, sometimes referred to as the

"(k)(0)" inquiry because it precedes the analyses under sections (k)(1) and (k)(2) of

Commerce's regulation.  *See Meridian Prods.*, 851 F.3d at 1381 (explaining that

"case law has added another layer to the inquiry" such that Commerce "must begin

with the order's scope to determine whether it contains an ambiguity and, thus, is

susceptible to interpretation") (citations omitted).  Scope language is deemed

---

[1] Commerce revised this regulation in 2021, but the revision does not apply
to this case.  *See Regulations to Improve Administration and Enforcement of
Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't of
Commerce Sept. 20, 2021).  Hence, throughout this brief, all citations to section
351.225 refer to the previous version of the regulation.

"unambiguous" if the relevant terms have "a single clearly defined or stated meaning." *Id.* at 1381 n.7 (citation omitted). Importantly, the threshold to show that Commerce justifiably found ambiguity is low. *Id.* at 1381 n.6 (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

Applying this low threshold, for example, this Court has treated the term "flat-rolled" (analogous to the undefined term "butt-weld" here) as ambiguous. *Novosteel*, 284 F.3d at 1266, 1271-72. A finding of no ambiguity may be rebutted with sufficient evidence of trade usage, *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012), but "consideration of industry jargon {for this limited purpose} is not the same as conducting a full-fledged analysis of the factors embodied in 19 C.F.R. § 351.225(k)(2)." *Id.* at 88 n.8.

Second, if the scope language does not unambiguously answer the question, Commerce engages in an interpretive analysis using the sources enumerated in 19 C.F.R. § 351.225(k)(1). These include descriptions of the merchandise contained in the petition, the initial investigation, prior Commerce determinations (including scope determinations), and those of the International Trade Commission (ITC). *Meridian Prods.*, 851 F.3d at 1382. If the descriptions of the subject merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the products fall within the order's scope. 19 C.F.R. § 351.225(d); *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir.

2005).  The (k)(1) sources are "dispositive" when they "definitively answer the scope question."  *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).  This Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as a question of fact.  *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020).

If Commerce finds the (k)(1) sources non-dispositive, it will initiate a scope inquiry pursuant to 19 C.F.R. § 351.225(e) to consider the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2).  *See, e.g.*, *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014).  These criteria are:  (i) "The physical characteristics of the product"; (ii) "The expectations of the ultimate purchasers"; (iii) "The ultimate use of the product"; (iv) "The channels of trade in which the product is sold"; and (v) "The manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).  The criteria help to "determine whether a product is sufficiently similar as merchandise unambiguously within the scope of an order as to conclude the two are merchandise of the same class or kind."  *Wirth Ltd. v. United States*, 5 F. Supp. 2d 968, 981 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999).  Commerce has discretion in how to balance the criteria. *Meridian Prods.*, 851 F.3d at 1382 (citations omitted).

The (k)(0) inquiry presents a question of law that courts review *de novo*, whereas the question of whether a product meets the scope terms then presents a

question of fact reviewed for substantial evidence. *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (citing *Meridian Prods.*, 851 F.3d at 1382). At the same time, because the meaning and scope of orders are particularly within Commerce's expertise and special competence, this Court grants Commerce "substantial deference with regard to its interpretation of its own Orders." *Id.* (citing *Meridian Prods.*, 851 F.3d at 1381-82); *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citations omitted).[2] Deference is also appropriate because scope cases are "highly fact-intensive and case-specific." *Fedmet*, 755 F.3d at 918 (quoting *King Supply*, 674 F.3d at 1345). Parties challenging Commerce scope determinations thus confront a high barrier to reversal. *United Steel and Fasteners*, 947 F.3d at 798 (citations omitted).

## II.   Course Of Proceedings Below

### A. Commerce's Order And The Underlying Petition

The BWPFs order stems from a 1992 investigation. Appx4-5; Appx23. The order's scope covers, in relevant part:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings).

---

[2] Appellant Sigma's contrary suggestion is inaccurate. *See* Sigma Br. 23-24.

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 Fed. Reg. 29,702-03 (Dep't of Commerce July 6, 1992) (*China BWPFs Order*).

The domestic industry petition that prompted Commerce's investigation included a non-exhaustive list of basic butt-weld pipe fitting shapes, as well as illustrated "Examples of Carbon Steel Butt-Weld Fittings." Appx707; Appx712. These include a "saddle"—a type of "seamless welded fitting" with a contoured edge to be welded to the curved side of a pipe (reproduced below). Appx755-756.



The petition also lists "caps" among the most common butt-weld pipe fitting shapes. Appx712. "Caps are used to seal the end of a pipe," Appx652-653, and illustrations of caps in a pictorial index and product catalog in the petition show one beveled end and the cap itself on the other end. Appx756; Appx760-764. Likewise, the petition includes "lap joint stub ends," another undisputed butt-weld pipe fitting that have a beveled edge for a permanent welded connection on one end, while the other end is temporarily bolted in place using a flange. Appx756; Appx72, Appx77, Appx103-104, Appx107-108 (discussing these fittings).

7

Contemporaneously with its *China BWPFs Order*, Commerce issued a scope ruling concerning merchandise "essentially physically identical" to Vandewater's merchandise, in which the agency interpreted the term "butt-weld pipe fittings" for purposes of its antidumping duty order on BWPFs from Taiwan. Appx25-26. The "Sprink Scope Ruling" determined that "Sprink-let" outlets were BWPFs under the Taiwan order, even though they have only one end welded to the piping system. Appx468-471 (Sprink Scope Ruling); Appx470-471 (concluding Taiwan order "does not require that all pipe fitting connections be welded" and that Sprink-let is a "butt-weld pipe fitting" because it has a beveled edge for permanent welding). Since 1992, Commerce has classified outlets "essentially physically identical" to Vandewater's products as BWPFs subject to the Taiwan order.

### B. <u>Vandewater's Scope Request And Commerce's Initial Determination</u>

Vandewater filed its scope request in May 2018. Appx23; Appx167. Vandewater's products are known as CEREICO brand "steel branch outlets" or "welded outlets." Appx23. They are designed for fire sprinklers and other low-pressure piping systems and have two ends. *Id.* The "header" or "run" side is designed to be placed against the mid-section of another pipe (called a "header" or "run" pipe), and is contoured to match the curve of the header pipe's mid-section. *Id.* The contoured end also has a beveled edge that permits it to be welded to the header pipe. *Id.* According to Vandewater, the contoured end allows the welded

outlet to sit atop the header pipe "like a saddle." *Id.* (citing Appx169). The other end of the fitting, the "branch" or "outlet" side, is either threaded or grooved. *Id.* The threaded or grooved end is intended to connect to another component of the piping system, such as a sprinkler head, using a non-welded connection. *Id.*

Vandewater's scope request argued that the scope language of Commerce's order excludes Vandewater's products because the industry's understanding of the term "butt-weld pipe fittings" does not include steel branch outlets. Appx175-183. Vandewater further asserted that BWPFs require a welded end-to-end connection with another pipe, a beveled edge on each end of the fitting as well as on the pipe to which it is welded, and a welded joint on the same plane. *Id.* Vandewater stated that its welded outlets do not satisfy these alleged requirements because they are welded to the side of another pipe, do not have a beveled edge on each end (the "header" or "run" side is beveled while the "branch" or "outlet" side is threaded or grooved), and have a contoured edge that does not allow adjoining pipes to be welded on the same plane. *Id.* Vandewater similarly asserted that BWPFs create permanent welded connections, and while its welded outlets have a permanent connection on one end, the other end is threaded or grooved, creating fastening methods specifically excluded from the order. Appx181.

At the same time, Vandewater's scope request included an industry catalog with an illustration of a "Vesselet"—a similar product with a contoured edge—and

the illustration (reproduced below) points directly to a contoured end welded to the curved side of a pipe and labels it a "butt-weld" along with a description that states "{t}rue butt-weld installation in header." Appx403; *see* Appx390-410.



Domestic industry producer Island Industries Inc. (Island) opposed Vandewater's scope request. Appx24; Appx452-484. Addressing Vandewater's contention that the "industry" does not regard outlets as butt-weld pipe fittings, Island highlighted that appellant SCI had imported steel branch outlets under the "Cooplet" brand name and described these products as "butt weld outlets." Appx456. Island likewise highlighted the Sprink Scope Ruling and its relationship

to the history of BWPFs proceedings.  Appx453-455, Appx462-471.  Island also disputed Vandewater's arguments relying on industry standards.  Appx456-458.[3]

Appellant Sigma Corporation entered an appearance but made no other filings during Vandewater's initial scope proceeding, meaning that Sigma did not qualify as an "interested party" for intervention purposes when the matter ripened into litigation.  SCI filed July 2018 comments supporting Vandewater's position. In response to Island's assertion that SCI has imported steel branch outlet products described as "butt weld outlets," SCI admitted that import documentation for its Cooplet products had included the phrases "threaded butt welded outlet," "grooved butt welded outlet," and "butt weld outlets" from December 2017 through April 2018, but claimed that this was an error and that the documentation had since been changed.  Appx571.  Sigma and SCI also filed separate scope requests contending that their products were excluded from the *China BWPFs Order*.

Commerce began its analysis by examining the scope language, and in doing so, analyzed "butt-weld" as an adjective describing the type of pipe fittings within the scope.  Commerce observed that a "plain reading of the scope includes carbon steel butt-weld pipe fittings that have an inside diameter of fourteen inches or less, which require a weld to be permanently attached to a piping system."  Appx139.

---

[3] Because Sigma had filed its own scope request by this point, Island filed its submission in both proceedings and addressed both requestors.  Appx452.

11

Applying the scope language to Vandewater's merchandise, Commerce found that "the steel branch outlets are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections." *Id.* It was apparent that "Vandewater's description of its steel branch outlets matches the description of the scope covering butt-weld pipe fittings." *Id.*

Commerce did not stop its analysis there, however, because the term "butt-weld pipe fittings" is undefined in the scope, and the scope language does not on its own unambiguously answer the question of whether Vandewater's steel branch outlets are BWPFs covered by the order. Accordingly, Commerce engaged in an interpretive analysis that considered the (k)(1) sources to determine whether the term "butt-weld pipe fittings" encompassed Vandewater's steel branch outlets.

Ultimately, based upon its (k)(1) analysis, Commerce found that the distinguishing characteristic of butt-weld pipe fittings under the *China BWPFs Order* is at least one end with a beveled edge facilitating permanent attachment to another pipe or fitting. Appx35; Appx139-140. Commerce noted, for example, that the petition's inclusion of caps showed that "fittings with only one welded connection are not excluded from the scope of the order." Appx140.

Addressing the Sprink Scope Ruling, Commerce stated that it addressed a product "essentially physically identical" to Vandewater's outlets. Appx141.

12

Commerce explained that it was "not *bound* by the agency's analysis in the Sprink

Scope Ruling" because that ruling involved a different proceeding and slightly

different scope language. *Id.* (emphasis added); *see* Appx25-26. At the same time,

Commerce viewed the Sprink ruling as a relevant (k)(1) source that had previously

interpreted the term "butt-weld pipe fittings" regarding nearly identical products

and did not require the additional characteristics and restrictions that Vandewater

asserted. Appx134-136 (listing Sprink ruling as relevant prior ruling). Commerce

noted that "here, as in that case, we have concluded that the merchandise is

covered by the scope of an antidumping duty order on 'butt-weld pipe fittings'

because the merchandise is permanently joined by welding." Appx141.

Thus, Commerce found Vandewater's products to be within the order's

scope. Appx142. As a result of its scope ruling, Commerce, consistent with 19

CFR § 351.225(l)(3), issued instructions to U.S. Customs and Border Protection

(CBP) to continue to suspend liquidation of entries of BWPFs from China,

including Vandewater's steel branch outlets. Appx4287-4288, Appx4292-4294.

