2023-1093, 2023-1141

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

VANDEWATER INTERNATIONAL INC.,

Plaintiff,

SIGMA CORPORATION, SMITH-COOPER INTERNATIONAL, INC.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

ISLAND INDUSTRIES,

Defendant.

---

Appeal from the United States Court of International Trade
in Case No. 1:18-CV-00199
Senior Judge Leo M. Gordon

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## SIGMA CORPORATION

Walter J. Spak
Lucius B. Lau
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant
Sigma Corporation

May 11, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2023-1093, -1141

**Short Case Caption** Vandewater International Inc. v. US

**Filing Party/Entity** SIGMA Corporation

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  05/11/2023

Signature: /s/ Lucius B. Lau

Name: Lucius B. Lau

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| SIGMA Corporation | | Fairfax Financial Holdings LTD |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑      None/Not Applicable          ☐      Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐      None/Not Applicable          ☐      Additional pages attached

| | | |
|---|---|---|
| Carbon Steel But-Weld Pipe Fittings from Peoples Republic of China; SCO - Vandewater | A-570-814 | Department of Commerce |
| Sigma Corporation v. United States and Island Industries | 19-00003 | Court of International Trade |
| Vandewater International Inc. v. US | 2023-1411 | Court of Appeals for the Federal Circuit |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑      None/Not Applicable          ☐      Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

SUMMARY OF REPLY ........................................................................ 1

ARGUMENT .................................................................................... 5

I.     THE GOVERNMENT MISAPPLIES THE STANDARD OF REVIEW AND MISCHARACTERIZES THE RELEVANT LEGAL ANALYSIS .................................................................. 5

    A.    Contrary to the Government's Assertion, *De Novo* Review Means No Deference to Commerce or the CIT .............................. 5

    B.    The Government Mischaracterizes this Court's Rulings Concerning the Legal Analysis for Scope Proceedings .................. 6

II.    DESPITE THE GOVERNMENT'S ARGUMENTS OTHERWISE, COMMERCE'S DETERMINATION IGNORES THE UNAMBIGUOUS SCOPE OF THE *BUTT-WELD ORDER* .................. 9

    A.    The Government Asks the Court to Disregard Commerce's Clear Legal Obligation to Interpret Terms in an Order Consistent with Trade Usage and Industry Standards .................... 9

    B.    The Government's Claims of "Contested Extrinsic Evidence" of Trade Usage are Unfounded and its Citations to Allegedly "Contrary Evidence" are Unavailing ............................................ 17

    C.    The Government Fails to Demonstrate that Commerce Took Into Account the Sperko Declarations in Reaching its Determination .............................................................................. 23

III.    THE GOVERNMENT'S ARGUMENT REGARDING SIGMA'S CITATION TO DOCUMENTS FROM THE RECORD OF ITS SCOPE PROCEEDING IS INCORRECT .............................................. 27

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arcelormittal Stainless Belg. N.V. v. United States*,
   694 F.3d 82 (Fed. Cir. 2012) ......................................................................passim

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962)....................................................................................25, 27

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1087 (Fed. Cir. 2002) .........................................................................12

*Fedmet Res. Corp. v. United States,*
   755 F.3d 912, 921 (Fed. Cir. 2014) ...................................................................12

*In re Howarth*,
   654 F.2d 103 (CCPA 1981) ................................................................................13

*In re Stepan Co.*,
   868 F.3d 1342 (Fed. Cir. 2017) .........................................................................25

*King Supply Co., LLC v. United States*,
   674 F.3d 1343 (Fed. Cir. 2012) ...................................................................16, 17

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004) .........................................................................13

*Litton Sys. v. Honeywell, Inc.*,
   87 F.3d 1559 (Fed. Cir. 1996),
   *rev'd on other grounds*, 520 U.S. 1111 (1997) ....................................................6

*Meridian Prods., LLC v. United States*,
   851 F.3d 1375 (Fed. Cir. 2017) .......................................................................5, 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..............................................................................................24

*Novosteel SA v. United States*,
   284 F.3d 1261 (Fed. Cir. 2002) ...........................................................................8

*OMG, Inc. v. United States*,
  321 F. Supp. 3d 1362 (Ct. Int'l Trade 2018),
   *remanded to* 389 F. Supp. 3d 1312 (Ct. Int'l Trade 2019),
   *aff'd on other grounds* 972 F.3d 1358 (Fed. Cir. 2020) .....................................18

*Tak Fat Trading Co. v. United States*,
  396 F.3d 1378 (Fed. Cir. 2005) ...........................................................................12

*Wellman, Inc. v. Eastman Chem. Co.*,
  642 F.3d 1355 (Fed. Cir. 2011) ...........................................................................13

*Whirlpool Corp. v. United States*,
  890 F.3d 1302 (Fed. Cir. 2018) .............................................................................5

*Yepes-Prado v. INS*,
  10 F.3d 1363 (9th Cir. 1993) .................................................................................6

## STATUTES AND REGULATIONS

28 U.S.C. § 2637(d) ....................................................................................................28

19 C.F.R. § 351.225(k)(1) ...........................................................................................24

19 C.F.R. § 351.225(k)(2) .............................................................................................7

## ADMINISTRATIVE DETERMINATIONS

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of
  China*,
  57 Fed. Reg. 29,702 (July 6, 1992) .....................................................................13

## MISCELLANEOUS

American Welding Society, *Standard Welding Terms and Definitions*,
  12th Ed., AWS A.30M/A3.0:2010 at 1,
  *available at* https://pubs.aws.org/download_pdfs/a3.0m-a3.0-2010pv.pdf .......15

## SUMMARY OF REPLY

In its *Brief of Defendant-Appellee United States* ("Gov't Br.") (ECF 25), the Government claims that Sigma goes "too far," insisting that this Court should defer to Commerce and the CIT without question, and pointing to the "high bar" for review of a scope determination, which Sigma allegedly failed to meet. The Government gets it wrong.

