**Case No. 2023-1093, 2023-1141**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

VANDEWATER INTERNATIONAL INC.,

*Plaintiff*,

SIGMA CORPORATION, SMITH-COOPER INTERNATIONAL, INC.,

*Plaintiffs-Appellants*,

v.

UNITED STATES,

*Defendant-Appellee*,

ISLAND INDUSTRIES,

*Defendant*.

On Appeal from the United States Court of International Trade
Case No. 1:18-cv-00199, Hon. Leo M. Gordon, Judge

## PLAINTIFF-APPELLANT'S REPLY BRIEF

Gregory S. McCue
Zachary Simmons
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-6421

*Counsel for Smith-Cooper
International, Inc.*

Dated: June 1, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1093, -1141 |
| **Short Case Caption** | Vandewater International Inc. v. US |
| **Filing Party/Entity** | Smith-Cooper International, Inc. |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/01/2023

Signature:   /s/ Gregory S. McCue

Name:   Gregory S. McCue

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Smith-Cooper International, Inc. | | ASC Engineered Solutions |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**FORM 9. Certificate of Interest**

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

---

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Carbon Steel But-Weld Pipe Fittings from Peoples Republic of China; SCO - Vandewater | A-570-814 | Department of Commerce |
| Smith-Cooper International, Inc, | 19-00011 | Court of International Trade |
| | | |

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

I. SUMMARY OF ARGUMENT ...........................................................................1

II. ARGUMENT .................................................................................................5

    A.    All Of The Materials To Which SCI Cited In Its Opening Brief Were On The Administrative Record Before Commerce ............................5

    B.    The Government Fails To Overcome SCI's Presentation Demonstrating That Multiple Unambiguous Terms Within The AD Order's Scope Exclude Welded Outlets ................................................7

        1.    The Government's Procedural Arguments On SCI's Claims Concerning The Unambiguous Terms Of The Order's Scope Should Be Rejected ..................................................................9

        2.    The Term "Butt-Weld" Is Unambiguous And Excludes Welded Outlets From The Order's Scope ...........................12

            a.    Evidence Concerning SCI's Trade Usage ......................13

            b.    *Sprink* Scope Ruling .....................................................15

    C.    The Government Fails To Overcome SCI's Demonstration That The (k)(1) Sources Exclude Welded Outlets From The Scope Of The AD Order ................................................................................................18

        1.    The Government's Procedural Arguments On SCI's Claims Concerning The (k)(1) Sources Should Be Rejected ...............18

        2.    The Government Fails Rebut SCI's Demonstration That The (k)(1) Sources Exclude Welded Outlets From The Scope Of The Order ...............................................................................22

            a.    The Petition ...................................................................22

            b.    The ITC 2016 Sunset Review Determination ................26

            c.    Forged Steel Fittings Scope Ruling ...............................28

            d.    Multiple (k)(1) Sources On Industry Standards .............31

    D.    SCI Did Not Forfeit Its Arguments On Commerce's Suspension Instructions, Nor Are These Arguments Moot ....................................33

III. CONCLUSION AND STATEMENT OF RELIEF REQUESTED .................41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*King Supply Co., LLC v. United States*,
    674 F.3d 1343 (Fed. Cir. 2012) ........................................................35

*OMG, Inc. v. United States*,
    321 F. Supp. 3d 1262 (Ct. Int'l Trade May 29, 2018).......................12

*Simpson Strong-Tie v. United States*,
    335 F. Supp. 3d 1311 (Ct. Int'l Trade Sept. 21, 2018)......................12

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ........................................................42

**Regulations**

19 C.F.R. § 351.225(e)...........................................................................38

19 C.F.R. § 351.225(k)(1)...................................................................4, 44

19 C.F.R. § 351.225(k)(2)........................................................................5

19 C.F.R. § 351.225(l)(1).......................................................................38

19 C.F.R. § 351.225(l)(3)..................................................................38, 39

**Administrative Determinations**

<u>Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan,
    Taiwan, and Thailand, Investigation Nos. 731-TA-308-310, 520,
    521 (Second Review)</u>, USITC Pub. 3809 (Oct. 2005) .......................34

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's
    Republic of China*, 57 Fed. Reg. 29,702 (Dep't of Commerce July
    6, 1992) ........................................................................................*passim*

## I.    SUMMARY OF ARGUMENT

On behalf of Smith Cooper International, Inc. ("SCI"), this reply addresses

the arguments raised by defendant-appellee United States ("Government") in its

April 20, 2023 response brief (Docket No. 25).  Though the proceedings below

before the U.S. Department of Commerce ("Commerce") and the U.S. Court of

International Trade ("CIT") spanned several years and included multiple phases,

the issues now before this Court fall into just three overarching questions, in the

alternative:

1.    Does the plain language of the antidumping duty order on butt-weld

pipe fittings ("BWPFs") from China include unambiguous terms that

exclude welded outlets from the scope of the order?  *See Certain*

*Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of*

*China*, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("AD

Order").

2.    If the language of the AD Order does not address definitively the

exclusion of welded outlets from the scope, do the enumerated

sources of 19 C.F.R. § 351.225(k)(1) ("(k)(1) sources"), *i.e.*, the

Petition underlying the AD Order and prior determinations of the U.S.

International Trade Commission ("ITC") and Commerce scope

rulings, provide definitive resolution to that question, such that

welded outlets are excluded from the scope?

3.     If the (k)(1) sources do not speak definitively to the exclusion of

welded outlets from the scope, and the Court affirms Commerce's

CIT-ordered remand redetermination pursuant to 19 C.F.R. §

351.225(k)(2), is Commerce limited by its regulations and relevant

judicial precedent to the imposition of suspension of liquidation as to

unliquidated entries that entered the United States on or after the date

of initiation of the remand proceeding (October 30, 2020)?  *See*

**Appx21-124** ("Final (k)(2) Remand Redetermination").

As detailed below, the answer to each of the above questions in the alternative is

**"yes."**

Welded outlets are excluded from the AD Order's scope by multiple

unambiguous terms.  Such unambiguous scope terms include "butt-weld,"

"formed" or "forged"; "threaded" or "grooved" fastening methods; and "used to

join sections in piping systems where conditions require permanent, welded

connections."  Because welded outlets are not "butt-weld"; not "formed" or

"forged; not "used to join sections in piping systems where conditions require

permanent, welded connections," and include "threaded" or "grooved" fastening

methods they are not subject BWPFs.  Because Commerce's initial scope ruling in

2

the Vandewater International Inc. ("Vandewater") proceeding below failed, unlawfully, to address these unambiguous scope terms in favor of analysis under the (k)(1) sources, the CIT was first tasked with addressing the question of whether these scope terms exclude welded outlets from coverage under the AD Order.  In its less-than-a-page analysis of this question, the CIT relied on scant and faulty reasoning to find that just one of the above scope terms, "butt-weld," was not unambiguous.  It failed altogether to address the other scope terms raised.

**Appx143-148** ("(k)(0) opinion").  The Government now attempts to advance a collection of arguments in an attempt to support the CIT's thin (k)(0) opinion, but for the reasons below in **Sections II.A. and II.B.**, these arguments all fail.