## C. **The Vandewater Litigation And The Trial Court's Remand**

Vandewater challenged Commerce's scope ruling before the Court of

International Trade in September 2018. Appx153. In early 2019, Sigma and SCI,

which had their scope exclusion requests similarly denied by Commerce, filed their

own separate actions, Ct. Int'l Trade Nos. 19-00003 and 19-00011.

Following the Sigma and SCI complaints, the plaintiffs filed motions to consolidate the three cases.  We opposed the motions because (1) the plaintiffs were not all parties to each other's cases (meaning that they did not have the right to intervene or to access business proprietary information for the cases in which they did not participate); (2) the three actions challenged separate Commerce scope determinations resulting from independent proceedings that assessed separate merchandise and administrative records; and (3) consolidation would introduce the risk of parties conflating portions of the records, and potentially using information from one proceeding to challenge Commerce's determination in another.  Ct. Int'l Trade No. 18-0199, ECF No. 39.

Ultimately, following an extended back-and-forth with the parties, the trial court denied the motions to consolidate, but ordered simultaneous initial briefing across the three cases on what the plaintiffs identified in the interim as a threshold "(k)(0)" legal issue of whether the scope term "butt-weld pipe fitting" has an unambiguous meaning excluding each plaintiff's products from the order. Appx4111-4125.  Following that briefing, in which we responded separately to each of the three plaintiffs' (k)(0) claims, the trial court issued a decision across the three cases rejecting the (k)(0) claims.  Appx143-148.

In rejecting the (k)(0) arguments, the trial court highlighted two aspects of the record in all three proceedings as undermining the position that the scope term

14

"butt-weld pipe fitting" has a single, unambiguous meaning defined by trade usage. Appx147. First, the court noted SCI's admission that its importers had referred to branch outlets as a "threaded butt-welded outlet," a "grooved butt-welded outlet," and "butt-weld outlets"—which weakens any claim that there is a well-known, uniform "trade usage" of "butt-weld fitting" that excludes such merchandise from the order, even if those descriptions were somehow in error as SCI claimed. *Id.* (referencing evidence appearing at Appx456, Appx571). Second, the trial court observed that, under the Sprink Scope Ruling, welded branch outlets have been classified as "butt-weld pipe fittings" since 1992 under the similar order covering BWPFs from Taiwan. *Id.* (citing Sprink Scope Ruling, Appx468-471).

Having denied the (k)(0) claims, the trial court proceeded to briefing on Commerce's (k)(1) analysis in its Vandewater scope ruling. In doing so, it stayed Sigma's and SCI's cases pending final resolution of Vandewater's case. Ct. Int'l Trade No. 19-00003, ECF No. 69; Ct. Int'l Trade No. 19-00011, ECF No. 71.

Upon reviewing Commerce's (k)(1) analysis—in which Commerce had concluded that the scope language and (k)(1) sources dispositively established that Vandewater's products are within the scope—the trial court remanded because it found that Commerce's determination was not supported by substantial evidence. Appx125-130. The trial court held that it was unreasonable for Commerce to find that the scope language and (k)(1) sources were dispositive because they did not

resolve whether products with only one welded end were covered by the *China BWPFs Order*. Appx127-130. With respect to the scope language, the trial court stated that "{t}he language of the Order itself simply does not resolve the issue of whether Vandewater's steel branch outlets are covered." Appx128. With respect to the (k)(1) sources, the trial court explained that, on the one hand, Commerce had determined 28 years earlier in the Sprink ruling that nearly identical products were within the scope of the companion Taiwan BWPFs order. Appx128-129. On the other hand, the trial court observed that certain language in the petition and in the ITC's most recent sunset review of the order suggest that BWPFs must have end-to-end connections with beveling on the ends of both the fitting and adjoining pipe, which is not descriptive of Vandewater's outlets. Appx129-130.

Overall, the trial court concluded that Commerce's determination that the (k)(1) sources were dispositive was not reasonable because Commerce dismissed the Sprink Scope Ruling as non-binding, and the other (k)(1) sources Commerce relied upon "do not really tell the court anything about the inclusion of steel branch outlets within the scope." Appx.130. Accordingly, the trial court remanded and directed Commerce to conduct a scope inquiry to evaluate the outlets using the criteria enumerated in 19 C.F.R. § 351.225(k)(2).

### D. Remand Proceedings And The Trial Court's (k)(2) Ruling

In accordance with the remand order, Commerce in October 2020 initiated a

scope inquiry and reopened the record to provide interested parties an opportunity to submit comments and factual information relating to the section 351.225(k)(2) criteria.  Appx28.  Vandewater, Sigma, and SCI each submitted comments and new factual information, arguing that Vandewater's steel branch outlets are not covered by the *China BWPFs Order*.  *Id.*  Island submitted comments and factual information maintaining that steel branch outlets are similar to other unambiguous examples of subject merchandise covered by the order.  *Id.*

The factual information Commerce received includes additional trade usage evidence.  Appx66-68 (discussing Appx2436, Appx2453-2539; Appx2392-2412). For example, product specification sheets for a U.S.-based outlet distributor called Aleum USA, reproduced below, describe threaded and grooved outlet products as having "{b}utt welding ends."  Appx67 (quoting Appx2523-2526).



Like Vandewater's outlets, Aleum USA's outlets have one threaded or grooved end and a contoured edge on the other end that is connected to the middle of

another pipe. *Id.* A product catalog for a producer of the domestic like product, Bonney Forge—which was submitted to Commerce by Vandewater—includes an illustration of a "Vesselet" designed to be welded to the curved side of a pipe like the steel branch outlets at issue (not an end-to-end connection). Like the version in Vandewater's scope exclusion request, the illustration labels the header end of the fitting as a "butt-weld" with a description stating "{t}rue butt-weld installation in header." Appx68 (quoting Appx2405); *see* Appx403. Further, Island submitted an updated version of a U.S. producer's product catalog that includes saddles as a type of "seamless welded fitting" displayed side-by-side with a range of other BWPFs, as well as the catalog for a major U.S. distributor of pipes and fittings that includes a saddle as one of the various "Standard Butt Weld Fitting Types." Appx67-68 (quoting Appx2454-2456, Appx2517, Appx2535).

After considering the totality of the record evidence, Commerce in July 2021 issued its remand results and determined that Vandewater's steel branch outlets are covered by the *China BWPFs Order* pursuant to the (k)(2) criteria. Appx21-124. Commerce performed a lengthy analysis in reaching this determination. *Id.*

Specifically, Commerce found that: (i) steel branch outlets possess physical characteristics similar to other subject merchandise because they are formed or forged, made of carbon steel, less than 14 inches in diameter, and designed to have at least one end with a beveled edge for permanent attachment to a pipe or fitting

(Appx65-74); (ii) the expectations of ultimate purchasers of steel branch outlets and other subject merchandise are similar because they expect both to be welded into permanent, fixed piping systems for gases or liquids and fire sprinkler systems are a contemplated application for subject merchandise (Appx75-77); (iii) the ultimate uses of steel branch outlets and other subject merchandise are similar because both are permanently welded to piping systems to change or divide the flow of liquids, *e.g.*, redirecting water in a fire sprinkler system (Appx78-80); (iv) steel branch outlets and other subject merchandise are sold in similar channels of trade because both are sold through distributors and to fabricators and contractors (Appx80); and (v) steel branch outlets and other subject merchandise are similarly advertised and displayed in online catalogs. Appx80-82. In making its finding, Commerce addressed the importers' comments and found that the evidence was insufficient to show that steel branch outlets are fundamentally different from subject merchandise such that they should not be considered within the class or kind of merchandise covered by the *China BWPFs Order*. Appx82-116.

In addition, Commerce explained its intent with respect to the suspension of liquidation and cash deposit requirements that CBP would be instructed to apply to Vandewater's entries if the remand redetermination were to be sustained. Appx82, Appx116-123; *see also* Appx4284-4285; Appx4287-4303 (responding to trial court's inquiries on this issue). No party, however, raised the issue concerning

allegedly suspended "mixed entries" consisting of subject and non-subject merchandise that SCI now raises before this Court.  Appx19.

The trial court issued an equally thorough decision sustaining Commerce's (k)(2) analysis in September 2022.  Appx1-20.[4]  In doing so, it examined and rejected multiple arguments relevant to this appeal.  For example, the trial court addressed plaintiffs' arguments concerning language in the Petition and 2016 ITC Sunset Review report, as well as their arguments concerning trade usage evidence for products similar to Vandewater's outlets, and concluded that "the court cannot agree with Plaintiffs that Commerce's determination here was unreasonable." Appx8-9.  Likewise, the court reviewed plaintiffs' arguments stemming from Commerce's determination in a separate proceeding concerning *Forged Steel Fittings* (in which Commerce structured the proceeding to avoid any conflict with its order in this case) and found that "Plaintiffs' argument falls short . . . because the scope exclusion guidelines Commerce determined in the *Forged Steel Fittings* investigation do not neatly correspond to the scope of products covered under the *China BWPFs Order*."  Appx10 (citation omitted).

---

[4] Because Sigma (as well as SCI) participated in the remand proceedings, both companies now qualified as interested parties for purposes of intervention. The trial court granted their July/August 2021 motions to intervene in the Vandewater case to challenge Commerce's (k)(2) analysis following remand. Appx162, ECF Nos. 120, 128.  Appellants are incorrect in suggesting that they intervened at an earlier stage of proceedings.  Sigma Br. 19; *see also* SCI Br. 9 (discussing (k)(1) briefing by "parties below," omitting SCI's non-party status).

Further, the trial court explained that "{t}hough Plaintiffs maintain that various physical characteristics of outlets make them unique from BWPFs, Commerce addressed each potentially distinguishable physical characteristic raised and found that other products covered by the *China BWPFs Order* also had the physical characteristics that Plaintiffs claimed were exclusive to outlets and not found in BWPFs." Appx11. The trial court also addressed plaintiffs' arguments concerning a report they had obtained from Mr. Walter Sperko (Appx12-13), relevant industry standards (Appx13-14), and applicable HTSUS subheadings (Appx14-15). Finally, the trial court declined to entertain SCI's argument concerning the applicability of Commerce's suspension of liquidation instructions to alleged "mixed entries" of both subject and non-subject merchandise, because SCI had raised the issue for the first time after briefing on the remand results. Appx19-20 (explaining that SCI's arguments appeared to have "evolved significantly" following briefing, and suggesting that issue might also be moot).

Again, save for the procedural suspension instructions issue, Sigma and SCI *do not challenge* Commerce's remand determination or the trial court's decision sustaining it. *See* SCI Br. 43-44. Nonetheless, they appeal the decisions rejecting Vandewater's (k)(0) arguments and remanding Commerce's (k)(1) analysis, on the grounds that the trial court should have found dispositively in Vandewater's favor at these earlier stages of the litigation. In doing so, they cite a significant volume

of material from the records of their separate stayed cases, which are not before the

Court, while making arguments that depart from those made before Commerce and

the trial court in this litigation. We explain below why this Court should disregard

this extrinsic evidence and argument, and affirm the trial court's judgment.

## <u>SUMMARY OF THE ARGUMENT</u>

Commerce's determination that Vandewater's steel branch outlets are

covered by the scope of the *China BWPFs Order* is supported by substantial

evidence and otherwise lawful. As an initial matter, the Court should restrict its

appellate review to the evidence and arguments on the record of this proceeding,

declining appellees' invitation to ignore the bounds of the record on appeal.

Substantively, appellants favor an inappropriately narrow interpretation of

the *China BWPFs Order* that relies on unwarranted distinctions between steel

branch outlets and other subject merchandise. In pursuing this claim, appellants

take the concept to clarifying scope language with trade usage too far by relying

on contested evidence—which Commerce ultimately found was outweighed by

contrary evidence—as grounds to claim that the order's scope is unambiguous.

Appellants' (k)(0) claims should be rejected, in any event, chiefly because a wide

array of record evidence contradicts their core contention that the adjective "butt-

weld" (as used in the *China BWPFs Order*) has a single, unambiguous meaning

excluding welded outlets from the order's scope. None of appellants' additional

arguments concerning matters such as the Court's decision in *King Supply*, Commerce's determinations in the Sprink and *Forged Steel Fittings* proceedings, and additional allegedly unambiguous scope language alters the (k)(0) analysis.