In reality, this case is simple, and comes down to straightforwardly applying this Court's precedent to a relevant set of facts. Chief among that precedent is *Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012). In *Arcelormittal*, this Court explained how to treat a case like this one. That is, Commerce should not interpret antidumping duty orders "in a vacuum devoid of any consideration of the way the language of the order is . . . . customarily used in the relevant industry"; and must not "identify an ambiguity where none exists." *See Arcelormittal*, 694 F.3d at 88-90 (citations omitted). ***Commerce failed to follow either principle in this case***.

The Government does not account for Commerce's failure to act in accordance with the above legal requirements. Instead, the Government draws analogies with inapplicable cases and points the Court's attention elsewhere, including incorrect interpretations of various legal and factual elements of this case.

First, the Government misapplies the standard of review, insisting that *de novo* review involves deference to Commerce and the CIT. The Government further mischaracterizes this Court's rulings concerning the legal analysis for scope proceedings, selectively quoting from this Court's prior rulings and omitting subsequent language that — even within the same sentence — directly contradicts the Government's arguments.

Second, the Government fails to make its key argument, *i.e.*, that despite the record evidence and documented trade usage demonstrating a single, customary industry definition, the term "butt-weld" is somehow ambiguous. In attempting to convince the Court of this purported ambiguity, the Government essentially asks it to disregard Commerce's legal obligation to recognize interpret terms in an order consistent with trade usage and industry standards. The Government further claims that Sigma inappropriately relied on "contested extrinsic evidence," but fails to demonstrate that such evidence was contested; refuses to recognize that trade usage necessarily involves recourse to industry materials; and simultaneously cites "extrinsic" materials that are vague or contradictory. And, in attempting to demonstrate that Commerce took the declarations of Walter Sperko into account, the Government engages in *post-hoc* rationalization.

Finally, the Government implores this Court to disregard Sigma's few citations to evidence from the record of Sigma's scope proceeding, claiming that

Sigma's arguments "stem" from "a significant volume of non-record material" and implying that Sigma has failed to exhaust its administrative remedies. Even the most cursory reading of Sigma's Brief makes clear that Sigma based its arguments solely on the record of the Vandewater scope proceeding, and that the few citations to Sigma's own record documents were, in fact, included to demonstrate that Sigma exhausted its administrative remedies.

Overall, the Government responds in form, but not substance, failing to rebut any of the central claims from Sigma's Brief. This leaves only one reasonable outcome in this case: in accordance with *Arcelormittal* and other relevant precedent, the Court should find that the term "butt-weld" has a single, unambiguous meaning consistent with the trade usage of that term.

In summary, as demonstrated in Sigma's Brief and supported by expert declarations prepared by Walter Sperko and submitted to Commerce by both Vandewater and Sigma, a butt-weld pipe fitting:

- Must contain a "butt weld" (or, "butt joint"), a "joint type in which the butting ends of one or more workpieces are aligned in approximately the same plane";

- Is "always welded to the *end* of a pipe, another butt weld fitting, or a butt weld valve" – and "is always an *end-to-end connection*";

- Involves a connection in which "the beveled edges of the fitting and the beveled pipe (or beveled end of another butt-weld fitting) form a shallow channel that accommodates the circumferential 'beads' of the butt weld that fastens together the two parallel adjoining pieces"; and

- Is manufactured to ASME standard B16.9.

3

Br. of Pl.-Appellant Sigma Corp. at 11-14 (ECF 13) ("Sigma Br.") (citations omitted, emphasis original). As Sigma further demonstrated to both Commerce and the Court, Vandewater's (and Sigma's) welded outlets:

- Involve a "corner joint" — a "joint type in which butting or nonbutting ends of one or more workpieces converge approximately perpendicular to one another";

- Are "welded to a hole cut in the wall of the pipe, not to the end of the pipe" and include "a contoured connection to the run pipe";

- Do not "have a circular, single-plane, beveled opening that can be abutted and butt-welded to the beveled end of a pipe or to the beveled end of another fitting"; and

- Are manufactured to MSS standard SP-97.

*Id*. (citations omitted). Consequently, this Court should vacate the CIT's judgment and remand to Commerce with instructions to find that welded outlets are excluded from the scope of the *Butt-Weld Order*.

# ARGUMENT

## I. THE GOVERNMENT MISAPPLIES THE STANDARD OF REVIEW AND MISCHARACTERIZES THE RELEVANT LEGAL ANALYSIS

The entirety of the Government's argument is based on a misapplication of the standard of review and a mischaracterization of the legal analysis used in scope proceedings. As explained below and in the subsequent sections, a correct understanding of both of these elements, followed by a review of Commerce's actions in the underlying proceeding consistent with the arguments in Sigma's brief, demonstrates that Commerce's affirmative scope ruling is contrary to law.

### A. Contrary to the Government's Assertion, *De Novo* Review Means No Deference to Commerce or the CIT

As explained in detail in Sigma's Brief, and as this Court stated in *Whirlpool*, the "question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review *de novo*." *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381–82 (Fed. Cir. 2017)); *see also* Sigma Br. at 23-24.

The Government concedes this point. Gov't Br. at 6 ("The (k)(0) inquiry presents a question of law that courts review *de novo*"). "At the same time," the Government immediately and incompatibly claims, this Court should afford Commerce "substantial deference" and, without elaborating, that "Appellant

Sigma's contrary suggestion is inaccurate." *Id.* at 6 & n.2.  Apparently, this latter statement refers to Sigma's explanation that *de novo* means "without deference to Commerce's determination."  Sigma Br. at 24 (citation omitted).