Though the unambiguous terms of the AD Order's scope speak definitively to the exclusion of welded outlets from coverage under the order, it is also the case that the (k)(1) sources definitively exclude welded outlets from the scope.  In particular, the Petition and prior determinations of the ITC include physical requirements and common shapes of subject BWPFs, none of which welded outlets meet.  These sources also reference specific industry standards applicable to subject BWPFs, to which welded outlets do not adhere.  And, in the previous *Forged Steel Fittings* Scope Ruling, Commerce determined that a "butt weld" requires that a product be "butt welded at both end connections," whereas welded outlets have <u>zero</u> butt welded end connections (that is, not even one).  **Appx590-**

3

**601**.  In its (k)(1) scope ruling (**Appx131-142**), which determined that the (k)(1)

sources spoke definitively to the *inclusion* of welded outlets under the AD Order,

Commerce ignored much of this evidence, instead determining that the presence of

a single beveled edge for any type of welding (that is, not in limited to the type of

edge specific to butt welding) is sufficient for that product to be a subject BWPF,

despite the clear evidence of applicable industry standards for the term butt-weld.

In its review of Commerce's (k)(1) scope ruling (**Appx125-130**), the CIT similarly

erred by ignoring the record evidence before it and instead relying on a two-

decade-old Commerce scope ruling (*Sprink*), which Commerce itself had rejected

because it stemmed from a different AD order with different scope language.

Nonetheless, the CIT relied on *Sprink* to hold that the (k)(1) sources did not speak

definitively to the *inclusion* or *exclusion* of welded outlets under the scope of the

AD Order.  The Government now attempts to support the CIT's flawed analyses of

the (k)(1) sources through a number of arguments.  However, for the reasons

provided below in **Sections II.A. and II.C.** all of these arguments fail.

Finally, though the unambiguous terms of the AD Order's scope and, in the

alternative, the (k)(1) sources, definitively exclude welded outlets from the scope,

should this Court disagree, and affirm the CIT's opinion (**Appx1-20**) sustaining

Commerce's Final (k)(2) Remand Redetermination (**Appx21-124**), it should

nonetheless reach the merits of SCI's claims concerning Commerce's legal

authority to suspend liquidation of entries pursuant to that determination. The CIT erroneously held that SCI's arguments on this issue had "evolved significantly" over the course of the proceeding and were thus waived. This was despite the fact that SCI had consistently argued, before both Commerce and the CIT, that Commerce was limited by its regulations and relevant judicial precedent to the imposition of duties to unliquidated entries that entered the United States on or after the date of initiation of the remand proceeding (October 30, 2020). **Appx19**. The Government now attempts to defend the CIT's unlawful holding by mischaracterizing SCI's arguments below and ignoring the relevant procedural history before Commerce and the CIT. For the reasons provided below in **Section II.D.**, the Government's arguments fail. SCI did not waive its claims concerning Commerce's liquidation authority. Accordingly, the Court should reach the merits of the legal question presented on this issue, and rule that Commerce may not impose duties on entries that entered prior to October 30, 2020 pursuant to its Final (k)(2) Remand Redetermination. In the alternative, the issue should be remanded back to the CIT to decide this question in the first instance.

## II.    ARGUMENT

### A.    All Of The Materials To Which SCI Cited In Its Opening Brief Were On The Administrative Record Before Commerce

The Government asserts that SCI cited a "significant volume of non-record material from {its} stayed case{} in connection with {its} (k)(0) claims" and that

SCI's (k)(1) claims also rely on evidence that was not on the administrative record before Commerce. Government Brief at 25-26. The Government asserts that the Court should "disregard these materials" and that it "highlights below {in its brief} where this is relevant." Government Brief at 28. The Court should reject these arguments because they are false.

In its nearly fifty pages of argument, the Government makes <u>one</u> reference to materials cited by SCI in the context of its (k)(0) claims (at 4-8 and 18-19 of its Opening Brief, Docket No. 15) that were allegedly not on the administrative record of the Vandewater proceeding before Commerce. Government Brief at 43. These materials include just <u>one</u> document, SCI's Scope Ruling Request (**Appx3728-3987**). First, SCI's Scope Ruling Request was on the record of the Vandewater proceeding, attached as an exhibit to SCI's November 19, 2020 comments on Commerce's (k)(2) remand proceeding (Remand Record P.D. 9 at Exhibit 6), which was cited by Commerce in its Final (k)(2) Remand Redetermination (**Appx21-124**). The images from SCI's Scope Ruling Request that were reproduced in its Opening Brief to the Court were, moreover, similar to those provided by Vandewater in its own scope ruling request, also on the record of the Vandewater proceeding. *See, e.g.*, **Appx170-172**, **Appx179-180**.

Second, given the CIT's procedural management of the proceeding below, in which Vandewater's, SCI's, and SIGMA's (k)(0) claims were heard in parallel,

unconsolidated cases, it is appropriate for SCI to rely on record materials from its

own case before Commerce in connection with its (k)(0) claims, as such materials

were before the trial court prior to its issuance of a single opinion on all (k)(0)

issues in all three cases, which is now subject to review before this Court.  *See* SCI

Opening Brief at 8-9; CIT (k)(0) Opinion, citing SCI's Scope Ruling Request

(**Appx144-145**).

The Government makes <u>no</u> reference to non-record materials cited by SCI in

the context of its (k)(1) claims.

For these reasons, the Court should reject the Government's arguments

concerning the materials cited by SCI in connection with its (k)(0) and (k)(1)

claims and consider the entirety of the record materials cited.

### B.    The Government Fails To Overcome SCI's Presentation Demonstrating That Multiple Unambiguous Terms Within The AD Order's Scope Exclude Welded Outlets

In its Opening Brief, SCI demonstrated that the unambiguous terms within

the AD Order's scope exclude welded outlets from coverage under the order.  SCI

Opening Brief at 16-27.  SCI's presentation centered on the term "butt-weld," but

also included discussion of other unambiguous terms:  (1) "formed" or "forged";

(2) "threaded" or "grooved" fastening methods; and (3) "used to join sections in

piping systems where conditions require permanent, welded connections."  As SCI

explained, the meanings of all of these unambiguous terms pointed in a single direction – exclusion of welded outlets from the scope of the AD Order.

Below, the CIT simultaneously and collectively reviewed arguments from Vandewater, SCI, and SIGMA related to the plain language of the AD Order's scope (*i.e.*, the above terms), resulting in the issuance of a <u>single</u> opinion in all three parties' cases, based on the filings of all three parties.  **Appx143-148**.  At that point, the specific question before the CIT was whether Commerce had, in its initial (k)(1) Scope Ruling (**Appx131-142**), committed legal error by ignoring the plain, unambiguous language of the AD Order's scope for analysis under the enumerated (k)(1) sources.  In its cursory, less-than-a-page analysis, the CIT failed to accord appropriate consideration to the evidence before it, instead relying primarily a single Commerce scope ruling from 1992, under a different AD order with different scope language (which, moreover, Commerce explicitly rejected as controlling its interpretation of the AD Order in proceeding below), to find that the term "butt-weld" is not unambiguous because there is not a "well-known, uniform 'trade usage' of the term" (and failing whatsoever to address the other terms of the scope language).  **Appx147**.

In its brief to the Court, the Government attempts to defend the CIT's unsupportable (k)(0) opinion through various procedural arguments and assertions.

Government Brief at 28-50.  For the reasons discussed in the following sections,

the Government's arguments fail.