Likewise, appellants' arguments regarding the trial court's (k)(1) analysis concern evidence that is contradicted by multiple other aspects of the record (sometimes from the same source), and which Commerce analyzed on remand in its unchallenged (k)(2) analysis and concluded does not support appellants' claims. Consequently, appellants' arguments that the trial court should not have just remanded the (k)(1) analysis, but instead should have concluded that these disputed materials conclusively exclude Vandewater's products, lacks merit.

The Court should also decline to entertain SCI's separate procedural claim concerning "mixed entries" in relation to Commerce's suspension of liquidation instructions because the trial court lawfully held that SCI had not properly raised its current claim below. SCI's claim is also moot because it does not apply to Vandewater, the only party whose entries are at issue in this matter, whereas SCI has not raised the claim in its own currently stayed proceeding.

Ultimately, after robust analysis of an extensive record, including ample evidence of trade usage, Commerce and the trial court agreed it was reasonable to conclude that the scope of the *China BWPFs Order* covers Vandewater's outlets. Although they disagree with Commerce's analysis, appellants fail to satisfy the

high bar to demonstrate that Commerce's scope determination failed to rely on

substantial evidence or is otherwise unlawful.  Their claims should be denied.

## ARGUMENT

## I.    Standard Of Review

Applying the statutory standard anew, this Court upholds Commerce's

determinations unless they are "unsupported by substantial evidence on the record,

or otherwise not in accordance with law."  *Sunpreme Inc. v. United States*, 946

F.3d 1300, 1308 (Fed. Cir. 2020) (en banc) (cleaned up) (quoting 19 U.S.C. §

1516a(b)(1)(B)(I)); *see also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009)

("The specific factual findings on which {Commerce} relies . . . are conclusive

unless unsupported by substantial evidence.").  The Court in doing so recognizes

"Commerce's special expertise" as "master" of the antidumping laws.  *Shakeproof*

*Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d

1376, 1381 (Fed. Cir. 2001); *Torrington Co. v. United States*, 68 F.3d 1347, 1351

(Fed. Cir. 1995).  Indeed, by statute, determinations by Commerce are "presumed

to be correct."  28 U.S.C. § 2639(a)(1).

A decision is supported by substantial evidence if "a reasonable mind might

accept it as adequate to support a conclusion" and Commerce's findings "may still

be supported by substantial evidence even if two inconsistent conclusions can be

drawn from the evidence."  *Sunpreme*, 946 F.3d at 1308-09 (cleaned up; citations

omitted).  Hence, "{i}t is not for this court on appeal to reweigh the evidence or to

reconsider questions of fact anew." *Downhole Pipe & Equip. L.P. v. United States*,

776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (citation omitted).  Further, the Court's

"review is limited to the record before Commerce," *Qingdao Sea-Line Trading Co.

v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014), and "the burden of creating

an adequate record lies with interested parties and not with Commerce." *QVD

Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (cleaned up).

Finally, the Court reviews decisions regarding the forfeiture or waiver of

arguments and failure to exhaust administrative remedies for abuse of discretion.

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027,

1031 (Fed. Cir. 2000); *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912

(Fed. Cir. 2017).  These requirements apply equally following remand.  *See Mittal

Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008);

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1350 (Fed. Cir. 2016).

## II.    The Court Should Disregard Materials And Arguments From Outside The Record Of This Case

Sigma and SCI each rely on materials and arguments that are not part of the

record on appeal in this case.  Both appellants cite a significant volume of non-

record material from their stayed cases in connection with their (k)(0) claims.[5]  SCI

---

[5] SCI and Sigma seek to excuse their disregard for the well-established
limitations on appellate records by pointing to the fact that the trial court issued a

takes this a step further by basing its (k)(0) arguments primarily on materials and claims that SCI submitted before Commerce and the trial court in its own case, rather than those presented by Vandewater.  Indeed, despite its plaintiff-intervenor status (meaning it is limited to supporting Vandewater's claims), SCI makes a series of (k)(0) scope language arguments Vandewater *declined* to make before Commerce and the trial court.  Further, although SCI's (k)(1) arguments—which Sigma incorporates by reference—rely less on materials from outside the record, they nonetheless depart from the (k)(1) arguments raised by Vandewater at a time when SCI and Sigma were not even parties to the action, since they only became intervenors following remand.  Finally, as the trial court recognized, SCI's claim concerning application of Commerce's suspension of liquidation instructions to "mixed entries" was new when SCI raised it during consultations between the trial court and parties just prior to the trial court's final judgment.

Because this Court's review is limited to the record and arguments presented to the administrative agency and trial court, both by statute and by the exhaustion and waiver/forfeiture doctrines, the Court should decline to consider appellants' citations and arguments stemming from matters outside the record on appeal.

Specifically, the Supreme Court has explained that "the focal point for judicial review should be the administrative record already in existence, not some

---

consolidated decision on the (k)(0) issue across the three plaintiffs' unconsolidated cases.  But this does not constitute a basis to jettison the applicable rules.

new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the 'arbitrary and capricious' standard into effectively de novo review." *Axiom*, 564 F.3d at 1380 (citation omitted). Limiting review to the agency record also furthers important efficiency and finality considerations. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012) ("To allow constant reopening and supplementation of the record would lead to inefficiency and delay in finality.").

Likewise, pursuant to 28 U.S.C. § 2637(d), the Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies." *Boomerang Tube*, 856 F.3d at 912. Courts take "a 'strict view' of the requirement that parties exhaust their administrative remedies . . . in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("{A}bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."); *Boomerang Tube*, 856 F.3d at 912 (same).

"Simple fairness," moreover, "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel*, 548 F.3d at 1383-84 (quoting *United States v. L.A. Tucker*

*Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (emphasis added by Court)). Thus, under the exhaustion doctrine, parties are required to raise issues before Commerce at the time that Commerce is addressing them. *See id.* (requiring exhaustion on remand).

Here, because a significant portion of appellants' claims rely on evidence or arguments that are not properly before the Court, the Court should disregard these materials. We highlight below where this is relevant. Correspondingly, the Court should either strike or disregard those portions of appellants' appendix comprising materials from outside the record, which based on appellants' designations to date are Appx3271-4098 and Appx4126-4141. If appellants wanted to appeal the (k)(0) issue based on the records of their separate cases, they could have asked the trial court to enter Rule 54(b) judgment on that issue, as it had stated its intention to do. *See* Appx4115. Having failed to pursue that available remedy, it is inappropriate for appellants to flout well-established rules regarding the record on appeal.

## III.   **Commerce's And The Trial Court's (k)(0) Analysis Was Lawful**

Appellants' position is that Commerce and the trial court erred as a matter of law by failing to conclude that the adjective "butt-weld" used in the phrase "butt-weld pipe fittings" in the order's scope has a single, unambiguous meaning that excludes Vandewater's steel branch outlets based on trade usage. Contrary to this claim, Commerce and the trial court lawfully concluded that further analysis was warranted, as exemplified by multiple contrary trade usage indicators.

28

## A. The Term "Butt-Weld" Is Not Defined In The Order's Scope And Appellants' "Trade Usage" Arguments Take That Concept Too Far

Appellants' claim that Commerce's *China BWPFs Order* unambiguously excludes Vandewater's products is flawed because they improperly import a (k)(2) analysis of contested trade usage evidence into determining whether the scope is unambiguous, and even then, fail to show that the scope is unambiguous. In this case, Commerce considered "butt-weld" as an adjective describing the type of pipe fittings in the scope language (distinct from the noun "butt weld"). Commerce and the trial court properly treated the order's description of "butt-weld pipe fittings" as ambiguous because "butt-weld" (a) does not have a plain meaning in the scope and (b) does not have a plain meaning even considering trade usage. *See Meridian Prods.*, 851 F.3d at 1381 n.7 (requiring "single clearly defined or stated meaning").

Appellants' core theory is that Vandewater's steel branch outlets cannot be considered BWPFs because they are defined by separate industry standards, as discussed in declarations submitted on Vandewater's behalf by Walter Sperko, which correspondingly require BWPFs to have end-to-end connections along the same plane (as opposed to the way in which the contoured end of a steel branch outlet is welded perpendicular to the center of a pipe). *See* Sigma Br. 8-12, 37-39; SCI Br. 4-8, 18-19. Commerce, however, reasonably disagreed with this claim.

The scope of Commerce's *China BWPFs Order* does not refer to industry standards or an end-to-end requirement. It states "{t}he products covered by this

order are carbon steel butt-weld pipe fittings, having an inside diameter of less than

14 inches, imported in either finished or unfinished form" and "{t}hese formed or

forged fittings are used to join sections in piping systems where conditions require

permanent, welded connections, as distinguished from fittings based on other

fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."  57 Fed. Reg. at

29,703.  In its initial scope ruling and final (k)(2) analysis, Commerce found that

Vandewater's outlets meet the physical characteristics the order identifies because

they:  (1) are made of carbon steel; (2) are forged; (3) have an inside diameter of

less than 14 inches; (4) require a permanent welded connection to be attached to a

piping system; and (5) have a beveled edge to accommodate welding.  Appx138-

140 (initial ruling); Appx65-74, Appx101-109 (final (k)(2) determination).

   Contrary to appellants' claims, Commerce did not "fail to actually examine"

the scope language in this case.  Sigma Br. 26-27; *see* SCI Br. 8.  Commerce stated

up-front that unambiguous scope language governs, while grounding its analysis in

"{a} plain reading of the scope."  Sigma Br. 26 (quoting Appx139); *see* Appx132,

Appx138.  Appellants argue that Commerce did not analyze the term "butt-weld"

in isolation, but Commerce is not required to do so.  Commerce explicitly found—

after citing Vandewater's reliance on the Sperko declaration ("Exhibit 7")—that

"there is nothing in the scope language or the sources under 19 CFR 351.225(k)(1)

that limits the scope of the *Chinese Butt-Weld Order* to butt-weld pipe fittings with

an end-to-end, flat, perpendicular, or single plane connection" (as appellants assert

is required by industry standards and diagrams). Appx140. Commerce also found

that "{o}ther than the existence of a beveled edge, there are no angle restrictions to

*what is considered a butt-weld connection according to the scope* and the 19 CFR

351.225(k)(1) sources." *Id.* (emphases added). Commerce's interpretation that

"butt-weld" does not unambiguously mandate such requirements is evident. Even

if this was not explicit, this Court will "uphold a decision of less than ideal clarity

if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v.

State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

The crux of the issue concerns what characteristics are required for a pipe

fitting to be a "butt-weld" fitting under the order. *See King Supply*, 674 F.3d at

1348-49 (*China BWPFs Order*'s scope driven by physical characteristics, rather

than end-use restriction). As Vandewater acknowledged in its scope request,

however, "{t}he scope language itself does not define the physical characteristics

of a 'butt-weld pipe fitting.'" Appx175. Thus, Commerce lawfully determined

that further analysis was appropriate. *See Novosteel*, 284 F.3d at 1272. (noting low

threshold for finding ambiguity). Commerce considered the scope language,

Vandewater's submissions, and the relevant record materials, which include the

industry standards that appellants emphasize are analyzed in the declarations

provided on Vandewater's behalf by Walter Sperko. Appx133-141; Appx65-116;

*cf. Melendez Camilo v. United States*, 642 F.3d 1040, 1045 (Fed. Cir. 2011) (Court

presumes fact-finder reviews all evidence presented). Ultimately, Commerce

identified one physical characteristic that "butt-weld" imposed beyond the other

characteristics listed in the scope: having a beveled edge to accommodate welding.