The Government's vague, conclusory proclamation of "inaccuracy" contradicts this Court's pronouncement that "[b]y use of the term *de novo*, this court means that ***it does not defer to the lower court ruling or agency decision*** in question." *Litton Sys. v. Honeywell, Inc.*, 87 F.3d 1559, 1566 n.1 (Fed. Cir. 1996), *rev'd on other grounds*, 520 U.S. 1111 (1997) (quoting *Yepes-Prado v. INS*, 10 F.3d 1363, 1367 n.5 (9th Cir. 1993)) (emphasis added, internal quotation marks omitted); *see* Sigma Br. at 24.

As a threshold matter, then, this Court should reject the Government's mischaracterization of the standard of review and attempt to shoehorn deference into the analysis where it is neither required nor appropriate.  The sole question here is whether the term "butt-weld" has an unambiguous meaning, and this Court will reach the answer to that question by considering the matter *de novo*, with no deference to Commerce or the CIT.  *See* Sigma Br. at 4, 23-24 (providing statement of the case and citing to relevant precedent for the Court's standard of review).

## B.   The Government Mischaracterizes this Court's Rulings Concerning the Legal Analysis for Scope Proceedings

Separately, the Government mischaracterizes this Court's rulings, in particular, through selective quotation, when discussing the legal analysis for scope

6

proceedings. Read in its full context, the language quoted by the Government renders its argument meritless.

First, the Government cites *Meridian Products* to argue that "[i]mportantly, the threshold to show that Commerce justifiably found ambiguity is low." Gov't Br. at 4 (citing *Meridian Prods.*, 851 F.3d at 1381 n.6). What the Government omits, however, is the statement this Court made immediately afterward — that, despite the low threshold, "Commerce ***must not identify an ambiguity where none exists***[.]" *Meridian Prods.*, 851 F.3d at 1381 n.6 (citation and internal quotation marks omitted; emphasis added). As demonstrated in Sigma's Brief, Commerce found "ambiguity where it does not exist" by neglecting to acknowledge the term "butt-weld" altogether, and the definition of the term "as customarily used in the relevant industry," on the way to its (k)(1) analysis. *See* Sigma Br. at 25-27; *Arcelormittal*, 694 F.3d at 88.

Second, the Government quotes *Arcelormittal*, where this Court stated that "consideration of industry jargon is not the same as conducting a full-fledged analysis of the factors embodied in 19 C.F.R. § 351.225(k)(2)." Gov't Br. at 4 (quoting *Arcelormittal*, 694 F.3d at 88 n.8). Yet there, too, the Court immediately went on to explain: "[i]n answering the ***initial question*** of whether a [term] recited in an antidumping duty order is subject to interpretation, ***the question Commerce asks is whether the [term] has an industry-accepted meaning*** . . . ." *Arcelormittal*,

694 F.3d at 88 n.8 (emphasis added).  Sigma has demonstrated to the Court that "butt-weld" has an industry-accepted meaning, which Commerce failed to consider during the (k)(zero) phase — despite its obligation to do so.  *See* Sigma Br. at 27-32, 37-39.

Finally, the Government compares this case to *Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002), claiming that the Court deemed the term "flat-rolled" (which, the Government avers, is "analogous to the undefined term 'butt-weld' here") to be ambiguous.  Gov't Br. at 4 (citing *Novosteel*, 284 F.3d at 1266, 1271-72).  Putting aside the conclusory nature of this statement and the fact that the Government fails to prove how or why these terms should be considered "analogous," the Government appears to have misread *Novosteel*.  The *Novosteel* Court did not explicitly find that the ***term*** "flat-rolled" was ambiguous; rather, it stated that "no language in the petitions unambiguously excludes the [product at issue] from the scope[.]"  *Novosteel*, 284 F.3d at 1270.

In fact, the *Novosteel* Court found that the definition of "flat-rolled" relied upon by the appellant in that case (sourced from the Harmonized Tariff Schedule of the United States, or HTSUS) was "every bit the same as" the definition evaluated by the CIT.  *Id.* at 1271.  The Government asks the Court to rely on a misplaced analogy to an irrelevant case to justify a finding of ambiguity.  In contrast, Sigma has demonstrated to the Court that the term "butt-weld" — the only term that matters

here — has an unambiguous meaning in trade usage.  *See* Sigma Br. at 10-17, 37-39.

## II.  DESPITE THE GOVERNMENT'S ARGUMENTS OTHERWISE, COMMERCE'S DETERMINATION IGNORES THE UNAMBIGUOUS SCOPE OF THE *BUTT-WELD ORDER*

The Government insists that Commerce and the CIT "lawfully concluded that further analysis was warranted" to determine whether Vandewater's welded outlets fall within the scope of the *Butt-Weld Order*, due to "multiple contrary trade usage indicators."  Gov't Br. at 28.  Yet, in the fifteen pages that follow, the Government fails to rebut the legal and factual issues at the core of this case by asking the Court to disregard Commerce's obligation to interpret terms in an antidumping duty order consistent with trade usage and industry standards.  The Government further erroneously claims that Sigma cited to "contested extrinsic evidence" of trade usage, and otherwise fails to demonstrate the existence of allegedly "contrary evidence." Finally, the Government argues — but fails to demonstrate — that Commerce took the Sperko declarations into account when reaching its determination.