> **1.    The Government's Procedural Arguments On SCI's Claims Concerning The Unambiguous Terms Of The Order's Scope Should Be Rejected**

In its arguments concerning the AD Order's scope language, the

Government raises two procedural claims, both of which should be rejected by the

Court.  First, the Government claims that SCI's argument that "{t}he CIT's (k)(0)

ruling ignored substantial evidence presented before Commerce and the CIT …

concerning … objective dictionary definitions of the term 'butt-weld'" is

"insufficient to preserve any related issue for review."  SCI Opening Brief at 18,

citing, CIT 18-00199 ECF No. 58, CIT 19-00003 ECF No. 49, CIT 19-00011 ECF

No. 49; Government Brief at 43.

SCI properly raised this issue before the Court because it is relevant to its

review of the CIT's disposition of the (k)(0) issues below that the CIT ignored

entirely large volumes of record evidence and arguments related to dictionary

definitions of the term "butt-weld."  Because prior cases before the CIT have

involved reliance on dictionary definitions to determine that certain scope terms

are unambiguous, it is relevant to this Court that the CIT failed to address the

dictionary definitions of the AD Order's key scope term – "butt-weld" – with

which it was presented.  *See OMG, Inc. v. United States*, 321 F. Supp. 3d 1262,

1268 (Ct. Int'l Trade May 29, 2018) (relying on the dictionary definition of "nail" in determining that it is "an unambiguous term"); *see also Simpson Strong-Tie v. United States*, 335 F. Supp. 3d 1311, 1318 (Ct. Int'l Trade Sept. 21, 2018) (similarly relying on dictionary definitions to find "nail" to be unambiguous).

Second, the Government asserts that "SCI ma{de} a set of arguments that Vandewater *declined* to make – either before Commerce or in its (k)(0) briefing" and that "{b}ecause these arguments have not been raised on the record of this case, they are both unexhausted and waived for this appeal." Government Brief at 48. Such arguments, provided at pages 24 to 27 of SCI's Opening Brief, explain the unambiguous meanings of other scope terms (beyond "butt-weld") and how each of these terms support the exclusion of welded outlets from the scope of the AD Order. SCI Opening Brief at 24-27.

The Government's claim that SCI's arguments concerning the unambiguous meanings of other scope terms are waived should be rejected. As explained in SCI's Opening Brief, the CIT denied Vandewater's, SCI's, and SIGMA's motions for case consolidation and instead reviewed each plaintiff's (k)(0) claims in parallel, resulting in the issuance of a single opinion covering all (k)(0) claims across all three cases. SCI Opening Brief at 8-9. The CIT did *not* divide its opinion into separate parts relating to each of the plaintiff's scope proceedings before Commerce and the related arguments and record evidence before the

agency.  Rather, the CIT reviewed the arguments and evidence before Commerce

in <u>all three</u> proceedings, and issued a <u>single</u> opinion concerning the plain language

of the AD Order's scope on the docket of <u>all three</u> cases.  That (k)(0) opinion is

now on review by this Court.  **Appx143-148**.  Because SCI's arguments

concerning the unambiguous meanings of other scope terms were before the CIT

and informed its (k)(0) opinion now on review by this Court, and these arguments

have been fully brief in the instant appeal, those arguments are not waived.  CIT

19-00011 ECF No. 49 at 7-10; SCI Opening Brief at 24-27.  Rather, it is the

*Government* that has waived its arguments concerning the meanings of these other

scope terms by not substantially addressing SCI's arguments in its brief to the

Court.  *See* Government Brief at 48-50.  However, should the Court agree with the

Government that these arguments are not properly before the Court in this appeal

(which SCI respectfully submits they are), then the Court should clearly indicate in

its decision that such arguments are preserved in SCI's own case, which is

currently stayed at the CIT, including all further proceedings and potential appeals

stemming from that case.

Finally, the Government asserts that SCI's arguments concerning

Commerce's prior *Sprink* Scope Ruling are "based on documents from SCI's

separate record" and that because "SCI *did not* contest the ruling's relevance

before the trial court" they are waived.  Government Brief at 45.  There are several

11

issues with these arguments.  First, it is unquestionably the case that both

Commerce, in its (k)(1) Scope Ruling on Vandewater's welded outlets (**Appx141**),

and the CIT, in its (k)(0) opinion, cited the *Sprink* Scope Ruling.  The *Sprink*

Scope Ruling is thus relevant to the underlying administrative and judicial

decisions that are now before this Court on review.  Second, although a subset of

SCI's arguments, concerning certain deficiencies of the *Sprink* Scope Ruling and

also differences between the AD Order and Taiwan BWPF Order at issue in

*Sprink*, were before Commerce in the SCI proceeding, those arguments constituted

part of the record before the CIT in connection with its (k)(0) opinion, and are thus

integral to this appeal.  **Appx3755-3761**.  As explained above, the CIT issued <u>one</u>

(k)(0) opinion based on the records of the Vandewater, SCI, and SIGMA

administrative records, and the evidence from each of those records is thus

germane to the CIT's decision.  Below, in **Section II.B.2.ii.**, SCI addresses the

Government's additional arguments on the *Sprink Scope Ruling*.

### 2.    The Term "Butt-Weld" Is Unambiguous And Excludes Welded Outlets From The Order's Scope

Before the CIT, Vandewater, SCI, and SIGMA presented, simultaneously,

substantial record evidence concerning the unambiguous term "butt-weld" in the

AD Order's scope language.  Such evidence included:  (1) the well-defined and

consistently used term "butt-weld" within industry; (2) the different industry

standards applicable to welded outlets on the one hand, and "butt-weld" pipe

fittings on the other; and (3) objective dictionary definitions of the term "butt-weld." CIT 18-00199 ECF No. 58; CIT 19-00003 ECF No. 49; CIT 19-00011 ECF No. 49. Many of these points are analyzed for this Court by plaintiff-appellant SIGMA, in its own separate brief. Docket No. 28.

As explained above, instead of according appropriate consideration to such evidence, the CIT relied, unreasonably, on just two items on the administrative record to determine that the term "butt-weld" is not unambiguous. The items are (1) petitioner Island's unsupported assertions regarding SCI's alleged trade usage of the term "butt-weld"; and (2) Commerce's 1992 *Sprink* Scope Ruling. The Government now defends the CIT's reliance on these items, but for the reasons set forth in the below sections, the CIT's related findings are unsupportable and should be overturned by the Court. Government Brief at 44-48.

### a.    Evidence Concerning SCI's Trade Usage

In its (k)(0) opinion, the CIT impermissibly relied on unsupported assertions regarding SCI's alleged trade usage of the term "butt-weld" to find that there is "{not} a well-known, uniform 'trade usage' of the term 'butt-weld fitting' that excludes {the} Plaintiffs' merchandise from the Order." **Appx147**. The CIT did so by pointing to unsupported assertions made by Island in the proceeding below before Commerce, despite the fact that neither Commerce (in its (k)(1) Scope Ruling) nor the Government (in its subsequent (k)(0) briefs to the CIT) relied on

13

these unsupported assertions to argue that the term "butt-weld" is not unambiguous. And, in doing so, the CIT ignored entirely SCI's explanation to Commerce that any mention of "butt-weld" products in a limited number of import documents was the result of limited <u>human error</u>, and not reflective of the consistent and uniform understanding of the term "butt-weld" at the company or within the industry, which excludes welded outlets. **Appx571**.

The Government asserts that "Island's representation and SCI's admission are on the records of all three proceedings," and then goes on to cite documents from the initial Vandewater scope ruling proceeding record and the subsequent (k)(2) remand proceeding record. Government Brief at 44. There are several problems with the Government's assertion.