Appx139-140; Appx65-66. Moreover, Commerce in its (k)(2) analysis considered

at length the materials that appellants claim unambiguously define "butt-weld" and

concluded that they *do not* exclude welded steel branch outlets. *See*, *e.g.*, Appx68-

69, Appx70-72, Appx101-103, Appx110-111.[6]

     By resorting to alleged trade usage to interpret "butt-weld," appellants

concede that the order's scope language does not define the term. Nonetheless,

relying on contested extrinsic evidence, analyzed in declarations prepared in

support of Vandewater's scope request, appellants argue that trade usage of the

term "butt-weld" requires exclusion of steel branch outlets. Sigma Br. 27-39; SCI

Br. 18-19. These arguments regarding alleged butt-weld requirements lack merit

because, on the one hand, they take the trade usage concept too far by attempting

to use contested factual materials that are properly part of a (k)(2) analysis to

interpret undefined terms in the order as a matter of law, and on the other (as we

discuss below), do not establish a lack of ambiguity.

---

[6] Additionally, although the Court need not (and should not) reach the non-record evidence that appellants proffer, appellants' claims ring hollow given that Commerce specifically addressed their claims about industry standards in its scope rulings rejecting both of their exclusion requests. *See* Appx3724-3725; Appx4094.

Effectively, appellants want this Court to decide this appeal under (k)(0), and to disregard various (k)(1) and (k)(2) materials, by looking at a subset of the record that Commerce analyzed in detail on remand.[7]  That misapplies this Court's decision in *ArcelorMittal*, which discussed trade usage in the (k)(0) context, but cautioned that "consideration of industry jargon is not the same as conducting a full-fledged analysis of the factors embodied in 19 C.F.R. § 351.225(k)(2)."  694 F.3d at 88 n.8.  Although this Court in *ArcelorMittal* looked to trade usage as part of its (k)(0) analysis, it did not endorse the notion of transforming the preliminary question of whether an order's scope is clear on its face into an evidentiary inquiry into disputed trade usage evidence.[8]  *Cf. Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 784 (Fed. Cir. 1995), *as corrected on reh'g* (Sept. 1, 1995) (holding it was "not unreasonable" for Commerce to interpret term "as used in the antidumping duty order").  Indeed, Commerce ultimately determined that the industry standard and other materials on which appellants rely do not provide an exclusive standard for defining BWPFs.  *See* Appx68-69, Appx70-72, Appx101-

---

[7] Notably, Vandewater's complaint repeatedly framed its industry practice claims as substantial evidence challenges, not pure legal issues requiring (k)(0) analysis.  *See* Ct. Int'l Trade No. 18-00199, ECF No. 5 ¶¶ 41, 45, 50, 54; *see also* Ct. Int'l Trade No. 19-00003, ECF No. 4  ¶¶ 8, 31; Ct. Int'l Trade No. 19-00011, ECF No. 8  ¶¶ 27, 31 (Sigma and SCI complaints – Same).  SCI *still frames* the issue of the scope's meaning as a matter of "substantial evidence."  SCI Br. 10, 18.

[8] By contrast, most of the cases that Sigma cites do not involve (k)(0) analyses.  Many do not even concern scope proceedings.  *See* Sigma Br, 27-32.

103, Appx110-111. Because the materials on which appellants rely under (k)(0)

are subject to considerable dispute, as exemplified by Commerce's extensive

analysis of these same materials and contrary conclusion on remand, they do not

provide a valid basis to overturn Commerce's determination on (k)(0) grounds.

### B. The Term "Butt-Weld" Pipe Fittings Lacks Unambiguous Meaning

The record of this case illustrates both why appellants' trade usage claims go

beyond an appropriate (k)(0) analysis and that the record evidence does not render

the scope unambiguous. The materials appellants cite as excluding Vandewater's

products do not provide a single definition of "butt-weld pipe fittings" and instead

require explanation through (contested) extrinsic analysis. Sigma Br. 8-12, 37-39;

SCI Br. 4-8; 18-19. Even on appellants' terms, moreover, the materials do not

evidence an unambiguous definition requiring end-to-end, same-plane connections

or the exclusion of steel branch outlets more generally.

For example, appellants point to the absence of steel branch outlets among

examples in American Society of Mechanical Engineers (ASME) standard B16.9

and argue that they are instead covered by Manufacturers Standardization Society

(MSS) SP-97, Sigma Br. 8-10, but this presupposes that ASME B16.9 provides an

exclusive definition of "butt-weld pipe fittings." By contrast, nothing in the scope

language limits the *China BWPFs Order* to merchandise matching ASME B16.9

standards. In fact, the scope of Commerce's order makes no mention of industry

standards. At the same time, the initial antidumping petition contains trade usage materials showing "Examples of Carbon Steel Butt-Weld Fittings" that include a "saddle" that does not appear in ASME B16.9. Appx707, Appx756; *see* Appx70-71, Appx102. Further evidence shows that BWPFs may match specifications other than ASME B16.9. Appx70-71, Appx102 (citing Appx2774-2842). Indeed, "the ITC report at the time of the investigation explicitly noted that not all shipments of *BWPFs from China*—the precise product for which the petitioner sought relief—met the ASME standard." Appx102 (citing Appx1997-1998).[9]

Conversely, Commerce has explained that the MSS SP-97 standard for "Integrally Reinforced Forged Branch Outlet Fittings" is a "non-exclusive" standard and that several aspects of MSS SP-97 incorporate by reference the standards established by ASME, including butt-welding standards. Appx71-72, Appx103, Appx110-111 (discussing Appx1319, Appx1322-1323, Appx1337). In fact, as Commerce has further explained, products confirming to MSS SP-97 can have many of the same characteristics that appellants attribute to BWPFs, such as full penetration welds and beveled edges. *Id.* There is no reason to conclude that products conforming to MSS SP-97 cannot also be BWPFs. Thus, the record does

---

[9] The antidumping petition cited ASME B16.9 in a footnote, but Commerce explained why this does not require conformity with the standard under the order. *See* Appx70, Appx101-102; *United Steel and Fasteners*, 947 F.3d at 800 (petition reference to industry standard, without more, does not require subject merchandise *must* meet those specifications); *King Supply*, 674 F.3d at 1345 (scope controls).

not establish that "butt-weld" pipe fittings are synonymous with ASME B16.9, or that the ASME and MSS standards are mutually exclusive.

Appellants also reference information promulgated by the American Welding Society (AWS). Sigma Br. 14-15. However, they omit that the AWS handbook lists "butt weld" as a "*nonstandard* term for a weld in a butt joint." Appx302 (emphasis added). The source describes this nonstandard term by cross-referencing the definition for a "butt joint," but there is no indication that this is an industry-wide accepted meaning for butt-weld pipe fitting. *Id*. Regardless, the AWS handbook does not trump other contrary trade usage rendering the scope's use of "butt-weld" subject to interpretation.

Importantly, as the trial court recognized, appellants ignore other trade usage evidence that contradicts their claims. The trial court highlighted two such pieces of evidence: (1) SCI's admission that it had referred to its own products as "butt-weld outlets" and (2) that Commerce, since the 1992 Sprink Scope Ruling, has classified nearly identical outlets as BWPFs under the Taiwan order. Appx147 (discussing evidence at Appx456, Appx571, Appx468-471); *see also* Appx2437, Appx3047-3048 (additional record evidence). As the trial court explained, even if SCI's descriptions were in error as SCI claims, they demonstrate that "trade usage" is not as clear and unambiguous as appellants advocate. *Id.* Likewise, that branch outlets have since 1992 been classified as BWPFs under an antidumping duty order

covering "butt-weld" fittings from another country makes it "hard for a reasonable mind to be persuaded that branch outlets could never be classified as butt-weld fittings because there is one, and only one, widely- and well-known 'trade usage' of the term 'butt-weld fittings' that excludes {Vandewater's} branch outlets." *Id.*; *see also* Appx25-26 (discussing Commerce's consideration of the Sprink Scope Ruling as reflecting "Commerce's longstanding interpretation of {the} exact same term . . . as it relates to the *Taiwan BWPFs Order*").

Further, the record includes considerable additional evidence of trade usage contradicting appellants' claims that products with contoured ends welded to the curve of a header pipe cannot be considered "butt-weld" fittings. *Cf. Adams v. United States*, 59 F.4th 1349, 1355 (Fed. Cir. 2023) (appellate court "may affirm the trial court on a ground not selected by the trial judge so long as the record fairly supports such an alternative disposition of the issue") (cleaned up); *United States v. New York Tel. Co.*, 434 U.S. 159, 166 n.8 (1977) ("{T}he prevailing party may defend a judgment on any ground which the law and the record permit that would not expand the relief it has been granted."); *see also* Ct. Int'l Trade No. 18-00199, ECF No. 66 (United States' trial court brief detailing such evidence).

As shown above, the underlying antidumping petition includes trade usage materials depicting a contoured "saddle" alongside other BWPFs, as "Examples of Carbon Steel Butt-Weld Fittings" or "Seamless Welding Fittings," to be welded to

the curve of another pipe.  Appx707; Appx756.  Correspondingly, Vandewater's

scope request asserts that steel branch outlets sit atop a header pipe "like a saddle."

Appx23; Appx169.  Vandewater's scope request also includes an industry catalog

from domestic producer Bonney Forge depicting a "Vesselet" (reproduced on page

10 above) that points directly to the product's contoured end and labels it as "butt-

weld" with a "{t}rue butt-weld installation in header."  Appx403.

Other materials in Vandewater's scope request identify a butt weld as a

"groove-type weld" that "fills in grooves that are cut on the inside of two pieces of

metal that are positioned next to each other" (*i.e.*, beveled edges on branch outlets).

Appx427; *see generally* Appx426-430.  The same materials describe a fillet weld,

contrary to the beveled edges on Vandewater's products, as one that "fills in space

on the *outside* of pieces of metal that are positioned at an angle to each other."  *Id.*

(emphasis added).  This suggests a "butt-weld" connection—rather than fillet weld,

as appellants claim—when beveled edges are present.  Still further record evidence

indicates there are numerous welding types that can be performed at a butt joint,

and numerous joint types where beveled and other groove-type welds can be used.

Appx432-439.  Thus, contrary to appellants' reliance on the "nonstandard" AWS

description, a butt weld is not the only type of weld used at a butt joint, and a butt

joint may not be the only type of joint where a butt weld is used.

Additionally, Commerce received even more trade usage evidence when parties submitted materials on remand, depicting "butt-weld" pipe fittings similar to Vandewater's outlets. *See* Appx66-68 (discussing Appx2436, Appx2453-2539; Appx2392-2412), Appx81, Appx104-106, Appx115. For example, specifications for outlet distributor Aleum USA (reproduced on page 17 above) depict threaded and grooved outlets with "{b}utt welding ends." Appx67, Appx81, Appx105-106; Appx2523-2526. Like Vandewater's welded outlets, Aleum USA's outlets have one threaded or grooved end and a contoured edge on the other end that connects to the middle of a pipe. *Id.* Next, Vandewater itself submitted another catalog from domestic producer Bonney Forge depicting a "Vesselet" designed to be welded to the curved side of a pipe like the steel branch outlets at issue. Like the version included in Vandewater's scope request, the illustration labels the header end of the Vesselet as "butt-weld" with a description stating "{t}rue butt-weld installation in header." Appx68, Appx105; Appx2405. Further, Island submitted an updated catalog displaying saddles as "Seamless Welded Fittings" with other BWPFs, and the catalog for a major distributor listing saddles as "Standard Butt Weld Fitting Types." Appx67-68 (citing Appx2454-2456, Appx2517, Appx2535); *see also* Appx11-12 ("Commerce reasonably identified saddles as a type of BWPF that has physical characteristics comparable to the subject outlets").

39

Collectively, these multiple sources of trade usage contradict appellants'

claim that the term "butt-weld," as used in the *China BWPFs Order*'s scope, has a

single, uniform meaning requiring Commerce to refrain from analyzing the record.

Rather than attempting to expand the order to include products not covered by the

scope; Commerce lawfully found that "butt-weld" does not unambiguously entail

the restrictions appellants assert. Commerce's decision to conduct further analysis

under its regulation should thus be upheld.