### A.  The Government Asks the Court to Disregard Commerce's Clear Legal Obligation to Interpret Terms in an Order Consistent with Trade Usage and Industry Standards

As Sigma demonstrated in its Brief, the combination of Commerce's obligation to first examine the scope language for ambiguity, while recognizing and interpreting terms consistent with their trade usage, means that it acted contrary to

law in the *Vandewater Scope Ruling* when it refused to apply the meaning of the term "butt-weld" in the context of trade usage and industry standards. *See* Sigma Br. at 25-32, 37-39.

The Government asks the Court to disregard these requirements. It starts by claiming that Sigma takes the concept of trade usage "too far" and "improperly import[s] a (k)(2) analysis of contested trade usage evidence into determining whether the scope is unambiguous . . . ." Gov't Br. at 29. To be clear: this Court has established that, in the (k)(zero) context, Commerce must examine the plain language of an antidumping duty order; determine if it is ambiguous; and must use the definition of the relevant terms as in customary trade usage to make this determination. That is the cornerstone of this Court's holding in *Arcelormittal*:

> [A]ntidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry. As the Court of International Trade also observed, "[c]ourts have long recognized the importance of considering context, including industry custom, in interpreting written language." . . . . Because the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage. Thus, a finding of no ambiguity for [a term] may be rebutted by sufficient evidence showing that [the term is] not customarily used in the relevant industry. . . .

> Commerce's broad reading of the SSPC order is in conflict with the plain language of the order itself, which unambiguously precludes nominal merchandise meeting the specified dimension when read in light of industry practice regarding delivered products and Commerce's previous decision in *Carbon Steel Plate*. Thus, Commerce was not justified in finding the order ambiguous.

694 F.3d at 88-90 (citations omitted). It is not clear what going "too far" with respect to this standard actually means.

Nevertheless, the Government avers that Sigma went "too far" because it allegedly used a (k)(2) analysis that considered "contested trade usage evidence[.]" Gov't Br. at Appx29. This allegation is incorrect. Commerce conducts a (k)(2) analysis only after it finds that the language is ambiguous and the (k)(1) factors are "not dispositive"; moreover, a (k)(2) analysis involves a number of factors including physical characteristics, end uses, and advertisement. *See* Sigma Br. at 6 (explaining Commerce's analytical framework in scope proceedings). A plain reading of Sigma's brief makes clear that its argument is limited to (k)(zero), and we further address the Government's allegations of allegedly "contested trade usage evidence" in Section II.B below.

Then, the Government insists, ordinary trade usage, as demonstrated in the Sperko declarations and industry standards and as cited by Vandewater, cannot define the term "butt-weld," because the *Butt-Weld Order* itself "does not refer to industry standards or an end-to-end requirement." Gov't Br. at 29. Similarly, the Government claims that Commerce "specifically addressed" industry standards in the *Sigma Scope Ruling* (despite simultaneously urging the Court not to consider that decision). *Id.* at 32 n.6 (citations omitted). Yet, Commerce also ducked the

11

industry standard (ASME B16.9) in the *Sigma Scope Ruling* simply because it is not

mentioned in the *Butt-Weld Order*. Appx3724.

In sum, despite this Court's warning that antidumping duty orders are not to

be read in a vacuum and devoid of trade usage context, *see Arcelormittal*, 694 F.3d

at 88, the Government and Commerce seek to do exactly that, hiding behind the

shield that the industry standard and trade usage definitions are not explicitly

contained in the order. This approach — requiring that Commerce only find terms

to be unambiguous where the relevant trade usage is explicitly spelled out in the

order – is untenable. This Court recognized as much in *Fedmet Res. Corp. v. United

States*:

> Apparently satisfied by Resco's representations that industry
> terminology was sufficient, Commerce and the Commission
> determined not to go beyond the "name" of MAC bricks, not to provide
> any chemical composition or technical specifications for MAC bricks,
> and not to adopt an explicit exclusion for MAC bricks because it was
> unnecessary. These decisions cannot now operate to create ambiguity
> or otherwise detract from the clear import of the meaning given to the
> term MAC bricks in the underlying investigations. While Commerce
> enjoys considerable latitude in clarifying its orders, it may not change
> the original scope of its orders through the interpretative process.

755 F.3d 912, 921 (Fed. Cir. 2014) (citing *Tak Fat Trading Co. v. United States*, 396

F.3d 1378, 1383 (Fed. Cir. 2005) and *Duferco Steel, Inc. v. United States*, 296 F.3d

1087, 1095 (Fed. Cir. 2002)). The Court need only replace the term "MAC brick"

in the passage above with "butt-weld" to see how straightforward this case is, and

likewise, how unreasonable the Government's position is. Nor is this principle

unique to the context of scope proceedings, or even trade cases. This Court has likewise held, for example, that "[w]ell known industry standards need not be repeated in a patent." *See*, *e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1367 (Fed. Cir. 2011) (citing *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004); *In re Howarth*, 654 F.2d 103, 105 (CCPA 1981)).

Next, the Government insists that, despite Sigma's demonstration that Commerce did not consider the term "butt-weld" nor find any ambiguity, Sigma Br. at 27, Commerce nevertheless determined that Vandewater's welded outlets fall within the scope of the *Butt-Weld Order* "because they: (1) are made of carbon steel; (2) are forged; (3) have an inside diameter of less than 14 inches; (4) require a permanent welded connection to be attached to a piping system; and (5) have a beveled edge to accommodate welding." Gov't Br. at 30 (citing Appx138-140). Looking again at the scope language, these physical descriptors all follow the term "butt-weld":

> The products covered by this order are carbon steel **butt-weld** pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.,* threaded, grooved, or bolted fittings).