First, the record documents cited from the initial Vandewater scope ruling proceeding are those that contain Island's unsupported assertions regarding SCI's alleged trade usage of the term "butt-weld" and SCI's explanation that such usage was the result of limited human error. *Id.*, citing **Appx456**, **Appx571**. Because these documents include unsupported assertions related to SCI's alleged trade usage of the term "butt-weld" and also SCI's explanation for the erroneous use of "butt-weld" in certain import documents by the company, the CIT erred in relying on such documents to find that there is "{not} a well-known, uniform 'trade usage' of the term 'butt-weld fitting' that excludes {welded outlets}." **Appx147**. There is

no reasonable basis for reaching that conclusion based on review of these record documents, either in isolation or in the context of all the contrary record evidence demonstrating the consistent understanding and use of the term "butt-weld" within industry.

Second, the documents cited from the subsequent (k)(2) remand proceeding record were not before the CIT prior to its issuance of the (k)(0) opinion in the court proceeding below and are therefore not germane to this Court's review of the CIT's (k)(0) opinion.  Government Brief at 44, citing **Appx2437**, **Appx3047-3048**. The Government's attempt to rely on such documents, introduced to the (k)(2) remand record at a later point in the proceeding, reflects impermissible post-hoc rationalization, and should be rejected by the Court.  In any event, these documents include explanation by SCI of the temporary, erroneous use of the term "butt-weld" (but notably, never "butt-weld fitting") in certain of its import documents between December 2017 and April 2018.  **Appx3047-3048**.  To the extent the Court relies at all on such documents in its review of the CIT's (k)(0) opinion, which it should not, it must consider SCI's explanation of the human error that resulted in the limited use of "butt-weld" in certain of its import documents, which does not indicate any broader industry usage of "butt-weld" fittings to describe welded outlets.

### b.    *Sprink* Scope Ruling

In its (k)(0) opinion, the CIT relied unreasonably on Commerce's 1992 *Sprink* Scope Ruling to hold that the term "butt-weld" in the AD Order's scope is not unambiguous. **Appx147**. The CIT found that "similar branch outlets have been included since 1992 under a similar antidumping duty order covering butt-weld fittings from another country." *Id.* Based on this, the CIT held that it is "hard for a reasonable mind to be persuaded that branch outlets could never be classified as butt-weld fittings because there is one, and only one, widely- and well-known 'trade usage' of the term 'butt-weld fittings.'" *Id.* In doing so, the CIT ignored Commerce's explicit determination in the (k)(1) Scope Ruling that it was "not bound by the agency's analysis in the Sprink Scope Ruling" (**Appx141**). Moreover, in reaching this decision, the CIT ignored critical evidence and argument before it, demonstrating that (1) the *Sprink* Scope Ruling was incorrectly decided; (2) because the *Sprink* Scope Ruling concerned a different order with different scope language, it does not control the interpretation of the AD Order's scope language; and (3) the more recent and more detailed *Forged Steel Fittings* Scope Ruling (which determined that a "butt-weld" must be "butt welded at both end connections") carries much more weight than the two-decade-old *Sprink* Scope Ruling on the interpretation of the AD Order's scope. SCI Opening Brief at 22-24.

The Government's attempt to defend the CIT's reliance on the *Sprink* Scope Ruling in its (k)(0) opinion should be rejected by the Court. First, the Government

argues that, although Commerce determined in the (k)(1) Scope Ruling that it was "not bound by the … Sprink Scope Ruling," Commerce later "clarified" in its Final (k)(2) Remand Redetermination that the "Sprink ruling addressed a product 'essentially physically identical' to Vandewater's outlets, and that … the Sprink ruling {w}as {thus} 'informative.'" Government Brief at 47 (the Government also refers to the *Sprink* Scope Ruling as "persuasive authority"). The Government's analysis in the Final (k)(2) Remand Redetermination was not before the CIT prior to the issuance of the (k)(0) opinion, and is thus not germane to the Court's review of the CIT's (k)(0) opinion.

Second, the Government argues that the more contemporaneous *Forged Steel Fittings* Scope Ruling, which provides conflicting guidance with the *Sprink* Scope Ruling on the meaning of a "butt weld," does not control the interpretation of the AD Order because it stems from a different case, with a different record and analysis. Government Brief at 47-48. However, as SCI has explained, inasmuch as the *Forged Steel Fittings* Scope Ruling stems from a different case, so does the *Sprink* Scope Ruling. Specifically, there a number of differences between the scope language of the Taiwan BWPF Order (at issue in *Sprink*) and the AD Order at issue in this case. *See* SCI Opening Brief at 22, n. 2. The Court is thus faced with two choices. It can discount the relevance of both the *Sprink* Scope Ruling and *Forged Steel Fittings* Scope Ruling because they stem from separate cases.

17

Or, it can assess the relevance of both the *Sprink* Scope Ruling and *Forged Steel Fittings* Scope Ruling.  Under this latter option, and because it was issued almost simultaneously with Commerce's (k)(1) Scope Ruling in the below proceeding (as opposed to two decades ago), the Court should accord more weight to the guidance provided under the *Forged Steel Fittings* Scope Ruling.  For further discussion of the *Forged Steel Fittings* Scope Ruling, *see* **Section II.C.2.iii.**

C. **The Government Fails To Overcome SCI's Demonstration That The (k)(1) Sources Exclude Welded Outlets From The Scope Of The AD Order**

In its Opening Brief, SCI demonstrated that the (k)(1) sources – specifically, the Petition and prior ITC determinations and Commerce scope rulings – definitively exclude welded outlets from the scope of the AD Order.  SCI Opening Brief at 28-43.  The Government attempts to contest SCI's presentation through various procedural arguments and other assertions.  Government Brief at 50-67. For the reasons discussed in the following sections, the Government's arguments fail.

1. **The Government's Procedural Arguments On SCI's Claims Concerning The (k)(1) Sources Should Be Rejected**

In its arguments on the (k)(1) sources, the Government raises two procedural claims, both of which should be rejected by the Court.  First, the Government claims that "SCI depart{ed} from the arguments that Vandewater made in its (k)(1) trial court briefing," *i.e.*, that the "(k)(1) materials did not support Commerce's

18

initial ruling, and that the trial court should remand the matter for (k)(2) analysis." Government Brief at 50. According to the Government, SCI's (k)(1) arguments are thus waived and forfeited. *Id.* at 50-51. The Government's arguments ignore the entire procedural history of the proceeding below, and also misconstrue Vandewater's claims before the CIT.