## C. The *King Supply* Decision Does Not Support Appellants' Position

Appellants also argue that this Court's decision in *King Supply* supports their

claim because Commerce found that the merchandise in that appeal conformed to

ASME B16.9. Sigma Br. 33-37; SCI Br. 41-43 (raising issue as (k)(1) argument).

Their reliance on *King Supply* is misplaced. *See* Appx13-14 (rejecting argument).

As an initial matter, neither Vandewater nor appellants made this argument

as part of (k)(0) briefing in their respective cases. Rather, appellants raised it in

connection with Commerce's (k)(2) analysis. Hence, Commerce addressed their

arguments in that context. *See* Appx97, Appx101.

Appellants correctly explain that *King Supply* involved merchandise used in

structural applications such as handrails, fencing, and guardrails (rather than piping

systems), which King Supply argued was excluded from the *China BWPFs Order*

because it construed language referring to BWPFs being "used to join sections in

piping systems" as an end-use limitation.  674 F.3d at 1347.  Appellants, however, overstate the "centrality" (Sigma Br. 34) of industry standards to Commerce's and this Court's rejection of King Supply's claim.

It is true that Commerce, in its *King Supply* (k)(1) analysis, found that "not only were King's products physically identical to the products described in the first sentence of the *AD Order*, but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition," including ANSI/ASME B16.9.  *See* Sigma Br, 33-34; SCI Br. 42 (quoting *King Supply*, 674 F.3d at 1347).  Appellants misconstrue this reasoning, however, as validation that a product is covered *only* if it is produced according to American Society for Testing and Materials (ASTM) and ASME/American National Standards Institute (ANSI) standards referenced in a petition footnote.  *See* Sigma Br. 35-36; SCI Br. 41-42.  Although conformity with such standards may support including products within an order's scope, *King Supply* "does not stand for the proposition that the industry standard and the scope of the order are, or must be, coextensive."  Appx101.  As we establish above, the *China BWPFs Order*'s scope neither includes nor refers to any industry standards (and it is the scope rather than the petition that controls).  *See*, *e.g.*, *King Supply*, 674 F.3d at 1345 ("While petitioners and other interested parties in the investigation may propose the scope of merchandise to be investigated, Commerce alone defines the scope of the AD order.").

As the trial court further explained, "{t}hough Plaintiffs are correct that Commerce has relied on industry standards as one relevant consideration in concluding that certain products should be included under the *China BWPFs Order*, Plaintiffs ignore the fact that Commerce also found {King Supply's} merchandise at issue to be 'physically identical to the products described in the first sentence of the {*China BWPFs Order*}.'" Appx13 (quoting *King Supply*, 674 F.3d at 1347). Hence, "while *King Supply* supports the proposition that Commerce does consider industry standards in reaching its determinations as to the scope of the *China BWPFs Order*, it does not support Plaintiffs' follow-on proposition that products that do not fall within the industry standards should automatically be excluded from the *China BWPFs Order*." *Id.*

We demonstrate above that multiple record evidence sources indicate that products do not, in fact, need to conform to ASME B16.9 to be covered by the *China BWPFs Order*. Appellants' arguments that *King Supply* makes the scope of the *China BWPFs Order* synonymous with ASME B16.9 thus lack merit.

Moreover, Sigma's argument entails a further fatal flaw. It is based on the incorrect assumption that Vandewater's steel branch outlets are "physically distinct from butt-weld pipe fittings." Sigma Br. 35-36; *see also id.* at 34-35. Sigma relies on this assumption, in combination with its industry standard claim, to allege an unlawful inconsistency between this case and *King Supply*. *See* Sigma Br. 35-37.

42

But, in truth, Sigma merely disagrees with Commerce's finding that Vandewater's outlets *are not* physically distinct from subject merchandise, because Commerce rejected additional physical requirements that appellants advocate. Indeed, we demonstrate above that there are multiple BWPF types that share the physical characteristics of Vandewater's welded outlets. *See*, *e.g.*, Appx66-68 (discussing evidence); Appx71-72 (noting overlap between MSS SP-97 and ASME B16.9). Consequently, *King Supply* does not support appellants' claims.

### D. SCI's Additional Arguments Lack Merit

SCI raises a number of additional arguments that do not support overturning the trial court's (k)(0) decision. We address each below.

First, SCI bases its claims concerning the allegedly unambiguous meaning of "butt-weld" in the *China BWPFs Order's* scope primarily on non-record materials stemming from SCI's separate challenge to Commerce's denial of SCI's scope request. *See* SCI Br. 4-8, 18-19. We demonstrate above why these claims lack merit. Because the claims are highly intertwined with information that is not properly before the Court, they should also be rejected on that basis. Further, SCI makes a passing reference to "dictionary definitions" while citing generally to the plaintiffs' trial court (k)(0) briefs, which is insufficient to preserve any related issue for review. *See* SCI Br. 18. Although we addressed the arguments that SCI appears to be referencing at the trial court, *see* Ct. Int'l Trade No. 19-00011, ECF

No. 55 at 7-8, it is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir.2001)).  SCI thus cannot raise these arguments for the first time in this appeal on reply.  *See Novosteel*, 284 F.3d at 1273-74 (argument first raised on reply waived).

Second, SCI's argument that the trial court "impermissibly relied on non-record evidence" in its (k)(0) decision is both inaccurate and meritless.  *See* SCI Br. 20-21.  SCI claims that the trial court "impermissibly relied on an assertion, submitted to Commerce without supporting documentation," when it discussed as evidence of trade usage "record information" submitted by Island relating to SCI's use of the terms "threaded butt-welded outlet," "grooved butt-welded outlet," and "butt-weld outlets" in describing its own products.  *Id.* (quoting Appx147).  But SCI ignores that it had *admitted on the record* to doing so, while disavowing its actions based on alleged error.  In fact, Island's representation and SCI's admission are on the records of all three proceedings.  *E.g.*, Appx456, Appx571 (Vandewater initial record); Appx2437, Appx3047-3048 (further evidence on remand).  Hence, the trial court acted within its discretion in citing this information.  Moreover, as we show above, this evidence constitutes just one item among a host of record materials contradicting SCI's position that the adjective "butt-weld" in the *China*

*BWPFs Order*'s scope has a single, unambiguous meaning. Commerce and the trial court each analyzed extensive trade usage materials on remand and disagreed with SCI's position—which appellants do not challenge. *See* Appx65-116; Appx7-17; *see also* SCI Br. 43-44 (disclaiming challenge). SCI's argument thus does not provide a basis to overturn Commerce's and the trial court's determinations.

Third, SCI attacks the Sprink Scope Ruling, which the trial court cited as evidence undermining appellants' position that welded outlets could never be classified as BWPFs because Commerce has since 1992 classified steel branch outlets as "butt-weld pipe fittings" under the Taiwan order. *See* SCI Br. 21-24; Appx147 (citing Sprink Scope Ruling, Appx468-471). This is another instance in which SCI's arguments are based on documents from SCI's separate record rather than those from the record on this proceeding. *Compare* SCI Br. 22-23 & nn.1-2 *with Axiom*, 564 F.3d at 1379-80 (discussing record review). Further, although Commerce addressed the Sprink ruling's relevance on remand and SCI contested the issue at that time, *see* Appx25-26, Appx3021-3030, SCI *did not* contest the ruling's relevance before the trial court, meaning its arguments are presented to this Court for the first time on appeal. *See Novosteel*, 284 F.3d at 1273-74 (finding waiver in such circumstances). Nonetheless, SCI's arguments lack merit.

Sprink, Inc., like Vandewater, claimed that its Sprink-let product fell outside the antidumping duty order on carbon steel butt-weld pipe fittings from Taiwan

because "a butt-weld pipe fitting is defined as one that requires welding as a means of attachment for all connections, and although requiring welding onto the outside of the pipe, the Sprink-let's connection for the {outlet} pipe is either threaded or grooved." Appx470. Based on the scope language and previous determinations, Commerce found that the Taiwan order "does not require that <u>all</u> pipe fitting connections be welded," and concluded that the Sprink-let is a "butt-weld pipe fitting" for purposes of the Taiwan order because it has a beveled edge that is permanently joined by welding. Appx470-471. That the other edge was threaded or grooved did not remove the Sprink-let from the order's product coverage. *Id.*

SCI tries to claim that the Sprink ruling was incorrectly decided, but an appellate court is hardly the proper forum to raise such an issue. Indeed, SCI's contention appears to be based on its assertion that BWPFs are required to have certain characteristics that Commerce and the trial court rejected after extensive analysis, in addition to Commerce's rejection of similar claims in the Sprink ruling itself. *See* SCI Br. 22 n.1; Appx7-15; Appx65-74, Appx469-471. Nor does SCI's collateral attack on the Sprink ruling alter the trial court's point that steel branch outlets have been classified as BWPFs since 1992 under the Taiwan order, which undermined appellants' (k)(0) claim of unambiguity. *See* Appx147.

SCI next emphasizes Commerce's statement that it was not bound by Sprink in its scope ruling in SCI's case (Commerce made a similar statement in its initial

Vandewater ruling).  *See* SCI Br. 22-23.  This ignores that Commerce clarified its

reliance on the Sprink ruling in its uncontested remand results.  *See* Appx25-26.

Commerce explained that the Sprink ruling addressed a product "essentially

physically identical" to Vandewater's outlets, and that while it was not *bound* by

the Sprink ruling because it involved a different proceeding with slightly different

scope language, it still viewed the Sprink ruling as "informative" because "it was a

prior scope ruling that considered whether outlets nearly identical to the outlets

imported by Vandewater are 'butt-weld pipe fittings.'"  *Id.*  Thus, Commerce

interpretation of "butt-weld pipe fittings" under the *China BWPFs Order* is

"consistent with Commerce's longstanding interpretation of that exact same term

in the Sprink Scope Ruling as it relates to the *Taiwan BWPFs Order*."  *Id.*  In other

words, even though Commerce is not bound by the Sprink ruling, it is persuasive

authority.  *See* Appx135-136 (listing Sprink as "Relevant Prior Scope Ruling").

       SCI also argues that the Sprink Scope Ruling should be discounted in

comparison to Commerce's scope determination in an investigation concerning

forged steel fittings, a separate proceeding involving an exclusion for butt weld

outlets.  SCI Br. 23-24.  We address the *Forged Steel Fittings* investigation

substantively below in connection with appellants' (k)(1) arguments.  For purposes

here, it is sufficient to observe that the trial court agreed that Commerce's scope

exclusion guidelines from the *Forged Steel Fittings* proceeding do not control in

47

this case, while also recognizing "the different purposes and records undergirding the two analyses." Appx10 (discussing Appx105 n.539). Unlike the Sprink Scope Ruling interpreting similar language from another BWPFs order in relation to "essentially physically identical" merchandise, the *Forged Steel Fittings* guidance stems from an entirely different proceeding, which Commerce structured to avoid overlap between separate proceedings. *See* Appx2695-2698 (*Forged Steel Fittings* clarification memo). Thus, SCI's allegation of an inconsistency lacks merit.

In any event, the Sprink ruling is just one item among a wide array of trade usage evidence contradicting appellants' claims that "butt-weld" in the *China BWPFs Order* has a single meaning. Thus, SCI's criticisms are not grounds to overturn Commerce's determination. *See Adams*, 59 F.4th at 1355; *New York Tel. Co.*, 434 U.S. at 166 n.8 (permitting alternative grounds for affirmance).

Fourth, SCI makes a set of arguments that Vandewater *declined* to make— either before Commerce or in its (k)(0) briefing—asserting that other language besides "butt-weld" in the *China BWPFs Order*'s scope unambiguously excludes steel branch outlets (the brief SCI cites is its (k)(0) brief in its separate case). *See* SCI Br. 24-27. Because these arguments have not been raised on the record of this case, they are both unexhausted and waived for this appeal. *See Boomerang Tube*, 856 F.3d at 912 (exhaustion); *Novosteel*, 284 F.3d at 1273-74 (waiver). Although this Court should not entertain SCI's request to go beyond the administrative and

trial court records, we addressed these arguments in SCI's case. *See* Ct. Int'l Trade No. 19-00011, ECF No. 55 at 10; Appx4094-4095 (finding SCI products "formed or forged"); Appx4093, Appx4095 (discussing *King Supply* and other evidence refuting SCI claims focusing on "used to join sections in piping systems" and "based on other fastening methods" language).  Further, Vandewater and SCI did make similar arguments on remand under the rubric of substantial evidence, and Commerce addressed them as part of its (k)(2) analysis. *See* Appx65-66, Appx72-73, Appx75, Appx103-106, Appx108-109, Appx111-112.