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 57 Fed. Reg. 29,702, 29,703 (July 6, 1992) (emphasis added). The fact that Vandewater's welded outlets meet all the physical requirements ***that come after the***

**term "butt-weld"** in the order is meaningless without first considering the meaning of the term "butt-weld." The Government's defense, in fact, proves Sigma's point: in reviewing the scope language, Commerce essentially skipped over the term "butt-weld," failing to consider whether the term was unambiguous; had Commerce actually done so, and recognized the term's definition as customarily used in the relevant industry, *see Arcelormittal*, 694 F.3d at 88, there would have been no need for a (k)(1) analysis, as it would have found welded outlets to fall outside of the scope.

Finally, the Government takes aim at the industry standards and trade usage cited by Sigma in an effort to prove that they do not actually govern the products at issue. For example, the Government claims that "Commerce ultimately determined that the industry standard and other materials on which appellants rely do not provide an exclusive standard" and that MSS SP-97, which governs production of welded outlets (while ASME B16.9 governs production of butt-weld pipe fittings), is "non-exclusive." Gov't Br. at 33, 35-36.

The Government mischaracterizes, or at a minimum, misunderstands, the term "non-exclusive." As stated in MSS SP-97 itself, the purpose of the standard is "to provide an effective, clear, and non-exclusive standard" that "describes minimal requirements and is intended as a basis for common practice by the manufacturer, the user, and the general public. The existence of an MSS Standard Practice does

not in itself preclude the manufacture, sale, or use of products not conforming to the Standard Practice."  Appx1319.  In other words, "non-exclusive" in the context of MSS SP-97 does not, as the Government suggests, mean that welded outlets produced under it could qualify as butt-weld pipe fittings, which are produced in accordance with ASME B16.9.  *See* Gov't Br. at 35.

Similarly, the Government takes issue with Sigma's citation to the AWS *Standard Terms and Definitions*, because that publication "lists 'butt weld' as a '*nonstandard* term for a weld in a butt joint.' . . . The source describes this nonstandard term by cross-referencing the definition for a 'butt joint,' but there is no indication that this is an industry-wide accepted meaning for butt-weld pipe fitting."  Gov't Br. at 36 (emphasis original to brief) (quoting Appx302).

The Government misconstrues the AWS's use of the term "nonstandard."  As the AWS itself explains, because the *Standard Terms and Definitions* is meant to "encompass all terms . . . directly related to welding or allied fields[,] . . . nonstandard terms are included with cross-references to the corresponding standard terms." American Welding Society, *Standard Welding Terms and Definitions*, 12th Ed., AWS A.30M/A3.0:2010 at 1, *available at* https://pubs.aws.org/download_pdfs/a3.0m-a3.0-2010pv.pdf.  In other words, inclusion in the AWS *Standard Terms and Definitions*, be it as a standard or nonstandard term, connotes accepted use by the

industry, and therefore provides conclusive evidence of trade usage. The Government's claim otherwise is wrong.

The Government's misunderstanding extends to Sigma's citation to *King Supply Co., LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012). As Sigma demonstrated, this Court affirmed Commerce's affirmative *King Supply Scope Ruling*, which concerned the *Butt-Weld Order*, because "not only were King's products physically identical to the products described in the first sentence of the *AD Order*, *but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition*." *Id.* at 1347 (emphasis added); *see also* Sigma Br. at 33-37. As Sigma explained, the inconsistency between *King Supply* and the *Vandewater Scope Ruling* makes the latter *ipso facto* unreasonable. *See* Sigma Br. at 34-36 (citations omitted).

The Government seeks to nullify *King Supply* in two ways, neither of which succeeds. First, it claims that the scope of the *Butt-Weld Order* and industry standards need not be "coextensive" and cites to the fact that the scope of the *Butt-Weld Order* "neither includes nor refers to any industry standards. . . ." Gov't Br. at 41. Yet, as explained in Section II.A *supra*, insisting that the industry standards be explicitly listed in the *Butt-Weld Order* in order for Commerce to acknowledge them is untenable. *See also* Sigma Br. at 29-31 (discussing precedent and Commerce

16

practice defining terms in antidumping duty orders consistent with industry standards).

Second, the Government claims that Sigma's argument is "based on the incorrect assumption that Vandewater's steel branch outlets are 'physically distinct from butt-weld pipe fittings.' . . . [I]n truth, Sigma merely disagrees with Commerce's finding that Vandewater's outlets *are not* physically distinct from subject merchandise . . . ." Gov't Br. at 42-43 (citations omitted). Sigma, of course, disagrees with Commerce's finding, because — as demonstrated throughout its Brief and in the Summary of the Argument above — welded outlets are clearly distinct from butt-weld pipe fittings. *See supra* at 3-4; Sigma Br. at 11-15. Repeating Commerce's incorrect conclusion does not make it correct. Nor does it invalidate this Court's ruling in *King Supply*, which continues to support the conclusion that the physical distinctiveness of welded outlets, along with the fact that they are produced to different industry standards, renders them outside the scope of the *Butt-Weld Order*.

### B. The Government's Claims of "Contested Extrinsic Evidence" of Trade Usage are Unfounded and its Citations to Allegedly "Contrary Evidence" are Unavailing

The Government repeatedly attempts to discredit Vandewater and Sigma's reliance on evidence of trade usage to define the term "butt-weld" (*e.g.*, the Sperko Declarations and industry standards) by claiming that such materials are "extrinsic"

evidence of "contested" trade usage and "are properly part of a (k)(2) analysis. . . ." *See* Gov't Br. at 22, 29, 32, 34. This argument is misplaced.