In particular, before Commerce, Vandewater advanced a number of arguments that its welded outlets are not subject to the scope of the AD Order based on the (k)(1) sources. *See* **Appx183-201**. Such arguments cited the Petition, ITC investigation determination, and prior Commerce scope rulings. ***Id.*** In its (k)(1) Scope Ruling, Commerce rejected Vandewater's arguments, determining instead that the (k)(1) sources speak definitively to the inclusion of welded outlets in the AD Order's scope. **Appx131-142**. In its (k)(1) brief to the CIT, Vandewater argued that "Commerce's determination was not reasonable in concluding that (k)(1) sources dispositively pointed to Vandewater's welded steel outlets as covered by the scope of the <u>China Butt-Weld Order</u>" and that "if anything the (k)(1) factors point to a 'dispositive' conclusion that Vandewater's steel branch outlets are <u>outside</u> the scope of the <u>China Butt-Weld Order</u>, which would require the Court to reverse and remand." Vandewater's Motion for Judgment on the Agency Record (June 24, 2020), CIT 18-00199, ECF No. 93 at 6, 29. Vandewater argued that "{i}f the Court determines that the (k)(1) sources are *not dispositive*

*either way*, then the Court should remand with instructions directing Commerce to initiate a formal scope inquiry, examine the (k)(2) sources." *Id.*, emphasis added. Accordingly, Vandewater asked the CIT to first review Commerce's analysis of its (k)(1) arguments (whether the (k)(1) sources spoke definitively to inclusion (as Commerce determined) or exclusion (as Vandewater argued) under the AD Order) and to remand for analysis under (k)(2) only if necessary following such review. In its review of Commerce's (k)(1) Scope Ruling, the CIT rejected both Commerce's determination that the (k)(1) sources spoke definitively to the *inclusion* of welded outlets within the scope of the AD Order and Vandewater's argument that the (k)(1) sources spoke definitively to the *exclusion* of welded outlets from the scope of the AD Order, remanding for further analysis under (k)(2). **Appx125-130**.

In its Opening Brief to this Court, SCI agreed with the CIT's rejection of Commerce's reliance on the (k)(1) sources to find that welded outlets are subject to the scope of the AD Order, but disagreed with its finding that the balance of the "(k)(1) sources … do not really tell the court anything about the inclusion of steel branch outlets within the scope of the Order." **Appx130**. Rather, as Vandewater has argued since its May 2018 scope ruling request to Commerce, SCI explained that the (k)(1) sources speak definitively to the exclusion of welded outlets from the scope of the AD Order. SCI Opening Brief at 28-43. Based on the above

procedural history of this proceeding, SCI's (k)(1) arguments are not waived or forfeited.  When this Court makes its *de novo* review of Commerce's (k)(1) Scope Ruling and the CIT's review of that determination, it can and should consider SCI's arguments, which parallel and support those made by Vandewater.

Second, the Government's argument that SCI "seeks to circumvent Commerce's and the trial court's further analyses of the {(k)(1)} materials" is completely unfounded.  Government Brief at 51.  The Commerce remand redetermination which the CIT ultimately sustained was conducted based on an analysis of the (k)(2) sources, not the (k)(1) sources.  SCI is asking that this Court review Commerce's (k)(1) Scope Ruling (**Appx131-142**), and examine the CIT's review of that determination (**Appx125-130**), and find that both Commerce and the CIT were incorrect – the (k)(1) sources speak definitively to welded outlets' exclusion from the scope of the AD Order.  This is necessary because, should SCI prevail on this point, Commerce's Final (k)(2) Remand Redetermination would be invalidated; under Commerce's regulations, analysis under the (k)(2) sources is only necessary if the (k)(1) sources do not speak definitively to the coverage of the product at issue under the relevant scope.  Accordingly, there is nothing about SCI's request to this Court that reflects an intent to circumvent the below proceedings either before Commerce or the CIT, and this Court should reach the merits of SCI's (k)(1) arguments.

2.    **The Government Fails Rebut SCI's Demonstration That The (k)(1) Sources Exclude Welded Outlets From The Scope Of The Order**

a.    **The Petition**

In its Opening Brief, SCI demonstrated that the Petition underlying the AD Order, a (k)(1) source, excludes welded outlets from the scope.  SCI Opening Brief at 29-33.  Specifically, SCI explained that the physical requirements of subject BWPF were identified in the Petition, and that none of these requirements were met by welded outlets.  *Id.* at 29-31.  Such requirements are that:  (1) both or all available edges of the fitting are beveled; (2) the fitting is designed to connect to the end of a pipe; and (3) the beveled edge of the fitting is designed to be set against another beveled edge on the connecting pipe, so that the two beveled edges create the type of channel necessary for the butt-weld type of welding.  *Id.* at 29.  In its (k)(1) Scope Ruling, Commerce ignored these requirements, determining that subject BWPFs need only possess one beveled edge, suitable for non-butt-weld types of welding, and that an end-to-end connection is not required.  **Appx140**.  In its (k)(1) opinion, the CIT ruled against Commerce's determination, holding that the "petition language, which contemplates beveling on both parts of the assembled pipe, is … not descriptive of the actual physical characteristics of {welded outlets}."  **Appx130**.  SCI also explained that the "basic shapes" of subject BWPFs identified in the Petition (*i.e.*, elbows, tees, caps, and reducers) do

22

not resemble welded outlets. *Id.* at 31-33.  Commerce and the CIT ignored such

argument and evidence when presented by SCI below.

Each of the Government's arguments concerning the Petition language are

unavailing.  First, the Government's reliance on Commerce's analysis of the

Petition in its Final (k)(2) Remand Redetermination is not relevant to SCI's (k)(1)

claims before this Court.  *See* Government Brief at 53-54.  Such analysis was

conducted under the (k)(2) sources, not the (k)(1) sources.  SCI has argued that

Commerce, in its (k)(1) Scope Ruling, and the CIT, in its (k)(1) opinion, erred by

failing to recognize that the (k)(1) sources definitively exclude welded outlets from

the scope of the AD Order.  Commerce's subsequent Final (k)(2) Remand

Redetermination is thus irrelevant to the question before the Court, since it came

after the reviewable legal and factual errors adopted by Commerce and the CIT.

The Court should thus ignore the related arguments raised by the Government.  In

so doing, the Court will observe that the Government has failed in its brief to

address the physical requirements of subject BWPFs contained in the Petition, to

which welded outlets do not adhere.

Second, the Government's arguments related to the alleged "multiple

contrary 'examples of carbon steel butt-weld fittings'" contained in the Petition

fail.  The Government essentially concedes that the CIT failed to consider the

"basic shapes" of subject BWPFs identified in the Petition by asserting that it is

"*presume{d}* … that the fact-finder reviewed all of the evidence presented."
Government Brief at 57, emphasis added.  In addition, the Government fails to
demonstrate that Commerce reasonably analyzed this information in the
administrative proceeding below.

The Government relies repeatedly on the existence of an image of a saddle
in an appendix to the Petition as evidence that the Petition contained "contrary
examples" to the basic shapes identified.  Government Brief at 54-59.  However, as
SCI explained in its Opening Brief, such argument represents <u>post-hoc</u>
<u>rationalization</u>; nowhere in Commerce's (k)(1) Scope Ruling did the agency
explain the relevance of the saddle image to its determination, and the Government
cannot advance related arguments for the first time before the CIT and now this
Court.  SCI Opening Brief at 32.  The Government's assertion that Commerce
"referenced the (k)(1) sources and 'descriptions of the merchandise contained in
the petition' … in finding initially that those sources did not limit the scope of the
*China BWPFs Order* as SCI claims" is insufficient to demonstrate that Commerce
actually analyzed the saddle image contained in the Petition in its (k)(1) Scope
Ruling (it did not).  Government Brief at 58.  In any event, and as SCI
demonstrated in its Opening Brief, a saddle, unlike a welded outlet, has <u>one</u>
traditional butt-weld side, suitable for butt-weld type welding for end-to-end
connection with a pipe, which may explain why it was included in an appendix to

24

the Petition.  SCI Opening Brief at 32-33.  Although the Government contends that there is "{no} record evidence that saddles are categorized as subject merchandise exclusively by virtue of featuring a beveled edge on the non-contoured end rather than the contoured header end," there is equally no record evidence demonstrating (nor any reasonable basis to believe) that saddles are subject BWPFs *for any other reason* (indeed, this point underscores the post-hoc rationalization presented by the Government in its arguments).  Government Brief at 58-59.