The claims also lack merit because SCI merely disagrees with Commerce's findings that (1) SCI's products *are* formed or forged (despite SCI's claims to the contrary) and that (2) the scope's "use" and "based on other fastening methods" language does not require *both* ends of a subject fitting to be butt welded (in this regard, we note that the scope language in general is written in plural terms). *See* Appx65-66, Appx72-73, Appx75, Appx103-106, Appx108-109, Appx111-112, Appx139-140 (Commerce's findings on record of this case that Vandewater's products are "formed or forged" and that products with one permanent welded connection are covered); *cf.* Appx4093-4095 (rejecting SCI's arguments in its own case).  For example, Commerce noted multiple ways in which Vandewater and its supporters had conceded that Vandewater's products are formed or forged, while highlighting two BWPFs types ("caps" and "lap joint stub ends") that are listed in

the industry standards that appellants emphasize and that undoubtedly have only one welded connection. *See* Appx65-66, Appx72-73, Appx77, Appx103-104, Appx107-109, Appx139-140. Given that SCI merely disagrees with Commerce's analysis of the record, these are not proper (k)(0) claims and are meritless. *See Downhole Pipe*, 776 F.3d at 1376-77 ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew.") (citation omitted).

## IV. Appellants' Claims That (k)(1) Sources Dispositively Exclude Vandewater's Welded Outlets From Commerce's Order Lack Merit

SCI makes an additional series of arguments claiming that that trial court, in remanding Commerce's (k)(1) ruling for further analysis, erred by failing to rule that the (k)(1) sources dispositively exclude Vandewater's welded outlets. *See* SCI Br. 28-43; Sigma Br. 39 (joining arguments). There are two basic flaws in these arguments. First, in asking this Court to rule affirmatively that the (k)(1) sources exclude Vandewater's products, SCI departs from the arguments that Vandewater made in its (k)(1) trial court briefing (at a time when SCI and Sigma were not parties and did not make (k)(1) arguments). Vandewater argued that the (k)(1) materials did not support Commerce's initial ruling, and that the trial court should remand the matter for (k)(2) analysis. *See* Ct. Int'l Trade No. 18-00199, ECF No. 93 at 7 ("Accordingly, this Court should hold at the least that the (k)(1) criteria are not 'dispositive' and should remand the case back to Commerce to conduct a formal scope inquiry under section 351.225(e) and apply the (k)(2) factors.").

SCI's current arguments are therefore waived/forfeited.[10]  Given that no party advocated the result SCI requests (beyond Vandewater's cursory statement), SCI cannot claim that the trial court erred on that basis.

Second, SCI seeks to circumvent Commerce's and the trial court's further analyses of the materials that SCI cites following remand.  The trial court held that these materials raised questions about whether products under the *China BWPFs Order* are required to have welded connections on both ends (notwithstanding Commerce's contrary finding in the Sprink Scope Ruling, which Commerce had deemed non-binding).  *See* Appx130.  Commerce examined these questions on remand and explained in detail why the *China BWPFs Order* requires a beveled edge to form a permanent, welded connection on only one end of the fitting.  *See* Appx65-74, Appx100-109.  The trial court reviewed Commerce's explanation and sustained it.  *See* Appx7-10.  Given the procedural history, in which the trial court directed Commerce to re-examine the record and it did so, SCI's attempt to avoid Commerce's analysis is inappropriate.  Commerce engaged with the record, including the evidence SCI cites, and explained why its findings are supported by substantial evidence.  We address each of SCI's arguments below.

---

[10] Vandewater did make a cursory statement in the conclusion of its brief to the effect that, if anything, the (k)(1) factors pointed to dispositive exclusion of its products, *see* Ct. Int'l Trade No. 18-00199, ECF No. 93 at 29, but this Court deems such undeveloped arguments waived.  *See SmithKline*, 439 F.3d at 1320; *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013).

## A. Commerce Lawfully Determined That The Petition Does Not Exclude Welded Outlets From The Order

SCI first argues that certain language in the petition dispositively excludes Vandewater's outlets because the language allegedly requires that: "(1) both or all edges of the fitting are beveled; (2) the fitting is designed to connect to the end of a pipe; and (3) the beveled edge of the fitting is designed to be set against another beveled edge on the connecting pipe, so that the two beveled edges create the type of channel necessary for butt-welding." SCI Br. 29 (citing Appx712). SCI asserts that Vandewater's outlets do not fit this description, and that "Commerce ignored the petition's plain language requiring specific types of edges for specific types of welding." *Id*. at 30. It is well-established, however, that "{w}hile petitioners . . . may propose the scope of merchandise to be investigated, Commerce alone defines the scope of the AD order." *King Supply*, 674 F.3d at 1345.

Another flaw in SCI's analysis is that the language it cites is just one aspect of the petition, which also contains "Examples of Carbon Steel Butt-Weld Fittings" (such as of caps, saddles, and lap joint stub ends) that do not fit the criteria that SCI derives from the petition, and instead support Commerce's determination. Appx707, Appx756. Hence, contrary to SCI's claims, the trial court did not identify the materials SCI cites as dispositive. *See* Appx8; Appx130 (holding (k)(1) sources "do not really tell the court anything about the inclusion of steel branch outlets within the scope of the Order").

The deeper flaw in SCI's argument is that Commerce examined the petition —as part of both its (k)(1) and (k)(2) analyses—and reasonably determined that it *does not* entail the requirements that SCI asserts. Commerce found in its initial ruling that "there is nothing in the scope language or the sources under 19 CFR 351.225(k)(1) that limits the scope of the *Chin{a} Butt-Weld Order* to butt-weld pipe fittings with an end-to-end, flat, perpendicular, or single plane connection." Appx140. Likewise, in rejecting Vandewater's arguments that the *China BWPFs Order* only covers fittings capable of being butt-welded on both ends, Commerce explained why the scope language only requires a single welded connection and also highlighted that caps are an undisputed BWPF type with only one welded end. *See* Appx139, Appx140. Hence, "simply having a fitting with a connection other than a butt-weld (*e.g.*, threaded or grooved) does not distinguish steel branch outlets from butt-weld pipe fittings." Appx140.

Although the trial court was initially unconvinced and remanded for further analysis, Commerce provided additional explanation on remand that convinced the trial court and refutes SCI's position. Commerce cited the petition language that SCI focuses upon as detracting evidence. *See* Appx27-28, Appx69 & n.345. But Commerce also explained how that evidence is outweighed by other evidence from the petition and elsewhere, showing that it is sufficient to be covered by the order for products to have one beveled end to form permanent welded connections. *See*

53

Appx66-67, Appx69 & n.345, Appx69-70, Appx72 & n.357, Appx77, Appx81, Appx103-104, Appx107-108, Appx109, Appx112 & n.563, Appx115 & n.577 (discussing petition and contrasting evidence). Commerce also explained why the record does not support SCI's contention that covered BWPFs are limited to those with end-to-end connections. *See* Appx66-68, Appx104-106, Appx115 & nn.377-378 (highlighting that saddles, "Vesselets," and Aleum's products are BWPFs that do not involve end-to-end connections). Additionally, Commerce explained that, by focusing on characteristics of the *other* pipe, SCI effectively reads an end-use restriction into the order, which this Court rejected in *King Supply*. *See* Appx69 (citing *King Supply*, 674 F.3d at 1348-49); *see also* Appx135, Appx139.

Correspondingly, the trial court explained why the petition language (and other evidence that SCI highlights) does not overcome Commerce's reasonable analysis of the record evidence. Appx8-9. Given that Commerce acknowledged that certain petition language implies that end-to-end connections and beveling on the recipient pipe are required, but reasonably concluded that the totality of the record evidence did no support such a finding, Appx69 n.345, Commerce's determination should be upheld. *See Downhole Pipe*, 776 F.3d at 1376-77 (Court does not reweigh evidence or consider facts anew).

SCI next seizes upon the petition's statement that BWPFs come in "several *basic* shapes" to argue that the lack of welded outlets in the accompanying listing

excludes them from the order. *See* SCI Br. 31-33 (quoting Appx712 (emphasis added)). In doing so, SCI ignores the multiple contrary "Examples of Carbon Steel Butt-Weld Fittings" (such as of caps, saddles, and lap joint stub ends) attached to the petition as the Appendix B referenced on that same page. Appx707, Appx712, Appx756 (listing multiple examples sharing features with Vandewater's outlets).

SCI's argument is also contrary to this Court's longstanding recognition that scope language must be written in general terms because it concerns the overall "class or kind" of merchandise subject to the order, meaning that a list of "basic" shapes is not dipositive of the petition's or resulting order's coverage. *See*, *e.g.*, *Meridian Prods*, 851 F.3d at 1379 (discussing 19 C.F.R. § 351.225(a) and 19 U.S.C. § 1677(25)). Indeed, by regulation, a petition must contain "{a} detailed *description* of the subject merchandise that defines the requested scope of the investigation, including the technical characteristics and uses of the merchandise and its current U.S. tariff classification number." 19 C.F.R. § 351.202(b)(5) (emphasis added). Petitioners are not required to provide an exhaustive list of products to be covered. *See Novosteel*, 284 F.3d at 1269 ("{A} petitioner . . . need not circumscribe the entire universe of articles that might possibly fall within the order it seeks.") (cleaned up).

This physical description is what Commerce relies upon in crafting scope language to cover the relevant "class or kind" of merchandise in general terms.

Hence, products meeting the *physical description* of subject merchandise in the scope are covered by the order. *See Stein Indus. v. United States*, 365 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2019) ("{p}roducts that meet the description of subject merchandise in the scope are covered unless explicitly excluded from the scope") (citation omitted); *see also Sunpreme*, 946 F.3d at 1309 ("{M}erchandise facially covered by an order may not be excluded from the scope of the order unless the order can be reasonably interpreted so as to exclude it.") (citation omitted). Although the (k)(1) sources might explicitly identify the product in question, there is no requirement that they list every individual product among the "basic" shapes.

Here, Commerce determined and the trial court upheld that Vandewater's outlets meet the physical description of subject merchandise in the *China BWPFs Order. See* Appx7-10, Appx65-74, Appx100-109, Appx138-141. Moreover, contrary to SCI's claims based on the petition's listing of certain basic shapes, Commerce identified multiple types of BWPFs included in the petition that share physical characteristics with Vandewater's outlets. These include caps and lap joint stub ends with only one welded connection, and saddles that are welded to the curved side of the header pipe. Appx707, Appx756; *see* Appx66-68, Appx69-70, Appx72-73, Appx77, Appx81, Appx103-104, Appx107-108, Appx109, Appx112, Appx115; Appx140 (discussing these fitting types). Indeed, when Vandewater requested a scope ruling on its welded outlets, it described them as having a

56

contoured edge that allows the outlet to sit stop the header pipe "like a saddle." Appx23, Appx169.  Further, the record contains considerable evidence that industry participants describe products with these characteristics as "butt-weld" fittings.  Appx66-68; Appx104-106, Appx115 (discussing, *e.g.*, Appx403; Appx2405; Appx2523-2526; Appx2535).