It is true that the Sperko declarations and other industry standards establishing the unambiguous definition of butt-weld are "extrinsic" insofar as they are not part of the language of the *Butt-Weld Order*. Yet, given that trade usage itself is inherently extrinsic, recourse to such materials is often necessary. Indeed, that is exactly why this Court has stated that "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *Arcelormittal*, 694 F.3d at 88.

An understanding of "the way the language of the order is used in the relevant industry" can only be attained by looking to materials from the relevant industry — materials that the Government writes off as "extrinsic." That is precisely why courts regularly turn to "dictionaries, scientific authorities, and other reliable sources of information, including testimony of record" to define relevant terms, and cite "industry actors" when defining key terms in an antidumping duty order. *OMG, Inc. v. United States*, 321 F. Supp. 3d 1362, 1368-69 (Ct. Int'l Trade 2018), *remanded to* 389 F. Supp. 3d 1312 (Ct. Int'l Trade 2019), *aff'd on other grounds* 972 F.3d 1358 (Fed. Cir. 2020) (citation and internal quotation marks omitted). Contrary to the Government's claim, the fact that evidence of trade usage is extrinsic does not disqualify it from consideration in the (k)(zero) context.

Nor is it true that such evidence in this case is "contested." The Government obliquely points to the Sperko declarations, identifying "contested extrinsic evidence, analyzed in declarations prepared in support of Vandewater's scope request[.]" Gov't Br. at 32. Yet, for evidence to be "contested" requires that someone ***actually contest*** the evidence. And, as Sigma has already explained to the Court, "[a]side from Vandewater (and the two other importers . . .), no other interested party provided expert testimony on the meaning of 'butt-weld,' trade usage, or industry standards; nor . . . did Commerce ultimately cite to any industry expert in [the *Vandewater Scope Ruling*]." Sigma Br. at 11 (citation omitted).

While the Government does cite to a few pieces of evidence in its effort to demonstrate that evidence of trade usage was contested, many of these already have been disproven as irrelevant, namely: (1) the concept of "nonexclusive" industry standards and "nonstandard" terms, *see supra* Section II.A; (2) the alleged relevance of the *Sprink-let Ruling*, *see* Sigma Br. at 15 ("In part, Mr. Sperko explained, the *Sprink-let Ruling* did not take into account the different physical characteristics and industry standards used in producing each kind of product.") and *infra* Section II.C; and (3) the statement by Smith-Cooper's employee, *see* Sigma Br. at 39 (joining Smith-Cooper's brief with respect to "the statement by Smith-Cooper's employee"). The four remaining pieces of evidence cited by the Government likewise do not demonstrate that the trade usage demonstrated by Vandewater was "contested."

First, quoting Commerce, the Government avers that "the ITC report at the time of the investigation explicitly noted that not all shipments of *BWPFs from China*—the precise product for which the petitioner sought relief—met the ASME standard." Gov't Br. at 35 (quoting Appx102; citing Appx1997-1998). Both the Government and Commerce below, however, cite to this finding out of context. The ITC's finding that some subject imports did not meet the industry standard was explicitly and inherently tied to quality testing, rather than defining product characteristics:

> Two of seven U.S. producers reported that Chinese butt-weld fittings are ***inferior in quality*** to the domestic product, while the remaining five indicated no quality differences between the two products. ***Both producers noting quality differences stated that butt-weld fittings from China often do not meet ASTM and/or ANSI specifications when tested*** by distributors and end users.

Appx1997-1998 (emphasis added). Indeed, on the preceding page of the ITC report, the Commission specifically linked these industry standards to product quality:

> Ends are ***beveled to the specifications of the American National Standards Institute (ANSI), and inside diameters are bored and tapered to ANSI tolerances***. The fittings are then ground to remove surface imperfections and stamped with an identification of each heat lot number, parent material, size, and wall thickness. Next, the fittings are ***inspected for flaws and defects***, in addition to being checked for thickness, length dimensions, ***and inside and outside diameter tolerances*** per the specifications of the ***American Society for Testing and Materials (ASTM) and ANSI***.

Appx1996 (emphasis added). It is entirely plausible — and indeed, supported by a plain reading of the ITC report — that a product can meet the dimensional and

20

physical requirements of an industry standard to qualify as the product defined in that standard, but fail its quality requirements, thereby "not meet[ing]" the industry standard. *See* Appx1996-1998. Because the ITC's statement that certain subject imports from China failed to meet these industry standards does not speak to whether those specific products met the industry definition of "butt-weld," it cannot constitute evidence upon which to "contest" the industry definition that Commerce ignored in its (k)(zero) analysis.

Second, the Government cites to specifications from Aleum USA, an outlet distributor, which "depict threaded and grooved outlets with butt welding ends." Gov't Br. at 18, 39 (citations and internal quotation marks and brackets omitted). Yet, these diagrams show "a threaded or grooved connection at one end and a fishmouth connection at the other . . . . These items have no butt-weld end." Appx3045. In particular, they do not have a "circular, single-plane, beveled opening that can be abutted and butt-welded to the beveled end of a pipe or to the beveled end of another fitting." *Compare* Sigma Br. at 14, Appx 554, *and* Appx3327-3328 *with* Appx2524, Appx2526. Moreover, the record indicates that Aleum, a "small industry participant . . . in no way represents the industry's view. Aleum's stray word usage is not representative of the industry usage and cannot define the industry usage for the Department's analysis here." Appx3046. Given the incorrect use of the term "butt-weld" in this document, and the fact that Aleum is not representative

of the industry, the document cannot counter the widespread, accepted trade usage found in industry standards and the Sperko Declarations, and does not reflect the definition "customarily used in the relevant industry." *See Arcelormittal*, 694 F.3d at 88.