Similarly, the Government relies repeatedly on the existence of caps as an identified "basic shape" in the Petition to argue that welded outlets are subject to the scope of the AD Order.  Government Brief at 54-59.  Though Commerce determined that caps demonstrate that "fittings with only one welded connection are not excluded from the scope of the order," neither Commerce nor the CIT (or the Government in its brief) addressed SCI's argument that a cap only has <u>one</u> end – which is a traditional butt-weld connection.  With only one end (a butt-weld end) at all, it would thus be impossible for a cap to meet the Petition requirement of having <u>two</u> butt-weld ends.  SCI Opening Brief at 33.  In any event, unlike caps (and also saddles), which have a butt weld connection, welded outlets' two ends employ <u>zero</u> butt-weld connections.  *Id.*  Accordingly, the Petition's mention of caps does not demonstrate that welded outlets are subject the scope of the AD Order.

### b.    The ITC 2016 Sunset Review Determination

In its Opening Brief, SCI demonstrated that the ITC 2016 Sunset Review

Determination, a (k)(1) source, excludes welded outlets from the scope.  SCI

Opening Brief at 34-36.  Specifically, the 2016 Sunset Review Determination

identified several key requirements of subject BWPFs, none of which are present

in welded outlets:  (1) the presence of beveled edges (plural); (2) the presence of

welded connections (plural); (3) the exclusion of "threaded" or "grooved" ends,

which indicate a "different type of fastening method"; and (4) placement against

the beveled end of a pipe.  *Id.* at 34.  Though Commerce recognized the pertinent

language from the ITC's determination in its (k)(1) Scope Ruling, it unreasonably

determined that only a single beveled edge is required for a product to be subject to

the AD Order, effectively disregarding the other requirements identified by the

ITC.  **Appx140**.  This is despite the fact that the single beveled edge of a welded

outlet is not beveled for butt welding, and that it cannot be connected to the end of

a pipe.   The CIT rightly disagreed with Commerce's determination, holding that

the "ITC sunset review … contemplates beveling on both parts of the assembled

pipe … {and} is therefore not descriptive of the actual physical characteristics of

{welded outlets}."  **Appx130**.  SCI also explained that the 2016 Sunset Review

Determination identified common shapes of subject BWPFs – elbows, tees,

reducers, and caps – all of which attach only to the <u>end</u> of a pipe and only with

butt-weld connections (unlike welded outlets).  SCI Opening Brief at 35-36.  The

ITC mentioned no other kinds of shapes in its determination.  *Id.*

Each of the Government's arguments concerning the ITC 2016 Sunset

Review Determination must fail.  First, the Government repeats Commerce's

unreasonable position that even though the 2016 Sunset Review Determination

requires subject BWPFs to be placed "against the end of a beveled pipe" (emphasis

added), subject BWPFs can nonetheless be "attached to a non-beveled opening on

the side of the adjoining pipe."  SCI Opening Brief at 34, citing Carbon Steel Butt-

Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand:  Investigation

Nos. 731-TA-308-310 and 520-521 (Fourth Review), USITC Pub. 4628 (Aug.

2016) at 6; Government Brief at 60.  On its face, this position is irreconcilable with

the plain language of the ITC's determination.

Second, the Government deflects from the ITC 2016 Sunset Review

Determination by asserting that *other* (k)(1) sources "indicate that '{a} pipe fitting

possesses the requisite beveled edge if it is capable of creating a shallow channel to

accommodate the bead of the weld that fastens the two adjoining pieces…'"

Government Brief at 60.  Not only is this argument unrelated to the ITC 2016

Sunset Review Determination language cited by SCI, but, as a factual matter, it is

also the case that welded outlets are *not* capable of creating the type of channel

shown in actual examples of butt weld connections. *See* SCI Opening Brief at 4, 7, contrasting images of subject BWPFs with those of welded outlets.

Finally, although the Government is correct that the ITC 2016 Sunset Review Determination notes "further variations within each class of fitting based on differences in the size of one or more of the outlets," this language does not expand the list of common shapes identified by the ITC. Government Brief at 61. Rather, as SCI explained in its Opening Brief, such recognized variations are *within* each class of fitting identified (*e.g.*, the ITC cites "reducing elbows" and "reducing tees"), all of which have at least one, and sometimes two, connections that require a butt weld, not other types of welds. SCI Opening Brief at 36. The Government's argument that this language expands that list of common shapes identified by the ITC is thus unavailing.

### c.     Forged Steel Fittings Scope Ruling

In its Opening Brief, SCI demonstrated that Commerce's prior *Forged Steel Fittings* Scope Ruling, a (k)(1) source, confirms the physical requirements of subject BWPFs discussed in the Petition and relevant ITC determinations, providing additional support for the exclusion of welded outlets from the scope of the AD Order. SCI Opening Brief at 37-39. Specifically, in *Forged Steel Fittings*, Commerce provided clarity on the meaning of a "butt weld," as relevant to the scope exclusion applicable in that proceeding, which excluded "flanges, butt weld

fittings, butt weld outlets, nipples, and all fittings that have a maximum pressure rating of 300 pounds of pressure/PSI or less" from the scope. **Appx592**. Commerce determined that an outlet "butt welded at <u>both end connections</u>" was a butt-weld fitting and thus appropriately excluded from the investigations on forged steel fittings, a different product. **Appx597** (emphasis added). Conversely, outlets with a "socket-weld or threaded end connection, or with only <u>one butt weld end connection</u>, {were} not considered a butt weld fitting and, therefore, {were} not excluded from the scope of the investigations." **Appx597-598** (emphasis added). Commerce's *Forged Steel Fittings* Scope Ruling thus confirmed the requirement that subject BWPFs have "beveled edges" (plural) for butt welding, a requirement that welded outlets do not meet. Both Commerce and the CIT failed to meaningfully address this prior scope ruling in the proceedings below.

The Government's arguments on the *Forged Steel Fittings* Scope Ruling all fail. Government Brief at 61-65. First, the Government argues that the *Forged Steel Fittings* Scope Ruling is immaterial to the question of welded outlets' coverage under the AD Order's scope because "{t}he *China BWPFs Order* and *Forged Steel Fittings* orders stem from separate proceedings that cover two distinct classes or kinds of merchandise." *Id.* at 63. Though SCI agrees that the respective AD orders cover different merchandise, the Government fails to provide a basis or explanation for why it is logical or reasonable for Commerce to define a "butt-weld

pipe fitting" (a singular product) as more than one thing across these cases. SCI Opening Brief at 39. In the same way the Government asserts that other Commerce scope rulings under separate orders provide "persuasive authority" to its interpretation of the AD Order, it is clear that the *Forged Steel Fittings* Scope Ruling is relevant to Commerce's determination of what constitutes a BWPF. Government Brief at 47.

Second, the Government's reliance on the scope clarification memorandum issued by Commerce in the *Forged Steel Fittings* proceeding does not advance its arguments. Government Brief at 64-65; **Appx4071-4072**. Importantly, the scope clarification memorandum *post dates* Commerce's (k)(1) Scope Ruling below, and is therefore not integral to that determination. Any arguments related to the scope clarification memorandum are thus post-hoc rationalizations that should not be heeded by the Court. Moreover, the scope clarification memorandum, which addresses products with "at least one, but not all butt welded end connections" and those with "all butt welded end connections," fails to address products with zero butt-welded end connections, such as welded outlets. Accordingly, the scope clarification memorandum does not directly address the very product that was at issue before Commerce and the CIT below. In any event, the *Forged Steel Fittings* Scope Ruling and subsequent scope clarification memorandum both make clear

that at least some butt-weld connection must be present to constitute a butt-weld fitting (whereas welded outlets have none).