SCI claims that the trial court erred—in *agreeing* with Vandewater and remanding the case to Commerce—by not specifically discussing the petition's "basic shapes" language to affirmatively exclude Vandewater's products.  SCI Br. 31-32.  This Court presumes, however, that the fact-finder has reviewed all of the evidence presented.  *See Melendez Camilo*, 642 F.3d at 1045.  SCI's argument is also based on the false premise that Vandewater's outlets "do not match any of the shapes of the subject merchandise described in the Petition."  SCI Br. 32.  Further, the argument runs contrary to the basic principle that scope and petition language is typically written in general terms.  The petition's "basic shapes" language is clearly not meant as an exhaustive list of BWPF shapes.  Appx712.  SCI equally ignores that Commerce and the trial court addressed this issue on remand, discussing the "basic shapes" language and why Commerce was persuaded by the multiple other illustrations of BWPFs examples with comparable characteristics to Vandewater's products.  *See* Appx8-9, Appx11-12; Appx66-68 & n.335.

Likewise, SCI's claims that Commerce engaged in post-hoc rationalization when referencing Vandewater's products' similarity to saddles are unpersuasive. Commerce referenced the (k)(1) sources and "descriptions of the merchandise contained in the petition" (which the includes "Appendix B" materials depicting saddles), in finding initially that those sources did not limit the scope of the *China BWPFs Order* as SCI claims. *See* Appx139-141; *see also* Appx707, Appx712, Appx756 (relevant petition pages). Commerce also addressed multiple fitting types with similar features to Vandewater's outlets, including saddles, on remand. *See*, *e.g.*, Appx65-74, Appx101-109. Hence, Commerce and the trial court addressed the relevance of saddles in detail as part of the final judgment before this Court on appeal. *See* Appx9, Appx10-12.[11]

Finally, SCI attempts to distinguish Vandewater's products from saddles and caps, but its arguments amount to mere disagreement with Commerce's and the trial court's findings. *See* SCI Br. 32-33. SCI claims that saddles are BWPFs only because of the butt-weld connection on the outlet end of the fitting, but there is no evidence that is the case. Saddles—with contoured ends to be permanently welded to the curved side of a pipe—are displayed in the petition as "Examples of Carbon Steel Butt-Weld Fittings" and listed elsewhere among "Standard Butt Weld Fitting

---

[11] SCI's argument is also disingenuous when, although the Court should not reach appellants' non-record documents, Commerce explicitly referenced saddles in its initial scope ruling in SCI's case. *See* Appx4093-4094.

Types." Appx707, Appx756; Appx2535. Vandewater specifically compared its products to saddles in its scope ruling request. Appx23; Appx169. SCI fails to identify record evidence that saddles are categorized as subject merchandise exclusively by virtue of featuring a beveled edge on the non-contoured end rather than the contoured header end. Rather, "Commerce reasonably identified saddles as a type of BWPF that has physical characteristics comparable to the subject outlets." Appx11-12. Likewise, that caps are listed in the petition as one of the most common BWPF types evinces an intent to include fittings with at least one beveled edge under the *China BWPFs Order*. *See* Appx712; Appx756. Thus, it is reasonable for Commerce to determine that welded outlets with one beveled end akin to caps (and lap joint stub ends) are covered by the order. *See* Appx67 n.335, Appx107-108, Appx109; Appx140.

### B. The ITC's 2016 Sunset Review Determination Does Not Exclude Welded Outlets From The Order

SCI's arguments regarding similar language in the ITC's 2016 Sunset Review determination (sometimes called the ITC's Fourth Review of the order) lacks merit for the same reasons as its arguments concerning the petition, as these two sources are discussed together in the trial court and remand materials. *See* SCI Br. 34-36 (citing Appx622, Appx652-653). The trial court persuasively explained why SCI's position lacks merit. *See* Appx8-10 (sustaining remand).

SCI contends that the 2016 Sunset Review excludes shapes such as saddles and only accounts for shapes that attach on both sides with end-to-end butt-weld connections. *See id*. Again, Commerce acknowledged the ITC report language SCI highlights as evidence detracting from its determination. Appx27-28, Appx69 & n.345. But "given the conflicting evidence on the record with respect to these points," Commerce disagreed that the statements SCI cites are dispositive of the issue and explained that its "analysis of the physical characteristics shows that BWPFs, like outlets, can be permanently attached to a non-beveled opening on the side of the adjoining pipe." Appx69 n.345; *see also* Appx65-74, Appx100-109 (analyzing full record regarding physical characteristics of BWPFs).

A further flaw in SCI's analysis is that the ITC 2016 Sunset Review is just one of several (k)(1) sources, including the petition, other investigatory materials (such as the ITC's 1992 determination), and other Commerce and ITC decisions (such as the Sprink ruling and other ITC reviews). *See* 19 C.F.R. § 351.225(k)(1). These sources indicate that "{a} pipe fitting possesses the requisite beveled edge if it is capable of creating a shallow channel to accommodate the bead of the weld that fastens the two adjoining pieces, as described in the Petition and prior ITC determinations." Appx68-69 (finding Vandewater's outlets met this requirement).

Moreover, the 2016 Sunset Review states that it provides a list of "several *basic* shapes, *the most common* of which are elbows, tees, reducers, and caps" and

that "there are further variations within each class of fitting based on differences in the size of one or more of the outlets (for example, there are reducing elbows and reducing tees)." Appx652 (emphasis added). It is clear that this is not an exhaustive list, and given the broader record regarding caps and saddles, it is reasonable for Commerce to consider fittings featuring similar characteristics to be BWPFs covered by the *China BWPFs Order*.

### C. SCI's Arguments Concerning Additional (k)(1) Sources Lack Merit

SCI's claims that other (k)(1) sources dispositively exclude Vandewater's welded outlets from the antidumping order are equally meritless. SCI Br. 36-43.

First, SCI argues that a scope ruling issued in Commerce's *Forged Steel Fittings* investigations confirms that Commerce's definition of a butt-weld fitting excludes welded outlets. SCI Br. 37-39. Specifically, SCI references an exclusion for "butt weld" fittings or outlets developed in the context of investigations of forged steel fittings from China (and other countries) that were ongoing at the time of Commerce's initial Vandewater scope ruling. *Id*. Notably, SCI accuses the trial court of failing to address the issue, while ignoring that the trial court did so persuasively on remand. *See* Appx10. Further, SCI's position that Commerce's interpretation of the exclusion in *Forged Steel Fittings* defines "butt-weld pipe fittings" as requiring a fitting to be butt-welded on both ends for purposes of the *China BWPFs Order* is at odds with both the pre-existing Sprink ruling and other

record sources concerning *actual* BWPFs that list and/or depict shapes with only

one welded end.  *See* Appx25-26, Appx66-67, Appx69-70, Appx72, Appx77,

Appx103-104, Appx107-108, Appx112 & n.565; Appx140 (discussing this

evidence).  Hence, as Commerce explained, its "construction of an exclusion in a

separate proceeding is not determinative here."  Appx105 n.539.

Originally, Vandewater argued that its outlets could not be subject to the

*China BWPFs Order* because the *Forged Steel Fittings* investigations classified

them as forged steel fittings, rather than BWPFs.  *See* Appx136 (citing Appx168);

Appx198-201.  Responding to this argument in its initial scope ruling, Commerce

concluded that Vandewater's outlets were not covered by the *Forged Steel Fittings*

investigations.  Appx140-141.  Commerce explained that the "proposed scope in

the forged steel fittings investigations expressly excludes {'}all fittings that have a

maximum pressure rate of 300 pounds of pressure/PSI or less,' and as Vandewater

has argued, its steel branch outlets meet both of those criteria."  Appx140.  Hence,

Vandewater's outlets "are not part of the 'class or kind' of merchandise covered by

the forged steel fittings investigations, and therefore there is no concern about two

existing or future antidumping duty orders applying to the same merchandise in

this case."  Appx140-141.  Consequently, although Vandewater's arguments had

evolved to encompass the *Forged Steel Fittings* exclusion, Commerce determined

that there was no need to address further the definition of "butt weld outlets" in the then-ongoing *Forged Steel Fittings* investigations.  Appx141 & n.82.[12]

SCI nonetheless argues that the scope exclusion in *Forged Steel Fittings*, which Commerce defined for purposes of that proceeding as products butt-welded at both ends, defines "butt-weld" for determining the products included in the *China BWPFs Order*.  SCI Br. 37-39.  It does not.  *See* Appx10; Appx105 n.539 (rejecting argument).  The *China BWPFs Order* and *Forged Steel Fittings* orders stem from separate proceedings that cover two distinct classes or kinds of merchandise.  *Cf. SunPower Corp. v. United States*, 253 F. Supp. 3d 1275, 1285-88 (Ct. Int'l Trade 2017), *aff'd sub nom.*, 918 F.3d 909 (Fed. Cir. 2019) (sustaining Commerce's definition of separate "classes or kinds" of merchandise based on differing origin rules).  Commerce's objective in each proceeding is to craft scope language that includes the products for which the petitioning industry requests relief and excludes those for which it does not.  In doing so, Commerce generally defers to the petitioning industry's intent regarding the products to be included. *See M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2022).

As a result, identical or similar terms may not have identical meanings across proceedings.  Based on the record and the intent of the petitioning industry

---

[12] This is also another instance in which Commerce further addressed SCI's arguments in its own proceeding, though this Court need not and should not reach such non-record materials in affirming the trial court.  *See* Appx4096-4097.

in *Forged Steel Fittings*, Commerce determined that fittings with one butt-weld end do not qualify for the scope exclusion contained in those orders. This helped define the class or kind of merchandise covered by the *Forged Steel Fittings* orders. But it did not modify the class or kind of merchandise covered by the pre-existing *China BWPFs Order*. As the trial court recognized, "the scope exclusion guidelines Commerce determined in the *Forged Steel Fittings* investigation do not neatly correspond to the scope of products covered under the *China BWPFs Order*." Appx10.

Moreover, to avoid any overlap with the pre-existing *China BWPFs Order*, Commerce released a clarification memorandum with the final determinations in *Forged Steel Fittings* further defining coverage between the separate proceedings. Appx2695-2698; *Forged Steel Fittings from Italy and the People's Republic of China*, 83 Fed. Reg. 60,397 n.3 (Dep't of Commerce Nov. 26, 2018). Commerce clarified that butt-weld fittings or outlets with one butt-weld end are covered only to the extent that they are: (a) not otherwise excluded from the *Forged Steel Fittings* order (as in the case of Vandewater's products) and (b) not covered by the pre-existing *China Butt-Weld Order*. *See* Appx2697-2698. Importantly, as the trial court observed, Commerce "found that products such as caps and lap joint stub ends, which would not meet the narrow definition of BWPFs under the *Forged Steel Fittings* exclusion guidelines, nevertheless are plainly within the

scope of the China BWPFs Order." *Id.*; *see also* Appx129 ("For over 25 years . . . Commerce has treated steel branch outlets as butt-weld fittings."). Therefore, *Forged Steel Fittings* does not negate Commerce's determination here.

Second, SCI reprises appellants' argument that welded outlets are excluded from the *China BWPFs Order* based on industry standards. SCI Br. 39-41. As we show above in reference to the (k)(0) argument, SCI overstates the significance of ASTM and ANSI/ASME standards. *See* Appx13-14 (sustaining Commerce on industry standards issue). The *China BWPFs Order* neither includes nor refers to conformity with industry standards, and the scope language, rather than the petition or an ITC report, controls. *See King Supply*, 674 F.3d at 1345 (affirming this principle). Further, mere reference to an industry standard in the petition, without more, does not mean that merchandise *must* meet that industry standard. *See United Steel and Fasteners*, 947 F.3d at 800 (rejecting claim that petition's reference to ASME standards excluded products at issue).

Conversely, the petition contains trade usage materials showing "Examples of Carbon Steel Butt-Weld Fittings" including a "saddle" that does not appear in ASME B16.9. Appx707, Appx756; *see* Appx71, Appx102. Further record evidence shows BWPFs that match specifications other than ASME B16.9. *See* Appx70-71, Appx101-102 (citing Appx2774-2842). Likewise, despite referring to industry standards, the ITC investigation report explicitly states that not all BWPF

meet ASME standards.  *See* Appx69, Appx102, Appx107 (citing Appx1997-1998).

More generally, Commerce explained that the industry standards appellants cite do

not provide the exclusive definition of BWPFs, and reflect "substantial overlap"

with the MSS SP-97 standard that appellants claim applies to steel branch outlets.