Third, and similarly, the Government proffers a catalog from a domestic manufacturer of pipe fittings, Bonney Forge, which offers a "Vesselet" product that, the Government claims, is similar to Vandewater's product because it is "designed to be welded to the curved side of a pipe like the steel branch outlets at issue" and advertises a "{t}rue butt-weld installation in header." Gov't Br. at 17, 39 (citations omitted). Importantly, however, the advertisement in question states that Vesselet outlets are "available in butt-weld, socket-weld, threaded, & flanged configurations[.]" *See* Appx403. In other words, the Vesselet *can*, but need not have a butt weld. Accordingly, variations of the Vesselet *with* a butt weld would fall within the scope of the order, while variations of the Vesselet *without* a butt weld (*e.g.*, with a threaded configuration — just like Vandewater's and Sigma's welded outlets) would clearly fall outside the scope of the order. The Court should therefore likewise reject this document as evidence of any purportedly contrary evidence of trade usage.

Finally, the Government points to the fact that the petition included "trade usage materials showing 'Examples of Carbon Steel Butt-Weld Fittings' that include

22

a 'saddle' that does not appear in ASME B16.9." Gov't Br. at 7, 35 (citations omitted).  Like the other examples cited above, this piece of evidence is readily dismissed.  The saddle identified in the petition is not a butt-weld fitting by reason of the curved portion that connects to the header pipe. *See* Appx756.  Instead, that saddle is a butt-weld pipe fitting by reason of the single-plane connection at the branch end that contemplates use of a butt weld. *See id.*

Moreover, the ***text*** of the petition — which  defines  the petitioners' intent to limit the scope to butt-weld pipe fittings — could not be clearer: "Carbon steel butt-weld fittings are commodity type products, manufactured in conformity with industry standards as established by the American Society for Testing and Materials ('ASTM') and the American National Standards Institute ('ANSI')" and explicitly stating in a footnote to this language, "ASTM A234-82a for materials; ANSI B16.9 for dimensions."  Appx712.  The stray appearance of certain fittings in a catalog submitted with the petition cannot outweigh the clear requirement — per the petitioners' own language — that, to qualify as a butt-weld pipe fitting, the product must conform to the relevant industry standard, here ANSI/ASME B16.9.

### C.    The Government Fails to Demonstrate that Commerce Took Into Account the Sperko Declarations in Reaching its Determination

As Sigma demonstrated in its Brief, neither Commerce nor the CIT even acknowledged the views of, and demonstrations of trade usage in, the Sperko

declarations. Sigma Br. at 16 (citing Appx131-142), 18 (citing Appx143-148). This, rendered Commerce's scope determination contrary to law. *Id.* at 37-39.

The Government, however, insists that Commerce "considered" the Sperko declarations. Gov't Br. at 31. As the Government would have it:

> Commerce explicitly found — after citing Vandewater's reliance on the Sperko declaration ('Exhibit 7')—that "there is nothing in the scope language or the sources under 19 CFR 351.225(k)(1) that limits the scope of the Chinese Butt-Weld Order to butt-weld pipe fittings with an end-to-end, flat, perpendicular, or single plane connection" (as appellants assert is required by industry standards and diagrams) . . . . Commerce also found that "{o}ther than the existence of a beveled edge, there are no angle restrictions to *what is considered a butt-weld connection according to the scope* and the 19 CFR 351.225(k)(1) sources." . . . Commerce's interpretation that "butt-weld" does not unambiguously mandate such requirements is evident. Even if this was not explicit, this Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

Gov't Br. at 30-31 (quoting Appx140 and *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (emphasis original to brief).

Despite the Government's attempts to prove otherwise, Commerce's "consideration" of the Sperko declarations (allegedly, one citation in passing) is not evident from this language, and contrary to *State Farm*, its "interpretation" is not reasonably discernible. To demonstrate that it, in fact, "considered" the analysis contained in the Sperko declaration, Commerce should have explicitly stated how and why its conclusions either ignored or outright contradicted the expertise and

documented trade usage, including industry standards, contained in the Sperko declarations.

For example, Mr. Sperko quoted industry materials, including the AWS *Standard Terms and Definitions*, to state that a "butt weld" or "butt joint" is a "joint type in which the butting ends of one or more workpieces are aligned in approximately the same plane." Appx302. Conversely, Commerce, as quoted above, stated that "nothing in the scope language" limits the scope of the *Butt-Weld Order* to "to butt-weld pipe fittings with a[] . . . single-plane connection." Appx140. This misses the point because, per industry usage, a butt-weld pipe fitting ***must have*** a single-plane connection. And, thus, the Sperko declaration should have informed Commerce that the very presence of the term "butt-weld" in the scope thereby limited the *Butt-Weld Order* accordingly.

Consequently, the Government's assertion that Commerce "considered" Sperko's analysis, to reach a completely contradictory conclusion, and without explaining how it did so, makes no sense. At best, it amounts to *post-hoc* rationalization. The Court will "not accept appellate counsel's *post hoc* rationalization for agency action[.]" *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962); *see also In re Stepan Co.*, 868 F.3d 1342, 1347 (Fed. Cir. 2017) (citations omitted).

The Government also doubles down on the relevance of the *Sprink-let Ruling*, citing in part the CIT's reliance on that decision. *See*, *e.g.*, Gov't. Br. at 8, 36-37. Sigma has already demonstrated the irrelevance of this earlier ruling, which Mr. Sperko explained, was "wrong from an industry perspective, relies on faulty logic, and runs counter to the very definition of a butt weld" — and moreover, did not take into account the different physical characteristics and industry standards relevant to production. Appx553-554 (internal quotation marks omitted); *see also* Sigma Br. at 15, 17. It is odd that the Government relies on this scope ruling, particularly given that Commerce itself concluded that the antidumping duty order at issue in the *Sprink-let Ruling* contained unique language and Commerce was "not bound by the agency's analysis" therein. Appx141. Moreover, the *Sprink-let Ruling* says nothing as to the ambiguity of the term "butt-weld" in the scope of the *Butt-Weld Order*.