### d.    Multiple (k)(1) Sources On Industry Standards

In its Opening Brief, SCI demonstrated that multiple (k)(1) sources exclude welded outlets from the scope of the AD Order based on industry standards.  SCI Opening Brief at 39-43.  Specifically, the Petition identified that subject BWPFs are "manufactured in conformity with industry standards as established by the American Society for Testing and Materials ('ASTM') and the American National Standards Institute ('ANSI')."  **Appx712**.  The particular standards identified by the Petition are ASTM A234-82a for materials and ANSI B16.9 for dimensions.  *Id.*  Various determinations of the ITC confirmed that these are the applicable industry standards for subject BWPFs.  SCI Opening Brief at 40-41.  The ITC 2005 Sunset Review, for example, provided that purchasers confirmed that subject merchandise "sources have to manufacture to ANSI B16 standards."  <u>Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Investigation Nos. 731-TA-308-310, 520, 521 (Second Review)</u>, USITC Pub. 3809 (Oct. 2005) at II-6.  Similarly, the ITC 2016 Sunset Review provided that "<u>all</u> carbon steel BWPF, whether domestic or imported, remained subject to ASTM and ANSI standards."  **Appx639** (emphasis added).  Both Commerce and the CIT

failed to meaningfully consider the (k)(1) sources' clear and consistent information

with respect to applicable industry standards.  SCI Opening Brief at 43.

The Government's arguments concerning the industry standards applicable

to subject BWPFs, spread across multiple (k)(1) sources, fail.  Without any

reasoning or citation to authority, the Government asserts that "SCI overstates the

significance of ASTM and ANSI/ASME standards."  Government Brief at 65.

According to the Government, "{t}he *China BWPFs Order* neither includes nor

refers to conformity with industry standards, and the scope language, rather than

the petition or an ITC report, controls."  *Id.*  In making these arguments, the

Government fails to appreciate that the precise purpose of turning to the (k)(1)

sources is because the plain language of the order's scope is ambiguous with

respect to coverage of the product at issue.  In this case, should the Court

determine that the plain language of the AD Order's scope does not speak

definitively to the inclusion or exclusion of welded outlets, then reliance on the

Petition, ITC determinations, and other (k)(1) sources, including the industry

standards contained in those sources, to determine the parameters of the scope, is

both lawful and reasonable.  The Court's decision in *King Supply* confirms this to

be the case.  *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1345-1346

(Fed. Cir. 2012) (affirming Commerce's scope ruling based on, *inter alia*, the

agency's determination that the products at issued matched the industry standards referenced in the petition).

Additionally, the Government's arguments citing supposedly detracting evidence demonstrating that subject BWPFs adhere to industry standards other than ASTM A234-82a for materials and ANSI B16.9 for dimensions constitute post-hoc rationalization and cannot be considered by the Court. Government Brief at 65-66. Commerce did not rely on such arguments and evidence in its (k)(1) Scope Ruling. Moreover, at least some of the evidence relied on by the Government is rebutted by other record evidence. *Compare* Government Brief at 65-66 ("the ITC investigation report explicitly states that not all BWPF meet ASME standards") and ITC 2016 Sunset Review at 23 ("all carbon steel BWPF, whether domestic or imported, remained subject to ASTM and ANSI standards") (emphasis added).

### D.    SCI Did Not Forfeit Its Arguments On Commerce's Suspension Instructions, Nor Are These Arguments Moot

In its brief, the Government attempts to confuse the basis for SCI's consistent legal arguments, raised before both Commerce and the CIT, that suspension of liquidation and imposition of duties under Commerce's Final (k)(2) Remand Redetermination should apply only to entries made on or after October 30, 2022 (the date that Commerce initiated the (k)(2) remand proceeding). SCI Opening Brief at 43-61. The Government does this by claiming that SCI's

arguments relate (and always have related) exclusively to a factual scenario described as "mixed entries" (*i.e.*, entries containing both welded outlets and merchandise subject to suspension under unrelated AD/CVD orders) which, the Government further asserts, SCI addressed for the first time in post-remand briefing before the CIT.  Government Brief at 67-74.  But such characterization of SCI's arguments completely ignores the procedural history of this case, and the arguments that were explicitly raised before both Commerce and the CIT, which addressed Commerce's applicable regulations and were not limited to factual scenarios involving "mixed entries."  Moreover, and contrary to the Government's assertion (Government Brief at 74), Commerce *did* address – and reject – SCI's legal arguments concerning suspension of liquidation in both its Draft (k)(2) Remand Redetermination (**Appx3168**) and Final (k)(2) Remand Redetermination (**Appx123**), which served as the basis for SCI's presentation of such arguments to the CIT in the proceeding below (**Appx4261-4279**).  Because the CIT declined to reach the merits of SCI's legal arguments, instead finding, incorrectly, that SCI had waived its arguments, this Court should now overturn the CIT's finding and reach the merits of SCI's arguments (in the event it affirms Commerce's Final (k)(2) Remand Redetermination).  Alternatively, the Court should require the CIT to address SCI's arguments regarding the effective date for suspension of liquidation

in Commerce's Final (k)(2) Remand Redetermination and rule on that issue in the first instance.

A comprehensive overview of SCI's presentation of arguments concerning the suspension of liquidation of entries covered by Commerce's (k)(2) remand proceeding – which the Government does not contest – was provided in SCI's Opening Brief. *See* SCI Opening Brief at 43-58. In short, SCI argued in its initial comments on Commerce's (k)(2) remand proceeding that an affirmative final remand redetermination should only result in entries made on or after October 30, 2020 (the date that Commerce initiated the (k)(2) remand proceeding) being suspended and subject to cash deposits of estimated duties under the AD order. **Appx914-916**. This argument was based on Commerce's applicable regulations: (1) **19 C.F.R. § 351.225(l)(3)** (requiring that Commerce, in the event of a final affirmative scope ruling, "suspend liquidation and … require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry"; (2) **19 C.F.R. § 351.225(l)(1)** (requiring that, when Commerce initiates a scope ruling under 19 C.F.R. § 351.225(e) (as here), and the "product in question is already subject to suspension of liquidation," the "suspension of liquidation will be continued, pending a … final scope ruling"); and

(3) **19 C.F.R. § 351.225(l)(3)** (requiring that this "continued" suspension of liquidation be continued in the event of a final affirmative scope ruling).

In its Draft (k)(2) Remand Redetermination, Commerce rejected SCI's arguments, determining that its existing instructions to CBP, which included instructions to "{c}ontinue to suspend liquidation of entries of {welded outlets} from {China}" going back to the original 1992 AD Order (*i.e.*, well before October 30, 2020), need not be modified. **Appx3168**. According to Commerce, this was because "Vandewater ha{d} not provided any information to show that its outlets were not subject to the suspension of liquidation prior to the date of initiation of th{e} scope inquiry." *Id.* Following its review of additional arguments submitted by SCI (**Appx3220-3254**), Commerce modified its determination in the Final (k)(2) Remand Redetermination. Specifically, Commerce determined: (1) for entries on or after the date of initiation of the (k)(2) remand proceeding, to "instruct CBP to suspend or continue to suspend entries"; and (2) for entries before the date of initiation of the (k)(2) remand proceeding, to "instruct CBP to refund cash deposits upon request but continue to suspend the entries at zero percent cash deposit rate pending any appeals." **Appx123**.