*See* Appx68-69, Appx70-72, Appx101-103, Appx110-111, Appx114.  Therefore,

SCI's assertion that subject BWPFs are only produced to ASTM and ANSI

standards is inaccurate, and the order's scope is not coextensive with a particular

industry standard.  *See* Appx13-14 (sustaining Commerce's analysis).

Third, SCI reprises the argument that *King Supply* mandates that Commerce

adhere to specific industry standards in interpreting the *China BWPFs Order*.  SCI

Br. 41-43.  *King Supply* did not hold that *only* products meeting certain industry

standards are covered by the order.  *See* Appx13; Appx101.  The scope language

neither includes nor is defined by any reference to industry standards.  Although

conformity with such standards may support including products, *King Supply*

"does not stand for the proposition that the industry standard and the scope of the

order are, or must be, coextensive."  Appx101.  Thus, *King Supply* does not

demonstrate any error in Commerce's ruling.

Overall, SCI's claims do not provide grounds to disregard Commerce's

considered determination, based on the totality of the evidence, that Vandewater's

products are covered by the *China BWPFs Order*.  *See Downhole Pipe*, 776 F.3d at

1376-77 (Court does not reweigh evidence or consider facts anew); *United Steel and Fasteners*, 947 F.3d at 798 (challenges to scope determinations confront high barrier to reversal).  The Court should thus affirm the trial court's judgment.

## V.    SCI Forfeited Its "Mixed Entries" Challenge To Commerce's Suspension Instructions And The Issue Is Also Moot

Finally, SCI argues that Commerce unlawfully instructed CBP to suspend liquidation of Vandewater's entries of steel branch outlets from prior to initiation of the (k)(2) scope inquiry.[13]  According to SCI, the trial court abused its discretion in holding that SCI forfeited its current argument—which focuses on the potential application of duties to "mixed entries" that have been "suspended only due to the presence of products other than those in question, that had been covered by other, unrelated AD/CVD orders"—by failing to raise this argument before Commerce or in briefing on Commerce's remand results.  SCI Br. 44, 58-61.  SCI thus submits that this Court should either rule on the merits of SCI's argument or remand the issue.  *Id.* at 61.  Because the trial court lawfully held that SCI forfeited its claim, and because the claim is moot in this appeal, this Court should affirm the trial court's ruling.  If the Court nonetheless deems the issue preserved, it should remand for Commerce to address the issue in the first instance.

---

[13] Liquidation refers to the final computation or ascertainment of duties on entries of merchandise.  19 C.F.R. § 159.1.

## A. SCI Forfeited Its Claim Regarding "Mixed Entries" By Not Timely Raising It Below

The trial court did not abuse its discretion in declining to rule on arguments that SCI failed to preserve before Commerce and the trial court. Although SCI argues that it "fully" presented its mixed entry arguments below, SCI Br. 58-59, the record does not support its characterization, showing instead that SCI's argument "evolved significantly" before trial court. Appx19.

When Commerce conducts a scope inquiry and determines that the product in question is covered by the scope of the order(s), two situations may arise under Commerce's regulation applicable to this proceeding. If entries of the merchandise have not already been suspended by CBP, then "a new suspension must be ordered beginning only 'on or after the date of initiation of the scope inquiry'"; however, if entries made prior to the inquiry's initiation date have already been suspended by CBP, then the regulation "dictates that the existing suspension 'will continue.'" *Sunpreme*, 946 F.3d at 1319 (quoting 19 C.F.R. § 351.225(l)(3) (2020)). Thus, should liquidation of entries already be suspended pursuant to CBP's independent statutory authority, the suspension will continue under the second scenario, even if the entries predate the scope inquiry. *See id.*

In the remand proceeding before Commerce, SCI argued that Commerce lacked the legal authority to instruct CBP to suspend liquidation of Vandewater's entries pre-dating initiation of the (k)(2) inquiry. Specifically, SCI argued that

Vandewater's steel branch outlets were not subject to suspension of liquidation prior to Commerce's 2018 scope ruling and that, as a result, suspension of the entries was not permitted under *Sunpreme* and *United Steel and Fasteners*. Appx3245-3249 (citing *Sunpreme*, 946 F.3d 1300; *United Steel and Fasteners*, 947 F.3d 794). Similarly, in post-remand briefing, SCI argued that Commerce may only suspend liquidation of entries made after initiation of the (k)(2) inquiry, and that Commerce unlawfully "propose{d} to apply suspension to all entries" since imposition of the antidumping duty order in 1992. Appx4267. SCI also argued that there was no pre-existing suspension for Vandewater because "Commerce had made no prior statement regarding suspension of liquidation for this type of welded outlet." Appx4271-4272.

Commerce responded to these arguments. In particular, Commerce explained that its instructions to CBP are consistent with its regulations and this Court's holdings in *Sunpreme* and *United Steel and Fasteners*. Commerce did not direct CBP to suspend entries of steel branch outlet fittings back to 1992.[14] Rather, consistent with its regulations, Commerce instructed CBP to *continue* to suspend entries that CBP may have already suspended. Appx122-123; Appx3168-3169; Ct. Int'l Trade No.18-00199, ECF No. 144 at 44-45 (citing 19 C.F.R. § 351.225(l)).

---

[14] Indeed, as the trial court recognized, it was the plaintiffs who requested and received a statutory injunction from the trial court, requiring Commerce to suspend any unliquidated entries back to 1992. *See* Appx19, Appx4288-4289.

As to SCI's claim that there was no pre-existing suspension to continue, the record did not address that issue. *See* Appx3168-3169. We explained, however, that even if CBP had not suspended any Vandewater entries pre-initiation, "the importers have not identified any language in the instruction that instructed CBP to suspend liquidation retroactively." Ct. Int'l Trade No.18-00199, ECF No. 144 at 45. Finally, Commerce explained that any entries suspended pursuant to Commerce's invalidated September 10, 2018 initial scope ruling would remain suspended at a zero percent cash deposit rate pending a final and conclusive decision in this litigation (protecting against the possibility that the trial court's (k)(1) ruling could be appealed and the initial scope ruling reinstated). *See* Appx123.

After post-remand briefing, the trial court held two conferences at which SCI significantly altered its arguments. *See* Appx19. For the first time, SCI identified as an issue potential application of Commerce's suspension instructions to "mixed entries" consisting of merchandise subject to other antidumping or countervailing orders in addition to steel branch outlet fittings. SCI ultimately asserted that Commerce could only order continued suspension of the "product at issue" (*i.e.*, steel branch outlet fittings) rather than entries that included steel branch outlet fittings and were suspended for other reasons. *See* Appx4308.

This argument was not presented with any specificity before Commerce or in initial proceedings before the trial court and, as such, the trial court correctly

held that it was forfeited. *See* Appx19-20.[15] Although SCI presents a strained reading of its filings to suggest that this argument was made below, SCI Br. 45-48, at most SCI presented a "skeletal or undeveloped" argument that did not preserve the issue for appeal. *See, e.g.*, *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) (citations omitted); *SmithKline*, 439 F.3d at 1320. Nor has SCI raised the issue in its own case, which remains stayed without a remand.

SCI asks that the Court consider its argument because all parties "were aware of and had {an} opportunity to respond to SCI's arguments" after the issue was identified in conferences with the trial court. SCI Br. 60. This is inaccurate. Although parties were made aware of SCI's claims at a late stage of litigation, parties have not had an opportunity to respond to those claims nor has Commerce (as the agency that administers the relevant regulation) had an opportunity to address this potential application of its regulation against the particular facts that SCI identifies. In these circumstances, the Court should decline to address an issue when only SCI has been heard. *See Novosteel*, 284 F.3d at 1274 ("parties must give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief"); *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (exhaustion requirements are designed "to give the agency a fair and full opportunity to adjudicate {parties'} claims").

---

[15] Although not the basis for the trial court's ruling, SCI also did not exhaust its argument before Commerce. *See* 28 U.S.C. § 2637(d).

## B. In Any Event, SCI's Claim Is Moot Because Vandewater Has No Suspended "Mixed Entries"

Although the trial court appropriately held that SCI forfeited its mixed entry argument, SCI's argument also fails for a second reason:  mootness.  SCI appeals from a trial court judgment sustaining Commerce's determination that steel branch outlets *imported by Vandewater* are covered by the *China BSPFs Order*.  Thus, if SCI preserved any arguments regarding mixed entries, the arguments are limited to *Vandewater's* entries.  However, there are no relevant Vandewater entries.

Following briefing on Commerce's remand determination, and based on an inquiry from the trial court, the United States sought to identify whether there were any suspended entries of steel branch outlets pre-dating Commerce's initiation of a (k)(2) inquiry.  Appx4284-4285; Appx4287-4288.  After identifying certain entries imported by Vandewater and receiving a revised statutory injunction from the trial court, Commerce instructed CBP to liquidate the entries in question without regard to antidumping duties.  *See* Appx4310-4312 (amended injunction, ordering Commerce to liquidate entries from prior to September 10, 2018).  Based on the foregoing, and our corresponding consultations with Vandewater's counsel, we are unaware of *any* unliquidated entries of steel branch outlet fittings by Vandewater (let alone any "mixed" entries) pre-dating Commerce's October 2020 initiation of its scope inquiry.  *See* Appx4288.

Because Vandewater's suspension claims were "resolved" at the trial court, *see* Appx19, SCI effectively asks for a ruling with respect to its *own* entries that are not subject to this appeal. As an intervenor, however, SCI is not permitted to enlarge the issues before the Court. *See Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944) ("{O}ne of the most usual procedural rules is that an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding.").[16]

A decision on mixed entries would thus be purely advisory in this appeal. The Court should decline to opine on that moot issue. *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1337-38 (Fed. Cir. 2007) ("{F}ederal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it.'" (quoting *Local No. 8-6, Oil Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)).

---

[16] That SCI's arguments relate to its own entries is confirmed by its statement that "because *the company* had entries that would be impacted by the position taken by the United States, the issue identified by the CIT was not moot." *See* SCI Br. 55-56 (emphasis added). Contrary to SCI's claims, the issue is moot because this appeal relates to Vandewater, not SCI.

### C. This Court Should Decline To Address The Merits Of SCI's "Mixed Entries" Claim In The First Instance

If the Court were to find that SCI's suspension claims are preserved for adjudication, this Court still should not reach the merits. Instead, it should remand this case to the trial court for Commerce's consideration in the first instance.

As the Supreme Court has held, "{f}undamental principles of administrative law . . . teach that a federal court generally goes astray if it decides a question that has been delegated to agency if that agency has not first had a chance to address the question." *Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019) (citations omitted). Because SCI did not clearly present its arguments to Commerce, Commerce has not addressed the applicability of 19 C.F.R. 351.225(l) to mixed entries and should have an opportunity to do so prior to adjudication on the merits. *See Bowen v. City of New York*, 476 U.S. 467, 485 (1986) ("Because of the agency's expertise in administering its own regulations, the agency ordinarily should be given the opportunity to review application of those regulations to a particular factual context"). Accordingly, if the Court decides to reach this issue, it should do so only with the benefit of Commerce's analysis on remand.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

74

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                            /s/ Joshua E. Kurland
JARED CYNAMON                          JOSHUA E. KURLAND
Attorney                               Senior Trial Counsel
Department of Commerce                 U.S. Department of Justice
Office of the Chief Counsel            Civil Division
for Trade Enforcement & Compliance     Commercial Litigation Branch
U.S. Department of Commerce            P.O. Box 480, Ben Franklin Station
                                       Washington, D.C.  20044
                                       Tel: (202) 616-0477
                                       Email: Joshua.E.Kurland@usdoj.gov

April 20, 2023                         *Attorneys for Defendant-Appellee*
                                       *United States*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Circuit Rule 32(b) and the Court's word-limit order of April 18, 2023, the undersigned certifies that the word processing software used to prepare this brief indicates that it includes a total of 17,320 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/ Joshua E. Kurland