Finally, the Government cites to "materials" in Vandewater's scope request that "describe a fillet weld," which, "contrary to the beveled edges on Vandewater's products . . . 'fills in space on the *outside* of pieces of metal that are positioned at an angle to each other.' . . . This suggests a 'butt-weld' connection—rather than fillet weld, as appellants claim—when beveled edges are present." Gov't Br. at 38 (quoting Appx426-430) (emphasis original to brief). The *Vandewater Scope Ruling* is devoid of any discussion of fillet welds, thereby making this argument, too, a *post-*

26

*hoc* rationalization.  *See* Appx131-142; *see also Burlington Truck Lines*, 371 U.S. at 168.

In any event, Mr. Sperko explicitly contrasted a butt weld, which involves beveled gaps filled by welding material at the connection to the pipe, with the "end of a branch fitting" that is "*not* beveled" at the connection to the pipe, and the angle of which "allows welding of a full-penetration or partial penetration groove weld reinforced by a fillet weld."  Appx303 (emphasis original).  The Government's new conclusions before this Court, like Commerce's below, fail to take into account key product characteristics defined in the industry and explained by Mr. Sperko.

## III.  THE GOVERNMENT'S ARGUMENT REGARDING SIGMA'S CITATION TO DOCUMENTS FROM THE RECORD OF ITS SCOPE PROCEEDING IS INCORRECT

Separate from its substantive arguments, the Government claims that Sigma's Brief includes citations to "a significant volume of non-record material" from the administrative record of its scope proceeding and urges the Court to "decline to consider [these] citations and arguments stemming from matters outside the record on appeal."  Gov't Br. at 25-26.

Sigma does not contest the fact that it cited some materials from its scope proceeding in its Brief.  However, the Government's notion that Sigma cited "a significant volume of non-record material" to make any of its arguments is wrong.  As Sigma explained:

Sigma also cites in this Statement of the Case, and will include in the joint appendix, relevant submissions from its own scope proceeding. Those **limited citations do not form the basis for any arguments** made in this brief, and are included for the purpose of providing the Court a **complete factual background** and demonstrating to the Court that Sigma has **exhausted its administrative remedies**.

Sigma Br. at 8 (emphasis added). In fact, a review of Sigma's Brief demonstrates that, consistent with the above statement, Sigma only cited to documents from its administrative record in the Statement of the Case, while the Argument section of Sigma's Brief only contained citations to the administrative record of Vandewater's scope proceeding. *Compare* Sigma Br. at 4-20 *with* Sigma Br. at 23-40.

Indeed, in making this incorrect argument, the Government even cites to the statutory requirement that parties exhaust their administrative remedies. *See* Gov't Br. at 27 (quoting 28 U.S.C. § 2637(d) and relevant precedent of this Court). Yet that requirement, as demonstrated above, is exactly why Sigma cited limited documents its administrative record in its Statement of the Case — documents that the CIT **reviewed together with** those from Vandewater's administrative in its combined, non-consolidated opinion regarding (k)(zero) matters. In any event, Sigma does not need to rely on documents from its own administrative record. That is why the Argument section of its Brief relies solely on documents on the record of Vandewater's scope proceeding, including two reports by Walter Sperko, that (as discussed both in Sigma's Brief and above) Commerce ignored.

28

In short, the Court should reject the Government's mischaracterization of Sigma's limited citations to its administrative record. Nor should the Court give credence to the Government's assertion that, if Sigma "wanted to appeal the (k)(0) issue based on the record[] of its separate case[, it] could have asked the trial court to enter Rule 54(b) judgment on that issue[.]" Gov't Br. at 28. The CIT issued one opinion on (k)(zero); Sigma appealed the (k)(zero) issue based on the Vandewater record alone; and Sigma, as a defendant-intervenor in *Vandewater*, had the right to appeal the CIT's judgment.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For these reasons and the reasons contained in Sigma's Brief, this Court should:

1)     Vacate the CIT's judgment;

2)     Find that Commerce's determination that welded outlets fall within the scope of the *Butt-Weld Order* is not in accordance with law;

3)     Remand to Commerce with instructions to find that welded outlets are not "butt-weld pipe fittings" (as that term is defined using industry standards) and, as a result, such products are excluded from the scope of the *Butt-Weld Order*; and

4)     Grant Sigma such additional relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Lucius B. Lau*
Walter J. Spak
Lucius B. Lau
Ron Kendler
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant Sigma Corporation

May 11, 2023

30

## CERTIFICATE OF SERVICE

### <u>Vandewater International Inc. v. US</u>
### CAFC Court Nos. 2023-1093, 2023-1141

I hereby certify that on May 11, 2023 the foregoing document filed on behalf of Sigma Corporation was served upon all parties by operation of the Court's electronic filing system.

Date: May 11, 2023

*/s/ Lucius B. Lau*
Lucius B. Lau
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

(Form 19)

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

**CAFC Court Nos. 2023-1093, 2023-1141**
**<u>Vandewater International Inc. v. US</u>**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

     ☑    the filing has been prepared using a proportionally-spaced typeface and includes 6,855 words.

     ☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

     ☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: May 11, 2023          Signature:     */s/ Lucius B. Lau*

                          Name:     Lucius B. Lau