In comments to the CIT on Commerce's Final (k)(2) Remand Redetermination, SCI renewed its arguments concerning Commerce's unlawful determination to suspend liquidation of and impose cash deposits on entries that

entered prior to October 30, 2020. **Appx4261-4279**. As SCI explained, Commerce's determination to suspend liquidation of pre-initiation entries was unlawful because there was no previous suspension to "continue" on the "product in question," *i.e.*, welded outlets (a fact that the Government acknowledges in its brief, Government Brief at 70). **Appx4271-4273**. Rather, Commerce was "attempting to achieve a result – suspension 'just in case' – that it ha{d} no authority to impose." **Appx4265**.

The CIT then initiated, *sua sponte*, a series of written and verbal exchanges with the parties to the below proceeding related to SCI's arguments. First, the CIT asked to "clarify whether or not there was a pre-existing suspension of liquidation." **Appx4280-4283**. The initial result of this question to the parties was a concession by the Government (following an inquiry into this question) that there was no pre-existing suspension of liquidation covering the parties' (that is, Vandewater, SCI, and SIGMA) welded outlets. As the Government stated, "Commerce … did not issue any relevant suspension instructions prior to September 2018 {(following the original (k)(1) scope ruling on Vandewater's products)} focused on … steel branch outlets, and … {has} not been able to identify any prior suspension by CBP. Although it is theoretically possible that CBP could have suspended one or more individual entries as of September 2018 pursuant to other authority, which could have continued under Commerce's

regulations and post-ruling instructions, Commerce's search … did not identify any such entry." **Appx4287-4288**.

The CIT then engaged in a series of exchanges with the parties to determine whether or not, in light of the Government's concession, the arguments raised by SCI were moot.  In this context, SCI explained that the position adopted by the Government (*see* above quote), that pre-initiation entries containing welded outlets could be suspended for any reason whatsoever (*i.e.*, not only because suspension on <u>welded outlets</u> had been instructed), including, for example, because such entries also included other merchandise subject to suspension under unrelated AD/CVD orders, was unlawful.  And, in this context, SCI explained that its arguments were not moot because the company had entries that would be impacted by the position adopted by the Government.

Finally, following the above exchanges, the Government and Vandewater entered into a settlement and proposed an amendment to the CIT's 2018 statutory injunction, such that only entries made on or after September 10, 2018 (as opposed to on or after the date of the 1992 AD Order) *or* that were previously suspended as of that date *and* that remain unliquidated would be subject to the injunction. **Appx4304-4306**.  In its comments on the proposed amendment to the injunction, SCI explained that the proposal would not address its arguments concerning the legal position adopted by the Government, which would allow Commerce to

"continue" to suspend liquidation of unliquidated entries made prior to initiation of the (k)(2) remand proceeding if those entries were suspended for any reason whatsoever (*e.g.*, because they included merchandise subject to suspension under unrelated AD/CVD orders). **Appx4307-4309**. The CIT granted the proposed amendment to the injunction. **Appx4310-4312**.

Based on the above procedural history, it is clear that SCI did not forfeit its arguments concerning suspension of liquidation. The question of "mixed entries" was but one aspect of SCI's arguments, which was raised specifically because the CIT asked the parties factual questions about their entries, and how such entries may be implicated by the legal position adopted by the Government. It is inaccurate to characterize SCI's arguments as pertaining *only* to "mixed entries" and it is a gross abuse of discretion for the CIT to use factual information provided by SCI in response to its questions as a basis for finding that SCI's "arguments … evolved significantly" and were therefore forfeited. **Appx19**. In addition, the cases cited by the Government in support of the CIT's forfeiture finding are inapposite – SCI's arguments, spanning dozens of pages before both Commerce and the CIT, were clearly more than "skeletal or underdeveloped" and went far beyond passing reference in a footnote. Government Brief at 71, citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir 2009) and *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). For these

reasons, this Court should now overturn the CIT's forfeiture finding and reach the merits of SCI's arguments. In doing so, the Court should rule that Commerce's regulations only permit the agency to "continue" suspension for pre-initiation entries where such suspension related specifically to the "product in question" (here, welded outlets). This is a pure question of law, and one that this Court may reach here.

Additionally, the Court should reject the Government's argument that SCI's arguments concerning suspension of liquidation are moot. Government Brief at 72-73. SCI recognizes that Commerce's (k)(2) remand proceeding concerned Vandewater's entries and that there are no unliquidated entries of welded outlets by Vandewater pre-dating Commerce's October 2020 initiation of the remand proceeding. *Id.* However, by explicitly engaging not only Vandewater, but also SCI and SIGMA, about their entries in the proceeding below, the CIT made relevant the factual and legal disposition of all three companies' entries in this appeal. Indeed, of relevance to this Court, this CIT did not rule (though it theoretically could have) that SCI's arguments were moot. For these reasons, the Government's arguments on mootness should be rejected. However, to the extent that this Court adopts the Government's mootness arguments, it should make clear that Commerce's determination with respect to suspension of liquidation applies exclusively to Vandewater's entries, and that SCI and SIGMA may pursue related

arguments concerning their own entries, subject to their own currently stayed

cases, in subsequent proceedings at the CIT and any appeals that follow.

## III.    CONCLUSION AND STATEMENT OF RELIEF REQUESTED

For the reasons set forth above, and those contained in SCI's Opening Brief,

SCI respectfully requests that this Court should find that:

(1) the plain language of the AD Order's scope contains unambiguous terms

that exclude welded outlets or, in the alternative,

(2) the enumerated sources of 19 C.F.R. § 351.225(k)(1) exclude welded

outlets from the AD Order's scope or, in the alternative,

(3) should Commerce's Final (k)(2) Remand Redetermination be upheld,

Commerce may only impose suspension of liquidation as to unliquidated

entries that entered on or after October 30, 2020, and that retroactive

suspension on any entries made prior to that date is unlawful or, in the

alternative,

(4) the CIT should address SCI's arguments regarding the effective date for

suspension of liquidation in Commerce's Final (k)(2) Remand

Redetermination and rule on that issue in the first instance.

Respectfully Submitted,

/s/ Gregory S. McCue
Gregory S. McCue
Zachary Simmons

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, DC 20036
(202) 429-6421

*Counsel to Smith-Cooper*
*International, Inc.*

Dated: June 1, 2023

## CERTIFICATE OF SERVICE

### <u>Vandewater International Inc. v. US</u>
### CAFC Court Nos. 2023-1093, 2023-1141

I hereby certify that on June 1, 2023 the foregoing document filed on behalf of Smith-Cooper International, Inc. was served upon all parties by operation of the Court's electronic filing system.

<u>/s/ Gregory S. McCue</u>
Gregory S. McCue

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, DC 20036
(202) 429-6421

Date: June 1, 2023

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1093, 2023-1141

**Short Case Caption:** Vandewater International Inc. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓]  the filing has been prepared using a proportionally-spaced typeface and includes 9,367 words.

[ ]  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ]  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/01/2023

Signature: /s/ Gregory S. McCue

Name: Gregory S. McCue